CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2011 FEB 22  PM 12:43

DEPUTY CLERK _____

# SEALED

O

ORIGINAL

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.,* | ) |
| | ) |
| CURTIS LOCKEY | ) |
| 100 Coast Blvd., Suite 302 | ) |
| San Diego, CA  92037 | ) |
| | ) |
| CRAIG MacKENZIE | ) |
| 1500 Jackson Street | ) |
| Dallas, TX  75201 | ) |
| | ) |
| | ) |
| Plaintiffs-Relators, | ) |
| | ) |
| BRINGING THIS ACTION ON BEHALF | ) |
| OF THE UNITED STATES OF AMERICA | ) |
| | ) |
| c/o | ) |
| UNITED STATES ATTORNEY | ) |
| Earle Cabell Federal Building | ) |
| 1100 Commerce Street, Suite 300 | ) |
| Dallas, Texas 75242-1699 | ) |
| | ) |
| and | ) |
| | ) |
| ATTORNEY GENERAL OF | ) |
| THE UNITED STATES | ) |
| 10th and Constitution Avenue, N.W. | ) |
| Washington, DC 20530 | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF DALLAS, TEXAS, | ) |
| c/o Dallas Attorney's Office | ) |
| Dallas City Hall | ) |
| 1500 Marilla Rm 7DN | ) |
| Dallas, TX  75201-6622 | ) |
| | ) |
| DALLAS HOUSING AUTHORITY, | ) |
| 3939 North Hampton Road | ) |
| Dallas, TX  75212 | ) |
| | ) |

**3-11CV0354-0**

COMPLAINT
FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730 (b)(2)

**JURY TRIAL
DEMANDED**

DALLAS COUNTY, TEXAS,                                )
c/o District Attorney's Office                       )
133 N. Riverside                                     )
Dallas, TX 75207                                     )
                                                     )
DALLAS COUNTY HEALTH AND HUMAN                       )
SERVICES, DALLAS COUNTY HOUSING                      )
AGENCY,                                              )
2377 North Stemmons Freeway                          )
Dallas, TX 75207-2701                                )
                                                     )
                          Defendants.                )
                                                     )
_____         )

## PRELIMINARY STATEMENT

1.    This is a civil action brought by Plaintiffs-Relators Curtis Lockey and Craig MacKenzie on behalf of themselves and the United States of America ("United States") against the Defendants, City of Dallas, Texas ("Dallas"), Dallas Housing Authority ("DHA"), Dallas County, Texas ("Dallas County") and the Dallas County Housing Agency ("DCHA") (hereinafter, "Defendants") to recover, under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act"), damages sustained by, and penalties owed to, the United States as the result of Defendants having knowingly presented or caused to be presented to the United States false claims to obtain federal funding for housing and community development, as more specifically detailed *infra*.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the claims brought herein pursuant to 28 U.S.C §§ 1331 and 1345, and 31 U.S.C. § 3730(a).

3.    Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as well as 31 U.S.C. § 3732(a), because Defendants are located in this District, Defendants do business in this District, and the acts complained of herein took place in this District.

4.      To the best of Plaintiffs-Relators' knowledge, there has been no public disclosure of the allegations contained in this Complaint. In the event that a public disclosure has occurred, Plaintiff-Relators are an original source of all such disclosures.

5.      Prior to filing this Complaint, Plaintiffs-Relators made comprehensive disclosures to the government containing substantially all of the allegations made herein, as well as supporting documents.

6.      Pursuant to the requirements of the False Claims Act, 31 U.S.C § 3729, *et. seq.*, Plaintiffs-Relators have provided the government with a confidential disclosure statement and served them with copies of this Complaint.

## PARTIES

7.      The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

8.      Plaintiff-Relator Curtis Lockey resides in California, and he is an original source of the allegations set forth herein.

9.      Plaintiff-Relator Craig MacKenzie resides in Texas, and he is an original source of the allegations set forth herein.

10.      Defendant City of Dallas, Texas is a municipal corporation as defined by the laws of the State of Texas and is a recipient of U.S. Department of Housing and Urban Development ("HUD") funds resulting from the misconduct alleged herein. The City of Dallas is located within Dallas County, Texas.

11.      Defendant Dallas Housing Authority is an agency of the City of Dallas, Texas and is a recipient of HUD funds resulting from the misconduct alleged herein.

12.      Defendant Dallas County, Texas is a county located in the State of Texas and is a

recipient of HUD funds resulting from the misconduct alleged herein.

13.     Defendant Dallas County Housing Agency ("DCHA") is part of the Dallas County Health and Human Services and is an agency of Dallas County, Texas. DCHA is a recipient of HUD funds resulting from the misconduct alleged herein.

14.     At all times relevant herein, the Defendants acted in concert with each other in committing, and were aware of, the acts complained of herein, and each of the Defendants is jointly and severally liable.

**FACTS**

**HUD Funding and Dallas Obligation
to Affirmatively Further Fair Housing**

15.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

16.     The United States grants housing and community development-related funding to states, counties, public housing authorities, and municipalities.

17.     The City of Dallas is a municipality located in the State of Texas and within Dallas County, and the Dallas Housing Authority is an Agency of the City of Dallas. Dallas County is a county located in the State of Texas and the DCHA is an agency of Dallas County.

18.     Defendants applied to HUD for federal funding, including but not limited to Community Development Block Grants ("CDBG") funds and Public Housing assistance grants and other housing funds, on behalf of themselves each year from 2000 to the present.

19.     Defendants made claims for and received payments of such grant funds from the United States during all times relevant.

20.     As a condition to receipt of federal funding, including CDBG funds and Public Housing Assistance funds and other housing funds, Defendants were required to certify that they



met a variety of fair housing obligations, including the obligation to affirmatively further fair housing ("AFFH").

21.    Specifically, Defendants, as grant recipients, were required to make certifications to HUD that, *inter alia*, "the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." *See* 42 U.S.C. § 5304(b)(2).

22.    Defendants were aware of their AFFH obligations prior to and during the relevant time period.

23.    In requesting and receiving millions of dollars annually, Defendants have engaged in a protracted course and pattern of fraudulent conduct to submit false claims for payment to or approval by the United States, by, *inter alia,* falsely representing every year that it is in compliance with federal laws and regulations requiring that Defendants AFFH, which is a core prerequisite to eligibility for the CDBG funds, Public Housing funds and other housing funds from the United States.  Defendants had, and continue to have, actual knowledge that they are not complying with their AFFH and other obligations, that their representations of compliance were and are false, and that Defendants therefore were and are submitting false or fraudulent representations of compliance.  Alternatively, Defendants act and have acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.  Plaintiffs-Relators assert causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B); for conspiracy to commit such violations, in violation of 31 U.S.C. § 3729(a)(1)(C); for violations of 31 U.S.C. § 3729(a)(1)(D), for failing to return money or property belonging to the United States; for violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and

knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government, and/or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment.

24.     Plaintiffs-Relators allege that the violations of 31 U.S.C. § 3729, *et seq.,* by Defendants, as set forth herein, are continuing and ongoing.

### Distinction Between AFFH Actions and Affordable Housing Activities

25.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

26.     Each of the Defendants received and/or had access to a copy of the HUD Fair Housing Planning Guide. *See* U.S. Dept. of HUD, Fair Housing Planning Guide (1996) ("HUD Guide").

27.     The HUD Guide provides guidance to help grantees fulfill the "fair housing requirements" of formula grants such as the Community Development Block Grant ("CDBG").

28.     The HUD Guide explains the distinction between AFFH actions and affordable housing activities: "The two concepts are not equivalent . . . When a jurisdiction undertakes to build or rehabilitate housing for low- and moderate-income families, for example, this action is not in and of itself sufficient to affirmatively further fair housing . . . When steps are taken to assure that the housing is fully available to all residents of the community, regardless of race, color, national origin, gender, handicap, or familial status, those are the actions that affirmatively further fair housing."

29.     At all times during the relevant time period, each of the Defendants were aware of

that distinction in connection with their AFFH obligations.

### Analyses of Impediments and Dallas' Obligation to
### Consider Racial and Ethnic Discrimination and Segregation

30.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

31.     To comply with their obligations to AFFH, defendants were required to undertake three tasks: "[i] conduct an analysis of impediments ['AI'] to fair housing choice within the area, [ii] take appropriate actions to overcome the effects of any impediments identified through that analysis, and [iii] maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.425(a)(1)(i), *see also id.* § 570.601(a)(2).

32.     In identifying impediments to fair housing choice as part of its AFFH responsibilities, Defendants had an obligation to consider and analyze impediments erected by racial and ethnic discrimination or segregation.

33.     If impediments erected by racial and ethnic discrimination or segregation existed, Defendants Dallas, Dallas County, DHA and DCHA had a further AFFH obligation to take appropriate actions to overcome the effects of those impediments, as well as maintain records reflecting the analysis and such actions.

34.     Prior to and during the relevant time period, Dallas, Dallas County, DHA and DCHA were aware of their AFFH obligations to analyze and take appropriate actions to overcome impediments erected by racial and ethnic discrimination or segregation.

35.     Prior to and during the relevant time period, members of the City of Dallas, Dallas County, DHA and DCHA, having responsibility for the administration of the grants associated with Defendants' public housing and CDBG programs attended HUD-sponsored training concerning AFFH and the proper preparation of an AI.

7

36.     Training materials by HUD that were available to Dallas, Dallas County, DHA, and DCHA were titled "Affirmatively Furthering Fair Housing[:] Conducting the Analysis of Impediments and Beyond," noted that "[d]uring the past thirty-seven years, Congress has spent more than one trillion dollars in a failed attempt to remedy the effects of a dual housing market in America," and traced the evolution of the dual market to, *inter alia*, minorities migrating to cities and encountering obstacles "designed to segregate them from the majority, and to maintain a dual society."

37.     The HUD Guide provided to each of the Defendants states that, in preparing AIs and fulfilling the AFFH requirement, grantees must, *inter alia*, "[a]nalyze and eliminate housing discrimination in the jurisdiction" and "[p]rovide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin."

38.     The HUD Guide states that an AI involves an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes."

39.     The HUD Guide defines impediments as "actions, omissions or decisions" that "restrict housing choices or the availability of housing choices," or that have the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," including "[p]olicies, practices, or procedures that appear neutral on their face."

40.     The suggested AI format set forth in the HUD Guide includes a housing profile describing "the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; [and] how segregation and restricted housing supply occurred."

