UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

—————————————————————
                                            )
UNITED STATES OF AMERICA, *ex rel.,*        )
                                            )
CURTIS LOCKEY                               )
100 Coast Blvd., Suite 302                  )
San Diego, CA  92037                        )
                                            )     No. 3:11-cv-00354-O
and                                         )
                                            )
CRAIG MacKENZIE                             )
1500 Jackson Street                         )     FIRST AMENDED COMPLAINT
Dallas, TX  75201                           )
                                            )     **JURY TRIAL DEMANDED**
                    Plaintiffs-Relators,    )
                                            )
                                            )
v.                                          )
                                            )
CITY OF DALLAS, TEXAS,                      )
c/o Dallas Attorney's Office                )
Dallas City Hall                            )
1500 Marilla Rm 7DN                         )
Dallas, TX  75201-6622                      )
                                            )
DALLAS HOUSING AUTHORITY,                   )
3939 North Hampton Road                     )
Dallas, TX  75212                           )
                                            )
                                            )
                    Defendants.             )
—————————————————————)

## PRELIMINARY STATEMENT

1.     This is a civil action brought by Plaintiffs-Relators Curtis Lockey and Craig

MacKenzie on behalf of themselves and the United States of America ("United States") against

the City of Dallas, Texas ("Dallas" or the "City") and Dallas Housing Authority ("DHA"),

(collectively, the "Defendants") to recover, under the False Claims Act, 31 U.S.C. §§ 3729 *et*

*seq.* (the "False Claims Act"), damages sustained by, and penalties owed to, the United States as

the result of Defendants having knowingly presented or caused to be presented to the United States false claims to obtain federal housing and community development funds, as more specifically detailed *infra*.

2.      To the best of Plaintiffs-Relators' belief, the City has improperly received at least $238,410,207 in federal funds, and DHA has received at least $1.14 billion in federal funds during the last six years as a consequence of making false statements, claims and certifications to the United States.

3.      In filing this First Amended Complaint, Plaintiffs-Relators intend to dismiss, without prejudice, those claims asserted in the original Complaint against Dallas County and the Dallas County Housing Agency.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims brought herein pursuant to 28 U.S.C §§ 1331 and 1345, 31 U.S.C. § 3730.

5.      Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), as well as 31 U.S.C. § 3732(a), because Defendants are located in this District, Defendants do business in this District, and the acts complained of herein took place in this District.

6.      To the best of Plaintiffs-Relators' knowledge, prior to the filing of their original Complaint, under seal, on February 22, 2011, there had been no public disclosure of the allegations contained in this Complaint.  In the event that a public disclosure has occurred, Plaintiff-Relators are an original source of all such disclosures.

7.      Prior to filing their original Complaint, Plaintiffs-Relators made comprehensive disclosures to the government containing substantially all of the allegations made herein, as well as supporting documents.

8.      Pursuant to the requirements of the False Claims Act 31 U.S.C § 3729, *et seq.*, Plaintiffs-Relators have provided the government with a confidential disclosure statement and served them with copies of their original Complaint.

## PARTIES

9.      The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

10.      Plaintiff-Relator Curtis Lockey resides in California, and he is an original source of the allegations set forth herein.

11.      Plaintiff-Relator Craig MacKenzie resides in Texas, and he is an original source of the allegations set forth herein.

12.      Defendant City of Dallas, Texas is a municipal corporation as defined by the laws of the State of Texas.   The City is a recipient of federal funds from the U.S. Department of Housing and Urban Development ("HUD").   For at least six years prior to the filing of the original Complaint, it received such funds through the misconduct alleged herein.

13.      Defendant Dallas Housing Authority is an agency of the City and receives funds directly from HUD.   For at least six years prior to the filing of the original Complaint, it received such funds through the misconduct alleged herein.

## FACTS

### HUD Funding and Obligation
### to Affirmatively Further Fair Housing

14.      The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

15.      The United States grants housing and community development-related funding to

states, counties, public housing authorities, and municipalities.

16.     The City of Dallas is a municipality located in the State of Texas and the Dallas Housing Authority is an agency of the City of Dallas.

17.     Throughout the period beginning February 22, 2005 and continuing through the present (the "False Claims Period"), Defendants applied to HUD for federal housing and community development funds.

18.     Defendants made claims for and received payments of such grant funds from the United States throughout the False Claims Period.

19.     As a condition to receipt of these federal housing and community development funds, Defendants were required to certify that they had complied, and would comply prospectively, with a number of civil rights certifications, including the obligation to affirmatively further fair housing ("AFFH"), pursuant to the Fair Housing Act and the Housing and Community Development Act of 1974, as amended, and related authorities.

20.     Specifically, Defendants, as grant recipients, were required to make certifications to HUD that, *inter alia*, each "grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." *See* 42 U.S.C. § 5304(b)(2); *see also* 42 U.S.C. §§ 3608(e)(5), 12705(b)(15); 24 C.F.R. §§ 91.225, 570.601, 570.602, 903.7(o) (collectively, the "federal civil rights obligations").

21.     Defendants were aware of their AFFH and other federal civil rights obligations prior to and during the relevant time period.

22.     In requesting and receiving millions of dollars annually the City and DHA have, independently and in concert with one another, engaged in a protracted course and pattern of fraudulent conduct to submit false claims for payment to, and sought approval by, the United

States.  Specifically, the City and DHA falsely represented, throughout the False Claims Period, that they were in compliance with their federal civil rights certifications, which certifications are a precondition for eligibility for the federal housing and community development funds at issue in this litigation.

23.     Defendants had, and continue to have, actual knowledge that they are not complying with their civil rights obligations, including the obligation to AFFH, that their representations of compliance were and are false, and that Defendants therefore were and are submitting false or fraudulent representations of compliance.

24.     Alternatively, Defendants act and have acted with deliberate indifference and/or reckless disregard as to the truth or falsity of their claims, statements and certifications of compliance.

25.     Plaintiffs-Relators assert causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B); for violations of 31 U.S.C. § 3729(a)(1)(D), for failing to return money or property belonging to the United States; for violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government, and/or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment.

26.     Plaintiffs-Relators allege that the violations of 31 U.S.C. § 3729, *et seq.,* by

Defendants, as set forth herein, are continuing and ongoing.

**Distinction Between AFFH Actions and Affordable Housing Activities**

27.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

28.     As a precondition for receiving federal funds such as those available under the Community Development Block Grant ("CDBG"), HOME Investment Partnership ("HOME"), Emergency Shelter Grant ("ESG") and Housing Opportunities for People with AIDS ("HOPWA") programs (collectively, the "block grant funds") administered by HUD, the City was required to conduct an Analysis of Impediments ("AI") to fair housing choice.  *See* 24 C.F.R. §§ 91.225, 570.601, 570.602.

