IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITES STATES ex rel. | | |
| CURTIS LOCKEY, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3-11-CV-354-O |
| | § | ECF |
| CITY OF DALLAS, et al., | § | |
| Defendants. | § | |

**CITY OF DALLAS' BRIEF IN SUPPORT OF**

**ITS MOTION TO DISMISS FOR LACK OF JURISDICTION**


THOMAS P. PERKINS, JR.
Dallas City Attorney

Charles Estee
Assistant City Attorney
Texas Bar No. 17827020
charles.estee@dallascityhall.com

Peter B. Haskel
Senior Assistant City Attorney
Texas Bar No. 09198900
peter.haskel@dallascityhall.com

City Attorney's Office
1500 Marilla Street, Room 7B North
Dallas, Texas  75201
Telephone:     214-670-3519
Telecopier:    214-670-0622

Attorneys for Defendant City of Dallas

# TABLE OF CONTENTS

I.      OVERVIEW ......................................................................................................1

II.     PUBLIC DISCLOSURES ....................................................................................2

        A.      The Public Disclosure Jurisdictional Bar...............................................2

        B.      Forms of Public Disclosures. ...............................................................3

III.    ALL OF RELATORS' CLAIMS ABOUT THE ANALYSIS OF
        IMPEDIMENTS ARE BASED UPON PUBLIC DISCLOSURES ..................................4

        C.      The Regulatory Scheme ......................................................................4

        D.      The City's Certifications......................................................................6

        E.      The 1993 Housing Plan and 1998 AI.....................................................7

        F.      Delay in Updating the 1998 AI .............................................................8

        G.      Content of the 2007 AI .......................................................................9

        H.      HUD's reports, investigations and audits ...........................................10

IV.     ALL OF RELATORS' CLAIMS BASED ON CITY ACTIONS  HAVE
        BEEN PUBLICLY DISCLOSED...........................................................................11

        A.      Low Income Housing Tax Credits ("LIHTC")......................................11

        B.      Tax Increment Financing Districts ("TIFs").........................................13

        C.      The Atmos, Continental , and Shamburger Projects...............................14

        D.      Community Development Building Grants ("CDBG")..............................15

        E.      Walker...............................................................................................16

        F.      Southern and Northern Dallas...............................................................17

        G.      Intown Housing Program ....................................................................18

        H.      Downtown Affordable Housing.............................................................18

        I.      Hurricane Katrina...............................................................................20

        J.      LIHTC Moratorium ............................................................................20

      K.      Downtown Mortgage Assistance Program ("DMAP")........................................20

      L.      HERA.......................................................................................................................21

      M.     Section 108 Interest Rates....................................................................................21

      N.      DHA........................................................................................................................22

V.     RELATORS PUBLICLY DISCLOSED THE ALLEGATIONS  AND TRANSACTIONS BEFORE FILING SUIT..................................................................22

VI.    RELATORS ARE NOT THE ORIGINAL SOURCE......................................................23

PRAYER.............................................................................................................................25

CERTIFICATE OF SERVICE ..........................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Federal Recovery Servs. Inc. v. United States,*
   72 F.3d 447 (5th Cir. 1995). ............................................................................ 1, 3

*Graham Co. Soil and Water Conserv. Dist.,*
   130 S. Ct. 1396 (2010) ................................................................................... 1, 2, 4

*Hollinger v. Home State Mut. Ins. Co.,*
   654 F.3d 564 (5th Cir. 2011) ............................................................................. 20

*Hughes Aircraft Co. United States ex rel. Schumer,*
   520 U. S. 939 (1997) ............................................................................................. 2

*In re Natural Gas Royalties Qui Tam Litigation,*
   467 F.Supp.2d 1117 (D.Wyo.2006) ....................................................................... 4

*Inclusive Communities Project, Inc. v. Tex. Dep't of Housing and Consumer Affairs,*
   749 F. Supp. 2d 486 (N.D. Tex. 2010) ................................................................. 12

*McClure v. Biesenbach,*
   402 F. Supp. 2d 753 (W. D. Tex. 2005) affirmed 355 Fed. Appx. 86 (5th Cir. 2009). ............. 19

*Schindler Elevator Corp. v. U.S.,*
   131 S. Ct. 1885 (2011) .......................................................................................... 3

*U.S. ex rel. Alcohol Foundation, Inc. v. Kalmanovitz Charitable Found., Inc.,*
   186 F. Supp.2d 458 (S.D.N.Y.2002) ...................................................................... 4

*U.S. ex rel. Biddle v. Bd. of Trustees of the Leland Stanford, Jr. University,*
   161 F.3d 533 (9th Cir. 1998) ............................................................................... 4

*U.S. ex rel. Devlin v. California,*
   84 F.3d 358 (9th Cir. 1996) *cert. denied* 519 U.S. 361 (1996) ............................ 4

*U.S. ex rel. Laird v. Lockheed Martin Eng. & Science Serv. Co.,*
   336 F.3d 346 (5th Cir. 2003) ......................................................................... 4, 24

*U.S. ex rel. Vuyyuru v. Jadhav,*
   555 F.3d 337 (4th Cir. 2009) *cert. denied* 130 S.Ct. 229 (2009) .......................... 2

*United States ex rel Lewis v. Walker,*
   738 F. Supp. 2d 1284 (M.D. Ga. 2010) affirmed 438 Fed. Appx. 885,
   2011 WL 3794690, * 2 (11th Cir. Aug. 26, 2011) .............................................. 3

*United States ex rel. Fried v. West Indep. Sch. Dist.,*
   527 F.3d 439 (5th Cir. 2008) ............................................................................... 10

*United States ex rel. Green v. Service Contract Education and Training Trust Fund,*
No. 09-738(RWR), 2012 WL 432569, *8 (D.D.C. Feb. 13, 2012) ............................................. 3

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.,*
384 F.3d 168, (5th Cir. 2004) .................................................................... 1, 2, 3, 4, 24

*United States ex rel. Repko v. Guthrie Clinic, P.C.,*
No. 3:04-cv-1556, 2011 WL 3875987, *7 (M.D. Pa. Sept. 1, 2011) ........................................ 3

*United States v. City of Crescent City,*
No. C 08-05663 MEJ, 2010 WL 4696835, *5 (N.D. Cal. Nov. 10, 2010) ................................. 4

*United States v. WB/Stellar IP Owner LLC,*
739 F. Supp. 396 (S.D. N.Y. 2010) ............................................................................. 3