41.     HUD distributed fair housing planning guidelines in February 1996 concerning its submissions for housing and community development related funding.

42.     In setting forth "matters of advice" for "areas for future improvement," the HUD

guidelines distributed by HUD in February 1996 informed Dallas that its AI should: (i) contain a description of the degree of segregation and restricted housing by race, ethnicity, disability status and families with children; (ii) explain how segregation and restricted housing supply occurred; and (iii) relate this information by neighborhood and cost of housing.

43.     Also, a HUD memorandum from Nelson R. Bregon, General Deputy Asst. Secretary for Community Planning and Development, and Carolyn Peoples, Assistant Secretary for Fair Housing and Equal Opportunity, re: "Analysis of Impediments to Fair Housing Choice Reissuance" was sent to all funding recipients, including the Defendants named herein, and further sets forth the legal guidelines applicable to state and local jurisdictions receiving funding through the Consolidated Plan process and the requirements to prepare and update the required Analysis of Impediments to Fair Housing Choice ("AI").

### Consolidated Plans and Their Relationship to Analyses of Impediments

44.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

45.     Federal housing fund grantees must periodically file Consolidated Plans that, *inter alia*, describe the grantee's "general priorities for allocating investment geographically within the jurisdiction . . . and among different activities and needs" for affordable housing, public housing, homelessness, other special needs (including the elderly, disabled, persons with alcohol or drug addiction, persons with HIV/AIDS and their families, and public housing residents), and non housing development pursuant to the CDBG program. 24 C.F.R. § 91.215.

46.     Consolidated Plans serve as: (i) planning documents for the grantee; (ii) a submission for federal funds under HUD's formula grant programs; (iii) the strategy to be followed in carrying out HUD programs; and (iv) a management tool for assessing performance

and tracking results. *Id.* § 91.1(b).

47.     The HUD Guide cautions grantees that: "[T]he explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing conditions more severe for certain groups in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups."

### Dallas's Analyses of Impediments

48.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

49.     Dallas completed the preparation of their initial Analysis of Impediments in 1993 and they completed another AI in 1998.  However, because the initial AI was prepared in 1993, and the AI completed in 1998 was based on the initial 1993 AI that was completed prior to the issuance of the HUD planning guide in 1996, the 1998 AI included topics not addressed in the initial 1993 AI.   Another AI was completed by Dallas in July of 2007 that updated the initial AI that was completed in 1993 and another completed in 1998.

50.     Dallas failed to complete the preparation of any other AI between 1998 and 2007, and there is no other AI on file for that time period.  In fact, the 2007-12 AI completed by Dallas in July of 2007 states the 2007-12 AI was prepared to update the 1998-2003 AI.  See, AI 2007-12, p. 1-1 (July 2007).

51.     Dallas's Consolidated Plans addressed housing and community development goals for four federal grant programs: (i) the CDBG grant program; (ii) the Emergency Shelter Grant; (iii) HOME Investment Partnership; and (iv) Housing Opportunities for Persons with

AIDS program. However, the Consolidated Plan submitted by Dallas to HUD on August 15, 2003 for the Fiscal Years 2003-04 through 2007-08 does not contain an AI and does not otherwise satisfy defendants' AFFH obligations.

### Dallas Undertook No Analysis of Whether Its Housing Efforts Had the Effect of Perpetuating or Increasing Segregation

52.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

53.    Prior to and during the relevant time period, Dallas was aware of the racial and ethnic makeup of its municipality.

54.    Prior to and during the relevant time period, each of the Defendants were aware of the racial and ethnic segregation within the City of Dallas and Dallas County, respectively.

55.    Defendants define the "Southern Sector" of the City of Dallas as the geographic portion of the City located south of the RL Thornton Freeway (I-30) and west of the Trinity River at its intersection with I-30.    Conversely, the "Northern Sector" is defined as the geographic portion of the City of Dallas located north of the RL Thornton Freeway (I-30) and east of the Trinity River at its intersection with I-30.

56.    The Southern Sector and Northern Sector are almost equal land masses. The Southern Sector contains 180 square miles of land, and the Northern Sector contains 177 square miles of land.

57.    According to the 2000 Census data, the City of Dallas' total population is about 1,262,000 people, making Dallas the ninth largest city in the U.S. More than 62% of Dallas' population lives in the Northern Sector, with less than 38% of the population living in the Southern Sector.

58.    Of the City's 511,000 total Housing Units, nearly 69% are located in the Northern

Sector and about 31% are located in the Southern Sector.

59.    Of Dallas' 1,262,000 residents, 36.4% are white. The remaining 63.6% are black, Hispanic, and other impacted minorities.

60.    In the Northern Sector, 49.7% of the residents are white. The remaining 50.3% of Northern Sector residents are black, Hispanic, and other impacted minorities.

61.    In the Southern Sector, only 14.1% of the residents are white. The remaining 85.9% of Southern Sector residents are black, Hispanic, and other impacted minorities.

67.    In the Northern Sector, only 13.61% of the residents are black. In contrast, 42.47% of Southern Sector residents are black.

68.    Of the 17 zip codes comprising the Southern Sector, 8 of the areas (75249, 75236, 75237, 75232, 75216, 75241, 75215, 75210) have majority (greater than 50%) black populations. Six of the zip codes contain highly concentrated black populations that exceed 75%: 75237@ 88.6%; 75232 @ 76.6%; 75216 @ 78.3%; 75241 @ 93%; 75215 @ 85.3%; and 75210 @ 84%.

69.    Of the 17 zip codes comprising the Southern Sector, only one of the areas (75253) has a majority (greater than 50%) white population. Of the 31 zip codes comprising the Northern Sector, only one of the areas (75247) has a majority (greater than 50%) black population; the total population of 75247 is only 254 people (clearly, this zip code is a statistical aberration).

70.    From 1999 to 2008, Dallas approved and sponsored the construction of fewer than 2,575 Low Income Housing Tax Credit supported housing units in the Northern Sector; these projects represent one low income housing unit for every 294 residents of the Northern Sector. During the same timeframe, Dallas approved and sponsored the construction of nearly 7,300 Low Income Housing Tax Credit supported housing units in the Southern Sector; these projects represent one low income housing unit for every 65 residents of the Southern Sector. So,

from 1999 to 2008, nearly 3 out of every 4 low income housing units built in the City of Dallas were located in the Southern Sector, at a per capita rate nearly five times that of the Northern Sector. Encouraging the development of numerous Low Income Housing Tax Credit projects for low and moderate income families in the Southern Sector, and discouraging Low Income Housing Tax Credit projects in the Northern Sector, is an impediment to fair housing choice. However, Defendants have failed to include and analyze this information and these impediments in their AI's.

71.    Defendants failed to prepare and make available for public inspection an AI for the City of Dallas between 2003-2007. The City of Dallas' 1998 and 2007 AI's focused on affordable housing, rather than fair housing.

72.    In the AI's that Dallas did prepare and make publicly available, they did not analyze how its placement of affordable housing affected segregation and racial or ethnic diversity, and Dallas failed to prepare and make publicly available an Analysis of Impediments at all between 2003-2007.

73.    Defendants did not undertake an analysis of whether the production of affordable housing, prior to and during the relevant time period, had the effect of increasing or decreasing racial or ethnic diversity in the neighborhoods in which the housing was built. Dallas also did not undertake an analysis of DHA's impediments to fair housing choice.

74.    The HUD Guide on page 1-3 informed Defendants that the, "AFFH obligation extends to all housing and housing-related activities in the grantee's jurisdictional area whether publicly or privately funded."

75.    An example of Dallas' and Dallas County's failure to AFFH is the minimal funding amounts being provided for affordable housing in the city's seventeen Tax Increment

Financing (TIF) Districts. Of the more than $1.033 Billion budget being contributed to the 17 TIF districts by Dallas and Dallas County, less than 4 1/2% has been budgeted for Affordable Housing. This is especially true for the eleven TIF Districts in the Northern Sector of the City where a dearth of affordable housing exists.   Of the nearly $647 Million budget being contributed to the Northern Sector TIF Districts by Dallas and Dallas County, less than ½% has been budgeted for Affordable Housing. It is counterintuitive and contradictory for  Dallas and Dallas County to provide financial support for the development of market rate residential units, while ignoring similar subsidies for affordable housing units.

76.     The HUD Guide on page 2-7 also informed Defendants that, "all AIs, whether new or updated, must be completed by February 6, 1996 (of this current Consolidated Plan cycle) as stated in the Preamble to the Consolidated Plan Regulations. Subsequent AIs must be completed/updated in accordance with future timeframes for the Consolidated Plan."  After missing the February 6, 1996 deadline, Dallas was nearly three years late completing the new/updated December, 1998 AI.  From 2004 until 2008, Dallas was operating without a (then) current AI, however, Dallas continued to falsely certify AFFH to HUD knowing it was not in compliance with HUD's most basic requirements.

77.     The HUD Guide on page 2-7 further informed Defendants that: "The AI is a review of impediments to fair housing choice in the public and private sector. The AI involves:

- A comprehensive review of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices
- An assessment of how those laws, etc. affect the location, availability, and accessibility of housing
- An assessment of conditions, both public and private, affecting fair housing choice for all protected classes
- An assessment of the availability of affordable, accessible housing in a range of unit sizes."

14

78.   Neither the December, 1998, nor the July, 2007 City of Dallas AI's contain the assessments required by page 2-7 of the HUD Guide.

79.   Page 2-17 of the HUD Guide informed Defendants that: "Impediments to fair housing choice include actions or omissions in the State or Entitlement jurisdiction that:

- Constitute violations, or potential violations, of the Fair Housing Act
- Are counterproductive to fair housing choice, such as:
  – Community resistance when minorities, persons with disabilities and/or low-income persons first move into white and/or moderate- to high-income areas

  – Community resistance to the siting of housing facilities for persons with disabilities because of the persons who will occupy the housing

- Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin."

80.   Neither the December, 1998, nor the July, 2007 City of Dallas AI's contain any assessment of "community resistance" or "NIMBY(Not In My Back Yard)ism" impediments that exist in the jurisdiction, required by page 2-17 of the HUD Guide.

81.   Pages 2-20 & 2-21 of the HUD Guide informed Defendants that: "Where the community planning and development perspective looks directly at needs for housing and possible barriers to meeting those needs, the fair housing perspective focuses as much on the causes of needs of groups or persons protected by the Fair Housing Act as it does on the needs themselves. Thus, the explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing conditions more severe for certain groups in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups." Despite including information in some

of the AI's it did undertake regarding the severe segregation that exists in the jurisdiction, Dallas does not conclude that the segregation is an impediment to fair housing choice.