29.     As a precondition for receiving block grant funds, the City is obligated to certify annually that it has complied with requirements of the previous paragraph.

30.     As a precondition for receiving federal funds from HUD's office of Public and Indian Housing ("PIH funds"), DHA was required, as part of its Public Housing Plan, to conduct a similar analysis of its programs, identify fair housing impediments, address those impediments and work with its local government entity to implement initiatives to AFFH.  24 C.F.R. § 903.7(o)(3).

31.     As a precondition for receiving PIH funds, DHA is obligated to certify annually that it has complied with requirements of the previous paragraph.

32.     Prior to the False Claims Period, the City and DHA received and/or had access to a copy of the HUD Fair Housing Planning Guide.  *See* U.S. Dept. of HUD, Fair Housing Planning Guide (1996) ("HUD Guide").

33.     The HUD Guide provides guidance to help grantees fulfill the "fair housing

requirements" related to block grant and PIH funds.  While these requirements apply by virtue of receipt of federal block grant funds, the "AFFH obligation extends to all housing and housing-related activities in the grantee's jurisdictional area whether publicly or privately funded."  HUD Guide at 1-3.

34.    For most of the False Claims Period, Defendants were on notice that the HUD Guide had been held to be "firmly rooted in the statutory and regulatory framework [for AFFH] and consistent with the case law," and therefore "persuasive" on the scope of a recipient's obligations to thoroughly analyze race-based impediments in each Analysis of Impediments.  *See U.S. ex rel. Anti-Discrimination Ctr. v. Westchester County, N.Y.*, 495 F. Supp. 2d 375, 387 (S.D.N.Y. 2007).

35.    The HUD Guide explains the distinction between AFFH actions and affordable housing activities:  "The two concepts are not equivalent . . . . When a jurisdiction undertakes to build or rehabilitate housing for low- and moderate-income families, for example, this action is not in and of itself sufficient to affirmatively further fair housing. . . . When steps are taken to assure that the housing is fully available to all residents of the community, regardless of race, color, national origin, gender, handicap, or familial status, those are the actions that affirmatively further fair housing."  HUD Guide at 5-4.

36.    Furthermore, Defendants were on notice that an AI must analyze whether the geographic location of affordable housing expands housing choice or simply perpetuates segregation.  *See U.S. ex rel. Anti-Discrimination Ctr. v. Westchester County, N.Y.,* 668 F. Supp. 2d 548, 564-65 (S.D.N.Y. 2009) (relying on HUD Guide for holding that "simply providing affordable housing for the low-income population 'is not in and of itself sufficient to affirmatively further fair housing,'" and that "providing more affordable housing for a low

income racial minority will improve its housing stock but may do little to change any pattern of discrimination or segregation.   Addressing that pattern would at a minimum necessitate an analysis of where the additional housing is placed").

37.     At all times during the relevant time period, each of the Defendants was aware of that distinction in connection with their AFFH obligations.

### Analyses of Impediments and City's Obligation to
### Consider Racial and Ethnic Discrimination and Segregation

38.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

39.     To comply with its obligations to AFFH, the City was required to undertake three tasks:   "[i] conduct an analysis to identify impediments to fair housing choice within the jurisdiction, [ii] take appropriate actions to overcome the effects of any impediments identified through that analysis, and [iii] maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1); *see also* 24 C.F.R. § 570.601(a)(2).

40.     In identifying impediments to fair housing choice as part of its AFFH responsibilities, the City had an obligation to consider and analyze impediments erected by racial and ethnic discrimination or segregation.

41.     If impediments erected by racial and ethnic discrimination or segregation existed, the City had a further AFFH obligation to take appropriate actions to overcome the effects of those impediments, and to maintain records reflecting the analysis and such actions.

42.     Prior to and during the False Claims Period, the City was aware of its AFFH obligations to analyze and take appropriate actions to overcome impediments erected by racial and ethnic discrimination or segregation.

43.     On information and belief, prior to and during the False Claims period, agents or employees of the City with responsibility for the administration of the block grant programs attended HUD-sponsored training concerning AFFH and the proper preparation of an AI.

44.     Through such training, HUD provided the City's agents or employees training materials indicating that the City had a legal obligation to analyze the extent of racial and ethnic segregation in Dallas and to ascertain the causes of such segregation in order to overcome the negative effects experienced by minority groups.

45.     The HUD Guide directs the City, in fulfilling its AFFH obligation, to, *inter alia*, "[a]nalyze and eliminate housing discrimination in the jurisdiction" and "[p]rovide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin."  HUD Guide at 1-3.

46.     The HUD Guide advises recipients, including the City, to conduct an AI that includes an "assessment of conditions, both public and private, affecting fair housing choice for all protected classes."  *Id*. at 2-7.

47.     The HUD Guide defines impediments as "actions, omissions or decisions" that "restrict housing choices or the availability of housing choices," or that have the effect of doing so, based on "race, color, religion, sex, disability, familial status, or national origin," including "[p]olicies, practices, or procedures that appear neutral on their face."  *Id*. at 2-8, 2-16 to 2-17.

48.     The AI format outlined in the HUD Guide includes a housing profile describing "the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; [and] how segregation and restricted housing supply occurred."  *Id*. at 2-28.  A plan that fails to "consider the existence and impact of race discrimination on housing opportunities and choice in its jurisdiction" does not meet federal AFFH standards.  *Westchester,*

495 F. Supp. 2d at 387.

49.     HUD initially distributed the HUD Guide and other fair housing planning materials to the City and other recipients of block grant funds in 1995.

50.     Through a 2004 memorandum titled "Analysis of Impediments to Fair Housing Choice Reissuance," HUD put the City on notice that HUD expected the City's AI to conform to the instructions provided in the HUD Guide.

### Consolidated Plans and Their Relationship to Analyses of Impediments

51.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

52.     As a condition of receiving federal block grant funds, the City must periodically produce, and submit to HUD, a Consolidated Plan that, *inter alia*, describes the grantee's "general priorities for allocating investment geographically within the jurisdiction . . . and among different activities and needs" for affordable housing, public housing, homelessness, other special needs (including the elderly, disabled, persons with alcohol or drug addiction, persons with HIV/AIDS and their families, and public housing residents), and non housing development pursuant to the CDBG program.  24 C.F.R. § 91.215.

53.     The Consolidated Plan serves as:  (i) a planning document for the grantee; (ii) a submission for federal funds under HUD's block grant programs; (iii) the strategy to be followed in carrying out HUD programs; and (iv) a management tool for assessing performance and tracking results.  24 C.F.R. § 91.1(b).