*Walker v. City of Mesquite,*
169 F.3d 973 (5th Cir. 1999) ................................................................................... 16

*Walker v. U.S. Dep't of Housing and Urban Dev.,*
734 F.Supp. 1289 (N.D. Tex. 1989) ........................................................................... 16

**Statutes**

31 U.S.C. § 3730(e)(4)(A) .......................................................................................... 2

31 U.S.C. § 3730(e)(4)(B) ......................................................................................... 24

42 U.S.C. § 5304(b) ................................................................................................... 5

42 U.S.C. §5301 ...................................................................................................... 15

Tex. Tax Code § 311.001 *et seq* ............................................................................... 13

Tex. Tax Code § 311.019 ........................................................................................... 14

**Rules**

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 2

**Regulations**

24 C.F.R. 570.483(b) ................................................................................................ 15

24 C.F.R. 91.220 ....................................................................................................... 5

24 C.F.R. 91.225(a) ................................................................................................... 5

24 C.F.R. 91.500 ....................................................................................................... 5

24 C.F.R. 91.520 ........................................................................................................... 6

24 C.F.R. 91.520(h) ...................................................................................................... 6

24 C.F.R. 91.525(a) ...................................................................................................... 6

24 C.F.R. Part 91.5, 91.15 ............................................................................................ 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | § | |
| **CURTIS LOCKEY, et al** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3-11-CV-354-O** |
| | § | **ECF** |
| **CITY OF DALLAS, et al.,** | § | |
| **Defendants.** | § | |

## CITY OF DALLAS' BRIEF IN SUPPORT OF
## ITS MOTION TO DISMISS FOR LACK OF JURISDICTION

TO THE HONORABLE COURT:

Defendant City of Dallas (the "City") files this brief in support of its motion to dismiss

for lack of jurisdiction, and respectfully shows the court the following:

## I.
## OVERVIEW

This is a *qui tam* suit brought under the False Claim Act, 31 U.S.C. § 3729, *et seq*. The

United States elected not to intervene.   The public disclosure bar deprives courts of jurisdiction

over *qui tam* suits when relevant information has already entered the public domain through

certain channels.  *Graham Co. Soil and Water Conserv. Dist. v. U.S. ex rel. Wilson*, 130 S. Ct.

1396, 1401 (2010).  The bar is intended to prevent parasitic suits by opportunistic late comers

who add nothing to the exposure of a claimed fraud.  *U.S. ex rel. Reagan v. E. Tex. Med. Ctr.

Reg'l Healthcare Sys.,* 384 F.3d 168, 174 (5th Cir. 2004).  The bar applies to those who merely

gather and review public documents and information and have no first-hand knowledge of the

claimed fraud.   *Id*, 177-78.  The bar applies if the claim is even partly based on the public

disclosures.  *Federal Recovery Servs. Inc. v. U.S.*, 72 F.3d 447, 451 (5th Cir. 1995).

All of the matters asserted by the Relators have been publicly disclosed.  Relators have

merely gathered public documents and assert their claim based on their review of the publicly disclosed information. They have no first-hand knowledge of the allegations and transactions that form the basis of their claim. Relators are not the original source of any information. The Court lacks subject-matter jurisdiction and the case should be dismissed. Fed. R. Civ. P. 12(b)(1).

The Fifth Circuit has indicated that where the facts related to the merits and public disclosure are intertwined, the motion should be evaluated under summary judgment standards. *Reagan,* 384 F.3d at 173. The facts are not intertwined as the question of disclosure is distinct from the merits of the Relators' claims. The issue is not whether there is any truth to the information that Relators rely upon to support their claim but whether that information has been publicly disclosed and the proof of each is distinct from the other. *U.S. ex rel. Vuyyuru v. Jadhav,* 555 F.3d 337, 350 (4th Cir. 2009) *cert. denied* 130 S.Ct. 229 (2009).

## II.
## PUBLIC DISCLOSURES

### A.     The Public Disclosure Jurisdictional Bar

The False Claim Act creates a "public disclosure" jurisdictional bar. The applicable version provides:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).[1]

---

[1] In 2010, the Patient Protection and Affordable Care Act amended the public disclosure bar but the amendments are not retroactive. *Graham County Soil and Water Conservation Dist., 130 S.Ct. at 1401, n. 1. See also Hughes Aircraft Co. U.S. ex rel. Schumer*, 520 U. S. 939, 946-52 (1997). Even if the amendments are applicable, the results remain unchanged because the disclosures were made through federal reports, hearings, investigations, and audits and through news media and through litigation to which the United States was a party.

The public disclosure bar applies when 1) there has been a "public disclosure" of allegations or transactions; 2) the *qui tam* action is "based upon" such publicly disclosed allegations or transactions; and 3) the relator is not the "original source" of the information. *Reagan,* 384 F.3d at 173.  The plain language of the statute suggests that there are three sub-parts to the public disclosure prong: (1) a public disclosure, (2) in a particular form specified in the statute, (3) of allegations or transactions.  *Id*.  The Supreme Court recently held that the term "allegations and transactions" suggests a wide-reaching public disclosure bar.  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1891 (2011).  The Court also described a classic example of an opportunistic litigation that the public disclosure bar was designed to discourage as one in which anyone could have obtained the same publicly disclosed information and anyone could then filed the same suit.  *Id.* at 1894.

**B.     Forms of Public Disclosures.**

Information on a publicly available website(s) is a public disclosure either as an administrative report or news media. *See U.S. ex rel. Green v. Service Contract Education and Training Trust Fund,* No. 09-738(RWR), 2012 WL 432569, *8 (D.D.C. Feb. 13, 2012)*; U.S. ex rel. Repko v. Guthrie Clinic, P.C.,* No. 3:04-cv-1556, 2011 WL 3875987, *7 (M.D. Pa. Sept. 1, 2011); *U.S. ex rel. Rosner v. WB/Stellar IP Owner LLC*, 739 F. Supp. 396, 402-406 (S.D. N.Y. 2010).

Responses by the federal, state or local government pursuant to the applicable open records law is a public disclosure through an administrative report.  *Schindler Elevator Corp.*, 131 S. Ct. at 1891; *U.S. ex rel Lewis v. Walker*, 738 F. Supp. 2d 1284, 1291-94 (M.D. Ga. 2010) affirmed 438 Fed. Appx. 885, 887-88, 2011 WL 3794690, * 2 (11th Cir. Aug. 26, 2011).  A "report, hearing, audit, or investigation" prepared by a state or local government or the federal

government is a public disclosure. *Graham Co. Soil and Water Conserv. Dist*., 130 S. Ct. at 1410-11(2010).