82.    An analysis of employment centers in the jurisdiction, along with linkages between employment centers and housing, as well as transportation, is not included in the Dallas Analyses of Impediments despite that on page 2-27 of the HUD Guide informed Dallas that these matters should be included in its AI's.

83.    Page 2-27 of the HUD Guide also informed Dallas that: "The Consolidated Plan contains information about housing conditions in the jurisdiction for lower-income minority and other lower-income households. If lower-income housing is in short supply, it should be the focus of the housing affordability strategy." According to the Dallas Mayor's Task Force on Affordable Housing, Dallas has a severe shortage of between 20,000 and 30,000 low income housing units. However, neither the City's AI nor the City's Consolidated Plan contain a housing affordability strategy to address this short supply, as required by the HUD Guide.

84.    Page 2-28 of the HUD Guide informed Defendants that: "In the AI, the jurisdiction should describe the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; how segregation and restricted housing supply occurred; and relate this information by neighborhood and cost of housing. This description should also discuss the extent to which a broad variety of accessible housing for persons with disabilities are distributed throughout the jurisdiction, demonstrating efforts made to provide such housing in an integrated setting." Although Dallas has included Census Data regarding segregation in the jurisdiction in the AI's it completed, it has not analyzed the segregation or its causes. Nor has Dallas concluded that the segregation is a problem and Defendants offer no actions to promote integration within the jurisdiction.

85.   Pages 2-28 and 2-29 of the HUD Guide informed Defendants that: "Jurisdictions should discuss issues in each of the areas reviewed for the AI and finish with a conclusion (e.g., because of a PHA's historical tenant and site selection policies and practices, the PHA's public housing developments are segregated by race or ethnicity). Conclusions require appropriate actions by the jurisdiction to assist in eliminating such problems." Although Dallas has included Census Data regarding segregation in the AI's it did complete, Dallas does not finish the discussion of segregation with any conclusions, nor have any actions been defined by the Defendants to eliminate the problem.

86.   Page 4-4 of the HUD Guide informed Dallas that:

The AI is a comprehensive review of a jurisdiction's laws, regulations, and administrative policies, procedures, and practices affecting the location, availability, and accessibility of housing, as well as an assessment of conditions, both public and private, affecting fair housing choice. The AI is a review of impediments to fair housing choice in the public and private sector. Impediments to fair housing choice are any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin that restrict housing choices or the availability of housing choices, or any actions, omissions, or decisions that have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin. Policies, practices, or procedures that appear neutral on their face but which operate to deny or adversely affect the provision of housing to persons of a particular race, color, religion, sex, disability, familial status, or national origin may constitute such impediments. Impediments include actions or omissions in the jurisdiction's public or private housing sector that:

• Constitute violations, or potential violations, of the Fair Housing Act.
• Are counterproductive to fair housing choice, such as NIMBYism:
    – Community resistance when minorities, persons with disabilities and/or low-income persons first move into White and/or moderate- to high income areas
    – Community resistance to the siting of housing facilities for people with disabilities in residential neighborhoods based on their disabilities
• Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin.

Upon completion of its AI, a jurisdiction should take actions that are responsive to any identified impediments. The AI should encompass all housing within a

jurisdiction and should not be limited to housing assisted or subsidized by the Federal, State, or local government.

87.     In addition to failing to AFFH, the Defendants have actually encouraged discriminatory practices through their actions. Examples include Dallas' approval of deed restrictions that disallow the use of a property for low income housing on a Downtown Dallas complex of four buildings (the Atmos Complex), Dallas' approval of CDBG Section 108 Loan Guarantees for the development of several properties (the Continental Building; the Shamburger Project) that would discriminate on the basis of familial status since only studio and 1-Bedroom units were proposed as income-restricted affordable units (despite the projects' inclusion of two and three bedroom floorplans), and Dallas' approval of a discriminatory plan for development of a four-building complex in Downtown Dallas that will concentrate all of the low income residential units into one of the buildings, instead of dispersing the income-restricted units throughout the complex (the Atmos Project).

88.     Contrary to pages 4-5 and 4-6 of the HUD Guide, and in violation of their AFFH obligations, Dallas has, nearly exclusively, channeled community development resources (primarily CDBG Funds) into "CDBG Eligible Census Tracts" which, by their nature, are low income high minority areas of the City. This policy contradicts the goals of affirmatively furthering fair housing, since these actions promote the continuation of segregation by "concentrating" resources in these existing high minority low income areas, instead of utilizing resources to support opportunities for low income, primarily minority, individuals in higher opportunity, low minority areas. The lack of cooperation and coordination between Dallas' Budget and Finance Department, Dallas' Housing Department, Dallas' Economic Development Department, Dallas' Fair Housing Office, Dallas County, the DCHA and DHA, results in ineffective utilization of resources to affirmatively further fair housing. Statements made to

plaintiffs-relators by Dallas Officials, such as "Low Income Housing is NOT a part of the vision for Downtown Dallas...," confirm the defendants' failure to comply with their AFFH obligations. Defendants have failed to include and analyze this information and these impediments in their AI's.

89. Contrary to pages 4-6 and 4-7 of the HUD Guide, which warned Defendants against the use of "steering" or "deed restrictions," and contrary to Defendants' AFFH obligations, approvals of the Atmos Complex project by Dallas are examples of "deed restrictions" and policies that result in "steering". Defendants have failed to include and analyze this information in their AI's.

90. Also contrary to pages 4-6 and 4-7 of the HUD Guide, Defendants failed to analyze or identify in its AI's segregated housing conditions as an impediment to fair housing choice. Although mentioned briefly in the 1998 AI, Dallas and DHA were both found guilty of overt actions that result in segregation by a Federal Court in the "Walker v. HUD" case. Defendants have knowingly and willfully failed to properly include and analyze this information in their AI's.

91. Page 5-6 of the HUD Guide informed Defendants that: "Placement of new or rehabilitated housing for lower-income people is one of the most controversial issues communities face. If fair housing objectives are to be achieved, the goal must be to avoid high concentrations of low-income housing." The placement of numerous low income housing developments in the City's "Southern Sector" by the Defendants has resulted in high concentrations of low income housing in high minority neighborhoods, directly contradicting the goals of affirmatively furthering fair housing. Defendants have knowingly and willfully failed to properly include and analyze this information in their AI's.

92.     Contrary to page 5-9 of the HUD Guide, and AFFH obligations, a strategy of improving conditions in highly concentrated minority areas through economic development and improved services has not been employed by Dallas in the "Southern Sector"; instead, neighborhood "improvements" have nearly always resulted in construction of additional low income housing. Nor have Defendants employed a strategy to provide lower-income housing opportunities in more economically advantaged areas, such as exist in the City's "Northern Sector." Defendants have knowingly and willfully failed to properly include and analyze this information in their AI's.

93.     On pages 5-6 through 5-12 of the HUD Guide Defendants were informed that they should include answers to specific questions in their AI's if they were relevant. For the Defendants, many of these questions are relevant to the segregation and discrimination findings from the *Walker v. HUD* litigation. However, the AI's prepared by Dallas and Consolidated Plans submitted by Dallas to HUD do not address many of these issues. Defendants have knowingly failed to properly include and analyze this information in their AI's.

94.     As mentioned in the July, 2007 AI, the previous AI was prepared by the City of Dallas in 1998, for the 1998-2003 timeframe. There is a **four year gap** (from 2003 till 2007) when the City of Dallas did not have a current Analysis of Impediments. The reason for the "gap" is not explained in the current AI. Defendants have knowingly failed to properly include and analyze this information in AI's required to be undertaken and made available for public inspection.

95.     The AI, published in July, 2007, mentions the "Intown Housing Program" in several different places (*id.,* p. III-3, table 3-2(6)), and mentions that the program had created 299 affordable housing units in Downtown Dallas "good until the deed restrictions expire"

20

(however, only 197 units had been created in Downtown Dallas by the program). By July, 2007, the "Intown Housing Program" was all but defunct. Santa Fe Lofts (name changed to SoCo lofts) was fully involved in a condo conversion; the University of North Texas had already purchased 1900 Elm Street (aka Majestic Lofts) where there was no deed restriction in-place; the Kirby Building and the Davis Building had already purchased the Section 108 loans for 60 cents on a dollar, and the City had already repaid the original $25M program loan to HUD in January, 2006. Defendants have knowingly failed to properly include and analyze this information in their AI's.

96.     On March 19, 2007, the Dallas Economic and Housing Committee was briefed by Dallas City staff on the status of affordable housing within the Central Business District, in a briefing entitled "Downtown Dallas 'living for all' Update on Affordable Housing". The briefing detailed the decline of affordable housing within the CBD (in contrast to the "explosion" of market rate housing units being developed in the CBD), including the demise of the Intown Housing Program. The briefing detailed several recommendations attempting to correct the imbalance, but nothing has changed. Defendants have knowingly failed to properly include and analyze this information in their AI's.

97.     Predatory lending practices are known to exist within the City of Dallas and Dallas County and such predatory lending practices by private lenders are an impediment to affordable and fair housing in the City of Dallas and Dallas County. Defendants have knowingly failed to properly include and analyze this information in their AI's.

98.     The 2007 AI should have identified the dearth of affordable housing units in Downtown Dallas as an "Impediment", but did not. Defendants have knowingly failed to properly include and analyze this information in their AI's.

99.     On August 12, 2003, Dallas was released from the *Walker* consent decree (2007
AI, p. III-4). A change in the policies and procedures mandated on the City by the *Walker* court
should have triggered the necessity of a new AI. The defendants should have completed an AI
during the summer of 2003, but instead failed to prepare a new AI until four years later. In the
four years after being released from *Walker*, Dallas was knowingly operating without a valid,
current AI (the City had received $135,698,847 in CDBG funds during this four year time
period).

100.    On Labor Day weekend, 2005, Hurricane Katrina ravaged the gulf coast of Texas,
Louisiana, Mississippi, etc. and New Orleans was nearly destroyed. Dallas became one of the
destinations for thousands of refugees who had been forced from their homes by the storm; and
many of those displaced residents have remained in the Dallas area. An event of this magnitude
should have triggered the Dallas Fair Housing Office to perform an updated AI, but the City of
Dallas' 2007 AI, prepared two years after the event, makes no mention of this event nor its
impact. Defendants have knowingly failed to properly include and analyze this information in
their AI's.