54.     The HUD Guide cautions grantees that:   "[T]he explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing

conditions more severe for certain groups in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups." HUD Guide at 2-20 to 2-21.

55.     Page 2-27 of the HUD Guide also informed Dallas that:  "The Consolidated Plan contains information about housing conditions in the jurisdiction for lower-income minority and other lower-income households.  If lower-income housing is in short supply, it should be the focus of the housing affordability strategy."  *Id*. at 2-27.  According to the Dallas Mayor's Task Force on Affordable Housing, Dallas has a severe shortage of between 20,000 and 30,000 low income housing units.  However, neither the City's AI nor the City's Consolidated Plan contain a housing affordability strategy to address this short supply, as provided in the HUD Guide.

56.     Pages 2-28 and 2-29 of the HUD Guide informed Defendants that: "Jurisdictions should discuss issues in each of the areas reviewed for the AI and finish with a conclusion (e.g., because of a PHA's [public housing agency's] historical tenant and site selection policies and practices, the PHA's public housing developments are segregated by race or ethnicity). Conclusions require appropriate actions by the jurisdiction to assist in eliminating such problems."  *Id*. at 2-28 to 2-29.

57.     The HUD Guide informed Dallas that:

The AI is a comprehensive review of a jurisdiction's laws, regulations, and administrative policies, procedures, and practices affecting the location, availability, and accessibility of housing, as well as an assessment of conditions, both public and private, affecting fair housing choice.  The AI is a review of impediments to fair housing choice in the public and private sector.  Impediments to fair housing choice are any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin that restrict housing choices or the availability of housing choices, or any actions, omissions, or decisions that have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin.  Policies, practices, or procedures that appear neutral on

their face but which operate to deny or adversely affect the provision of housing to persons of a particular race, color, religion, sex, disability, familial status, or national origin may constitute such impediments. Impediments include actions or omissions in the jurisdiction's public or private housing sector that:

- Constitute violations, or potential violations, of the Fair Housing Act

- Are counterproductive to fair housing choice, such as NIMBYism:

  – Community resistance when minorities, persons with disabilities and/or low-income persons first move into White and/or moderate- to high income areas

  – Community resistance to the siting of housing facilities for people with disabilities in residential neighborhoods based on their disabilities

  – Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin.

Upon completion of its AI, a jurisdiction should take actions that are responsive to any identified impediments. The AI should encompass all housing within a jurisdiction and should not be limited to housing assisted or subsidized by the Federal, State, or local government.

HUD Guide at 4-4 to 4-5.

58.     The HUD Guide on page 2-7 further informed Defendants that: "The AI is a

review of impediments to fair housing choice in the public and private sector. The AI involves:

- A comprehensive review of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices

- An assessment of how those laws, etc. affect the location, availability, and accessibility of housing

- An assessment of conditions, both public and private, affecting fair housing choice for all protected classes

- An assessment of the availability of affordable, accessible housing in a range of unit sizes."

HUD Guide at 2-7.

59.     Neither the December 1998 AI nor the July 2007 AI contains these assessments.

60.     Page 2-17 of the HUD Guide informed Defendants that:  "Impediments to fair housing choice include actions or omissions in the State or Entitlement jurisdiction that:

- Constitute violations, or potential violations, of the Fair Housing Act

- Are counterproductive to fair housing choice, such as:

  – Community resistance when minorities, persons with disabilities and/or low-income persons first move into white and/or moderate- to high-income areas

  – Community resistance to the siting of housing facilities for persons with disabilities because of the persons who will occupy the housing

- Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin."

HUD Guide at 2-17.

61.     The HUD Guide informed Defendants as follows:

Where the community planning and development perspective looks directly at needs for housing and possible barriers to meeting those needs, the fair housing perspective focuses as much on the causes of needs of groups or persons protected by the Fair Housing Act as it does on the needs themselves. Thus, the explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing conditions more severe for certain groups in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups.

HUD Guide at 2-20 to 2-21.

### The City's Analyses of Impediments

62.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

63.     The City prepared an initial fair housing plan in 1993, prior to the issuance of the HUD Guide, and completed an initial AI in 1998.  The City failed to update its 1998 AI, or to complete a new AI, until 2007.  None of these efforts complies with HUD regulations or the

HUD Guide because none adequately assesses the scope of actual impediments faced by blacks and Latinos or honestly analyzes the impact of City policies on housing choice for those populations.

64.     The 1993 fair housing plan, the 1998 AI and the 2007 AI amount to assessments of affordable housing needs, but fail to consider the extent of racial and ethnic segregation—either before or after the City invested funds to support affordable housing—in Dallas.  Nor do they assess the impact of the location of affordable housing units on fair housing choice for members of racial and ethnic minority groups.  As a consequence, none of these planning efforts complies with the obligation to AFFH, and any certification based upon them amounts to a false statement.

65.     Neither the December 1998 AI nor the July 2007 AI contains any assessment of "community resistance" or "NIMBY(Not In My Back Yard)ism" impediments that exist in the jurisdiction, as contemplated by the HUD Guide.

66.     Although the City continued to certify AFFH compliance, from 1998 to the present, as part of its applications for block grant funds, those certifications were false because the City was not in compliance with those certifications for any year during that period, either because its AI was incomplete or because it was not current.  Plaintiffs-Relators seek to recover funds the City received during the False Claims Period because of those false statements.

**The City Undertook No Analysis, Before or During the False Claims Period, of Whether Its Housing Efforts Had the Effect of Perpetuating or Increasing Segregation**

67.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

68.     Prior to and during the relevant time period, the City was aware of the racial and

ethnic makeup of the City of Dallas.

69.    While reporting statistics evidencing racial and ethnic segregation in the 1998 and 2007 AIs, the City fails altogether to analyze the fair housing impediments erected by such segregation, and fails altogether to take appropriate actions to overcome such impediments.

70.    For municipal planning purposes, the City has defined a "Southern Sector," located south of the RL Thornton Freeway (I-30) and west of the Trinity River at its intersection with I-30.   Conversely, the City has defined a "Northern Sector," located north of the RL Thornton Freeway (I-30) and east of the Trinity River at its intersection with I-30.

71.    The Southern Sector and Northern Sector are almost equal land masses.   The Southern Sector contains 180 square miles of land, and the Northern Sector contains 177 square miles of land.

72.    According to the 2000 Census data, the City of Dallas total population is about 1,262,000 people, making Dallas the ninth largest city in the United States.   More than 62% of Dallas' population lives in the Northern Sector, with less than 38% of the population living in the Southern Sector.

73.    Of the City's 511,000 total Housing Units, nearly 69% are located in the Northern Sector and about 31% are located in the Southern Sector.