Information provided in discussions at an open city council meeting and in its agenda, its reports, and backup information left at city hall and public library for public inspection are public disclosures. *U.S. v. City of Crescent City*, No. C 08-05663 MEJ, 2010 WL 4696835, *5 (N.D. Cal. Nov. 10, 2010).

Information in scholarly or scientific periodicals is public disclosures as "news media". *U.S. ex rel. Alcohol Foundation, Inc. v. Kalmanovitz Charitable Found., Inc.,* 186 F. Supp.2d 458, 463 (S.D.N.Y. 2002). Essays in trade journals, educational materials, seminar papers, instruction manuals and newspaper articles of a technical nature are also public disclosures. *In re Natural Gas Royalties Qui Tam Litigation,* 467 F. Supp.2d 1117, 1155 (D. Wyo.2006).

Any information disclosed in litigation and on file in the clerk's office is a public disclosure, even if in a state court proceeding. *Reagan*, 384 F.3d at 174.

Even lawsuits and news stories initiated or based on information provided by relators are public disclosures. *See U.S. ex rel. Laird v. Lockheed Martin Eng. & Science Serv. Co.,* 336 F.3d 346, 352 (5th Cir. 2003); *U.S. ex rel. Biddle v. Bd. of Trustees of the Leland Stanford, Jr. University,* 161 F.3d 533, 535-36 (9th Cir. 1998) *cert. denied* 526 U.S. 1066; *U.S. ex rel. Devlin v. California,* 84 F.3d 358, 360 (9th Cir. 1996) *cert. denied* 519 U.S. 361 (1996).

### III.
### ALL OF RELATORS' CLAIMS ABOUT THE ANALYSIS OF IMPEDIMENTS ARE BASED UPON PUBLIC DISCLOSURES

**C.      The Regulatory Scheme**

Relators allege that the city manager falsely certified that the City would affirmatively further fair housing ("AFFH") by signing certificates each August for the years 2004 to 2011. (Am. Compl. ¶¶ 141-146). The primary basis of their claim is that the City's analysis of

impediments ("AI") was defective for not complying with a HUD Guide and not including other information.  All of the matters were publicly disclosed.

The obligation to AFFH is derived from 42 U.S.C. § 5304(b) which states that a grantee will receive Community Development and Building Grants ("CDBG") "only if the grantee certifies to the satisfaction of the Secretary that … the grant will be conducted and administered in conformity with the Civil Rights Act and the Fair Housing Act, and the grantee will affirmatively further fair housing."  42 U.S.C. § 5304(b).  In its regulations, HUD defines the AFFH certification as requiring the grantee to "conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard."  24 C.F.R. 91.225(a).

The requirement is part of a detailed regulatory scheme concerning CDBG and similar funding.  Each grantee is required to prepare a Consolidated Plan to HUD.  The Plan serves as a comprehensive affordable housing strategy, community development plan, and submission of funding requests under CDBG and other similar programs for the upcoming five years.  *See* 24 C.F.R. Part 91.5, 91.15.  It includes an assessment of the housing needs, homeless needs, housing market analysis, and identifies barriers to affordable housing.  It also includes a strategy to address affordable housing and other needs and issues.  *Id*.  HUD reviews the Consolidated Plan and may disprove and require revision.  24 C.F.R. 91.500.

Additionally, each jurisdiction is required to submit annual action plans.  24 C.F.R. 91.220.  The action plans serve as an application for the federal funds and provide a budget of how the funds are planned to be used.  Each details the plans, projects, and dollar amounts.  As

part of the annual plan, the jurisdiction is required to provide the certificate to AFFH.  21 C.F.R. 91.225.

Within 90 days after the close of the program year, the jurisdiction is required to submit annual performance reports to HUD.  24 C.F.R. 91.520.  They are referred to as a Consolidated Annual Performance and Evaluation Report or "CAPER".  The CAPERs include an evaluation of the jurisdiction's progress in meeting specific objectives of providing affordable housing, reducing homelessness, action taken to AFFH, and detail the use of the federal funds.  HUD reviews the CAPER to determine if it is satisfactory.  24 C.F.R. 91.520(h).  HUD may withdraw and reallocate funding if, after notice and opportunity to be heard, it concludes a satisfactory CAPER was not submitted.  *Id*.  Additionally, HUD annually reviews the performance of each jurisdiction to assess the management of funds, compliance with the consolidated plan, accuracy of action plans, extent of progress, and compliance with agreements and the requirements of law. 24 C.F.R. 91.525(a).  The review can include site visits.  *Id*.

**D.     The City's Certifications**

The City's Consolidated Plans and each annual action plan were developed through public meetings, recommendations, and decisions by the Community Development Commission and City Council and then sent to HUD.   (City Appx. at 338-349, 357-360, 368-369, 373, 1777-1778). The action plans for the two most recent years have been available on the City's website. (City Appx. at 1778).  The Consolidated Plan and the annual plans have been available to the public at the main library, the City Secretary's Office, and City's Office of Financial Services or available pursuant to an open records request.   (City Appx. at1778).   The Consolidated Plan includes a summary of the AI.  (City Appx. at 372).  All the certificates about which Relators complain have been publicly disclosed.

E.      **The 1993 Housing Plan and 1998 AI**

Relators allege that the relevant time period began in February 2005, yet they complain about the City's fair housing plan prepared in 1993 and the City's 1998 AI. (*See* Am. Compl., ¶¶ 17, 63-66, 69). At the time the 1993 plan and the 1998 AI were prepared, the City was a party to a lawsuit in *Walker, et al v. City of Mesquite, et al*, Civil Action No. 3:85-CV-01210-O (N. D. Tex.). The Dallas Housing Authority of the City of Dallas ("DHA") and the United States Department of Housing and Urban Development ("HUD") were also parties. In 1990, the City entered into a consent decree that provided in part that the City would affirmatively further fair housing as well as submit records of its actions to the court, the *Walker* plaintiffs' counsel, and a special master appointed by the federal district court. (*See* City Appx. at 374-375).

The development of the 1993 plan and the 1998 AI were prepared after public hearings and input from a variety of sources. HUD, the special master, and the *Walker* plaintiffs' counsel all received drafts and final versions of the plan and AI. (*See* City Appx. at 430-432, 445). The plan and AI were also sent to the public library and made available to the public. *Id*. The City's actions to affirmatively further fair housing were reported, served on the parties, and filed with the district court in the City's quarterly reports. (*Id.*). Also, in 2000, the City filed a compliance report which detailed the City's actions in fulfilling the Decree requirements. (City Appx. at 505-589, 1788).