101.    During the summer of 2005, then-Mayor Laura Miller declared a moratorium on
housing production utilizing the Low Income Housing Tax Credit program, as a direct reaction
to an FBI probe of City Hall. The investigation has subsequently led to many indictments, and
convictions of numerous conspirators in a bribery/extortion scheme (ex-Mayor Pro Tem Don
Hill was sentenced to 18 years on 2-26-10) involving several low income housing developers.
There was virtually no affordable housing production using the LIHTC program in the City for
more than three years as a result of the moratorium. The 2007-2012 AI submitted by Dallas does

not identify this and include it as an "Impediment". Defendants have knowingly failed to properly include and analyze this information in their AI's.

102.    The City of Dallas' 2007 AI mentions the Downtown (Dallas) Mortgage Assistance Program, which provides $40,000 per qualifying households toward the purchase of a home in the Downtown Dallas Neighborhood (Table 3-2(2)). The table shows that the program created 74 affordable units, but that is far from the truth. The program has been a total failure, because it is dysfunctional. The problem? There are very few, if any, housing units of any type in Downtown Dallas that would sell for less than $200,000. Those who would have qualified for the program would never be able to qualify for a $160,000 mortgage because of their income levels. And, as the City staff pointed out in its 3-19-07 presentation to the Housing and Economic Development Committee, the private sector had not created any affordable housing units in Downtown Dallas, so the housing stock to support this program just did (and does) not exist. A well-prepared AI would have identified these issues as "impediments". Defendants have knowingly failed to properly include and analyze this information in AI's.

103.    There are numerous references, throughout the City of Dallas' 2007 AI, regarding population and demographic changes between the 1990 and 2000 census. Examples include, "the Hispanic population has more than doubled", 61.2% of Dallas' population is either African American or Hispanic (p. I-2) vs. 50% in 1990, 35.6% of Dallas' population is Hispanic vs. 21% in 1990 (p. I-19), 25.6% of Dallas' population is African American vs. 29% in 1990 (p. I-19). Neither the overall population growth, nor the changes in composition of the minority populations is analyzed or included in the AI as an "impediment". Defendants have knowingly failed to properly include and analyze this information in their AI's.

104.    Phrases referring to African Americans and Hispanics, like "remain concentrated", "continue to populate", "continue to primarily populate", used throughout the City of Dallas' 2007 AI (*id.,* pp. 1-19 and 1-20), confirm the existence (and continuation) of heavily segregated areas of the City. These observations are very apparent in the AI. However, the author(s) did not recognize the significance of these observations as they relate to "affirmatively furthering fair housing", since there is no mention of these factors as "impediments". Defendants have knowingly failed to properly include and analyze this information in their AI's.

105.    When discussing public housing provided by the Dallas Housing Authority, the City of Dallas' 2007 AI states that 86% of the occupants are African American (when only 25.6% of Dallas' population is African American), and only 6% of the occupants are Hispanic (when 35.6% of Dallas' population is Hispanic) (*id.,* p. III-17). Then on page III-43, the 2007 AI says "Fair Housing Impediments 'DHA Information Not Available'". The public housing programs operated by DHA appear to be their own impediments to Fair Housing. Defendants have knowingly failed to properly include and analyze this information in their AI's.

106.    There are several "impediments" identified in the City of Dallas' 2007 AI that were previously identified in the 1998 AI, including "accessibility requirements in the building code", chapter 27 of the building code (potential impact on familial status; i.e. families with children), etc. So, during the nine years since the 1998 AI was published, the City has apparently made little or no progress on removing these identified impediments. Defendants have knowingly failed to properly include and analyze this information in their AI's.

107.    Despite statements from some of the Housing Advocates that participated in the Survey reflecting serious problems and impediments to fair housing, the City of Dallas' 2007 AI

24

has not synthesized the observations into the AI as impediments to fair housing.  For example, these statements include:

- "agencies were politically motivated" (*id.,* p. VII-8)

- "political agendas get in the way of perfectly fine projects because they won't distribute dollars to a project they don't want to have implemented" (*id.,* p. VII-8)

- "the City should 'broaden beyond South and Southwest Dallas'" (*id.,* p. VII-14). This is likely a reference to the enormous resources that have been invested in South and Southwest Dallas (the "Southern Sector"), but not in the remainder (the "Northern Sector") of the City.

- "believe that barriers have become more formidable over this time (since 1998)" (*id.,* p. VII-12).

108.    Much of the 2007 AI prepared by Dallas appears to be an edited version of the prior AI's and is based on boiler plate instead of conducting a valid updated AI that conforms with the Defendants' obligations to AFFH.

**DHA Undertook No Analysis of Whether Its Housing Efforts Had the Effect of Perpetuating or Increasing Segregation and DHA Is Complicit With Violations Committed by Dallas**

109.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

110.    DHA is required by law to certify that it carries out its activities in compliance with Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990. DHA is also required to regularly examine its programs and any proposed programs to identify any impediments to fair housing choice within those programs.

25

111.    DHA has failed to identify and analyze impediments to fair housing; failed to address known impediments; and failed to affirmatively further fair housing. Additionally, DHA has falsely certified its compliance with civil rights and fair housing laws as well as its obligations to AFFH.

112.    DHA does not produce its own Analysis of Impediments ("AI"), but rather it collaborates with the City of Dallas in the preparation of the AI and Consolidated Plans produced by the City of Dallas. DHA knowingly falsely certifies to HUD annually that it is in compliance with all requirements and legal obligations. The City of Dallas has knowingly failed to meet its obligations under civil rights and fair housing laws, and the City of Dallas has failed to affirmatively further fair housing. DHA is complicit in those violations by the City of Dallas and collaborates with the City of Dallas in those violations.

113.    Significantly, the AI deficiencies and the four year gap in preparing an AI by the City of Dallas also applies to DHA. During the four year "gap," not only did the City of Dallas not have a current AI, but the same is true of DHA. Neither the City of Dallas nor DHA could have been in compliance with their AFFH obligations in the absence of a current AI. Also, DHA failed to provide the City of Dallas with its "impediments" for inclusion in the 2007 AI prepared by the City of Dallas.

### Defendants Did Not Take Actions to Overcome the Effects of Discrimination and Segregation on Fair Housing Choice

114.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

115.    Prior to and during the relevant time period, Defendants did not take appropriate actions to overcome the effects of discrimination and segregation on fair housing choice and Defendants' actions have increased or continued discrimination and segregation.

116.    Defendants have not deemed themselves to be failing to AFFH.

117.    Defendants knew that they had the authority and responsibility to do that which is necessary to AFFH.

118.    Defendants' production and placement of affordable housing, prior to and during the relevant time period, increased segregation in the jurisdiction.

119.    DHA's 2008 annual operating budget was $221.35 Million. DHA received nearly $190 Million in Operating and Capital Grants from the U.S. Department of Housing and Urban Development (HUD) during 2008.

120.    DHA owns and operates a total of 4,739 residential units (322 of these are currently under construction) in the City of Dallas, Texas.

121.    Of the 4,739 total residential units owned by DHA, 1,081 are designated as "Elderly" units, and 3,658 are designated as "Family" units.

122.    Of the 4,739 total residential units owned by DHA, 83.52% (3,958 units) are located in heavily minority census tracts within Dallas. Only 16.48% (781 units) of all the residential units owned and operated by DHA are located in non-minority census tracts. These DHA impediments are not identified in the Dallas AI's.

123.    Of the 1,081 "Elderly" units owned by DHA, 76.69% (829 units) are located in heavily minority census tracts within Dallas. Only 23.31% (252 units) of the "Elderly" units owned and operated by DHA are located in non-minority census tracts. These DHA impediments are not identified in the Dallas AI's.

124.    Of the 3,658 "Family" units owned by DHA, 88.90% (3,252 units) are located in heavily minority census tracts within Dallas. Only 11.10% (406 units) of the "Family" units owned and operated by DHA are located in non-minority census tracts. These DHA impediments

27

are not identified in the Dallas AI's.

125.    At the end of 2003, there were 6,916 people or households on the DHA waiting list for public housing units. With DHA's closing of the Section 8 Housing Choice Voucher waitlist on June 1, 2004, the number of people or households on the waiting list for public housing has increased to 10,519, outnumbering occupied public housing units by almost 2 to 1. This number represents a 432% increase in the number of people or households on the DHA waiting list for public housing since 1999. These DHA impediments are not identified in the Dallas AI's.

126.    The number of DHA-distributed Section 8 Housing Choice Vouchers is 16,640. DHA's Section 8 population is 88% Black/African American, 6% White, and 6% "Other" minorities. However, according to the 2000 Census, Dallas' population is 24.6% Black/ African American, 52.5% White, and 32.9% "Other" minorities. Clearly, Black/African American voucher recipients are disproportionately represented in DHA's Section 8 population. Nearly 75% of the Section 8 Housing Choice Vouchers are being used to subsidize the rental of housing units located in high minority, heavily distressed neighborhoods, located primarily in South and Southwest Dallas (the "Southern Sector"). During the last decade alone, the City of Dallas and the Texas Department of Housing and Community Affairs have constructed nearly 7,300 low income housing units, supported with low income housing tax credits, in South and Southwest Dallas neighborhoods. Landlords who accept Low Income Housing Tax Credits cannot refuse to accept Section 8 Housing Choice Vouchers. These DHA impediments are not identified in the Dallas AI's.

127.    At the end of 2003, there were slightly more than 10,000 people or households on the DHA waitlist for Housing Choice (Section 8) vouchers. As a result of the overwhelming

waitlist and cuts in federal funding, the Dallas Housing Authority suspended the program entirely for new applicants. Since June 1, 2004, the DHA has not accepted new applications for the Housing Choice (Section 8) waitlist. As of March 21, 2006, the (closed) waiting list for the Housing Choice Voucher Program was 16,341 people or households. However, DHA has recently announced that it is making 500 Section 8 Housing Choice Vouchers available for Mayor Tom Leppert's initiative to provide Permanent Supportive Housing for the formerly homeless. These DHA impediments are not identified in the Dallas AI's.