74.    Of Dallas' 1,262,000 residents, 36.4% are white.  The remaining 63.6% are black, Hispanic, or from other racial or ethnic minority groups.

75.    In the Northern Sector, 49.7% of the residents are white.  The remaining 50.3% of Northern Sector residents are black, Hispanic, and other impacted minorities.

76.    In the Southern Sector, only 14.1% of the residents are white.  The remaining 85.9% of Southern Sector residents are black, Hispanic or from other racial or ethnic minority

groups.  In the Northern Sector, only 13.61% of the residents are black.  In contrast, 42.47% of Southern Sector residents are black.

77.    Of the 17 zip codes comprising the Southern Sector, 8 of the areas (75249, 75236, 75237, 75232, 75216, 75241, 75215 and 75210) have majority (greater than 50%) black populations.  Six of the zip codes contain highly concentrated black populations that exceed 75%:  75237 at 88.6%; 75232 at 76.6%; 75216 at 78.3%; 75241 at 93%; 75215 at 85.3%; and 75210 at 84%.

78.    Of the 17 zip codes comprising the Southern Sector, only one of the areas (75253) has a majority (greater than 50%) white population.  Of the 31 zip codes comprising the Northern Sector, only one of the areas (75247) has a majority (greater than 50%) black population; the total population of 75247 is only 254 people (clearly, this zip code is a statistical aberration).

79.    There are numerous references, throughout the City's 2007 AI, regarding population and demographic changes between the 1990 and 2000 census.  Examples include, "the Hispanic population has more than doubled", 61.2% of Dallas' population is either African American or Hispanic (p. I-2) vs. 50% in 1990, 35.6% of Dallas' population is Hispanic vs. 21% in 1990 (p. I-19), 25.6% of Dallas' population is African American vs. 29% in 1990 (p. I-19).

80.    Phrases referring to African Americans and Hispanics—such as "remain concentrated," "continue to populate," and "continue to primarily populate"—used throughout the City of Dallas' 2007 AI (*id.* at pp. 1-19 and 1-20), confirm the existence (and continuation) of heavily segregated areas of the City.  These observations are very apparent in the AI.  However, the author(s) did not recognize the significance of these observations as they relate to the obligation to "affirmatively further fair housing," since there is no mention of these factors as

16

"impediments."  The City knowingly failed to properly include and analyze this information in its AIs.

81.     When discussing public housing provided by the Dallas Housing Authority, the City of Dallas' 2007 AI states that 86% of the occupants are African American (when only 25.6% of Dallas' population is African American), and only 6% of the occupants are Hispanic (when 35.6% of Dallas' population is Hispanic) (*id.* at p. III-17).  Then on page III-43, the 2007 AI says "Fair Housing Impediments 'DHA Information Not Available'".  The public housing programs operated by DHA appear to be their own impediments to Fair Housing.  The City knowingly failed to properly include and analyze this information in its AIs.

82.     Neither the overall population growth, nor the changes in composition of the minority populations is analyzed or included in the AI with respect to racial or ethnic segregation or discrimination, and no potential fair housing impediment related to segregation or discrimination is identified, examined or responded to by appropriate City actions.  On information and belief, the City knowingly failed to properly include and analyze this information in its AIs.

83.     Despite statements from some of the housing advocates that participated in the survey reflecting serious problems and impediments to fair housing, the City's 2007 AI has not synthesized the observations into the AI as impediments to fair housing.  For example, these statements include:

- "agencies were politically motivated" (*id.* at p. VII-8);

- "political agendas get in the way of perfectly fine projects because they won't distribute dollars to a project they don't want to have implemented" (*id.* at p. VII-8);

- "the City should 'broaden beyond South and Southwest Dallas'" (*id.* at p. VII-14).  This is likely a reference to the enormous resources that have been invested in

South and Southwest Dallas (the "Southern Sector"), but not in the remainder (the "Northern Sector") of the City.

- "believe that barriers have become more formidable over this time (since 1998)" (*id.* at p. VII-12).

84.     Much of the 2007 AI prepared by the City appears to be an edited version of the prior AIs and is based on boiler plate instead of conducting a valid updated AI that conforms with the Defendants' obligations to AFFH.

**The City Adopted and Implemented Zoning, Land Use and Funding Policies that Perpetuated and Exacerbated Racial and Ethnic Segregation**

85.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

86.     In addition to failing to AFFH, the City has actually encouraged discriminatory practices through their actions, including the following.

87.     Specifically, the City has adopted and enforced laws, regulations, policies and practices with respect to zoning, land use, building codes, funding, location of affordable housing units and the structure of housing subsidy programs that push many of the City's low- and moderate-income black and Latino residents into low-opportunity communities with poor schools, high crime rates, environmental and health problems, inadequate amenities, substandard transportation and poor connections to quality, living wage jobs.

88.     As a result, black and Latino residents of Dallas have been deprived of opportunities to live in integrated, high-opportunity communities, and the United States Government has been deprived of the benefit to which it is entitled under the AFFH and other civil rights mandates:  that the $1.378 billion in federal block grant and PIH funds would be used to expand housing choice for blacks and Latinos and promote healthy, integrated neighborhoods.

18

89.     During the False Claims Period, the City used its authority to steer the vast majority of housing for low- and moderate-income people in Dallas (who are disproportionately black or Latino) into already-segregated or low-opportunity neighborhoods and to steer it away from predominantly white or high-opportunity neighborhoods.

90.     From 1999 to 2008, the City provided zoning, land use or funding approval for fewer than 2,575 Low Income Housing Tax Credit supported housing units in the Northern Sector; these projects represent one low income housing unit for every 294 residents of the Northern Sector.

91.     During the same timeframe, the City provided zoning, land use or funding approval for nearly 7,300 Low Income Housing Tax Credit supported housing units in the Southern Sector; these projects represent one low income housing unit for every 65 residents of the Southern Sector.  As a consequence, during the False Claims Period, nearly 3 out of every 4 low income housing units built in the City of Dallas were located in the Southern Sector, at a per capita rate nearly five times that of the Northern Sector.

92.     The City's policies and funding decisions that supported this distribution of affordable housing had the effect of perpetuating racial and ethnic segregation in Dallas and placing people of color predominantly in low-opportunity neighborhoods.

93.     Encouraging the development of numerous Low Income Housing Tax Credit projects for low and moderate income families in the Southern Sector, and discouraging Low Income Housing Tax Credit projects in the Northern Sector, is an impediment to fair housing choice.  However, Defendants have failed to include and analyze this information and these impediments in their AI's.

94.     The City did not undertake an analysis of whether the production of affordable

housing, prior to and during the relevant time period, had the effect of increasing or decreasing racial or ethnic diversity in the neighborhoods in which the housing was built.  Nor did the City undertake an analysis of whether DHA's programs constituted impediments to fair housing choice.