The *Walker* plaintiffs' counsel did not believe the 1998 AI and City's action were sufficient and filed a motion challenging AI and the City's actions. (*See* City Appx. at 376-412). The City filed a response and set forth its arguments why the AI and the City's actions were sufficient. (*See* City Appx. at 413-504). HUD was a party to the lawsuit at the time and did not file any document disputing the sufficiency of the City's AI or its actions. The motion remained pending until the consent decree was terminated in August 2003. (City Appx. at 1788). When

the decree was terminated, all pending motions were dismissed with prejudice. (City Appx. at 590-594). The procedure, content, and claimed defects to the 1993 plan and 1998 AI were all part of the *Walker* proceedings to which HUD was a party.

Additionally, in 2006, the Texas Affordable Housing Project reviewed the City's 1998 AI and published the results of its review and posted the review on the internet. The report criticized the AI for many of the same alleged defects that Relators now assert. (City Appx. at 595, 603-609).

The allegations and transactions on which the claims related to the alleged defects in the 1993 plan and 1998 AI are based have been publicly disclosed.

**F.     Delay in Updating the 1998 AI**

Relators complain that the 1998 AI was not updated until 2007. (Am. Compl., ¶¶ 63, 66). The delay in updating the 1998 AI was publicly disclosed. In 2006, the Texas Affordable Housing Project's report noted that the City was currently conducting its first AI since 1998, "well beyond the 2 to 5 year window recommended by HUD." (City Appx. at 607). The 2007 AI states it is an update of the 1998 AI and the 2007 AI has been available online at the City's publicly accessible website, the City's main library, and the City's Fair Housing Office since 2007. (*See* City Appx. at 3, 1778, 1787). The 2005-2006 CAPER sent to HUD in December 2006 noted that the completion date for the new AI had been revised to June 2007. (City Appx. at 622). The following year's CAPER noted the AI had been submitted to HUD and available to the public on the internet. (City Appx. at 623). The CAPERs were available to the public at the City's main library, the Office of Financial Services, the City Secretary's Office, or through an open records request. (City Appx. at 1778).

In response to HUD's request, the City, on or about July 17, 2007, sent HUD a copy of the updated AI. (City Appx. at 624). Copies of the updated AI were then placed in the libraries,

request for comments were published in the local newspaper, notices were placed at the libraries and the on the City's website, and public hearings were scheduled for the following four weeks. (City Appx. at 168, 624). At the public meetings in which input was sought for the 2007 AI, a power point presentation was made that specifically referenced that this was the third AI, the other two being completed in 1993 and 1998. (*See* City Appx. 626, 1787). On or about September 24, 2007, the City sent HUD a revised updated AI that included the public comment section and made other minor corrections. (City Appx. at 628).

The allegations and transactions on which the claims related to the delay between the 1998 AI and the 2007 AI are based have been publicly disclosed.

## G.    Content of the 2007 AI

Relators' primary complaint is that the 1998 and 2007 AIs were defective in their content. Relators allege a comparison of the AIs to the 1996 HUD Guide reveals deficiencies obvious on the face of each AI. (*Compare* Am. Compl., ¶¶ 33-36, 45-50, 54-58, 60-61 to ¶¶ 59, 63-66, 69, 79-84). Elsewhere, Relators complain about the AIs failure to include other publicly disclosed matters. (Am. Compl. ¶¶ 105-115). As discussed above, any complaints regarding the 1998 AI were publicly disclosed long ago.

Further, the 2007 AI as described above was developed through a public process. The 2007 AI has been available to the public on-line and at the City's Fair Housing Office and at the City's main library since 2007. (City Appx. at 168, 372, 624, 628, 1778, 1787). A draft and final copy was submitted to HUD in 2007. (City Appx. at 624, 628). Relators acknowledge it was published in July 2007. (Am. Compl., ¶109). Any purported deficiencies in its content or alleged failure to comply with 1996 HUD Guide have been publicly disclosed.

Indeed, Relators allege that the 2007 AI was just an edited version of the 1998 AI and suffered the same defects. (Am. Compl. ¶ 84). The defects asserted by Relators as to the 2007

AI were raised as criticism to the 1998 AI in the *Walker* plaintiffs' motion and the Texas Affordable Housing Project's report. (City Appx. at 376-412, 595-621). Because Relators' allegations and transactions are at least in part based on the same allegations and transactions publicly disclosed in *Walker* and in the Texas Affordable Housing Project report, the jurisdictional bar applies. *See U.S. ex rel. Fried v. West Indep. Sch. Dist.,* 527 F.3d 439, 442 (5th Cir. 2008); *Federal Recovery Servs. Inc.*, 72 F.3d at 451.

The allegations and transactions on which the claims related to the content of the 2007 AI or its failure to comply with the 1996 HUD Guide are based have been publicly disclosed.

## H.      HUD's reports, investigations and audits

The allegations and transactions that form the basis of the Relator's claims have also been part of HUD's "report, hearing, audit, or investigation" of the City's AIs, Consolidated Plan, Annual Plans, and CAPERs. Copies of the City's AIs, Consolidated Plans, Annual Plans, and CAPERs have been provided to HUD. Each year HUD reviews the City's plans and CAPERs and performs site visits and audits. The reviews are thorough and extensive as is reflected by samples of HUD reports and audits. (City Appx. at 629-646, 1777-1778). The extent of the investigation is highlighted by a HUD report to the City dated February 22, 2010 concerning the 2008 program year, "As a result of our evaluation we have determined that the City of Dallas has carried out its programs substantially as described in its Consolidated Action Plan; the Consolidated Action Plan as implemented complies with the requirements of the Housing and Community Development Act and other applicable laws and regulations, …" (City Appx. 638). The full extent of the regulatory scheme and HUD's ongoing report, and investigation, and audits of grantee's AI is highlighted by recent actions taken by HUD against the State of Texas and the City of Houston. In both situations, HUD found the respective AIs inadequate and demanded changes and other actions. (City Appx. at 1747-1759). Any complaint about the City's AIs, the

City's actions, or the City's certifications have also been the subject of HUD's reports, investigations, and audits and therefore the allegations and transactions have been publicly disclosed.