128.   HUD's regulations implementing the Section 8 voucher program provide the DHA with several options to increase or decrease area rents in order to increase housing opportunities in non-minority areas. First, the DHA has the ability to vary rents between 90 and 110 percent (the "basic range") of HUD's published Fair Market Rent (FMR) and the ability to establish separate payment standard amounts within the basic range for a designated part of any FMR area. HUD approval is not required to establish a payment standard amount in the basic range. Second, the DHA has the ability, with approval from HUD's regional Fort Worth field office, to vary rents between 110 to 120 percent of HUD's published FMR in an "exception area" if DHA can show that median rents in those areas are that much higher than HUD's FMR. Third, DHA, with approval from HUD's Assistant Secretary for Public and Indian Housing, may set rents in an exception area that could include up to an entire county above 120 percent of HUD's published FMR to help families find housing outside areas of high poverty, if the DHA can show median rents in those areas are that much higher. Each of these payment exceptions provide the Dallas Housing Authority discretion to vary rents appropriately across an FMR Area, in order to promote housing integration.

129.   DHA's rigid adherence to the published HUD Fair Market Rents for the Dallas

area has resulted in 70% of rental units located in predominantly minority areas being available

to voucher holders, whereas only 30% of rental units located in predominantly white areas

are available, furthering segregation in the area served by DHA. These DHA impediments are

not identified in the Dallas AI's.

130.    Rather than locating new public housing developments in high-opportunity,

predominantly white neighborhoods in Dallas (i.e. "affirmatively furthering fair housing"), DHA

has been consistently constructing new public housing units in high-minority, distressed

locations in the City's "Southern Sector". Two examples follow:

a. During 2009, DHA demolished the 294 units at Turner Courts Public Housing

Project, originally constructed in 1952. Located at 6601 Bexar Street in the heart of Dallas'

"Southern Sector", DHA is currently constructing 334 new public housing units, calling the

project "Buckeye Trails", on the site of the former "Turner Courts". The Turner Courts/Buckeye

Trails site is located in a high minority census tract within a heavily distressed neighborhood in

South Dallas.

b. In 2005, DHA demolished the 550 units at Frazier Courts Public Housing Project.

DHA is constructing 310 new public housing units on the Frazier Courts site. Frazier Courts is

located in the 75210 zip code, the highest crime area in the entire City of Dallas. US Census data

shows that the tract has a median household income of just $15,000 per year (roughly 1/3 of the

median income for Dallas), the population is 91% black, and 58.6% of the area's population live

below the poverty line. Many have compared Dallas' Frazier neighborhood with New Orleans'

infamous Ninth Ward.

131.    In contrast with the two examples cited above, DHA has owned "Little Mexico

Village" since 1942. Located at 3027 Harry Hines Boulevard just Northwest of Downtown

Dallas in Dallas' "Northern Sector", the property consists of 13.37 acres. Little Mexico Village is situated immediately south of the "hospital district" and immediately north of the American Airlines Center and upscale "Victory Park" development, in the highly desirable "Uptown" neighborhood of Dallas, very close (walking distance) to the City's largest job center and with excellent access to public transportation. Dallas Central Appraisal District has assessed the property's land value at nearly $35 Million, but the market value of the land is probably twice that amount, making it the most valuable single asset in DHA's entire portfolio. The 13.37 acre site contains only 102 residential units. Conservatively, this property could easily accommodate 400 residential units or more in a low-rise three/four story configuration, but DHA has failed to make any efforts to expand the number of affordable housing units on the site.

132.    Despite HUD's national objective for 51% of residential units to serve low and moderate income persons, Dallas has adopted a policy within its "Downtown Connection" TIF District which restricts the number of housing units affordable to low and moderate income occupants to a maximum of 30%. This adopted policy clearly discourages the production of low and moderate income housing units within the Downtown Dallas Business/Residential District. As an example, a 100 unit multifamily residential project would provide only 30 Low Moderate Income units instead of 51 LMI units. Paradoxically, Dallas has imposed no such policy or restriction on projects located in TIF Districts within the "Southern Sector". In fact, Dallas has enthusiastically supported and sponsored numerous multifamily projects located in the Southern Sector with 100% of the units set aside for low income occupants. Dallas has failed to identify this policy as an impediment to fair housing choice in its AI's.

133.    On or about December 1, 2008, Dallas (Dallas Housing Finance Corporation) was awarded an allocation of $150 Million in Housing and Economic Recovery Act (HERA) Bonds

by the State Bond Review Board (Texas Department of Housing and Community Affairs). These HERA bonds encourage the production of low and moderate income housing units, since up to 40% of the housing units produced utilizing this financing must be set aside for low income occupants at 60% of Area Median Family Income and below (90% of the units produced using this financing are required to be income restricted). Despite an overwhelming need for 20,000 to 30,000 affordable housing units in Dallas, identified by the Mayor's Affordable Housing Task Force, Dallas (Dallas Housing Finance Corporation) transferred $75 Million of the HERA bond allocation to Texas State Affordable Housing Corporation, located in Austin, Texas, on April 26, 2010. This transfer of funds is an impediment to fair housing choice in Dallas and Dallas has failed to identify this as an impediment to fair housing choice in its AI's.

134.  For its Community Development Block Grant Section 108 Loan Guarantee program, Dallas has approved a policy to loan the Section 108 Loan Guarantee funds to private sector developers at an interest rate that is higher than Dallas' interest rate with HUD. HUD establishes the interest rate to be paid by entitlement jurisdictions on Section 108 Loan Guarantees at a very low rate, currently less than 1/2 of one percent, to encourage the production of housing and other qualifying community development initiatives for the benefit of low and moderate income households. The adoption of a CDBG Section 108 Loan Guarantee interest rate by Dallas at a rate higher than HUD's rate acts to discourage the production of affordable housing for low and moderate income occupants by increasing the cost of borrowing these funds, thereby resulting in the creation of an additional impediment to fair housing choice by Dallas. Dallas has failed to identify this as an impediment to fair housing choice in its AI's.

**Defendants Dallas County and DCHA Undertook No Analysis of Whether Its Housing Efforts Had the Effect of Perpetuating or Increasing Segregation**

135.  The allegations contained in the above paragraphs are hereby realleged as set

forth fully above.

136.   Defendants Dallas County and DCHA are required by law to certify that they carry out their activities in compliance with Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990.  Defendants Dallas County and DCHA are also required to regularly examine their programs and any proposed programs to identify any impediments to fair housing choice within those programs.

137.   Defendants Dallas County and DCHA have each failed to identify and analyze impediments to fair housing; failed to address known impediments; and failed to affirmatively further fair housing.

138.   Dallas County has knowingly failed to meet its obligations under civil rights and fair housing laws, and Dallas County has failed to affirmatively further fair housing.  DCHA is complicit in those violations by Dallas County and collaborates with Dallas County in those violations.  Dallas County knowingly submits false certifications to obtain CDBG funding from HUD.

139.   The number of DCHA-distributed Section 8 Housing Choice Vouchers is 3,678. DCHA's Section 8 population is 84% Black/African American, 12% White, and 3% Asian racial minorities, with only 5% Hispanic/Latino ethnicity. However, according to the 2000 Census, Dallas County's population is 20.31% Black/African American, 58.35% White, and 21.34% "Other" racial minorities, with 29.87% Hispanic ethnicity. Clearly, Black/African American voucher recipients are disproportionately over-represented, and those of "Other" racial minorities and Hispanic/Latino ethnicity are disproportionately under-represented, in DCHA's Section 8 population.

140.   Significantly, the AI's prepared by Dallas County contain deficiencies and in some years Dallas County failed to prepare and publish an AI as required by HUD.  During these years the timing of the completion of AI's by the county has produced gaps of 3 years and 2 years each where the county did not have a (then) current AI.  Defendants Dallas County and DCHA could not be in compliance with their AFFH obligations in the absence of a current AI.

141.   Although not mentioned specifically in Dallas County's AI, the ratios mentioned (47.8% and 77.1%, respectively) are called the "dissimilarity index", a calculation used by social scientists such as Douglas Massey to measure the degree of segregation that exists within a community.  These dissimilarity indices are correctly expressed as .478 for Dallas Hispanics, and .771 for Dallas African Americans.  In Dallas, nearly 5 out of every 10 Hispanics would have to move to "whiter" census tracts, and nearly 8 out of every 10 African Americans would have to move to "whiter" census tracts in order to achieve an integration level equal to the demographic profile of the Dallas metropolitan area.  Renowned sociologist and demographer Andrew Beveridge asserts that a dissimilarity index of .300 or below is considered by many social scientists as a measure of a "fairly integrated" community.  Clearly, the dissimilarity indices calculated by Massey for Dallas underscore the extremely high levels of segregation that exist for Hispanics and African Americans in the Dallas area.

142.   While the 1996 Dallas County AI includes numerous broad statements regarding segregation, housing discrimination, and predatory lending practices, no analysis has been performed and no conclusions are drawn; not even one Impediment to Fair Housing Choice is cited in the AI. Furthermore, the AI, while acknowledging the significant fair housing problem areas that exist within the County's jurisdiction, fails to identify even one solution or remedial action to be undertaken to ameliorate the problems

143.    The AI prepared by Dallas County in 2010 is very limited in its scope. It does not provide an analysis of impediments "in the jurisdiction" (i.e. Dallas County) as required by the HUD Fair Housing Planning Guide, but instead is focused only on the municipalities that participate in the County's CDBG consortium.

144.    On page 3 of the 2010 Dallas County AI, it states, "In Dallas County, the County's CDBG program is operated in the County's 97 square miles of unincorporated territory and in the following fifteen municipalities/cities: Balch Springs, Cedar Hill, Cockrell Hill, Combine, Coppell, Desoto, Duncanville, Farmers Branch, Glenn Heights, Hutchins, Lancaster, Seagoville, Wilmer, Highland Park, (and) University Park." Regardless of the size of the "unincorporated area", there is no demographic data included in the AI for the unincorporated area(s) of the county. Based on the Consortium Cooperation Agreements, there are 16 (not 15) municipalities/cities in the Dallas County consortium. The listing in the AI does not include the City of Sachse, which is definitely part of the consortium.