95.    Another example of the City's failure to AFFH is the minimal funding amounts provided for affordable housing in the city's seventeen Tax Increment Financing ("TIF") Districts.  Of the more than $1.033 billion contributed by the City to the 17 TIF districts, less than 4.5% has been budgeted for housing affordable to families at or below 80% of area median income.

96.    Even in the context of this underfunding, there is a dramatic difference between TIF funding for affordable housing in the Southern Sector and that in the Northern Sector.

97.    In the eleven TIF Districts in the Northern Sector, where there is a dearth of affordable housing, only 0.5% of TIF funding is designated for affordable housing, while 11.2% of TIF funding in the Southern Sector is for affordable housing.

98.    The City has approved deed restrictions that disallow the use of a property for low-income housing at the Atmos Complex, a four-building development in Downtown Dallas.

99.    The City has approved CDBG Section 108 Loan Guarantees for the development of several properties (the Continental Building; the Shamburger Project) that would discriminate on the basis of familial status since only studio and 1-Bedroom units were proposed as income-restricted affordable units (despite the projects' inclusion of two and three bedroom floorplans).

100.    The City approved a discriminatory plan for development of a four-building complex in Downtown Dallas that will concentrate all of the low income residential units into one of the buildings, instead of dispersing the income-restricted units throughout the complex

(the Atmos Project).

101.     The City permitted deed restrictions as part of City-supported financing at the Atmos Complex and permitted steering of minority families with children away from that development, despite provisions in the HUD Guide that specifically prohibit same.  *See* HUD Guide at 4-6 to 4-7.

102.     Despite HUD's national objective that CDBG- and HOME-funded housing have at least 51% of its units reserved for low- and moderate income persons and families, the City adopted a policy within its "Downtown Connection" TIF District that restricts the number of such units to 30%.  This policy discourages the production, in that District, of units affordable to black and Latino families with children.  Paradoxically, the City has imposed no such policy or restriction on any District in the Southern Sector, but has approved Southern District TIF developments with 100% low- and moderate-income occupancy.

103.     City has targeted CDBG funds and other community development resources into "CDBG Eligible Census Tracts" which, by their nature, are low income, high minority areas of Dallas.  This policy contradicts the goals of affirmatively furthering fair housing, since these actions promote the continuation of segregation by "concentrating" resources in these existing high minority low income areas, instead of utilizing resources to support opportunities for low income, primarily minority, individuals in higher opportunity.

104.     The Agents or employees of the City made statements to Plaintiffs-Relators indicating that low income housing "is not a part of the vision for Downtown Dallas," confirming that the City policy is adopted and implemented to limit fair housing choice of members of racial and ethnic minority groups.  Knowing that such policies have that effect, the City has failed or refused to identify this impediment in its AIs and has failed or refused to

undertake appropriate actions to overcome this impediment.

105.    The City has also failed properly to disclose and analyze the impact of historical discrimination by the City and DHA—as established in the long-running *Walker v. HUD* litigation in federal court, and has failed fully to take appropriate actions to overcome the impact of impediments experienced by members of racial and ethnic minority groups.

106.    Page 5-6 of the HUD Guide informed Defendants that:  "Placement of new or rehabilitated housing for lower-income people is one of the most controversial issues communities face.  If fair housing objectives are to be achieved, the goal must be to avoid high concentrations of low-income housing."  HUD Guide at 5-6.  The placement of numerous low income housing developments in the City's Southern Sector by the Defendants has resulted in high concentrations of low income housing in high minority neighborhoods, directly contradicting the goals of affirmatively furthering fair housing.  The City has knowingly and willfully failed to properly include and analyze this information in its AIs.

107.    Contrary to page 5-9 of the HUD Guide, and AFFH obligations, a strategy of improving conditions in highly concentrated minority areas through economic development and improved services has not been employed by Dallas in the Southern Sector; instead, neighborhood "improvements" have nearly always resulted in construction of additional low income housing.  Nor have defendants employed a strategy to provide lower-income housing opportunities in more economically advantaged areas, such as exist in the City's Northern Sector.  The City has knowingly and willfully failed to properly include and analyze this information in its AIs.

108.    On pages 5-6 through 5-12 of the HUD Guide, Defendants were informed that they should include answers to specific questions in the AI's if they were relevant.  For the

Defendants, many of these questions are relevant to the segregation and discrimination findings from the *Walker v. HUD* litigation. However, the AI's and Consolidated Plans prepared by the City and submitted to HUD do not address many of these issues. The City has knowingly failed to properly include and analyze this information in its AIs.

109.    The AI, published in July, 2007, mentions the "Intown Housing Program" in several different places (*id.* at p. III-3, table 3-2(6)), and mentions that the program had created 299 affordable housing units in Downtown Dallas "good until the deed restrictions expire" (however, only 197 units had been created in Downtown Dallas by the program). By July, 2007, the "Intown Housing Program" was all but defunct. Santa Fe Lofts (name changed to SoCo lofts) was fully involved in a condo conversion; the University of North Texas had already purchased 1900 Elm Street (aka Majestic Lofts) where there was no deed restriction in-place; the Kirby Building and the Davis Building had already purchased the Section 108 loans for 60 cents on a dollar, and the City had already repaid the original $25 million program loan to HUD in January 2006. The City has knowingly failed to properly include and analyze this information in its AIs.

110.    On March 19, 2007, the Dallas Economic and Housing Committee was briefed by Dallas City staff on the status of affordable housing within the Central Business District ("CBD"), in a briefing entitled "Downtown Dallas 'living for all' Update on Affordable Housing". The briefing detailed the decline of affordable housing within the CBD (in contrast to the "explosion" of market rate housing units being developed in the CBD), including the demise of the Intown Housing Program. The briefing detailed several recommendations attempting to correct the imbalance, but nothing has changed. The City knowingly failed to properly include and analyze this information in its July 2007 AI.

111.    On Labor Day weekend, 2005, Hurricane Katrina ravaged the gulf coasts of Texas, Louisiana, and Mississippi, and New Orleans was nearly destroyed.  Dallas became one of the destinations for thousands of refugees who had been forced from their homes by the storm, and many of those displaced residents have remained in the Dallas area.  An event of this magnitude should have prompted the City to perform an updated AI to reflect the impact on housing choice of residents of Dallas, whether newly arrived or of longer tenure, but the City's 2007 AI, prepared two years after the event, makes no mention of this event or its impact.