## IV.
## ALL OF RELATORS' CLAIMS BASED ON CITY ACTIONS HAVE BEEN PUBLICLY DISCLOSED

Relators loosely assert that various City actions either should have been included in the AIs or suggest a failure to AFFH.  (Am. Comp. ¶¶ 85-115).  Most of the claims relate to affordable housing and not fair housing.  The allegations and transactions upon which the claims are based have been publicly disclosed.  To the extent Relators claim that information related to these matters should have been included in the AIs, the alleged absence was obvious and also publicly disclosed.

### A.      Low Income Housing Tax Credits ("LIHTC")

Relators claim that the City was responsible for more LITHC projects being built in southern Dallas than in northern Dallas.  (Am. Compl., ¶¶89-94, 125).  However, the issue was already raised in a lawsuit.  *See The Inclusive Communities Project, Inc. v. Texas Dep't of Housing and Community Affairs*, Civil Action No. 3-08-CV-00546-D (N.D. Tex.).  In that case, the plaintiff ("ICP") alleged, among other things, that the State ("TDHCA") uses race and ethnicity as a factor in awarding credits which causes segregation and discrimination.  ICP complained of a concentration of LIHTC in minority neighborhoods in the City of Dallas. (City Appx. at 647-664).  TDHCA sought dismissal because of a failure to join the City.  (City Appx. at 665-673).  As part of its response, ICP offered a briefing to the Housing Committee and City Council action dealing with LIHTCs that noted the concentration of LIHTCs in southern Dallas. (City Appx. at 676-682, 701-739)  The court rejected TDHCA's contention that the City should be a party.  (*See* City Appx. at 747-748).

Later, in support of its summary judgment motion, TDHCA offered articles that complained about the concentration of LIHTC in low income areas.  (City Appx at 749-754). TDHCA also offered the Report of the Texas House of Representatives Committee on Urban Affairs.  It investigated practices concerning LIHTCs and their concentration in areas, including Dallas.  (City Appx. at 755-797).  It noted that the City's current policy was the result of concerns of saturation of low income families in certain sub-markets, mostly southern Dallas. (City Appx at 763-764, 794-797).  The parties both moved for summary judgment and tendered evidence about the concentration of LIHTCs in minority or low-come areas.  The court found, "Because TDHCA is the sole entity with authority to award tax credits to developers, its decisions directly affect the availability and geographical distribution of low-income housing" and concluded TDHCA disproportionately approved LIHTCs in minority neighborhoods. *Inclusive Communities Project, Inc. v. Tex. Dep't of Housing and Consumer Affairs*, 749 F. Supp. 2d 486, 496, 500 (N.D. Tex. 2010).  The filing of the lawsuit attracted media attention as well. (*See* City Appx. at 798-801). Final disposition has been stayed.  (City Appx. at 802-803). [2]

Additionally, concerns about LIHTC placement generally and in Dallas have been raised in a number of studies, articles, and public correspondence.  (City Appx. at 686, 695, 974-989).

Finally, the City's involvement with LIHTCs in general and with specific projects has been a matter of public disclosure in committee briefings and City Council actions.  (City Appx at 990-1000, 1785-1786).   The allegations and transactions on which the claims related to LIHTCs are based have been publicly disclosed. The Relators' allegations are parasitic.

---

[2] The City's involvement with LIHTCs was also part of the FBI's investigation and the later indictment and trial of former council member Don Hill.  There was extensive local media coverage of the investigation and trial.  (*See* e.g. City Appx. at 804-973).

**B.     Tax Increment Financing Districts ("TIFs")**

Relators complain of "the minimal funding provided for affordable housing" by the City's TIFs and the TIFs' affordable housing policy.  (*See* Am. Compl., ¶¶ 95-97, 102).   The TIFs' funding policies and each project considered for TIF support have been publicly disclosed.

Each of the City's TIFs was created pursuant to state law.   Tex. Tax § 311.001 *et seq*. The same general procedure was used to create each TIF.   It included the following: City Council public meeting to consider the formation of a specified TIF district; submission of a preliminary plan to other taxing entities in which the TIF District may be located; City Council public meeting to vote on creation of TIF and preliminary plan and appointment of TIF board of directors; TIF board of directors public meeting to draft and approve a final plan; Economic Development Committee of City Council public meeting and briefing on final plan; and City Council public meeting to vote on the final plan. (City Appx. at 1771-1773).   The final plan will contain the budget and any requirement for affordable housing.   The agenda, briefings, minutes, City Council action are available to the public from the City Secretary, the City's Department of Economic Development, and the City's website.   Since January 2010, each TIF plan has been on the City's website. (City Appx. at 1772-1773)

The City has now created a total of 19 TIF districts, and all but one remains active.  (City Appx, at 1001, 1773).   The first five TIF districts were created prior to 2005 and did not have an affordable housing requirement.   In 2005, after a public briefing to Economic Development Committee and later vote by the City Council, the City adopted a policy that future TIFs require affordable housing. (City Appx. at 1002-1018, 1773).   The 13 TIF districts created after 2005 all have requirements to provide affordable housing and two of the original five TIFs have amended their plans to include affordable housing requirements pursuant to the public process described above. (City Appx. 1019-1069, 1773).

As to any project requesting TIF funding, the proposal is reviewed by the TIF board, then briefed to the Economic Development Committee, and then voted upon by City Council.  All meetings are open to the public after public notice.  (City Appx. at 1773-1775).  The agenda, briefings, and minutes of the committee and the City Council meetings are on the City's website and are also otherwise available to the public.  (*Id.*).  In addition, annual summaries of the plans and projects for each TIF approved by the TIF boards, the Economic Development Committee, and City Council and then sent to the Texas Comptroller and the other taxing jurisdictions and posted on the City's website. (*See* Tex. Tax Code § 311.019; City Appx. at 1774).

Whether a TIF district requires affordable housing or whether a particular project receiving TIF funding will provide affordable housing have been publicly disclosed.  The allegations and transactions on which the claims related to TIF funding are based have been publicly disclosed. The Relators' allegations are parasitic.

C.    **The Atmos, Continental, and Shamburger Projects**

Relators complain about three housing projects in Dallas.  (Am. Compl., ¶98-101). Relators first claim that the Atmos project will concentrate and steer all the low-income units in one of four buildings.  (Am. Compl., ¶¶ 100, 101).  The developer's proposal was revised to encompass two other adjacent buildings to create an additional 123 housing units, of which 63 will be affordable.  The discussion of the original and the revised proposals and status of the project were the subject of public hearings before TIF boards, the City Council, and TDHCA and news articles.  (City Appx. at 1070-1108, 1706-1720, 1786).  The proposal for section 108 funding has been sent to HUD for its review and approval.  (City Appx. at 1781-1782).  The issues related to the project have been publicly disclosed.