145.    Also on page 3 of the Dallas County AI, it states, "Most of the municipalities have been a part of the County's CDBG program since its inception; however, during the last five years, one municipality (Rowlett) has had its population exceed 50,000 (and so it now directly receives federal funds on its own), and two additional cities (Combine and Desoto) have become a part of the County's CDBG program." After the completion of the Dallas County 2003 Analysis of Impediments, the City of Rowlett developed into a CDBG entitlement jurisdiction of its own (in 2006). However, the 2003 consortium consisted of 14 municipalities/cities, including Rowlett. New consortium cities since the 2003 AI include Combine, DeSoto, and Highland Park (which is not mentioned in this portion of the 2010 AI). Based on a review of the County's Annual Plan submittals, Combine and Highland Park were

participating in the consortium as of 2006, yet they were not included in the County's previous 2003 Analysis of Impediments. DeSoto began its participation in the consortium in 2008, yet it was not included in the County's 2003 Analysis of Impediments. At the time Rowlett left the consortium (in 2006), and Combine and Highland Park were added, an update to the 2003 Analysis of Impediments should have been prepared by the County, since the composition of the consortium had changed. In 2008, when the composition of the consortium changed again as a result of the addition of DeSoto, a revision to the County's AI was needed.

146.    As a result of the County's failure to update its AI, the 2003 Dallas County AI was only valid for three years, from 2003-2006.

147.    On the top of page 4 of the 2010 Dallas County AI ("Demographics") – curiously, the chart included in the AI shows population data for only 14 of the 16 consortium municipalities. Highland Park (2000 population 8,842) and University Park (2000 population 23,324) are missing from the chart.

148.    On page 4 of the 2010 Dallas County AI it states, "According to the 2000 Census data listed below, 26% of the County's CDBG population is listed as Black or African American, 54% Anglo, 4% is identified as Other (which includes Asian, American Indian and other races), and 16% of the County's CDBG population is reported to be of Hispanic descent. The entire population of Dallas County, including all of its twenty-eight cities, is 2,492,850 with 10% being African American and 15% being Hispanic."  It is interesting to note the County's use of the terminology "anglo" since none of the census data reports data for "anglos".  The demographics included in the 2010 Dallas County AI are incorrect; once analyzed, the 2000 census data for the 16 municipality consortium is calculated as 66.91% White, 21.49% Black/African American, 11.6% Other, and 15.17% Hispanic ethnicity. The 2000 Census data for Dallas County is:

2,218,899 total population; 58.35% White; 20.31% Black/African American; 21.34% Other; and 29.87% Hispanic ethnicity. The consortium population of 254,782, as reflected in the 2010 Dallas County AI, is slightly less than 11.5% of the total population of the county's jurisdiction, so the County's AI is completely inadequate in analyzing impediments to fair housing within its jurisdictional boundaries.

149.    The 2000 Census total population of Dallas County, including all of its 31 cities (some of which extend into the adjacent counties), is calculated as 2,523,943 people with 60.72% White, 18.74% African American, 20.55% Other Racial Minorities, and 27.70% Hispanic ethnicity. The 2010 Dallas County AI understates the Black/African American and Hispanic populations (10% and 15% respectively) of the 31 cities in Dallas County as a whole.

150.    On pages 5 and 6 of the 2010 Dallas County AI, the demographic data shown reflects data for only 12 of the 16 consortium municipalities. Demographic data for consortium members Combine, Highland Park, Hutchins, and University Park are missing from the chart, without explanation (Highland Park is 97.27% White; only .90% Black/AA; 1.83% Other Races; only 2.73% Hispanic ethnicity. University Park is 94.33% White; only 1.43% Black/AA; 4.24% Other Races; only 3.10% Hispanic ethnicity). This "missing data" is critical to an analysis of impediments to fair housing choice in the County's jurisdiction.

151.    On page 8 of the 2010 Dallas County AI, the median income data, as shown, reflects data for only 13 of the 16 consortium municipalities. Median Income data for consortium members Combine, Highland Park, and University Park are missing from the chart, without explanation (Household Median Income for Highland Park is $149,389, and for University Park is $151,418). Highland Park and University Park are the two highest median income areas in Dallas County.

152.   On page 9 of the 2010 Dallas County AI, the data included in the AI for Owner-Occupied and Renter-Occupied housing reflects data for only 13 of the 16 consortium municipalities. Data for consortium members Combine, Highland Park, and University Park are missing from the chart, without explanation. Once again, data critical to an analysis of impediments in the County's jurisdiction has not been included or considered in the AI.

153.   Comparison of the 2010 Dallas County AI with HUD's Suggested Format for the Analysis of Impediments demonstrate that the 2010 Dallas County AI is wholly deficient: (a) In the Introduction and Executive Summary of the Analysis, while there are numerous references to "staff" in the AI's introduction, it is not clear who actually conducted/prepared the AI; (b) the AI describes the participants of the AI process in an inadequate manner; (c) although the AI outlines the various sources of data reviewed, the methodology of how the data was analyzed is not discussed; (d) how the AI was funded is not included in the AI; (e) the Impediments Found  is not included in the Executive Summary of the AI;   (f) actions to address impediments is not included in the Executive Summary of the AI; (g) only partial demographic data is presented for the County's jurisdictional area, based on the 2000 U.S. Census instead of more up to date census data that was available; (h) detailed income data is not presented in the County's AI. Instead, statistics such as "median income" (2000 U.S. Census data) are presented. (i) there is an insignificant amount of "general, generic" employment data presented in the County's AI. No specifics regarding employment (or unemployment) for the County's jurisdiction are presented; (j) as for required Housing Profile information, the "Housing Stock Characteristics", included on pages 8 and 9 of the county's AI, do not satisfy HUD's requirement for a housing profile of the jurisdiction. For example, the simplest of questions (like "how many residential units are available for sale to low/moderate income households in the jurisdiction?", "how many

residential units are available for rent to low/moderate income households in the jurisdiction?",

"does the demand for affordable housing in the jurisdiction outstrip supply?") have not been

addressed in the County's AI; (k) there are no maps included in the County's AI; (l) no

additional "relevant" jurisdictional background data is included in the County's AI; (m) although

the County's AI mentions 83 discrimination complaints filed with HUD from 1999 to 2008, the

outcome of the complaints is not presented; (n) the County failed to include the Sunnyvale

litigation in its AI; (o) the County makes some general, broad statements regarding segregation

in its jurisdiction, but fails to analyze the segregation and does not identify the segregation as a

trend or pattern; (p) no other concerns about fair housing or problems are included in the

County's AI.

153.   In addition, the 2010 Dallas County AI deviates from HUD's Suggested Format

for the Analysis of Impediments demonstrate and is also wholly deficient with respect to

Identification of Impediments to Fair Housing Choice, as follows: (a) for the Public Sector,

Zoning and Site Selection these topics have not been addressed in the County's AI; (b) for

Neighborhood Revitalization, Municipal and Other Services, Employment-Housing-

Transportation Linkage, these topics have not been addressed in the County's AI; (c) for PHA

and Other Assisted/Insured Housing Provider Tenant Selection Procedures; Housing Choices for

Certificate and Voucher Holders, although information regarding policies and procedures for

Section 8 Voucher programs of Dallas County, Lancaster, and Balch Springs are discussed in the

AI, there is no information presented regarding "housing choices". In addition, the AI describes

the overwhelming need for assistance, but does not include this as an impediment to fair housing

choice. (d) as for Sale of Subsidized Housing and Possible Displacement, these topics have not

been discussed in the County's AI; (e) as for Property Tax Policies, the property tax policies of

Dallas County are not included in the AI. For example, there is no discussion regarding the County's policy for participation in the City of Dallas TIF Districts. Nor is there any information regarding the County's granting of tax abatements. There is no information presented regarding the property tax policies of the consortium members, and any affects or impediments that may be caused by same. (f) as for Planning and Zoning Boards, while information on these topics is presented for Dallas County, there is no information presented for the consortium members, nor other municipalities in Dallas County's jurisdiction; (g) as for Building Codes (Accessibility), information regarding Building Codes and code enforcement within the consortium municipalities is not presented in the AI; (h) as for the "Private Sector, Lending Policies and Practices," despite the statement "The HMDA data analysis for Dallas County … indicates that there may be issues of concern in mortgage lending," the County has not identified these concerns as an impediment to fair housing choice in its AI; (i) as for "Public and Private Sector Fair Housing Enforcement," aside from the mention of 83 Fair Housing complaints, the AI includes no other information on Fair Housing enforcement; (j) as for "Informational Programs" the AI concludes that the County needs to "increase (the) public's understanding of Fair Housing laws" through more effective informational programs; (k) as for "Visitability in Housing," this topic is not addressed in the County's AI; (l) as for addressing "[w]here there is a determination of unlawful segregation or other housing discrimination by a court or a finding of noncompliance by HUD under Title VI of the Civil Rights Act of 1964 or Section 504 of the Rehabilitation Act of 1973, or where the Secretary has issued a charge under the Fair Housing Act regarding assisted housing within a recipient's jurisdiction, an analysis of the actions which could be taken by the recipient to help remedy the discriminatory condition, including actions involving the expenditure of funds by the jurisdiction," the county's AI contains no information on this topic;

(m) as for "Assessment of Current Public and Private Fair Housing Programs And Activities in the Jurisdiction," the AI contains no "assessment" of these programs and activities; (n) in the "Conclusions and Recommendations," only one impediment to fair housing choice, "lack of awareness about fair housing", has been identified in the County's AI; (o) the County's AI does not include a signature page.

154.    Large portions of the county's 2010 AI are merely copied verbatim from the previous 2003 Dallas County AI, making the 2010 Dallas County AI largely a "cut and paste" of the previous AI. It is obvious that the 2010 Dallas County AI was carelessly prepared, resulting in numerous errors, incompleteness, and inaccuracies outlined above.

155.    : The HUD Fair Housing Planning Guide, and other guidance from HUD, requires that entitlement jurisdictions update their AI's every 3 to 5 years, and "on" the consolidated plan cycle for the jurisdiction. Dallas County produced its Analysis of Impediments in 1996 (meeting the FHP Guide February, 1996 deadline), then nearly eight years later in December of 2003, and most recently in December of 2010, seven years after the 2003 AI was completed. Dallas County's Consolidated Planning cycle is every five years, with Consolidated Plans having been submitted to HUD for 2001-2005, and 2006-2010. The county's December, 2010 AI was no doubt completed in anticipation of the upcoming 2011-2005 Consolidated Plan submission. However, Dallas County should have produced or updated its AI in 2000, to coincide with the 2001-2005 Consolidated Plan cycle, and again in 2005, to coincide with the 2006-2010 Consolidated Plan cycle. The timing of the completion of AI's by Dallas County has produced two "gaps" of 3 years and 2 years each where the county did not have a (then) current Analysis of Impediments.