112.    During the summer of 2005, then-mayor Laura Miller declared a moratorium on housing production utilizing the Low Income Housing Tax Credit ("LIHTC") program, as a direct reaction to an FBI probe of City Hall.  The investigation has subsequently led to many indictments, and convictions of numerous conspirators in a bribery/extortion scheme (ex-Mayor Pro Tem Don Hill was sentenced to 18 years on February 26, 2012) involving several low income housing developers.  There was virtually no affordable housing production using the LIHTC program in the City for more than three years as a result of the moratorium.  The 2007-2012 AI submitted by Dallas does not identify this and include it as an "Impediment."  The City has knowingly failed to properly include and analyze this information in its AIs.

113.    The City's 2007 AI mentions the Downtown (Dallas) Mortgage Assistance Program, which provides $40,000 per qualifying households toward the purchase of a home in the Downtown Dallas Neighborhood (Table 3-2(2)).  The table shows that the program created 74 affordable units, but that is far from the truth.  The program has been a total failure, because it is dysfunctional.  There are very few, if any, housing units of any type in Downtown Dallas that would sell for less than $200,000.  Those who would have qualified for the program would never be able to qualify for a $160,000 mortgage because of their income levels.  And, as the City staff

pointed out in its March 19, 2007 presentation to the Housing and Economic Development Committee, the private sector had not created any affordable housing units in Downtown Dallas, so the housing stock to support this program did (and does) not exist. A well-prepared AI would have identified these issues as "impediments." The City knowingly failed to properly include and analyze this information in its AIs.

114.   On or about December 1, 2008, Dallas (Dallas Housing Finance Corporation) was awarded an allocation of $150 million in Housing and Economic Recovery Act ("HERA") Bonds by the State Bond Review Board (Texas Department of Housing and Community Affairs). These HERA bonds encourage the production of low- and moderate-income housing units, since up to 40% of the housing units produced utilizing this financing must be set aside for low income occupants at 60% of Area Median Family Income and below (90% of the units produced using this financing are required to be income restricted). Despite an overwhelming need for 20,000 to 30,000 affordable housing units in Dallas, identified by the Mayor's Affordable Housing Task Force, Dallas (Dallas Housing Finance Corporation) transferred $75 million of the HERA bond allocation to Texas State Affordable Housing Corporation, located in Austin, Texas, on April 26, 2010. This transfer of funds is an impediment to fair housing choice in Dallas and the City failed to identify this as an impediment to fair housing choice in its AIs.

115.   For its Community Development Block Grant Section 108 Loan Guarantee program, Dallas has approved a policy to loan the Section 108 Loan Guarantee funds to private sector developers at an interest rate that is higher than Dallas' interest rate with HUD. HUD establishes the interest rate to be paid by entitlement jurisdictions on Section 108 Loan Guarantees at a very low rate, currently less than 1/2 of one percent, to encourage the production of housing and other qualifying community development initiatives for the benefit of low and

moderate income households.  The adoption of a CDBG Section 108 Loan Guarantee interest rate by Dallas at a rate higher than HUD's rate acts to discourage the production of affordable housing for low- and moderate-income occupants by increasing the cost of borrowing these funds, thereby resulting in the creation of an additional impediment to fair housing choice by Dallas.  The City failed to identify this as an impediment to fair housing choice in its AIs.

**DHA Undertook No Analysis of Whether Its Housing Efforts Had the Effect of Perpetuating or Increasing Segregation, and DHA Is Complicit With Violations Committed By Dallas**

116.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

117.    DHA is required by law to certify that it carries out its activities in compliance with Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990.  DHA is also required to regularly examine its programs and any proposed programs to identify any impediments to fair housing choice within those programs.

118.    DHA has failed to identify and analyze impediments to fair housing; failed to address known impediments; and failed to affirmatively further fair housing.  Additionally, DHA has falsely certified its compliance with civil rights and fair housing laws as well as its obligations to AFFH.

119.    While DHA does not produce its own AI, it is obligated to conduct a functionally equivalent AFFH review of all of its programs and policies as part of its Public Housing Agency ("PHA") Plan, *see* 24 C.F.R. § 903.7(o), and to collaborate with the City in the preparation of the City's AI and Consolidated Plans.  *Id.*  DHA's 2008 annual operating budget was $221.35 million.  DHA received nearly $190 million in Operating and Capital Grants from the U.S.

Department of Housing and Urban Development ("HUD") during 2008.

120.    DHA owns and operates a total of 4,739 residential units (322 of these are currently under construction) in the City of Dallas, Texas.

121.    Of the 4,739 total residential units owned by DHA, 1,081 are designated as "Elderly" units, and 3,658 are designated as "Family" units.

122.    Of the 4,739 total residential units owned by DHA, 83.52% (3,958 units) are located in heavily minority census tracts within Dallas.  Only 16.48% (781 units) of all the residential units owned and operated by DHA are located in non-minority census tracts.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

123.    Of the 1,081 "Elderly" units owned by DHA, 76.69% (829 units) are located in heavily minority census tracts within Dallas.  Only 23.31% (252 units) of the "Elderly" units owned and operated by DHA are located in non-minority census tracts.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

124.    Of the 3,658 "Family" units owned by DHA, 88.90% (3,252 units) are located in heavily minority census tracts within Dallas.  Only 11.10% (406 units) of the "Family" units owned and operated by DHA are located in non-minority census tracts.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

125.    During the last decade alone, the City has permitted construction of nearly 7,300 low income housing units, supported with low income housing tax credits, in South and Southwest Dallas neighborhoods.  Landlords who accept Low Income Housing Tax Credits

cannot refuse to accept Section 8 Housing Choice Vouchers.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

126.    At the end of 2003, there were 6,916 people or households on the DHA waiting list for public housing units.  With DHA's closing of the Section 8 Housing Choice Voucher waitlist on June 1, 2004, the number of people or households on the waiting list for public housing has increased to 10,519, outnumbering occupied public housing units by almost 2 to 1. This number represents a 432% increase in the number of people or households on the DHA waiting list for public housing since 1999.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

127.    Rather than locating new public housing developments in high-opportunity, predominantly white neighborhoods in Dallas (i.e., "affirmatively furthering fair housing"), DHA has been consistently constructing new public housing units in high-minority, distressed locations in the City's "Southern Sector" (the area that lies south of the RL Thornton Freeway (Interstate I-30) and west of the Trinity River at its intersection with I-30).  Two examples follow:

- During 2009, DHA demolished the 294 units at Turner Courts Public Housing Project, originally constructed in 1952.  Located at 6601 Bexar Street in the heart of Dallas' "Southern Sector", DHA is currently constructing 334 new public housing units, calling the project "Buckeye Trails", on the site of the former "Turner Courts".  The Turner Courts/Buckeye Trails site is located in a high minority census tract within a heavily distressed neighborhood in South Dallas.