Relators complain that two other projects were improper because the mix of the affordable units would discriminate on the basis of familial status.  (Am. Compl., ¶ 99).  The

first, the Continental project, has received a Section 108 guarantee loan award from HUD and the affordable units included a total of 31 one and two bedroom apartments.  The second, the Shamburger project, withdrew its application and is proceeding with construction without any City assistance.  The proposals for each project were briefed to a committee and then approved by City Council at a public meeting, sent to HUD, and reviewed by HUD. Updates on the status of application and project were provided to a City Council committee through public briefings at public meetings.  (City Appx. at 1072-1108, 1781-1782, 1785-1786).  The nature of the development, the type and number of affordable units has been publicly disclosed.  Additionally, HUD's review of each project is an investigation and a public disclosure.

The allegations and transactions on which the claims related to these three projects are based have been publicly disclosed.

## D.    Community Development Building Grants ("CDBG")

Relators fault the City for directing the allocation of CDBG funds and other unidentified community development resources into CDBG eligible census tracts which are high minority low income areas of the City.  (Am. Compl., ¶ 103).[3]  Relators' allegations ignore that one of the national objectives of CDBG and HUD regulations is improvement of those areas.  *See* 42 U.S.C. §5301(c); 24 C.F.R. 570.483(b).  But even if fulfilling the statutory purpose of CDBG could somehow form the basis of a false claim, the debate as to how to allocate CDBG funds has long been a matter of public discussion.  For example, in a newspaper article, dated December 16, 2004, the paper observed:

> … it took years to persuade council to concentrate federal Community Development Block Grant funds in a few targeted neighborhoods, rather than spreading it equally among all districts.

---

[3] Paradoxically, the Relators allege elsewhere that the City has not devoted enough resources to these areas.  (Am. Compl. ¶ 107).

> "The CDBG money had been used to placate neighborhoods", said council
> member Elba Garcia. "It was hard for members to give that up."
> Some council members still reject the need for a unified strategy.

(City Appx. 1137).  (*See also* City Appx. at 1117-1120).

Moreover, the procedure by which the decision on how to allocate the CDBG funds is a matter of open public meetings, discussion, debate, and decision involving the City's Community Development Commission and the City Council.  (*See* City Appx. at 338-350, 356-358, 360, 366-368, 373, 1777-1778).   Further the consolidated plan and action plans are submitted to HUD for review and approval.  (*See* City Appx. at 1777-1778).   The actual use of the funds is then reviewed by HUD after submission of the CAPER.  *Id*.  HUD's review of the annual plans and CAPERs is an investigation.

The allegations and transactions on which the claims related to the use of CDBG funds are based have been publicly disclosed. The Relators' allegations are parasitic.

E.      **Walker**

Relators allege that the AI "failed to properly disclose and analyze" the impact of historical discrimination" and findings "as established" in the *Walke*r case. (Am. Compl., ¶ 105, 108).[4]  All of the pleadings, filings, and orders in the *Walker* case were publicly disclosed.  The 2007 AI was publicly disclosed and does reference *Walker* and the termination of the decree in 2003.  (City Appx. at 62, 76, 118).   Whatever the claimed deficiency in the detail of that reference, it was publicly disclosed.

---

[4] There were no final findings against the City.  In a single order, the City was joined as a party, held bound to a consent decree entered by DHA and HUD, and had a partial summary judgment entered against it.  *See Walker v. U.S. Dep't of Housing and Urban Dev.*, 734 F. Supp. 1289 (N.D. Tex. 1989).  Rather than litigate and appeal that decision, the City entered into a consent decree that specifically denied liability.  (City Appx. at 374).  Moreover, in *Walker v. City of Mesquite*, 169 F.3d 973, 985 (5th Cir. 1999), the Fifth Circuit held that DHA, HUD, and the City of Dallas no longer discriminated against black families in DHA's public housing programs and were "active participants in crafting and implementing remedial measures to eliminate the vestiges of past discrimination."

F.      **Southern and Northern Dallas**

Relators allege that the City has not employed a strategy of improving conditions in southern Dallas and the only improvements made are to add low income housing.  (Amended Compl., ¶ 107).   They further allege that the City has not employed a strategy to provide affordable housing in more economically advantaged areas. (*Id*.).   The allocation of resources between parts of the City has been part of open and public debate.   For example, apart from the annual budgets and annual report process, the following reports and briefings prepared by or for the City have been publicly disclosed at public meetings and have been on the City's website shortly after each was briefed:

> 2002 Mayor's Task Force on Affordable Housing (City Appx. at 1138-1221);
> 2005 Strategic Engagement: Dallas' Economic Development Plan and 24 month status report (City Appx. at 1222-1276);
> 2006 forwardDallas! Comprehensive Plan (referenced in the 2007 AI) (City Appx. at 1277-1319);
> 2007 Downtown Dallas "living for all" Update on Affordable Housing (City Appx. at 1320-1340;
> 2007 Revitalizing Downtown: Creating Anchors to Build the Core (City Appx. at 1341-1397);
> 2008 Realizing Potential: A Framework for Enhancing the Southern Portion of Dallas (City Appx. at 1398-1482);
> 2008-2009 Mayor's Southern Dallas Task Force (City Appx. at 1483-1580);
> 2011 A New Paradigm: Strategies for Revitalizing Dallas' Distressed Neighborhoods (City Appx. at 1581-1601);
> 2011 Downtown Dallas 360 (City Appx. at 1602-1620)

In addition, in the last three bond elections, the City submitted to the citizens various bond proposals that resulted in a billion dollars of funding for southern Dallas.  (City Appx. at 1403).  In January 2009, the City sought and obtained $75 million of section 108 loan guarantee loans.  In deciding to seek such funds, City Council directed that half of the funds be allocated to southern Dallas.  (City Appx. at 1109, 1112).  The issues have been publicly disclosed.

Finally, issues related to the Relators' claims related to the allocation of resources and the distribution of affordable housing have been disclosed in news media and litigation. (City Appx. at 476-385, 647-660, 800-807, 1121-1137, 1733-1746). The allegations and transactions on which the claims related to southern and northern Dallas are based have been publicly disclosed.

## G.      Intown Housing Program

Relators complain about the Intown Housing Program referenced in the 2007 AI. (Am. Compl., ¶ 109). They rely on a 2007 public briefing to a City Council committee at a public meeting. The briefing has been available at the City's web-site since 2007. (City Appx. at 1320-1340, 1780). Relators' pleadings establish and admit the public disclosure.