156.   Dallas County chose to utilize nearly 10 year old data from the 2000 Census for its AI, despite that 2009 data was readily available from the U.S. Census Bureau.  By the time the County prepares to complete its next AI, the data in the current AI will be nearly 15 years old. Data from the U.S. Census Bureau American Factfinder shows that the 2009 population of Dallas County increased by nearly 10.5%, to 2,451,730 people, since the 2000 Census. During the same timeframe, the population of the municipalities participating in the County's CDBG program increased by 19.84%, nearly twice the rate of population growth of the County as a whole. Even more significant is the population growth that occurred in the Southern participating municipalities during this timeframe, where the population increased by 23.12%, more than twice the rate of population growth of the County and nearly 63% greater than the growth rate of Northern participating municipalities (where the population increased by 14.19% during the time period). Given the racial, ethnic, and economic characteristics for the Southern municipalities (outlined in detail below), the self-described segregation outlined in Dallas County's AI has accelerated (and is accelerating) significantly since the 2000 Census.

157.   Although demographic data for some of the consortium municipalities is included within Dallas County's 2010 AI, very little, if any, analysis has been performed, and no conclusions have been drawn from the presented or available data. The demographic data for each of the consortium municipalities could have been analyzed/compared/contrasted against the county's combined consortium demographic profile. This analysis, if it had been performed, would have revealed the significant segregation that exists within the consortium (and extends throughout the County). That analysis reveals the following; the demographic profile of the Dallas County Consortium is a population of 286,948, 98,790 households, average household size of 2.9 persons, 66.91% White, 21.49% Black/African American, 11.60% Other Races,

15.17% Hispanic ethnicity, household median income of $69,925, with 6.54% of the population below the poverty line. The demographic profile of the consortium municipalities located in the Northern portion of Dallas County (Coppell, Farmers Branch, Highland Park, Sachse, and University Park) is a population of 105,383 (36.73% of the consortium total population), 36,791 households, average household size 2.86 persons, 85.98% White (128.5% more white than the consortium), only 2.56% Black/African American (88.09% less black than the consortium, 11.46% Other Races, 13.75% Hispanic ethnicity (9.36% less Hispanic than the consortium), $103,636 median household income (48.21% higher than the consortium average), with 4.31% of the population below the poverty line (34.1% lower than the consortium average). The demographic profile of the consortium municipalities located in the Southern portion of Dallas County (Balch Springs, Cedar Hill, Cockrell Hill, Combine, DeSoto, Duncanville, Glenn Heights, Hutchins, Lancaster, Seagoville, and Wilmer) is a population of 181,565 (63.27% of the consortium total population), 61,999 households, average household size 2.93 persons, 55.85% White (16.53% less white than the consortium), 32.47% Black/African American (51.09% more AA than the consortium), 11.68% Other Races, 15.99% Hispanic ethnicity (5.4% more Hispanic than the consortium), $49,920 median household income (28.6% lower than the consortium average), with 7.84% of the population below the poverty line (19.88% higher than the consortium average). Clearly, this analysis shows the extreme segregation that exists between the northern and southern consortium municipalities, but it is not included in the Dallas County AI's.

158.    Furthermore, census data could have been (and should have been) analyzed in the Dallas County AI's for each one of the consortium members. A detailed review of demographics for each of the 16 consortium members reveals the segregation that exists among the individual municipalities. For example, there is no mention in the AI of the racial and ethnic segregation

that is apparent in Cockrell Hill, where 55.37% of the population are racial minorities, and a staggering 84.15% of the population is Hispanic (nearly 182% more Hispanic than Dallas County as a whole). Similarly, DeSoto's population is 51.17% racial minorities, with 45.53% of the population being Black/African American. Another example is Hutchins, which has a 56.93% racial minority population. Lancaster's population is 62.37% racial minorities, with 53% of the population being African American (nearly 161% more African American than Dallas County as a whole). Wilmer is 52.11% racial minorities, with 41.5% of the population being Hispanic (nearly 39% more Hispanic than Dallas County as a whole). Conversely, Combine (94.35% White), Seagoville (78.76% White), Coppell (83.23% White), Farmers Branch (78.38% White), Highland Park (97.27% White), Sachse (87.34% White), and University Park (94.33% White) all exhibit extremely low racial minority populations compared to Dallas County as a whole. Dallas County has failed to identify the highly segregated conditions that exist within the consortium municipalities, and has not identified any impediments to fair housing choice resulting from the segregated conditions in its AI's.

159. Within Dallas County's jurisdiction, there are 31 incorporated municipalities (it should be noted that the boundaries of several of the municipalities extend into the counties adjacent to Dallas County). Nine of these municipalities (Carrollton, City of Dallas, Garland, Grand Prairie, Irving, Lewisville, Mesquite, Richardson, and Rowlett) are entitlement jurisdictions that receive CDBG funding directly from HUD, and cannot participate in the county's consortium. These entitlement jurisdictions are required to prepare their own Analysis of Impediments, Consolidated Plans, Annual Plans, etc. Sixteen of the municipalities participate in the Dallas County CDBG program as members of the consortium (these municipalities are listed above). Curiously, there are six municipalities located within Dallas County's jurisdiction

44

that do not participate as consortium members (Addison, Ferris, Grapevine, Ovilla, Sunnyvale, and Wylie). There is no explanation in Dallas County's AI as to why these municipalities are not members of the consortium, nor are these municipalities included in Dallas County's AI.

160.   While the sixteen consortium municipalities are relevant to Dallas County's Consolidated and Annual Plans, since the County distributes some of the CDBG funds it receives from HUD to the consortium members, Dallas County's focus of its Analysis of Impediments only on the consortium members rather than preparing its AI for the entire Dallas County jurisdiction is flawed.

161.   On page 17 of Dallas County's 2010 AI, it states, "The County does not appear to be abusing its authority to establish minimum lot sizes in its unincorporated areas. Since these unincorporated areas rely exclusively upon private septic tanks to handle their wastewater disposal needs, the minimum lot sizes that the County imposes are solely based upon the lot's drainage, soil, water table and percolation characteristics and upon whether the proposed septic tank would adversely affect the environment or the public's health and are consistent with the guidelines established by the Texas Commission on Environmental Quality." As noted by the County, a one-acre minimum lot size is dictated by the on-site disposal systems being used in the unincorporated areas of the County. However, there is no mention of the possibility of extending sanitary sewer utilities (perhaps using CDBG funding) into these areas to allow for an increase in housing density, which would increase the value of the property (and taxes paid to the County), plus increasing the likelihood that affordable housing could be developed within Dallas County's unincorporated areas.

162.   While mentioned briefly in Dallas County's 2010 AI, Farmers Branch (one of the consortium municipalities) adopted an "anti-immigration" ordinance in 2006, including fining

landlords that rent to illegal aliens and allowing local authorities to screen illegal aliens in police custody. The measures also included a provision making English the official language of the city. The Hispanic population of Farmers Branch, at 37.23%, is among the highest concentrations of Hispanics of any municipality located in Dallas County. The passing of the ordinance by an overwhelming majority of the voters in a public referendum, in spite of the fact that it has never gone into effect because of several court challenges, signals high probabilities that those of Hispanic ethnicity will be scrutinized for housing opportunities at different levels than Non-Hispanics. However, Dallas County's 2010 AI does not conclude that the actions by Farmers Branch represent an impediment to fair housing choice, even though the ordinance included specific provisions that were targeted at housing.  :

163.    In 2005, a U.S. District Court determined that the city of Sunnyvale, Texas (a Dallas County municipality that does not participate in the Dallas County CDBG consortium) had zoning regulations that were discriminatory and made the development of affordable housing all but impossible. A ruling was handed down that year requiring the city to designate at least 70 affordable housing sites within three years. On March 22, 2010, US District Judge Reed O'Connor held Sunnyvale in contempt of court for failing to live up to a 2005 settlement agreement regarding affordable housing within the town limits. Dallas County is required by the HUD Fair Housing Planning Guide to have included this court ruling in its AI, however, Dallas County completely neglected to even mention Sunnyvale and failed to identify this impediment to fair housing choice which exists in the County's jurisdiction in the Dallas County 2010 AI.

### Defendants Knowingly Made False AFFH Certifications and False Statements to Get Claims Paid by HUD

164.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

165.  As part of the Consolidated Plan process, Dallas and Dallas County each annually submitted Action Plans, 24 C.F.R. § 91.220; *id.* § 91.420, that included applications for funding, as well as Dallas's and Dallas County's express certifications that they would AFFH, *see id.* § 91.225; *id.* § 91.425.

166.  Despite their respective failures to analyze the impediments to fair housing posed by discrimination and segregation and to take appropriate actions to address those impediments, Defendants, during the relevant time period, each knowingly submitted false certifications that they would: "affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard."

167.  DHA and DCHA each knowingly submitted false certifications annually between fiscal years 2000 and 2010. The certifications can be found as part of each of the approved PHA Plans annually submitted to HUD by DHA and DCHA, respectively.

168.  Defendants repeatedly and knowingly submitted to HUD claims for payment, including AFFH certifications, that were based upon false statements and certifications, including explicit and implicit representations that Dallas was complying with its AFFH obligations.

169.  Defendants further annually certify to HUD that they shall carry out the programs for which it is seeking funding in accordance with applicable HUD regulations.

170.  Defendants also further annually certify to HUD that the "housing activities to be undertaken with CDBG, HOME, ESG, and HOPWA funds are consistent with the strategic plan."

171.    Defendants annually certify to HUD that they will comply with section 3 of the Housing and Urban Development Act of 1968, and implementing regulations at 24 C.F.R. Part 135.

172.    Dallas and Dallas County also make specific CDBG certifications to HUD annually that it is in compliance with the requirements to receive CDBG funds, that it is in compliance with anti-discrimination laws and the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964 (42 USC § 2000d), the Fair Housing Act (42 USC §§ 3601-3619, and implementing regulations, and that it will comply with applicable laws.

173.    Dallas City Manager Mary K. Suhm submitted to HUD the above-referenced certifications on behalf of Dallas on July 29, 2002, August 15, 2003, August 13, 2004, August 12, 2005, August 11, 2006, August 13, 2007, August 15, 2008, and August 13, 2009.

174.    Additionally, Defendants Dallas County and DCHA have falsely certified their compliance with civil rights and fair housing laws as well as its obligations to AFFH.

175.    DCHA does not produce its own Analysis of Impediments ("AI"), but rather it collaborates with Dallas County in the preparation of the AI produced by Dallas County. DCHA prepares its own PHA Plans in which it has knowingly failed to meet, and has annually falsely certified to HUD that is in compliance with its obligations under civil rights and fair housing laws and to affirmatively further fair housing. DCHA has knowingly failed to affirmatively further fair housing. DCHA has knowingly submitted false certifications to obtain funding from HUD Public and Indian Housing.