- In 2005, DHA demolished the 550 units at Frazier Courts Public Housing Project. DHA is constructing 310 new public housing units on the Frazier Courts site. Frazier Courts is located in the 75210 zip code, the highest crime area in the entire City of Dallas.  US Census data shows that the tract has a median household income of just $15,000 per year (roughly 1/3 of the median income for Dallas), the population is 91% black, and 58.6% of the area's population live below the poverty line.  Many have compared Dallas' Frazier neighborhood with New Orleans' infamous Ninth Ward.

128.   In contrast with the two examples cited above, DHA has owned "Little Mexico Village" since 1942.   Located at 3027 Harry Hines Boulevard just Northwest of Downtown Dallas in Dallas' "Northern Sector," the property consists of 13.37 acres.   Little Mexico Village is situated immediately south of the "hospital district" and immediately north of the American Airlines Center and upscale "Victory Park" development, in the highly desirable "Uptown" neighborhood of Dallas, very close (walking distance) to the City's largest job center and with excellent access to public transportation.   Dallas Central Appraisal District has assessed the property's land value at nearly $35 million, but the market value of the land is probably twice that amount, making it the most valuable single asset in DHA's entire portfolio.   The 13.37 acre site contains only 102 residential units.   Conservatively, this property could easily accommodate 400 residential units or more in a low-rise three/four story configuration, but DHA has failed to make any efforts to expand the number of affordable housing units on the site.   These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

129.   The number of DHA-distributed Section 8 Housing Choice Vouchers is 16,640. DHA's Section 8 population is 88% Black/African American, 6% White, and 6% "Other" minorities.   However, according to the 2000 Census, Dallas' population is 24.6% Black/African American, 52.5% White, and 32.9% "Other" minorities.   Clearly, Black/African American voucher recipients are disproportionately represented in DHA's Section 8 population.

130.   Nearly 75% of the Section 8 Housing Choice Vouchers are being used to subsidize the rental of housing units located in high minority, heavily distressed neighborhoods, located primarily in South and Southwest Dallas (the "Southern Sector").   These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by

federal law.

131.    At the end of 2003, there were slightly more than 10,000 people or households on the DHA waitlist for Housing Choice (Section 8) vouchers. As a result of the overwhelming waitlist and cuts in federal funding, the Dallas Housing Authority suspended the program entirely for new applicants.  Since June 1, 2004, the DHA has not accepted new applications for the Housing Choice (Section 8) waitlist.  As of March 21, 2006, the (closed) waiting list for the Housing Choice Voucher Program is 16,341 people or households.  However, DHA has recently announced that it is making 500 Section 8 Housing Choice Vouchers available for Mayor Leppert's initiative to provide Permanent Supportive Housing for the formerly homeless.  These DHA impediments are not identified in the City's AIs or DHA's Public Housing Plan as required by federal law.

132.    Throughout the False Claims Period, DHA knowingly failed to comply with the federal requirements at 24 C.F.R. § 903.2(d)(2), requiring that DHA design its programs "to reduce racial and national origin concentrations," and the requirements at 24 C.F.R. § 903.7(o), requiring that all of DHA's programs be carried out in a fashion to AFFH.

133.    Throughout the False Claims Period, DHA knowingly submitted false annual certifications to HUD that it is in compliance with its AFFH and other civil rights obligations.

134.    Despite its certifications to HUD, DHA failed to provide the City with its list of DHA fair housing impediments for inclusion in the City's 2007 AI.

### Defendants Did Not Take Actions to Overcome the Effects of Discrimination and Segregation on Fair Housing Choice

135.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

136.    Prior to and during the False Claims Period, Defendants did not take appropriate actions to overcome the effects of discrimination and segregation on fair housing choice and Defendants' actions have increased or continued discrimination and segregation.

137.    Defendants knew that they had the authority and responsibility to do that which is necessary to AFFH.

138.    Defendants' production and placement of affordable housing, prior to and during the relevant time period, increased segregation in the jurisdiction.

### Defendants Knowingly Made False AFFH Certifications and False Statements to Get Claims Paid by HUD

139.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

140.    Each year during the False Claims period, and as part of the Consolidated Plan process, the City submitted Annual Action Plans, 24 C.F.R. §§ 91.220, 91.420, that included applications for funding, as well as the City's express certifications that they would AFFH, *see* 24 C.F.R. § 91.225.

141.    Despite its failures to analyze the impediments to fair housing posed by discrimination and segregation and to take appropriate actions to address those impediments, the City, during the False Claims Period, knowingly submitted express and implied false certifications that it would:  "affirmatively further fair housing, which means it will conduct an analysis of impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting that analysis and actions in this regard."

142.    Despite   its   failures   to   analyze   the   impediments   to   fair   housing   posed   by

31

discrimination and segregation and to take appropriate actions to address those impediments, the DHA, during the False Claims Period, knowingly submitted express and implied false certifications that it would affirmatively further fair housing in its programs and activities.

143. Defendants repeatedly and knowingly submitted to HUD claims for payment, including AFFH certifications, that were based upon false statements and certifications, including explicit and implicit representations that they were complying with the AFFH obligations.

144. During the False Claims Period, Defendants annually certified to HUD that they shall carry out the programs for which they were seeking funding in accordance with applicable HUD regulations.

145. Throughout the False Claims Period, the City also made specific CDBG certifications to HUD annually that it is in compliance with the requirements to receive CDBG funds, that it is in compliance with anti-discrimination laws and the grant will be conducted and administered in conformity with title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, *et seq.*, the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and implementing regulations, and that it will comply with applicable laws.

146. Dallas City Manager Mary K. Suhm submitted to HUD the above-referenced certifications on behalf of Dallas on August 13, 2004, August 12, 2005, August 11, 2006, August 13, 2007, August 15, 2008, August 13, 2009 and in the months of August 2010 and August 2011.

147. On each occasion that Defendants made a certification of the type described herein, the total number of which during the False Claims Period is not currently known to Plaintiffs-Relators, and on each occasion that Defendants otherwise requested or demanded payment from the federal government based on having supposedly complied with the Fair

Housing Act, the Community Development Act, and with their certification-based obligations, they committed a separate violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

148.    To be eligible to receive federal block grant or PIH funds, the City and DHA, respectively, must certify to the United States Government that it will comply with the above-stated requirements.  Each such certification is a precondition to the receipt of such funds, and the annual certification by Dallas is a core prerequisite for its eligibility to request and receive CDBG funds, Public Housing funds and other housing funds from the United States.  Defendants are ineligible to receive such funds without truthful certifications of compliance.

149.    Through the actions alleged herein, Defendants falsely induced the Government to approve and/or pay out block grant and PIH funds based on false promises and certifications made by Defendants that they had complied, and would comply, with their respective AFFH and other federal civil rights obligations.