Relators reference the sale or conversion of four projects in the Intown Housing Program. (Am. Compl., ¶ 109). In 2002, the publicly disclosed report by the Mayor's Task Force on Affordable Workforce Housing recommended that the City sell its interest in existing Section 108 properties. (City Appx. at 1198, 1220). The subsequent sale or conversion of each project was the subject of public hearings and public decisions before a City Council committee and the City Council. HUD's approval was required for three of the four sales. (City Appx. at 1780). The allegations and transactions on which the claims related to the Intown Housing Program are based have been publicly disclosed. The Relators' allegations are parasitic.

## H.      Downtown Affordable Housing

Relators again rely on the 2007 briefing to a City Council committee about the decline of downtown affordable housing. They allege that suggestions were made, nothing changed, and the 2007 AI did not include the information. (Am. Compl. ¶ 110). The allegations on their face demonstrate that public disclosures form the basis of the claim.[5]

---

[5] Relators allege that some unidentified City agent or employee at some unidentified time in some unidentified context said affordable housing is not part of the vision for downtown Dallas. (Am. Compl., ¶ 104). Even

Furthermore, the issues related to the creation of affordable housing in downtown Dallas have been publicly disclosed.  For example, the 2007 briefing referenced by Relators noted that the City had set a goal of creating 1,000 downtown affordable units but there were currently only 148 affordable units.  (City Appx. at 1320, 1326).

Previously, the City, after public debate, placed on the 2006 ballot a bond proposal to construct a homeless center.  After passage of the measure, there was public debate about the location of the center.  The City decided to build the center in downtown Dallas at an approximate cost of $23.8 million.  At an annual cost of approximately $6 million, the center, known as the Bridge, provides temporary housing for approximately 600 individuals every night and feeds over 700 people every day.  The initial bond measure, the construction and location of the Bridge, and its annual costs are matters of public disclosures.  (City Appx at 1621-1637).

In the spring of 2010, the City Walk at Akard opened in downtown Dallas.  It offers 200 affordable units.  Funding was through LIHTC and City support.  (City Appx. at 1638-1639).  The Atmos and Continental projects will create a total of 211 new affordable units in downtown.  The City's decision to provide assistance was done at public meeting after public briefings.  (City Appx. at 1072-1101, 1780-1782).

In June 2009, City Council directed that a development plan be created for the downtown.  The Downtown Dallas 360 report was later adopted by City Council in April, 2011.  The report noted the lack of housing choice in downtown and the report offered various ideas on how to create affordable housing in downtown.   (City Appx. at 1602-1608).

---

statement by members of the governing body are not binding on the City.  *See McClure v. Biesenbach*, 402 F. Supp. 2d 753, 762 (W. D. Tex. 2005) affirmed 355 Fed. Appx. 86 (5th Cir. 2009).

The need for more affordable housing in the downtown area and City's efforts to create it, successful or not, have been publicly disclosed. All the allegations and transactions on which the claims related to the downtown affordable housing are based have been publicly disclosed.

## I.    Hurricane Katrina

Relators claim that the impact of Hurricane Katrina should have been included in 2007 AI. (Am. Compl., ¶ 111). Contrary to Relators' implication, there was little long term effect.[6] The emergency evacuation caused by Hurricane Katrina was publicly disclosed and the absence of any reference to it in the AI was publicly disclosed.

## J.    LIHTC Moratorium

Relators allege that in 2005 the City mayor declared a moratorium on production of LIHTC housing because of an FBI probe. Relators claim that stopped production of affordable housing and should have been disclosed in the 2007 AI. (Amended Compl., ¶ 112). The letter and its impact on affordable housing were disclosed in the news media and judicial filings and other public sources. (City Appx. at 671-672, 677, 712-713, 747, 1642-1646). The existence of the moratorium, its possible impact on affordable housing, and its absence from the 2007 AI were publicly disclosed.

## K.    Downtown Mortgage Assistance Program ("DMAP")

Relators complain about the Downtown Mortgage Assistance Program ("DMAP") because no affordable units were created by the time the 2007 AI was finalized. (Am. Comp., ¶ 113). DMAP was created to help low income families purchase downtown condos by providing up to $40,000 in assistance. The program was briefed to a committee and then authorized by City Council at a public meeting in February 2007. (City Appx. at 1647-1655, 1781). A

---

[6]Based on the U.S. Census, the City's total  population only grew by 9,236, less than 1%, between 2000 and 2010. (City Appx. at 1640-1641).   The court may take judicial notice of U.S. Census data. *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011).

program summary was submitted to HUD and HUD has been informed of the program. (City Appx. at 1781). In March 2007 there was a public meeting and briefing to a city council committee that summarized the program and its goals, as well as, other programs and the overall goal of creating affordable downtown housing. (City Appx. at 1320-1338). In May and December 2007, City Council, in public meetings, approved additional funding for the program. (City Appx at 1661).

In 2008, the program was re-evaluated through a briefing before a city council committee in another public meeting. (City Appx. at 1656-1690). In August 2008, at a public meeting, City Council approved changes to the program to allow greater assistance in the purchase of downtown units, the lesser of 50% of the loan amount or $100,000. (City Appx. at 1692-1697). The failure to produce affordable units under the original parameters of the program were publicly disclosed, discussed, and debated. The result was a change to the program. Relators' allegation is another false parasitic allegation.

**L.   HERA**

Relators further complain about the transfer of HERA bond allocations to the Texas State Affordable Housing Corporation ("TSAHC"). (Amended Compl., ¶114).[7] The Dallas Housing Finance Corporation's ("DHFC") decision to transfer was made at a public meeting. (City Appx. at 1700-1701, 1784). TSAHC's request was made at a public meeting. (City Appx. at 1698-1699, 1784). There was a public disclosure.

**M.   Section 108 Interest Rates**

Relators assert that the City charges a .5% higher interest rate than HUD charges the City on the section 108 loans and this discouraged development of affordable housing. (Amended

---

[7] Relators' complaint is that the information related to this event should have been included in the 2007 AI even though the events occurred more than two years later.

Compl., ¶ 115).[8]  In 2009, the City Council approved a program statement for section 108 loans.

that referenced that the City would require credit enhancements if underwriting indicated a need.

(City Appx. at 1109-1116).  Afterwards, the City has required certain proposed projects provide

the .05% higher interest.  The .05% interest cushion was included in public briefings,

applications, and/or resolutions for each of these projects. (City Appx. at 1070-1071, 1781-

1782).  The briefings and approvals were made at public meetings and appear on the City's

website and the interest charge has been disclosed to HUD.  (City Appx. at 1781-1782).  There

was public disclosure.