176.    Separately from DCHA, Dallas County knowingly falsely certifies to HUD annually that it is in compliance with all requirements and legal obligations.

177.    On each occasion that Defendants made a certification of the type described herein, the total number of which during the false claims period is not currently known to Plaintiffs-Relators, and on each occasion that Defendants otherwise requested or demanded payment from the federal government based on having supposedly complied with the Fair Housing Act, the Community Development Act, and with its certification-based obligations, it committed a separate violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

178.    Therefore, for a jurisdiction to be eligible to receive federal housing funds, the federal statutes and regulations require the jurisdiction to certify to the United States Government that it will comply with the above-stated requirements. The annual certification by Dallas is a core prerequisite for its eligibility to request and receive CDBG funds, Public Housing funds and other housing funds from the United States. Defendants are ineligible to receive such funds without the certification of compliance with the above-stated requirements, including the AFFH obligation. As set forth above, Defendants knowingly violate these requirements and obligations.

179.    Dallas, through the signed annual certifications made by City officials, including City Manager Mary K. Suhm, in requesting and receiving tens of millions of dollars a year in CDBG funds and other housing funds, every year falsely certifies to HUD Defendant's compliance with its AFFH obligations and other federal laws and regulations. These false certifications were included in certifications submitted to HUD on behalf of Dallas on July 29, 2002, August 15, 2003, August 13, 2004, August 12, 2005, August 11, 2006, August 13, 2007, August 15, 2008, and August 13, 2009, and other certifications submitted annually.

180.    Likewise, Defendants Dallas County, DCHA, and DHA annually submitted their respective certifications in requesting funding and falsely certifying to HUD that each was in

compliance with AFFH obligations and other legal requirements.

181.    Defendants falsely induced the Government to approve and/or pay out CDBG and other housing funds, based on false promises and certifications made by Defendants to comply with their respective AFFH and other obligations.  The promises and certifications when made are false and the Government relied upon the promises and certifications in approving and paying out CDBG funds, Public Housing funds and other housing funds.  Upon making their false promises and certifications, Defendants knowingly engage in the illegal schemes described herein.

182.    As a result of their false certifications, Defendants, from 2001 through 2010, have improperly received at least $ 320 million in payments to the City of Dallas,: $30 million in payments to Dallas County, $1.90 billion to the DHA,  and $270 million to the DCHA, from HUD in housing and community development funding.

**COUNT I**

**(Violations of the False Claims Act
31 U.S.C. § 3729 (a)(1)(A)
Presenting False Claims for Payment)**

183.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

184.    Plaintiffs-Relator seek relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

185.    As set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of its requests for federal housing and community development-related grants and funding.

186.    The United States paid to Defendants housing and community development-

related grants and funding because of such false or fraudulent claims.

187.   In performing all of the acts described herein, Defendants have defrauded the United States of America by violating 31 U.S.C. §§ 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented/caused to be presented to the United States.

188.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

189.   By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

190.   Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest.

191.   . Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

192.   All Defendants are jointly and severally liable for all damages.

## COUNT II

**(Violations of the False Claims Act**
**31 U.S.C. § 3729 (a)(1)(B)**
**Use of False Statements and False Certifications)**

193.   The allegations contained in the above paragraphs are hereby realleged as set

forth fully above.

194. Defendants violated Section 3729(a)(1)(B) of the False Claims Act, as amended. As set forth above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal housing and community development-related grants and funding.

195. Defendants knowingly made false statements and false certifications in order to obtain payment of federal housing and community development-related grants and funding, with full knowledge that these false statements and false certifications would be material to the United States' decision to pay.

196. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

197. By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

198. Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest.

199. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

200. All Defendants are jointly and severally liable for all damages.

## COUNT III

### (Violations of 31 U.S.C. §3729(a)(1)(C))

201.   The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

202.   Defendants conspired with one another to commit the violations of the False Claims Act, 31 U.S.C. § 3729(a), described above in Counts I-II.

203.   In performing all of the acts described herein, Defendants have defrauded the United States of America by conspiring to violate 31 U.S.C. §§ 3729(a)(1)(A), (B), (D) and (G), in contravention of the False Claims Act, U.S.C. §3729(a)(1)(C), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented/caused to be presented to the United States.

204.   As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

205.   Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

206.   Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

207.   All Defendants are jointly and severally liable for all damages under this count.

## COUNT IV

### (Violations of 31 U.S.C. § 3729(a)(1)(D))

208.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

209.     Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(D) by withholding or failing to return some or all of the monies received from the Government pursuant to the HUD grant and other housing programs.

210.     Defendants have or had possession, custody or control of money or other financial instruments that Defendants knowingly converted for uses other their intended purposes pursuant to HUD and government requirements. By knowingly converting Government housing funds for improper uses, and failing to deliver or causing to be delivered less than all of the money owed the Government, Defendants have violated the False Claims Act.

211.     The United States Government has not received and Defendants continue to withhold money, property, and financial instruments as a result of Defendants' conduct.

212.     Government agencies missing payments and financial instruments include but are not limited to the U.S. Department of Housing and Urban Development.

213.     Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all monies, and the value of all financial instruments withheld by Defendants, treble damages and interest.

214.     Each instance of a knowingly false withholding from the government by Defendants is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

215.     All Defendants are jointly and severally liable for all damages under this count.

## COUNT V

## ("Reverse" False Claims Act Violations and Other Violations of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G))

216.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

217.   Defendants violated 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government.

218.   Defendants also violated 31 U.S.C. § 3729(a)(1)(G) by knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment of funding received from HUD and the Government.

219.   By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to pay the Government by Defendants and to knowingly convert funds for improper uses, Defendants violated the False Claims Act.

220.   By knowingly concealing and improperly avoiding or decreasing its obligation to pay or return funds to the Government Defendants violated the False Claims Act.

221.   By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to refund the Government for any overpayment of funds the Defendants violated the False Claims Act.

222.   By knowingly submitting express and implied false certifications for government funding material to an obligation to refund the Government for any overpayment of said funds, Defendants have violated the False Claims Act.

223.   By knowingly concealing and improperly avoiding or decreasing its obligation to repay the Government for overpayment of funds, the Defendants have violated the False Claims Act.

224.   The United States Government has paid and continues to pay false claims as a result of Defendants' false records and statements. Government agencies making these payments include but are not limited to the Department of Housing and Urban Development.

225.   Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all knowingly false claims that Defendants submitted or caused to be submitted.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

226.   Each instance of a knowingly violation or false claim to the government or false record for payment created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

227.   All Defendants are jointly and severally liable for all damages under this count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs-Relators, request that judgment be entered in their favor and against defendant Defendants as follows:

(a) That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained;

(b)  That because all Defendants are responsible for submitting false claims, using false records or statements to get such claims paid, submitting false certifications, failing to disclose the falsity of their claims, conspiring to submit false claims, and using false records or statements to hide the fact that replacements and/or refunds were due, all Defendants are jointly and severally liable for the full amount of damages and civil or criminal penalties awarded in this case;

(c)  That each and every Defendant be held jointly and severally liable for a civil penalty not to exceed $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation;

(d)  That Plaintiffs-Relators be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

(e)  That Plaintiffs-Relators be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds of the action or settlement of the claims or alternative remedies under the False Claims Act, 31 U.S.C. § 3730(c)(5), (d);

(f)  That Plaintiffs-Relators be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(g)  That Plaintiffs-Relators be granted a trial by jury;

(h)  That Plaintiffs-Relators and the United States be awarded pre-judgment interest;

(i) That Plaintiffs-Relators be granted any and all preliminary and permanent injunctive

relief, as appropriate;

(j) That Plaintiffs-Relators be granted any and all other relief set forth in the False Claims

Act which was not specifically referenced above;

(k) That Plaintiffs-Relators be granted all other relief as may be appropriate.

### JURY TRIAL DEMANDED

DATED: February 22, 2011.                    Respectfully submitted,

GILLESPIE, ROZEN & WATSKY, P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, Texas 75204
Tel.:   (214) 720-2009
Fax:   (214) 720-2291
E-mail: hkg@grwlawfirm.com
          jsanford@grwlawfirm.com

By: _____.
      Hal K. Gillespie
      *Attorney-in-Charge*
      Texas Bar No. 07925500
      James D. Sanford
      Texas Bar No. 24051289

          - and -

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Tel:   (202) 342-6980
Fax:   (202) 342-6984
E-mail: dc@kkc.com
          dz@kkc.com

David K. Colapinto
Dean A. Zerbe
*Application to Appear Pro Hac Vice*

JS 44 (TXND Rev. 2/10)

# CIVIL COVER SHEET

*SEALED*

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

U.S. ex rel. Curtis Lockey and Craig MacKenzie

## DEFENDANTS

City of Dallas, et al.

*RECEIVED*
*FEB 22 2011*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF TEXAS*

**(b)** County of Residence of First Listed Plaintiff    San Diego County, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

See attachment.

Attorneys (If Known)

**3-11CV0354-0**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. 3729 et seq.

Brief description of cause:
False Claims Act/false and fraudulent claims to government

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $    unliquidated

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED: (See instructions)

JUDGE _____ DOCKET NUMBER _____

DATE   February 22, 2011

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse  (TXND Rev. 2/10)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.   **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), Fed. R. Civ. P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers, or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress, or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**      Example      U.S. Civil Statute: 47 USC 553
                                                   Brief Description: Unauthorized reception of cab e service

VII.   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, Fed. R. Civ. P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference cases that are related to this filing, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is "related" to this filing if the case: (1) involves some or all of the same parties and is based on the same or similar claim; (2) involves the same property, transaction, or event; (3) involves substantially similar issues of law and fact; and/or (4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

GILLESPIE, ROZEN & WATSKY, P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, Texas  75204
Tel.:    (214) 720-2009
Fax:    (214) 720-2291
E-mail: hkg@grwlawfirm.com
            jsanford@grwlawfirm.com

Hal K. Gillespie
Texas Bar No. 07925500
James D. Sanford
Texas Bar No. 24051289

- and -

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C.  20007-2756
Tel:     (202) 342-6980
Fax:     (202) 342-6984
E-mail:  dc@kkc.com
             dz@kkc.com

David K. Colapinto
Dean A. Zerbe
*Application to Appear Pro Hac Vice*