150.    Defendants' claims, statements and certifications during the False Claims Period were false when they were made and the Government relied upon those claims, statements and certifications in approving and paying out block grant and PIH funds.

151.    In making their false claims, statements and certifications, Defendants knowingly engage in the illegal schemes described herein.

152.    As a result of its false certifications, during the False Claims Period, the City improperly received at least $238,410,207 in annual block grant funds, and an unknown additional amount in HUD competitive grants, disaster recovery and federal stimulus funds subject to the same certifications, the precise amount of which is not presently known to the Plaintiff-Relators.

153.    As a result of its false certifications, during the False Claims Period, DHA

improperly received at least $1,140,000,000 in PIH funds, and an unknown additional amount in HUD competitive grants, disaster recovery and federal stimulus funds subject to the same certifications, the precise amount of which is not presently known to the Plaintiff-Relators.

154.   Plaintiff-Relators seek a recovery for the United States of treble damages, based upon the full amount of improper funds received by the City and DHA during the False Claims Period, together with additional relief available under the False Claims Act, as more particularly pled below.

## COUNT I

### (Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### Presenting False Claims for Payment)

155.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

156.   Plaintiffs-Relators seek relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

157.   As set forth above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in connection with the submission of requests for federal block grant and PIH funds.

158.   The United States disbursed block grant and PIH funds to Defendants because of such false or fraudulent statements, claims and certifications.

159.   In performing all of the acts described herein, Defendants have defrauded the United States of America by violating 31 U.S.C. § 3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Defendants have engaged in a protracted

course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented/caused to be presented to the United States.

160.    As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

161.    By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

162.    Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

163.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## COUNT II

**(Violations of the False Claims Act
31 U.S.C. § 3729(a)(1)(B)
Use of False Statements and False Certifications)**

164.     The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

165.     Defendants violated Section 3729(a)(1)(B) of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(B).  As set forth above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to the false or fraudulent claims for federal block grant and PIH funds.

166.     Defendants knowingly made false statements and false certifications in order to obtain payment of federal block grant and PIH funds, with full knowledge that these false statements and false certifications would be material to the Government's decision to pay.

167.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

168.     By reason of Defendants' false or fraudulent claims, the United States has been damaged in a substantial amount to be determined at trial.

169.     Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

170.     Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 − $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

## COUNT III

### (Violations of 31 U.S.C. § 3729(a)(1)(D))

171.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

172.    Defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(D), by withholding or failing to return some or all of the monies received from the Government pursuant to the block grant and PIH programs.

173.    Defendants have or had possession, custody or control of money or other financial instruments that Defendants knowingly converted for uses other than their intended purposes pursuant to HUD and government requirements.  By knowingly converting Government block grant and PIH funds for improper uses, and failing to deliver or causing to be delivered less than all of the money owed the Government, Defendants have violated the False Claims Act.

174.    The United States Government has not received and Defendants continue to withhold money, property, and financial instruments as a result of Defendants' conduct.

175.    Government agencies missing payments and financial instruments include but are not limited to the U.S. Department of Housing and Urban Development.

176.    Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all monies, and the value of all financial instruments withheld by Defendants, treble damages and interest.

177.    Each instance of a knowingly false withholding from the government by Defendants is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

## COUNT IV

### ("Reverse" False Claims Act Violations and Other Violations of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G))

178.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

179.   Defendants violated 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government.

180.   Defendants also violated 31 U.S.C. § 3729(a)(1)(G) by knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment of funding received from HUD and the Government.

181.   By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to pay the Government by Defendants and to knowingly convert funds for improper uses, Defendants violated the False Claims Act.

182.   By knowingly concealing and improperly avoiding or decreasing its obligation to pay or return funds to the Government Defendants violated the False Claims Act.

183.   By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to refund the Government for any overpayment of funds the Defendants violated the False Claims Act.

184.    By knowingly submitting express and implied false certifications for government funding material to an obligation to refund the Government for any overpayment of said funds, Defendants have violated the False Claims Act.

185.    By knowingly concealing and improperly avoiding or decreasing its obligation to repay the Government for overpayment of funds, the Defendants have violated the False Claims Act.

186.    The United States Government has paid and continues to pay false claims as a result of Defendants' false records and statements. Government agencies making these payments include but are not limited to the Department of Housing and Urban Development.

187.    Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all knowingly false claims that Defendants submitted or caused to be submitted.  Defendants are liable to the United States for three times the full amount of these damages, plus interest.

188.    Each instance of a knowing violation or false claim to the government or false record for payment created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs-Relators, request that judgment be entered in their favor and against Defendants as follows:

(a) That this Court enter a judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained;

(b) That because Defendants are responsible for submitting false claims, using false records or statements to get such claims paid, submitting false certifications, failing to disclose the falsity of their claims, and using false records or statements to hide the fact that replacements and/or refunds were due, each Defendant is liable for the full amount of damages and civil or criminal penalties awarded in this case;

(c) That each Defendant be held liable for a civil penalty not to exceed $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation;

(d) That Plaintiffs-Relators be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

(e) That Plaintiffs-Relators be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds of the action or settlement of the claims or alternative remedies under the False Claims Act, 31 U.S.C. § 3730(c)(5), (d);

(f) That Plaintiffs-Relators be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

(g)  That Plaintiffs-Relators be granted a trial by jury;

(h) That Plaintiffs-Relators and the United States be awarded pre-judgment interest;

(i) That Plaintiffs-Relators be granted any and all preliminary and permanent injunctive relief, as appropriate;

(j) That Plaintiffs-Relators be granted any and all other relief set forth in the False Claims

Act which was not specifically referenced above;

(k)  That Plaintiffs-Relators be granted all other relief as may be appropriate.

**JURY TRIAL DEMANDED**

DATED:  January 30, 2012.                            Respectfully submitted,

GILLESPIE, ROZEN &WATSKY, P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, Texas  75204
Tel.:    (214) 720-2009
Fax:    (214) 720-2291
E-mail: hkg@grwlawfirm.com
            jsanford@grwlawfirm.com


By:  *s/ Hal K. Gillespie*
        Hal K. Gillespie
        *Attorney-in-Charge*
        Texas Bar No. 07925500
        James D. Sanford
        Texas Bar No. 24051289

        - and -

Michael Allen*
Stephen Hayes*
RELMAN, DANE & COLFAX, PLLC
1225 19TH STREET, N.W., SUITE 600
WASHINGTON, D.C.  20036-2456
Tel.:    (202) 728-1888
Fax:    (202) 728-0848
E-mail:  mallen@relmanlaw.com
            shayes@relmanlaw.com

*Applications to Appear Pro Hac Vice to be
submitted