**N.    DHA**

Relators fault the 2007 AI for failing to include more discussion about the fact that

DHA's tenant population was 86% African-American and the City did not receive other

information from DHA.  (Am. Comp. ¶ 81).  The 2007 AI observed that the tenant population

make-up was disproportionate to the Dallas population and recommended that DHA enhance its

outreach to increase the racial/ethnic diversity of the DHA tenant population.  (City Appx. at 75,

100).  Whatever claim Relators are trying to make, it is based entirely on the information

contained in the publicly disclosed AI.

**V.**
**RELATORS PUBLICLY DISCLOSED THE ALLEGATIONS**
**AND TRANSACTIONS BEFORE FILING SUIT**

Relators were owners of a corporation that sought City assistance for a proposed

development.  The City initially agreed to provide assistance.  The City later withdrew its

support after the Relator's company altered the proposal, was threatened with foreclosure, and

went into bankruptcy.  (City Appx. at. 1703-1705).  Since that time, the Relators have made the

---

[8] Again, Relators' complaint is that the information related to this event should have been included in the 2007 AI even though the events occurred more than two years later.

same allegations to news media and other governmental entities as presented in this action. For example, the Relators complained to TDHCA and to the news media about the Atmos project. (City Appx. at 1706-1720).[9] They likewise complained to the news media about the Continental project. (City Appx. at 1721, 1722).

On or about February 2, 2010, the Relators filed a fair housing complaint with HUD concerning their failed proposal. (City Appx. at 1723-1724). The complaint asserted the same allegations raised in this lawsuit. It included allegations concerning LIHTCs, TIFs, the Intown Housing Program, HERA, the north/south Dallas allocation, CDBG, downtown affordable units, and the same misquotes of City personnel. (*Id*.). In addition to the fair housing complaint, Relators spoke with the news media and provided at least one author a copy of their complaint who then wrote about the allegations. (City Appx. at 1725-1731).

Finally, in June 2010, the Relators again spoke to the news media who published a story regarding the possible False Claim Act violations because of the City's certifications to affirmatively further fair housing. (City Appx. 1729-1732).

The allegations and transactions about which Relators complain were based on information that they gleaned from public disclosures which they then publicly disclosed themselves before filing this action.

## VI.
## RELATORS ARE NOT THE ORIGINAL SOURCE

Relators allege that to the best of their knowledge there has been no public disclosure of the allegations in the complaint but if there have been, they are the original source. (Amended Compl., ¶¶ 6, 10, 11). The allegations are false.

An "original source" is defined as "an individual who has direct and independent

---

[9] Before the TDHCA, the sponsors of the Atmos project described Relators' challenge as "sour grapes". (City Appx. at 1717).

knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).  Knowledge is direct if it is derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others. *Reagan,* 384 F.3d at 177.  Knowledge is independent if it is not derived from public disclosures. *Id.*  The court is required to review the factual subtleties of the case and strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim.  *Laird,* 336 F.3d at 356. Knowledge that is based on research and review of public records is neither direct nor independent.  *Reagan*, 384 F.3d at 178-79.  Second hand information cannot be converted into direct and independent knowledge simply because a relator discovered what the public already knew.  *Id.*  Instead, the relator must provide some additional compelling fact or demonstrate a new and undisclosed relationship that puts a governmental agency on the trail of the fraud where that fraud might otherwise go unnoticed.  *Id.*

As the evidence outlined above reveals, the matters about which Relators complain have been a matter of public disclosure, discussion, and debate long before Relators purportedly brought their theories to the attention of the United States.  Indeed, in the new stories and complaints made by Relators, they note that their source of information is from public sources. (*e.g.* City Appx. at 1708, 1722).  To the extent that Relators should argue they are original sources based on the allegation contained in their company's housing discrimination complaint, those vague broad claims are also based on public disclosures and the information which on which the allegations and transactions are based have been publicly disclosed.  There is nothing

in that complaint that has not likewise been raised and addressed in the public arena.  At best,

Relators have reviewed publicly disclosed information and re-fashioned it to assert a claim.  As a

matter of law, Relators are not the original source.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, the City requests that the Court grant in

whole, or alternatively in part, its motion to dismiss for lack of jurisdiction.


Respectfully submitted,

OFFICE OF THE CITY ATTORNEY
CITY OF DALLAS, TEXAS


By: s/ Charles Estee
    CHARLES ESTEE
    Assistant City Attorney
    State Bar of Texas No. 06673600
    PETER B. HASKEL
    Senior Assistant City Attorney
    State Bar of Texas No. 09198900
    7BN Dallas City Hall
    1500 Marilla Street
    Dallas, Texas 75201
    Telephone – 214/670-3519
    Telecopier – 214/670-0622

## CERTIFICATE OF SERVICE

I certify that on March 16, 2012, I electronically filed the foregoing document with the clerk of court for the United States District Court for the Northern District of Texas using the electronic case failing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all counsel of record who have consented in writing to accept this Notice as service of this document by electronic means.

> ***Via Hand Delivery***
> Hal K. Gillespie
> Gillespie, Rozen & Watsky, P.C.
> 3402 Oak Grove Avenue
> Dallas, Texas  75204
> *Counsel for Plaintiffs/Relators*
>
> ***Via Certified Mail No. 7006 0100 0003 1302 9684***
> Michael Allen
> Stephen Hayes
> Relman, Dane & Colfax, PLLC
> 1225 19th Street, N. W., Suite 600
> Washington, D.C.  20036-2456
> *Counsel for Plaintiffs/Relators*
>
> ***Via Hand Delivery***
> Earsa Jackson
> Strasburger & Price, LLP
> 901 Main Street, Suite 4400
> Dallas, Texas  75202
> *Counsel for Defendant Dallas Housing Authority*
>
> ***Via Certified Mail No. 7006 0100 0003 1302 9667***
> Gerald Bright
> Walker Bright PC
> 100 North Central Expressway, Suite 800
> Richardson, Texas  75080
> *Counsel for Defendant Dallas Housing Authority*

***Via Certified Mail No. 7006 0100 0003 1302 9660***
Colin D. Speaker
Asst. U. S. Atty.
801 Cherry St., Suite 1700
Unit 4
Fort Worth, Texas  76102
*Attorney for United States*


                                         s/Charles Estee
                                        CHARLES ESTEE