UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>ANTI-DISCRIMINATION CENTER OF<br>METRO NEW YORK, INC., | : | **ECF CASE** |
| | : | 06 CV 2860 (DLC) |
| | : | |
| Plaintiff/Relator, | : | |
| | : | |
| -v- | : | |
| | : | |
| WESTCHESTER COUNTY, NEW YORK, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**PLAINTIFF/RELATOR ANTI-DISCRIMINATION CENTER OF METRO NEW YORK,
INC.'s MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**



EXHIBIT
A-1

Appendix 6

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii-v

I.     INTRODUCTION...................................................................1

II.    PROCEDURAL HISTORY ........................................................4

III.   STANDARD OF REVIEW ON MOTION TO DISMISS.......................6

IV.    STATUTORY AND REGULATORY FRAMEWORK ...........................6

    A.   The False Claims Act ...................................................6

    B.   The Obligation to Affirmatively Further Fair Housing .....................7

        1.   The Materiality of the "Affirmatively Furthering" Certification
             to the Receipt of Federal Housing Funds .............................8

        2.   The Essential Components of the AFFH Certification .....................9

            a.   The Obligation to Conduct an Analysis of Impediments to
                 Fair Housing Choice .................................................9

            b.   The Obligation to Take Appropriate Actions .....................11

V.     THE COMPLAINT ADEQUATELY PLEADS A VIOLATION OF THE
    FALSE CLAIMS ACT...........................................................11

    A.   Governing Circuit Law on "False or Fraudulent Claims" Under the False
        Claims Act   ..........................................................13

    B.   The Falsity of Defendant's Claims and Certifications....................13

        1.   The Obligation to Conduct an Analysis of Impediments.................15

        2.   The Obligation to Take "Appropriate Actions" .................17

    C.   Defendant Knew Its Certifications and Claims Were False  .................20

VI.    THE JURISDICTIONAL BAR OF 31 U.S.C. §3730(e)(4)(A) DOES NOT
    APPLY TO THIS LITIGATION ................................................22

    A.   The Two-Part Jurisdictional Inquiry.................................23

    B.   The Allegations and Transactions on Which Relator's Lawsuit Are
        Grounded Were Not Publicly Disclosed.................................24

    C.   The Discovery of Relevant Information Through Freedom of Information
        Requests is Not Subject to the Jurisdictional Bar ...........................24

D.      Even if the Court Were to Find That Relator's Lawsuit is Based Upon
        Publicly Disclosed Material Within the Jurisdictional Bar, Relator Is an
        Original Source ............................................................................................26

VII.    RELATOR HAS SATISFIED THE PLEADING REQUIREMENTS OF RULE
        9(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE ...................................27

CONCLUSION......................................................................................................29

**Appendix 8**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ................................28, 29

*Berenson v. Town of New Castle,* 38 N.Y.2d 102 (N.Y. 1975) .............................3, 20

*City of Rochester v. County of Monroe,* 72 N.Y.2d 338 (N.Y. 1988) ....................20

*Comer v. Cisneros,* 37 F.3d 775 (2d Cir. 1994)..........................................9

*Conley v. Gibson,* 355 U.S. 41 (1957) ..................................................6

*Crown Communication New York, Inc. v. Dep't of Transp. of the State of New York et al.,*
    4 N.Y.3d 159 (N.Y. 2005)...........................................................20

*Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475 (2d Cir. 1995)............................7, 27

*Huntington Branch, NAACP v. Town of Huntington,*
    844 F.2d 926 (2nd Cir. 1988) .....................................................17, 20

*In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187 (2d Cir.2006) ...................12

*Kennard v. Comstock Resources Inc.,* 363 F.3d 1039 (10th Cir. 2004) ...............24, 26, 27

*Langlois v. Abington Hous. Auth.,* 234 F.Supp.2d 33 (D.Mass. 2002).....................7

*Lockhart v. United States,* 126 S.Ct. 699 (2005) .......................................16

*Matter of County of Monroe,* 72 N.Y.2d 338 (N.Y. 1988) ................................3

*Mikes v. Strauss,* 274 F.3d 687 (2d Cir. 2001) .......................................*passim*

*NAACP v. Sec'y of Housing and Urban Dev.,* 817 F.2d 149.................................7

*Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973) ................7, 8

*Rockwell Int'l Corp. v. United States,* 127 S.Ct. 1397 (2007) ..........................26

*Shannon v. U.S. Dep't of Housing & Urban Dev.,* 436 F.2d 809 (3d Cir. 1970) ...........7

*Thompson v. U.S. Dep't of Hous. & Urban Dev.,* 348 F.Supp.2d 398 (D.Md. 2005).........7

*Twombly v. Bell Atl. Corp.,* 425 F.3d 99, 106 (2d Cir.2005)...........................12

*United States v. Catholic Healthcare W.,* 445 F.3d 1147 (9th Cir. 2006) ...............23, 25

*United States v. Incorporated Village of Island Park,*
    888 F.Supp. 419 (E.D.N.Y. 1995) ..................................................9

*United States v. NeifertWhite Co.*, 390 U.S. 228 (1968) ........................................14

*United States v. New York Medical College,* 252 F.3d 118 (2d Cir. 2001) ...............................7

*United States v. Starrett City Assocs.,* 840 F.2d 1096 (2d Cir. 1988)........................................1

*United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1987).........................1

*United States ex rel. Barth v. Ridgedale Elec. Inc.*, 44 F.3d 699 (8th Cir. 1995) ..................27

*United States ex rel. Biddle v. Bd. of Trs. of Leland Stanford Jr. Univ.,*
   161 F.3d 533 (9th Cir. 1998) ...........................................................27

*United States ex rel. Bondy v. Consumer Health Found.,*
   28 Fed.Appx. 178 (4th Cir. 2001) ......................................................25

*United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13 (2d Cir. 1990) ..........7, 26

*United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318 (2d Cir. 1992) ............7, 23, 25, 26

*United States ex rel. Dunleavy v. County of Del.*, 123 F.3d 734 (3d. 1997) ..........................25

*United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Group, Inc.,*
   370 F.Supp.2d 18 (D.D.C. 2005) .......................................................27

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996) ....................................14

*United States ex rel. Karvelas v. Melrose-Wakefield Hospital,*
   360 F.3d 220 (1ˢᵗ Cir. 2004) ...........................................................28

*United States ex rel. Kersulis v. RehabCare Group, Inc.,* 2007 WL 294122 ...................14, 21

*United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,*
   985 F.2d 1148 (2d Cir. 1993) .......................................................6, 7, 21

*United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013 (7thCir. 1999) ...............24

*United States. ex rel. Mistick PBT  v. Hous. Auth. of City of Pittsburgh,*
   186 F.3d 376 (3d. 1999) ...............................................................25

*U.S. ex rel. Pentagen Technologies Intern. Ltd. v. CACI Intern., Inc.,*
   1996 WL 11299 (S.D.N.Y. 1996) ......................................................25

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l. Heathcare Sys.,*
   384 F.3d 168 (5th Cir. 2004) ......................................................25, 27

*United States ex rel. Springfield Terminal Railway Co. v. Quinn,*
   14 F.3d 645 (D.C. Cir. 1994) .......................................................6, 23

**Appendix 10**

*United States ex rel. Yannacopolous v. Gen. Dynamics,*
    315 F.Supp.2d 939 (N.D.Ill. 2004)..............................................................25


## RULES AND STATUTES

24 C.F.R. §§91.425 ...........................................................................................8, 9, 11

24 C.F.R. 570.601(a)(2).....................................................................................3, 9, 11

31 U.S.C. §3729 *et seq.* ....................................................................................1, 13, 21

31 U.S.C. §3730(e)(4)..........................................................................................*passim*

53 Fed. Reg. 34416, 34468 (Sept. 6, 1988) ...........................................................9

Fair Housing Act, 42 U.S.C. §§3608 *et seq.* ..............................................2, 8, 14

Fed.R.Civ.P. 9(b) .......................................................................................................4

Housing and Community Development Act of 1974, 42 U.S.C. §5304(b)(2) .........8


## SECONDARY AUTHORITIES

*The History and Development of Qui Tam,* 1972 Wash.U. L.Q. 81, 86-87..............................6

U.S. Department of Housing and Urban Development, *Fair Housing Planning
    Guide* (1996) .......................................................................................................10

U.S. Government Accountability Office, *Information on False Claims Act Litigation,*
    GAO-06-320R (Jan. 31, 2006)............................................................................7

Willens, *Commentary: §3729 False Claims,* National Institute for Trial Advocacy,
    Lexstat 31 US NITA 3729 (2006).......................................................................21

U.S. Census Bureau, *Racial and Ethnic Residential Segregation in the
    United States, 1980-2000* ...................................................................................1

*Floor Statement of Senator Edward Brooke,* 114 Cong. Rec. 2281 [1968] ..............................2

*The New Oxford American Dictionary, Second Edition*
    (Oxford University Press, May 2005) ........................................................10, 11, 17

Appendix 11

**PLAINTIFF/RELATOR ANTI-DISCRIMINATION CENTER OF METRO NEW YORK, INC.'s MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

## I.   **INTRODUCTION**

This case involves the knowing presentation of false certifications, claims and requests for payment by Westchester County ("Defendant") to the U.S. Department of Housing and Urban Development ("HUD") to secure federal housing funds totaling more than $45 million from April 1, 2000 to the present (the "false claims period."). These actions violate the False Claims Act, 31 U.S.C. §3729 *et seq.* ("FCA").

Defendant's false claims did not occur in a vacuum. Rather, they occurred in a county that is "strongly residentially segregated by race and national origin," Complaint ¶13, and in which 24 of the municipalities participating in the Defendant's federal funding consortium had Black populations of less than 3%. Complaint ¶14.[1] Strong municipal resistance to integration and affordable housing in participating municipalities has "contributed to the continued pattern of racial segregation in [Westchester County]." Complaint ¶¶ 18, 19. *See also* Def. Mem. 2-3; Ex. D, Part 1, at 8. While repeatedly promising HUD that it was complying with statutory and regulatory obligations to identify and overcome impediments to fair housing for Blacks and others protected under the Fair Housing Act ("FHA")—promises that were material to its eligibility to receive the federal funds in the first place— Defendant was actually caving into this municipal resistance and refusing to comply with federal law.

The driving force behind passage of the FHA in 1968 was the elimination of housing discrimination on the basis of race, and "Congress saw the antidiscrimination policy as the means to effect the antisegregation-integration policy." *United States v. Starrett City Associates*, 840 F.2d 1096,

---

[1] Measured by the "isolation index," the metropolitan area of which Westchester is a part is *the most segregated major metropolitan area in the entire United States.* U.S. Census Bureau, *Racial and Ethnic Residential Segregation in the United States, 1980-2000*, at p. 69, available at http://www.census.gov/hhes/www/housing/resseg/pdf/censr-3.pdf. For purposes of assessing the vehemence of municipal opposition to affordable housing and integration in Westchester County, the Court can also take judicial notice of a case *United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1987), *aff'g* 624 F.Supp. 1276 (S.D.N.Y.1985)(holding that plaintiffs established that Yonkers' housing and schools were intentionally segregated by race). While Yonkers is not a participant in the Westchester CDBG consortium, Defendant did suggest that its fair housing analysis and planning documents did not consider race discrimination in part because "the Consortium does not include Yonkers," Complaint ¶ 43.

1

1101 (2d Cir. 1988). Congress included the AFFH obligations, at 42 U.S.C. §3608, precisely because of conditions of segregation and resistance that have predominated in places like Westchester County.[2]

Defendant misleads this Court by suggesting that, having tied both hands behind its back with respect to complying with its civil rights obligations, it was powerless to influence the participating municipalities, or overcome the impediments to fair housing choice experienced by Blacks and members of other protected classes who wished to live there. Def. Mem. 2-3. In point of fact, the County's self-imposed limitation on fair housing analysis and actions, identified in the complaint, cannot be an excuse for inaction. Rather, it is powerful evidence of Defendant's culpability.

Defendant's fraud was revealed on July 7, 2005, in the course of a private meeting, at which Norma Drummond, the Deputy Commissioner of Planning for Westchester County, revealed to Craig Gurian, Executive Director of the Anti-Discrimination Center, a number of facts, previously unknown to the public, that directly contradicted the Defendant's public and repeated certifications and claims to HUD that it was complying with its obligation to affirmatively further fair housing ("AFFH"). These disclosures include, *inter alia*, admissions that Defendant did not consider race discrimination at all when assessing impediments to fair housing choice, Complaint ¶¶ 37, 38; that it deliberately chose not to criticize or monitor the efforts (or lack thereof) by the participating municipalities to comply with federal law, ¶¶ 47, 48, although it was required to do so; and that it would not even consider withholding federal funds as a sanction, ¶ 50, although it knew that federal law required it to do so. Throughout the same period that it was intentionally abdicating the responsibilities imposed upon it by federal law, Defendant, in order to secure at least $45 million in federal funds, repeatedly told HUD that it was doing what the law required. Therein lies the falsity, which was not known publicly.

---

[2] *See, e.g., Floor Statement of Senator Edward Brooke.* ("What adds to the murk is officialdom's apparent belief in its own sincerity. Today's Federal housing official commonly inveighs against the evils of ghetto life even as he pushes buttons that ratify their triumph—even as he ok's public housing sites in the heart of the Negro slums, releases planning and urban renewal funds to cities dead-set against integration, and approves the financing of suburban subdivisions from which Negroes will be barred. These and similar acts are committed daily by officials who say they are unalterably opposed to segregation, and have the memos to prove it….But when you ask one of these gentlemen why, despite the 1962 fair housing Order most public housing is still segregated, he invariably blames it on regional custom, local traditions, personal prejudices of municipal housing officials.") 114 Cong. Rec. 2281 [1968]

In these circumstances, Defendant's calculated failure to consider race discrimination in its fair housing planning is simply inexcusable. The allegations of the complaint—which must be taken to be true for purposes of this motion to dismiss—describe the Defendant's deliberate decision to mislead HUD concerning fulfillment of its obligations under federal law to administer federal funds in such a way as to AFFH. The complaint alleges, Defendant knew of its obligation to conduct an "analysis of impediments to fair housing choice," 24 C.F.R. 570.601(a)(2), and knew of the historic impact of race and national origin discrimination in Westchester County, but misled HUD and the public by ignoring the question of race in its analysis.

More specifically, the complaint alleges that Defendant concealed its failure to analyze fair housing impediments in the 40 municipalities ("participating municipalities") belonging to the Westchester Urban County Consortium ("Consortium"), and chose not to identify and reveal such impediments unless they were identified by the participating municipalities themselves.

Further, the complaint alleges that Defendant knew of its obligation to take appropriate actions to overcome the effects of any impediments that should have been identified through that analysis, but determined that, *regardless of circumstances*, it would *not* take a vast array of appropriate actions because they might be politically difficult or unpopular with the elected leadership of the municipalities. Although it had statutory and other sanctions available to enforce the AFFH obligation against participating municipalities, Defendant, *a priori*, determined that it would not use any of these sanctions. At the same time, Defendant certified to HUD (as part of the AFFH certification) that it *was* taking appropriate steps to remove impediments to fair housing throughout the county.[3] From

---

[3] For instance, despite its knowledge of controlling New York and federal caselaw requiring parochial zoning interests to yield to important public objectives, such as reducing segregation and increasing the supply of genuinely open housing, *see, e.g., Berenson v. Town of New Castle,* 38 N.Y.2d 102 (N.Y. 1975); *Matter of County of Monroe,* 72 N.Y.2d 338 (N.Y. 1988), *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2nd Cir. 1988), Defendant excluded consideration of any steps to overcome barriers to fair housing that would, by seeking to use land for affordable housing in the face of municipal opposition, challenge those parochial zoning interests.

3

**Appendix 14**

these facts, a jury could conclude that Defendant knowingly made false claims for the purpose of receiving federal funds in violation of the FCA.

Defendant's memorandum thereof urges three points. First, it claims that Relator fails to state a "falsity" claim. The motion must fail because the complaint clearly alleges that Defendant's certifications and claims were false because they knowingly misrepresented that Defendant was taking the required steps to analyze impediments to fair housing and to overcome those impediments.

Second, Defendant's suggestion that this action is barred because it is based on allegations and transactions that were publicly disclosed is simply wrong. As amplified in the Gurian Declaration (Ex. 1), the essential falsity of Defendant's certifications and claims for payment was established by statements made in the course of a private meeting with Norma Drummond on July 7, 2005.

Finally, Relator asks the Court deny Defendant's motion with respect to the particularity requirements of Fed.R.Civ.P. 9(b). As described below, Relator has pled its allegations of fraud with sufficient specificity and particularity to satisfy the Rule, as interpreted by the Second Circuit.

## II.   **PROCEDURAL HISTORY**

Defendant has received federal housing and community development funds for more than 30 years. Def. Mem. Ex. E, p. 3. Each year, Defendant is required to certify that it is "affirmatively furthering fair housing," as that term is defined by HUD. Def. Mem. Ex. F, Part 2, p. 2; *see also* Complaint ¶¶ 2, 21-25. For all HUD and the general public knew, Defendant was actually carrying out its obligations pursuant to these certifications. Complaint ¶¶ 2, 71.

Relator requested and received a meeting with Deputy Commissioner Drummond on July 7, 2005. Declaration of Craig Gurian ("Gurian Declaration"), p. 1 (Ex. 1). Contrary to what Defendant had repeatedly represented to HUD, in annual certifications and in subsequent claims for payment, Ms. Drummond disclosed facts to Mr. Gurian that demonstrated that Defendant had not been complying

4

with its certifications.  Specifically, she made the following admissions and disclosures, many of

which are in direct contravention of Defendant's specific obligations under the AFFH regulations:

- Westchester's "demographic analysis for fair housing impediments analysis purposes did not encompass race, but only examined housing needs based on income."  Complaint ¶ 37.

- Westchester "sees discrimination as a problem of income discrimination, not racial discrimination."  Complaint ¶ 38.

- "Westchester's identification of impediments to fair housing was entirely passive and reactive. Its policy … was not to treat as an impediment anything that was not brought to defendant's attention at the instigation of a consortium partner or other non-County entity. In other words, defendant was unprepared to engage in any independent analysis or exploration of impediments, and in fact did not engage in any independent analysis or exploration of impediments."  Complaint ¶39.

- The "reason that the supposed analysis of impediments to fair housing did not refer to housing discrimination was because the Consortium does not include Yonkers."  Complaint ¶43.

- Defendant "did not *and would not as a matter of policy* monitor the effort (or lack of effort) of participating municipalities in respect to affirmatively furthering fair housing."  Complaint ¶ 47.

- Defendant's "policy has never been to criticize participating municipalities for their failure to meet their responsibilities in the context of either of affirmatively further[ing] fair housing or in respect to providing affordable housing."  Complaint ¶ 49.

- During the false claims period, "Westchester did not withhold federal funds from any participating municipality in connection with a failure to take steps to affirmatively further fair housing, including the failure to take steps to create affordable housing, and [ ] even the threat of such withholding of funds was not something that Westchester would do."  Complaint ¶ 50.

- Defendant "has a hands-off policy in respect to how participating municipalities plan, and … Westchester's message to participating municipalities is that each participating municipality knows its municipality best."  Complaint ¶ 51.

- Defendant "permits (and does not object to) the practice by which participating municipalities look only to the housing needs of existing residents, not the housing needs of persons living outside the municipality."  Complaint ¶52.

Relator filed this action, under seal and pursuant to the requirements of the FCA on April 12,

2006.  After the statutory period and an extension, the U.S. Department of Justice ("DOJ")

provisionally declined to intervene, and the matter was unsealed.  Relator served the complaint on

Defendant on January 8, 2007.  No discovery has been had in this matter.

**Appendix 16**

## III.   STANDARD OF REVIEW ON MOTION TO DISMISS

As the Supreme Court has recognized, a Rule 12(b)(6) motion should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). There has been no discovery in this matter. Defendant has not filed a summary judgment motion, nor should its motion be treated as such. At the pleading stage, the court's inquiry is limited to whether relator has pled facts sufficient to state a cause of action under the FCA. Defendant's attempts to distract the Court with material outside the record should be rejected.

The question before the Court is whether the allegations of the complaint are sufficient to establish a cause of action under the False Claims Act. Relator submits that they are, and that the motion to dismiss should be denied.

## IV.   STATUTORY AND REGULATORY FRAMEWORK

### A.   The False Claims Act

Recognizing that the federal government did not have enough "eyes and ears" to monitor the honesty of federal contractors, Congress first enacted the FCA in 1863 to create incentives for private citizens to help ferret out false claims and fraud against the federal government. *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 651 (D.C. Cir. 1994). These so-called *qui tam*[4] actions are brought in the name of the United States by a relator, who is given statutory standing to bring such a claim under carefully circumscribed conditions. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1154 (2d Cir. 1993). Congress has attempted to balance these incentives against the possibility of "parasitic lawsuits," *id.*, in which putative relators

---

[4] See *Quinn,* 14 F. 3d at 647, n. 1 ("*Qui tam* is an abbreviation for *qui tam pro domino rege quam pro seipso,* which means 'he who as much for the king as for himself.' John T. Boese, Civil False Claims and Qui Tam Actions 1-6 (1993). Historically, all *qui tam* actions have shared the common features of allowing private parties to initiate suit to enforce the laws in the government's stead and awarding victorious plaintiffs part of the recovery as bounty. *See* Note, *The History and Development of Qui Tam,* 1972 Wash.U. L.Q. 81, 86-87.")

add nothing to what the federal government already knows or has uncovered about a contractor's fraudulent submission of claims.[5]  Over the last 20 years, federal courts have entertained an increasing number of *qui tam* actions under the FCA.[6]

### B.   The Obligation to Affirmatively Further Fair Housing

The AFFH obligation, codified in the FHA at 42 U.S.C. §3608, "requires something more of [a grantee] than simply to refrain from discriminating itself or purposely aiding the discrimination of others, [rather, it] reflects the desire to have [HUD] grant programs … assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases," *NAACP v. Sec'y of Housing and Urban Development,* 817 F.2d 149, 154 (1st Cir. 1987); *see also Otero v. New York City Hous. Auth.,* 484 F.2d 1122, 1134 (2d Cir. 1973)( AFFH requires consideration of the impact of proposed housing programs on racial concentration in the area in which they are to be built).[7]

Congress has authorized a number of grant programs to support local housing and community development needs in low- and moderate-income communities.  These include the Community Development Block Grant ("CDBG"), HOME Investment Partnership ("HOME"), and other federal

---

[5] The statute permits a relator to maintain an action, whether or not the U.S. Government chooses to join the litigation, and to secure a percentage of the proceeds recovered for the Government.  31 U.S.C. §3732.

[6] *See, e.g., Mikes v. Straus,* 274 F.3d 687 (2d Cir. 2001)(submission of Medicare claims); *United States v. New York Medical College,* 252 F.3d 118 (2d Cir. 2001)(medical billing practices); *Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475 (2d Cir. 1995)(cost overruns on government housing construction projects); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148 (2d Cir. 1993)(safety certifications for military aircraft); *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318 (2d Cir. 1992)(billing practices under defense contracts); *United States ex rel. Dick v. Long Island Lighting Co.,* 912 F.2d 13 (2d Cir. 1990)(construction of a nuclear power station).  *See also* U.S. Government Accountability Office, *Information on False Claims Act Litigation,* GAO-06-320R  (Jan. 31, 2006), available at http://www.gao.gov/new.items/d06320r.pdf (last accessed May 23, 2007).  While many *qui tam* actions are brought by corporate insiders or "whistle blowers," the statute does not require such a status. Rather, the standing provisions of the FCA are as broad as Article III of the Constitution permits.  *Kreindler,* 985 F.2d at 1153-54.  Further, while the FCA bars *qui tam* actions that are "based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [Accountability] Office report, hearing, audit, or investigation, or from the news media," 31 U.S.C. §3730(e)(4)(A), it most certainly does not define information derived from private meetings with county officials as constituting such a public disclosure.

[7] *See also Shannon v. U.S. Dep't of Housing & Urban Dev.,* 436 F.2d 809, 821 (3d Cir. 1970)(holding that HUD had a duty to *investigate* the impact of its policy on minorities and make an informed judgment in light of fair housing concerns); *Langlois v. Abington Hous. Auth.,* 234 F.Supp.2d 33, 73 (D.Mass. 2002)(holding that local residency preference with disparate racial impact was impermissible); *Thompson v. U.S. Dep't of Hous. & Urban Dev.,* 348 F.Supp.2d 398 (D.Md. 2005)(holding that HUD violated AFFH by funding housing in racially impacted areas).

**Appendix 18**

housing and community development funds administered by HUD.  Defendant is a recipient of these

funds and is the lead agency of the Westchester Urban County Consortium ("Consortium"), an entity

authorized by HUD regulations to administer CDBG funds in urbanized areas.  Forty of the 45

municipalities within the geographic borders of Westchester County participate in the Consortium, and

receive these funds from Defendant pursuant to an application and review process Def. Mem. at 6.

1.    The Materiality of the "Affirmatively Furthering" Certification to the Receipt of Federal Housing Funds

Congress made regulatory compliance with AFFH the *sine qua non* of eligibility for CDBG

and other housing and community development funds.[8]  Because of the mandates imposed by the Fair

Housing Act, 42 U.S.C. §§3608, the Housing and Community Development Act of 1974, 42 U.S.C.

§5304(b)(2), and various implementing regulations, HUD funds may not be allocated to recipients

unless they certify that they will affirmatively further fair housing.[9]

The Second Circuit recognized the importance of this certification in an early case challenging

the New York City Housing Authority's decision to use federal housing funds to locate public housing

units without regard to considerations of segregation and discrimination.  In *Otero v. New York City

Housing Authority*, 484 F.2d 1122, 1134 (2d Cir. 1973), the appeals court interpreted the meaning

behind the AFFH obligation by saying:  "Action must be taken to fulfill, as much as possible, the goal

---

[8] *See* 42 U.S.C. §§3608(d) and 3608(e)(5)(requiring that HUD administer funding programs in a manner "affirmatively to further" the policies of the Fair Housing Act ).  The CDBG authorizing statute expressly conditions CDBG grants: "Any grant … *shall be made only if* the grantee certifies to the satisfaction of the Secretary that— (2) the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 [42 U.S.C. 2000a et seq.] and the Fair Housing Act [42 U.S.C. 3601 et seq.], and the grantee will affirmatively further fair housing…." 42 U.S.C. §5304(b)(2).

[9] 24 C.F.R. §§91.425 (Consortium certifications); 570.601 (incorporating the requirements of Title VI of the Civil Rights Act of 1964 and the Fair Housing Act); 570.602 (incorporating non-discrimination requirements of the Housing and Community Development Act of 1974, as amended).  *See also* 24 C.F.R. §570.601(a)(2)("In accordance with the Fair Housing Act, the Secretary requires that grantees administer all programs and activities related to housing and community development in a manner to affirmatively further the policies of the Fair Housing Act," and enumerating the steps a grantee must take to conduct an analysis of impediments and to take appropriate actions to overcome the effects of any impediments identified through that analysis).

of open integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat."[10]

### 2.   The Essential Components of the AFFH Certification

Because HUD lacks the resources to closely monitor thousands of recipients and subrecipients of its federal funds, it has developed certifications to ensure it that tax dollars are being spent consistent with program requirements. *See Comer v. Cisneros*, 37 F.3d 775, 792 (2d Cir. 1994). The AFFH certification is a grantee's promise that it will do three things: (1) "conduct an analysis to identify impediments to fair housing choice within the area"; (2) "take appropriate actions to overcome the effects of any impediments identified through that analysis"; and (3) "maintain records reflecting the analysis and actions in this regard." 24 C.F.R. §§ 91.425; 570.601. HUD typically does not require its recipients to submit the analysis of impediments ("AI") upon which its certifications are based; it relies solely on the recipients' honesty and good faith by way of the certifications. These requirements are non-negotiable; in order to receive federal funds, a grantee is required to comply.

### a.   The Obligation to Conduct an Analysis of Impediments to Fair Housing Choice

As early as 1988, HUD defined the relevant terms:

> "Fair housing choice" means the ability of persons regardless of race, color, religion, sex or national origin of similar income levels to have available to them the same housing choices.

> "Impediments to such housing choices" are any actions, omissions or decisions taken because of race, color, religion, sex or national origin which restrict housing choices or the availability of housing choices.

Final Rule, 53 Fed. Reg. 34416, 34468 (Sept. 6, 1988)(promulgating 24 C.F.R. §570.904 (c)(1)).

---

[10] *See also Comer v. Cisneros*, 37 F.3d 775, 792, 795 (2d Cir. 1994)(applying the AFFH obligation to a CDBG grantee, holding that local officials "must administer … and handle CDBG funds in conformance with … the applicable civil rights laws" and holding that a segregation-enforcing "local preference is null and void to the extent that [it] is inconsistent with [civil rights laws]."); *United States v. Incorporated Village of Island Park*, 888 F.Supp. 419, 432 (E.D.N.Y. 1995)("A unit of local government is eligible to receive CDBG funds only if it certifies to HUD that it … meets certain statutory requirements" concerning AFFH).

In 1996, HUD reminded Westchester and other recipients that an AI "is a review of impediments to fair housing choice in the public and private sector," involving:

- A *comprehensive review* of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices
- An assessment of how those laws, etc. affect the location, availability, and accessibility of housing
- *An assessment of conditions, both public and private, affecting fair housing choice for all protected classes*
- An assessment of the availability of affordable, accessible housing in a range of unit sizes.

U.S. Department of Housing and Urban Development, *Fair Housing Planning Guide* (1996), at 2-7 (available at http://www.hud.gov/offices/fheo/images/fhpg.pdf )(emphasis supplied).[11]

As defined by HUD, "impediments to fair housing choice" are:

- *Any* actions, omissions, or decisions taken *because of race, color, religion, sex, disability, familial status, or national origin* which restrict housing choices or the availability of housing choices
- *Any* actions, omissions, or decisions which have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin.

*Id.* at 2-8 (emphasis supplied).

Under these directives, the AFFH obligation cannot be satisfied without reference to the seven "protected classes" under the FHA, and cannot be limited to a subset of impediments. An AI that does not examine impediments faced by Blacks must fail the objective test of being an AI as HUD defines that term. Similarly, the failure of an AI to examine actions, omissions or decisions taken because of race which restrict housing choices is a failure to conduct an AI as HUD defines that term. An AI cannot merely be a study of the impediments to "affordable housing" or be limited to the impediments experienced by residents in one or two of the protected classes. It must consider "impediments to fair housing choice" experienced by members of *all* the protected classes.

---

[11] This understanding comports with the common understanding of the term "analysis," defined by the New Oxford American Dictionary to be a "detailed examination of the elements or structure of something, typically as a basis for discussion or interpretation." *The New Oxford American Dictionary, Second Edition* (Oxford University Press, May 2005)(emphasis added).

Appendix 21

b.   The Obligation to Take Appropriate Actions

Federal regulations also require a grantee to "take appropriate actions to overcome the effects of any

impediments" identified in its AI.  24 C.F.R. §§ 91.425, 570.601.  HUD's view of what constitutes

"appropriate actions" clearly require consideration of efforts to assist racial minorities and minority

communities.  *See, e.g.* U.S. Department of Housing and Urban Development, *Fair Housing Planning*

*Guide*  Moreover, it is fundamental that "appropriate actions" are those actions that are "suitable or

proper *in the circumstances." The New Oxford American Dictionary, Second Edition* (Oxford

University Press, May 2005)(emphasis added).

They require actions that are "appropriate," given the impediments identified in each

jurisdiction.  HUD has taken additional steps over the years to provide examples of what CDBG

grantees can do to fulfill this element of the AFFH obligations.

At a bare minimum, then, a grantee is required to conduct a detailed analysis that considers all

the impediments faced by Blacks and members of other FHA protected classes.  Without such an

analysis, a grantee does not comply with federal law on AFFH.  A grantee administering a CDBG

urban county consortium must also monitor the planning, analysis and performance of its participating

jurisdictions.  Finally, a grantee that knows its participating municipalities have erected substantial

impediments to fair housing choice, and have repeatedly failed or refused to take appropriate steps to

overcome these impediments, must consider a range of actions suitable to the circumstances, including

a decision to withhold funds to induce AFFH compliance by the municipalities.

## V.   THE COMPLAINT ADEQUATELY PLEADS A VIOLATION OF THE FALSE CLAIMS ACT

As this case comes before the Court on a motion to dismiss, the scope of the Court's review is

narrow.  Defendant's first point challenges the sufficiency of Relator's allegation of a "false claim,"

and must be considered under the familiar standard applicable to Rule 12(b)(6) motions: a trial court

"must accept as true all the factual allegations in the complaint and draw all reasonable inferences in

11

**Appendix 22**

plaintiffs' favor." *In re Tamoxifen Citrate Antitrust Litig.,* 466 F.3d 187, 200 (2d Cir. 2006), and may

"dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could

be proved consistent with the allegations" set forth therein. *Twombly v. Bell Atl. Corp.,* 425 F.3d 99,

106 (2d Cir.2005). Applying that standard, the motion to dismiss must be denied.

Congress intended to use the leverage of federal housing funds to require local governments to

affirmatively further fair housing that is, to dismantle local policies and practices that created or

reinforced segregation on the basis of race and other FHA protected classes. So, it is particularly

anomalous that Defendant failed absolutely to comply with the irreducible minimum AFFH

requirements. As made clear from Ms. Drummond's revelations on July 7, 2005, Westchester County,

knowing its obligations, simply chose not to comply. It altogether excluded race from its

impediments analysis. Complaint ¶¶ 37-39, 43. It determined that it would not monitor the

participating municipalities for AFFH compliance, Complaint ¶ 47, nor would it criticize participating

municipalities for their failure to meet their AFFH responsibilities. Complaint ¶ 49. Westchester

determined *a priori* that it would not threaten to cut off funds to non-compliant municipalities, or

actually cut off such funds. Complaint ¶ 50. Westchester could not possibly have tailored its actions

to be appropriate to the circumstances because it had a "hands-off policy in respect to how

participating municipalities plan" and conveyed the message that "each participating municipality

knows its municipality best." Complaint ¶ 51.

Unlike many of the cases to which Defendant refers the Court, Def. Mem. 10-12, the

allegations of false or fraudulent claims in this action are not infrequent, narrow, or technical

requirements. Rather, the complaint alleges that Defendant, knowing that the constituent members of

its Consortium would resist efforts to enhance fair housing opportunities for people of color,

Complaint ¶18, and that it would not impose any AFFH obligations upon them, Complaint ¶¶ 44-52,

54, knowingly represented to HUD—over and over again—that it was spending tens of millions of

federal tax dollars in a fashion that met the AFFH requirements of federal law. The gravamen of the

Appendix 23

complaint is that Defendant knowingly made false claims to HUD to receive more than $45 million over the course of six years, all the while never fulfilling, or intending to fulfill, its AFFH obligation.

It is undisputed for purposes of this motion to dismiss that Defendant did not comply with these most basic requirements, and the motion must therefore be denied.

A.    Governing Circuit Law on "False or Fraudulent Claims" Under the False Claims Act

The FCA provides that "[a] person may bring a civil action for violation of [31 U.S.C.] Section 3729 for the person and for the United States Government." 31 U.S.C. §3730(b).  Liability under can be established by showing that a person has "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval," or that such person has "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. §3729(a).  The FCA defines "knowing" as either "(1) possessing actual knowledge; (2) acting in deliberate ignorance of falsity; or (3) acting in reckless disregard of falsity."  31 U.S.C. §3729(b).

In order to state a claim under the FCA, a Relator must allege that Defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Id.* at 695.  Defendant does not suggest any deficiency in the complaint as regards elements (1), (2) or (5), but contends the complaint cannot be read, even liberally, to allege that a "false" claim was made with "knowing" falsity.

B.    The Falsity of Defendant's Claims and Certifications

The essential "falsity" of any false certification or claim lies in the discrepancy between what a grantee represents to the United States Government it is doing, and what it is actually doing.[12] Defendant made a series of certifications to the Government, knowing them to be untrue, and the

---

[12] In *Mikes*, the Second Circuit held that a relator could establish FCA liability based either (1) on "a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment," *id.* at 698 (an "expressly false certification") or (2) "when a defendant submits a claim for reimbursement while knowing—as that term is defined by the Act—that payment expressly is precluded because of some noncompliance by the defendant." *Id.* at 700 (an "implied false certification").

Government relied on those certifications when it approved and disbursed housing and community development funds to Defendant during the false claims period.[13] Complaint ¶ 71.[14]   In the case at bar, the falsity did not become apparent until Relator's July 7, 2005 meeting with Norma Drummond.

This FCA case involves a six-year pattern and practice of Defendant making a large number[15] of false certifications concerning its compliance with the AFFH requirements for receipt of federal housing and community development funding.   Specifically, Relator has alleged that the certifications and claims Defendant made to HUD were false, Complaint ¶ 4, and that with each annual application for federal funding, Defendant made a certification that it and the participating jurisdictions would comply with the AFFH obligation.   Complaint ¶¶ 20-21.   The Court must assume the truth of these specific allegations must find that the complaint adequately pleads the falsity of Defendants' repeated claims to the federal government, and must deny the motion to dismiss.

---

[13] The *Mikes* Court joined four other Circuits in holding that "a claim under the [FCA] is … false where a party certifies compliance with a statute or regulation as a condition to governmental payment." *Mikes*, 274 F.3d at 697 (citations omitted).   Defendant seeks refuge in *United States ex rel. Hopper v. Anton* for the proposition that "[m]ere regulatory violations do not give rise to a viable FCA action…particularly … where regulatory compliance was not the *sine qua non*" of receiving the funding in question.   91 F.3d 1261, 1267 (9ᵗʰ Cir. 1996). But *Anton* is clearly distinguishable.   In the case at bar, the AFFH certification *is* clearly a precondition to receiving federal funds. Moreover, *Anton* held that because the federal funding was allocated to the state prior to suballocations to school districts, the defendant's certification could not have been "the cause of the Government's providing the benefit." 91 F.3d at 1267.   In the present case, the federal statutes and regulations are clear that Defendant could not have received federal funding without making the AFFH certification.   Defendant's claim is legally false because it has "certifie[d] compliance with a statute or regulation as a condition to governmental payment." *United States ex rel. Kersulis v. RehabCare Group, Inc.,* 2007 WL 294122 at *4 (E.D. Ark. Jan. 29, 2007) (citing to *United States v. NeifertWhite Co.*, 390 U.S. 228, 232 (1968)).   This is not a case where failure to comply with the certification is "only tangential" to the disbursement of CDBG funds.   *Id.*   Here, certification is central to eligibility for federal funds.

[14] Relator suggests that the false certifications were material because, pursuant to 42 U.S.C. §§3608(d), 3608(e)(5) and implementing regulations discussed below, HUD could not approve or disburse the money if Defendant had not complied, and did not intend to comply, with the AFFH requirements.   Further, as the complaint alleges, had HUD known of the falsity of the certifications, it could not have approved subsequent claims for payment (or payment or approval), as these were conditional upon truthful AFFH certification.

[15] While the precise number of such claims or certifications is not yet known, for each of the six years of the false claim period (commencing April 1, 2000), Defendant's false claims would have appeared at least twice on five-year Consolidated Plans, annually on Consolidated Plan One Year Action Plans, Consolidated Annual Performance and Evaluation Reports ("CAPERs"), and requests for payment or approval and applications for federal assistance with respect to each of the following federal housing and community development programs:   CDBG, HOME, Emergency Shelter Grants, Supportive Housing Program, Shelter + Care and Housing Opportunities for People with AIDS.   On information and belief, therefore, Defendant made false certifications or claims in at least 48 separate instances.

14

1.     The Obligation to Conduct an Analysis of Impediments

Defendant "represented that it would conduct an AI to fair housing choice within its

jurisdiction, take appropriate actions to overcome the effects of any impediments identified through

that analysis, and maintain records reflecting that analysis and those actions," Complaint ¶22, and

made "explicit and/or implicit representations that [it] had and was [sic] complying with the [AFFH]

obligations…." Complaint ¶ 27.

Defendant was well aware of community resistance within the participating municipalities to

the development of more racially integrated housing and to integration on the basis of race and

national origin, Complaint ¶¶ 18, 19, but refused to identify or analyze it as an impediment.[16] *See also*

Def. Mem. at 5-6.  Indeed, Westchester's identification of impediments to fair housing was entirely

passive and reactive.  It refused to treat as an impediment anything that was not brought to Defendant's

attention at the instigation of a consortium partner or other non-County entity.  In other words,

Defendant was unprepared to engage in any independent analysis or exploration of impediments, and

in fact did not engage in any independent analysis or exploration of impediments.  Complaint ¶ 39.[17]

A reasonable jury could conclude from these omissions that Defendant affirmatively misled HUD.

In furtherance of that scheme, Defendant knowingly developed and submitted an AI that did

*not* include an assessment of conditions affecting fair housing choice for all protected classes:

- "Westchester made absolutely no reference to its [AI] being an evaluation of anything having
  to do with the house needs of different racial or ethnic groups," Complaint ¶ 36, and
  "acknowledged to the Center … that its demographic analysis for [AI] purposes did not
  encompass race, but only examined housing needs based on income."  Complaint ¶ 37.

- Westchester "explicitly stated … that it sees discrimination as a problem of income
  discrimination, not racial discrimination," Complaint ¶ 38, and "did not include as part of its

---

[16] That very municipal resistance to racial change was the impetus for Defendant's evasion of its AFFH obligations,
which it attempted to paper over with its false certifications and claims. Complaint ¶¶ 47, 49, 50.  Instead, Defendant
adopted the more politically palatable course, which was to leave to the municipalities themselves the decision about
whether local policies had created impediments to fair housing choice, Complaint ¶¶ 39, 51, and how to respond (if at
all).  Complaint ¶¶ 52-55.

[17] Defendant's AI was a sham, and did not meet the minimum federal requirements. Complaint ¶¶ 32-33, 35-36, 39.
In fact, the AI was so deficient as to constitute "worthless services."  Complaint ¶¶ 68, 69.

'analysis' any account of its own role prior to and curing the false claims period in failing to affirmatively further fair housing, or in failing to see that municipalities, including participating municipalities affirmatively furthered fair housing." Complaint ¶ 40.

These were not innocent mistakes or negligence.[18]  Rather, Defendant acted in deliberate ignorance or reckless disregard of the long history of segregation and discrimination on the basis of race and national origin in Westchester County.   The regulations give Defendant absolutely no discretion to limit the AI to just some of the protected classes,[19] but Defendant did so anyway and falsely certified to HUD that it was in compliance with the AFFH regulations.[20]

By choosing to "see[ ] discrimination as a problem of income discrimination, not racial discrimination," Complaint ¶ 38, Westchester undermines the very essence of the FHA and the obligation to "affirmatively further fair housing." A simple illustration demonstrates why: If Westchester concluded that its sole impediment to fair housing choice was the development of 18,000 additional affordable housing units, it might choose to address this impediment by building those units

---

[18] Defendant seeks to excuse its failure to conduct an AI according to the federal regulations by claiming that "neither its certification nor the relevant regulations contained any qualitative criteria by which to evaluate its analysis." Def. Mem. 12. Thus, Defendant reasons, "what ADC alleges the County did simply does not conflict with what the County certified it would do." Def. Mem. 12. Of course, these are factual matters that cannot be resolved on a motion to dismiss, but Relator notes that this assertion can only be true by maintaining the fiction that *any* document labeled an "Analysis of Impediments to Fair Housing Choice" will suffice to meet the AFFH mandate, regardless of its content or, indeed, even if it consists of cooking recipes or blank pages. The complaint specifically alleges that Defendant failed to consider the impediments to fair housing choice experienced by members of the FHA's protected classes in Westchester County. Complaint ¶¶ 36-38. That is sufficient, at this stage of the litigation, to state a claim that Defendant's AFFH certification is false.

[19] Defendant makes much of the fact that, in 1998, HUD proposed—and later withdrew—more stringent regulations concerning AFFH. The Court should draw no inference from this failed rulemaking, just as it would refuse to do so in the case of failed legislation. *See, e.g., Lockhart v. United States,* 126 S.Ct. 699, 702 (2005)(declining to read any meaning into a failed 2004 effort to amend the relevant statute). The fact that HUD wished to make regulations more specific with respect to "performance standards" does not mean that the regulations already in place with respect to conducting an AI and taking appropriate steps do not provide objective standards, which could be employed by a finder of fact to determine that Defendant made false claims and certifications to HUD.

[20] Through its Memorandum, Defendant suggests to the Court that it produced an "extremely comprehensive impediments analysis." Def. Mem. at 11. In fact, the very evidence in support of that proposition is contained within Defendant's Exhibit E, which informs the Court that the Defendant's "[f]air housing plan … [identifies] 13 impediments to the creation of *affordable* housing units," Def. Mem. Ex. E at 5 (emphasis supplied), and omits *any* reference whatsoever to impediments experienced because of race, color, religion, national origin, sex, disability or familial status. The complaint also alleges that "Defendant itself has characterized its [AI as merely] an evaluation of the needs for handicapped persons [,] larger/smaller families, extended families, and tenure opportunities…." Complaint ¶ 35.   That allegation, and the associated inference that six protected classes are entirely excluded from Defendant's AI, must be taken as true for purposes of this motion to dismiss.

where there is the least resistance, even if that meant locating *all* of them in municipalities where minority populations were already high, Complaint ¶ 15, and *none* of them in the 24 municipalities that have populations that re 3% Black or less.  Complaint ¶ 14.  While that may address the County's *affordable* housing problems, it would do nothing to overcome impediments to *fair* housing choice on the basis of race.  In fact, such a solution would simply perpetuate the segregation in Westchester County, an outcome the Second Circuit has condemned.[21]

Because a finder of fact could reasonably determine that Defendant conducted an analysis that does not comport with basic requirements of an AI (such as not considering race or ethnicity in assessing impediments to fair housing choice), and that its proposed actions were not targeted to overcoming impediments experienced by members of the protected classes, the Court should not dismiss this action.

2. The Obligation to Take "Appropriate Actions"

As outlined above, federal law requires Defendant, as a condition of receiving federal housing and community development funding, to "take appropriate actions to overcome the effects of any impediments" identified in its AI.  24 C.F.R. §§ 91.425, 570.601.  Because Defendant had not complied with even minimal federal requirements for conducting an AI, it also failed to take appropriate steps to overcome the segregation and discrimination experienced by Blacks and members of other protected classes living in Westchester County.  Complaint ¶¶ 44-46.

Without revealing its intention to HUD, Defendant deceptively refused to utilize a vast number of "appropriate actions" because they were not politically popular.[22]  In the present case, "appropriate actions" must be those that are "suitable" or "proper" in the circumstance of Westchester County still being "strongly residentially segregated by race and national origin," Complaint ¶ 13, with more than

---

[21] *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 937 (2nd Cir. 1988)(holding that Huntington's refusal to amend the restrictive zoning ordinance to permit privately-built multi-family housing outside the urban renewal area significantly perpetuated segregation in the Town).

[22] The New Oxford American Dictionary defines "appropriate" as "suitable or proper *in the circumstances.*" *The New Oxford American Dictionary, Second Edition* (Oxford University Press, May 2005)(emphasis added).

17

60 per cent of the Consortium's participating municipalities "hav[ing] populations that are three percent Black or less," Complaint ¶14. The actions had to be suitable in light of Defendant's awareness of this housing segregation throughout the false claims period, Complaint ¶ 16, and in light of Defendant's knowledge that "there was strong resistance in many participating municipalities to the creation of affordable housing units." Complaint ¶ 18.

In order to be "appropriate," actions must be calibrated to have a realistic chance of overcoming the barriers that actually exist. But Defendant was unwilling to tailor its actions to meet the demonstrated need, instead ruling out consideration of actions to overcome impediments simply because those actions are politically difficult:

- Defendant "did not *and would not as a matter of policy* monitor the effort (or lack of effort) of participating municipalities in respect to [AFFH]." Complaint ¶ 47.

- "In the period January 1, 1996 through and including June 30, 2005 … Westchester never informed, suggested, or referenced the possibility to any participating municipality that Westchester might withhold federal funds from such municipality if that municipality did not take steps to affirmatively further fair housing." Complaint ¶ 48

- Defendant's "policy has never been to criticize participating municipalities for their failure to meet their responsibilities in the context of either of affirmatively further fair housing or in respect to providing affordable housing." Complaint ¶ 49.

- Throughout the false claims period, "Westchester did not withhold federal funds from any participating municipality in connection with a failure to take steps to affirmatively further fair housing including the failure to take steps to create affordable housing, and [ ] even the threat of such withholding of funds was not something that Westchester would do." Complaint ¶ 50.

- Defendant "has a hands-off policy in respect to how participating municipalities plan, and … Westchester's message to participating municipalities is that each participating municipality knows its municipality best." Complaint ¶ 51.

- Defendant "permits (and does not object to) the practice by which participating municipalities look only to the housing needs of existing residents, not the housing needs of persons living outside the municipality." Complaint ¶52.

- Defendant "permits and does not object to the practice set forth in paragraph 52 [ ] even though it knows that the practice is in direct contravention of the requirements of State law, as established in the case of *Berenson v. Town of New Castle* [citation omitted] and that the practice causes a disparate impact based on race and national origin." Complaint ¶ 53.

**Appendix 29**

- In the period January 1, 1996 through and including June 30, 2005, Defendant "never required participating municipalities to document to Westchester, either in the course of a participating municipality's application for CDBG funding or otherwise, how the participating municipality was and would affirmatively further fair housing." Complaint ¶ 54.

- In the period January 1, 1996 through and including June 30, 2005, "Defendant "never required participating municipalities to identify land suitable for affordable housing development." Complaint ¶55.

Defendant "knew it was prohibited from expending [CDBG] funding for activities in or in support of any local government that does not affirmatively further fair housing within its own jurisdiction, or that impedes the county's action to comply with its fair housing certifications," Complaint ¶ 28, and "knew that it had the authority and responsibility to direct participating municipalities to do what is necessary—as determined by Westchester—to affirmatively further fair housing." Complaint ¶29.

Ironically, the allegations from Complaint ¶¶ 28 and 29 are drawn from Defendant's own Urban County Cooperation Agreements ("Cooperation Agreements") with the municipalities and its "Standard CDBG agreement ... with all anti-discrimination requirements attached." Def. Mem. Ex. K at pp. 2, 3. Each of these provides the mechanisms—required by the federal AFFH regulations themselves—to sanction non-compliant subrecipients. But, as the complaint alleges, Defendant's policy was not to monitor or sanction its subrecipients. Complaint ¶¶ 49, 50, 54.

Defendant's Memorandum of Law reflects its acute awareness of the fact that, at the same time it repeatedly assured HUD that it was taking appropriate actions to overcome impediments, it was actually refusing even to consider, let along perform, actions appropriate to the circumstances. This is why Defendant wants this Court to excuse its conduct by vague appeals to "practical realities" and to "actual constraints on the County's abilities to impose its will upon the various municipalities within its borders." Def. Mem. at 2-3. While, as a procedural matter, Defendant might try to urge these considerations at the proper moment later in this litigation (*i.e.,* at the trial), in fact, Westchester had many tools at its disposal. It could, to take one striking example, simply have enforced the terms of the Cooperation Agreements, specifically the provisions that the County is prohibited from expending

19

federal funds "for activities in or in support of any local government that does not affirmatively further fair housing within its own jurisdiction or that impedes the County's action to comply with its fair housing certifications." Complaint ¶ 28.

Moreover, despite Westchester's claims of "constraints," nothing barred the County from purchasing land in resistant municipalities to be used for affordable housing. If those municipalities tried to stymie such segregation-reducing construction, Westchester knew that it had public interest justifications considerably more significant than parochial zoning interests, and that it would have standing under a variety of well-established legal doctrines to challenge those parochial interests.[23]

Any recipient of federal housing funds, whether or not it is the lead agency of a Consortium, must take "appropriate actions" to overcome the specific impediments to fair housing choice experienced by residents in its area. In Westchester County and in the context of sustained segregation, there were specific and well-recognized "appropriate actions" Defendant could have taken, and Defendant refused to consider or implement any of them. Relator contends that a reasonable jury could find a violation of the AFFH requirement in these circumstances, and urges the Court to deny the motion.

C.   <u>Defendant Knew Its Certifications and Claims Were False</u>

At the pleadings stage, a relator satisfies the "knowing" prong of the FCA by alleging that a defendant "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and

---

[23] For instance, Defendant would have been able to utilize the legal doctrine of long-standing that local restrictive zoning can be challenged if it fails to take account of regional needs. *Berenson v. Town of New Castle,* 38 N.Y. 2d 102, 378 N.Y.S.2d 672 (N.Y. 1975). Similarly, in view of the disparate impact of restrictive local zoning and land use rules, it could have availed itself of Fair Housing Act relief pursuant to *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926 (2nd Cir. 1988). Furthermore, because of its hands-off policy with respect to participating municipalities, Defendant never considered that the applicability of local zoning to another governmental entity with competing interests is subject to a balancing test, with the factors being "the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests..." *City of Rochester v. County of Monroe,* 72 N.Y.2d 338, 343, 533 N.Y.S.2d 702, ____ (N.Y. 1988); *see also Crown Communication New York, Inc. v. Department of Transportation of the State of New York et al.,* 4 N.Y.3d 159, 791 N.Y.S.2d 494 (N.Y. 2005) (applying *County of Monroe* and holding that a state project was immune from local regulation under the balancing test).

no proof of specific intent to defraud is required." 31 U.S.C. §3729(b). *See also United States ex rel.*

*Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1152 (2d Cir. 1993).

The Second Circuit has held that under the FCA, "the 'requisite intent is the knowing presentation of

what is known to be false.'" *Mikes*, 274 F.3d at 703, *quoting from and adopting the standard in*

*Hagood v. Sonoma Co. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996).[24]   Defendant asserts that

"[i]f the County allegedly did not understand housing discrimination to be a problem, then the County

could not *knowingly* make a false statement." Def. Mem. at 8.  This is entirely specious, as the FCA

makes clear that the "knowing" standard includes "deliberate ignorance of … truth or falsity" and

"reckless disregard of …truth or falsity." 31 U.S.C. §3729(b).

The complaint alleges that Defendant knew what federal law required with respect to AFFH,

Complaint ¶¶ 25, 27-29, and knowingly submitted false claims and certifications that it was complying

with those requirements, and would do so in the future.  Complaint ¶¶30 (Defendant knew of falsity of

certifications and claims for payment), 37-39 (Defendant knew that its AI did not consider needs of all

FHA protected classes), 47 (Defendant knowingly failed or refused to enforce AFFH obligations on

municipalities),  58 (Defendant knew that many municipalities had violated AFFH obligations), 69

(Defendant knew that certifications were false and the basis for receipt of payments was false),[25] and

70 (Defendant acted with reckless disregard for truth or falsity of its certifications).

---

[24] In other words, the Act "is concerned only with the defendant's knowledge about information provided to or withheld from the government. Knowledge of legal requirements, contractual provisions, and other aspects of the defendant's conduct are irrelevant. If the defendant submitted a claim for payment when he knew that information contained in the claim was false and should have disqualified him from receiving that payment, then he acted 'knowingly.'" Willens, *Commentary: §3729 False Claims*, National Institute for Trial Advocacy, Lexstat 31 US NITA 3729 (2006) at 2.

[25] Defendant relies on *United States ex rel. Kersulis v. RehabCare Group, Inc.*, 2007 WL 2941222 (E.D. Ark. Jan. 29, 2007) for the proposition that its certification could not be knowingly false where "defendant's interpretation of the applicable regulations is reasonable even though incorrect." Def. Mem. at 11.  But because Congress and HUD have established clear and objective specifications for the AFFH obligation, it is not Defendant's role to "interpret" or second-guess the AFFH regulations; rather, its obligation is to comply with them.

## VI.   THE JURISDICTIONAL BAR OF 31 U.S.C. §3730(e)(4)(A) DOES NOT APPLY TO THIS LITIGATION

Defendant's second argument suggests that Plaintiff/Relator's lawsuit under the FCA is barred because it is based on the public disclosure of certain allegations or transactions evidencing the alleged false claims submitted by Defendant.  As detailed below, the complaint clearly distinguishes between two sets of facts.  The first set is comprised of those items secured through public records requests and general research.  *See, e.g.,* Complaint ¶¶ 12 (membership of Consortium); 14 (Census data); 15 (same); 28 (Defendant knew it was prohibited from expending housing and community development funds in noncompliant municipalities); 29 (same); 32-36 (content of Defendant's Consolidated Plan).  The second set of facts was learned in private, disclosed only to the Relator by Norma Drummond, Deputy Commissioner of the Westchester County Department of Planning, and the person responsible for Defendant's compliance with its obligation under the CDBG and related programs.  In a meeting with the Anti-Discrimination Center, substantial portions of which are memorialized in Complaint ¶¶ 37-39, 43, 47, 49, 50-52, Ms. Drummond revealed facts and information, unknown to and never revealed to HUD, with respect to Defendant's administration of its CDBG program.[26]  Most notable among these was that Defendant did not consider race as part of its AI, Complaint ¶¶ 37, 38; that Defendant "did not and would not as a matter of policy monitor the effort (or lack of effort) of participating municipalities in respect to affirmatively furthering fair housing," Complaint ¶ 47 (emphasis in the original); and that it had not and would not "withhold federal funds from any participating municipality in connection with a failure to take steps to affirmatively further fair housing."  Complaint ¶ 50.

The attached declaration (Exhibit #1) on behalf of Plaintiff/Relator amplifies and confirms the fact that the critical allegations or transactions of falsity were not publicly disclosed.  The Court should deny this element of the motion as well.

---

[26]  Defendant's claim not to know the details concerning the allegations of false certifications and claims is disingenuous, as Defendant's own Memorandum has an exhibit referencing the meeting at which Ms. Drummond revealed that Defendant, as a matter of policy, would not require the municipalities to comply with the AFFH obligation. See Def. Mem., Exh. H, at p. 1 ("I understand that you met with Deputy Commissioner Norma Drummond on July 7, 2005, and she provided you with …additional information at no charge….")

**Appendix 33**

A.    The Two-Part Jurisdictional Inquiry

Federal courts have articulated a two-part inquiry to determine whether a *qui tam* action can be barred under the FCA on jurisdictional grounds.  The first question is whether the lawsuit is "based upon the public disclosure of allegations or transactions (1) in a criminal, civil, or administrative hearing, (2) in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or (3) from the news media…"  31 U.S.C. §3730(e)(4).  *See also United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 323 (2d Cir. 1992)(holding that §3730(e)(4)(A) "furnishes an exclusive list of the ways in which public disclosure must occur for the jurisdictional bar to apply" and that a *qui tam* action is not otherwise barred).[27]

Thereafter, "[i]f—and only if—the answer to the first question is affirmative … will the court then proceed to the 'original source' inquiry, under which it asks whether the qui tam plaintiff 'has direct and independent knowledge of the information on which the allegations are based.'  31 U.S.C. § 3730(e)(4)(B)."  *U.S. ex rel. Springfield Terminal Railway Co. v. Quinn*, 14 F.3d 645, 651 (D.C. Cir. 1994)(internal citations omitted).

In the case at bar, the complaint and the attached declaration (Ex. 1) adequately demonstrate that the essential allegations of the lawsuit—that Defendant knowingly submitted false certifications and claims with respect to its AI and knowingly removed from consideration the vast majority of "appropriate actions" to overcome the effects of impediments suffered by protected class members— have never been publicly disclosed in any of the ways listed in §3730(e)(4), and were not publicly known prior to the July 7, 2005 disclosures by Norma Drummond.  It is likely that these facts have never been known by anyone other than Defendant and a small circle of its employees.  It is certain that Relator did not learn of these essential allegations in any manner set out in the jurisdictional bar.

---

[27] *U.S. v. Catholic Healthcare W.*, 445 F.3d 1147, 1152 (9th Cir. 2006) (finding that "for the suit to be barred, Defendants must show that its essential elements, *both* the alleged truth and the allegedly fraudulent statements, were publicly disclosed via an enumerated source") (emphasis added).  Nor does Relator need to prove that information conveyed by County officials was "confidential."  Def. Mem. 9.  Such a requirement is found nowhere in the statute.

B.     The Allegations and Transactions on Which Relator's Lawsuit Are Grounded Were Not
       Publicly Disclosed

In this case "[p]roving fraud … requires a comparison between the [County's] statements

regarding the plan and the truth of how the [CDBG program] was carried out." *United States ex rel.*

*Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999). In other words, a relator must

marshal evidence of two parallel sets of facts: (1) the "cover story" conveyed by the false claimant's

claims and certifications; and (2) the "truth" of how the Defendant was (or was not) carrying out its

activities with respect to the CDBG program and the AFFH certification on which receipt of funds was

predicated. It is the discrepancy between the two that gives rise to Relator's lawsuit.

Relator in this matter relied on public information to establish the contours of the "cover

story," but none of that public information revealed the falsity of that story. In these circumstances, the

jurisdictional bar will not apply. *See Kennard v. Comstock Resources Inc.*, 363 F.3d 1039, 1046 (10th

Cir. 2004)( suit could proceed where "none of the public documents disclosed the alleged fraud.")

Ms. Drummond's disclosures on July 7, 2005, *see* p. 8, *supra,* make it clear that Defendant was

acting in direct contravention of its specific statutory, regulatory and contractual AFFH obligations.

The relevant FCA "allegations or transactions" underlying this lawsuit are that the Defendant—

contrary to its numerous AFFH certifications—was "knowingly" failing to comply with specific

regulatory requirements concerning AFFH. Complaint ¶¶ 30, 32-40, 47-51,53, 54, 57, 58, 67.

C.     The Discovery of Relevant Information Through Freedom of Information Requests is Not
       Subject to the Jurisdictional Bar

Even if some of the information on which Relator bases its lawsuit derived from requests to

Defendant under New York's Freedom of Information Law ("FOIL"), Def. Mem. at 16-17, none of the

documents or materials secured through such requests implicates the jurisdictional bar. While the

Second Circuit has not opined on the subject, several federal courts, including a trial court in this

district, have held that information derived from a request under the federal Freedom of Information

Act ("FOIA") is not a "public disclosure" within the meaning of 31 U.S.C. §3730(e)(4)(A). *See U.S.*

B.   The Allegations and Transactions on Which Relator's Lawsuit Are Grounded Were Not Publicly Disclosed

In this case "[p]roving fraud … requires a comparison between the [County's] statements regarding the plan and the truth of how the [CDBG program] was carried out." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999). In other words, a relator must marshal evidence of two parallel sets of facts: (1) the "cover story" conveyed by the false claimant's claims and certifications; and (2) the "truth" of how the Defendant was (or was not) carrying out its activities with respect to the CDBG program and the AFFH certification on which receipt of funds was predicated. It is the discrepancy between the two that gives rise to Relator's lawsuit.

Relator in this matter relied on public information to establish the contours of the "cover story," but none of that public information revealed the falsity of that story. In these circumstances, the jurisdictional bar will not apply. *See Kennard v. Comstock Resources Inc.*, 363 F.3d 1039, 1046 (10th Cir. 2004)( suit could proceed where "none of the public documents disclosed the alleged fraud.")

Ms. Drummond's disclosures on July 7, 2005, *see* p. 8, *supra,* make it clear that Defendant was acting in direct contravention of its specific statutory, regulatory and contractual AFFH obligations. The relevant FCA "allegations or transactions" underlying this lawsuit are that the Defendant— contrary to its numerous AFFH certifications—was "knowingly" failing to comply with specific regulatory requirements concerning AFFH. Complaint ¶¶ 30, 32-40, 47-51,53, 54, 57, 58, 67.

C.   The Discovery of Relevant Information Through Freedom of Information Requests is Not Subject to the Jurisdictional Bar

Even if some of the information on which Relator bases its lawsuit derived from requests to Defendant under New York's Freedom of Information Law ("FOIL"), Def. Mem. at 16-17, none of the documents or materials secured through such requests implicates the jurisdictional bar. While the Second Circuit has not opined on the subject, several federal courts, including a trial court in this district, have held that information derived from a request under the federal Freedom of Information Act ("FOIA") is not a "public disclosure" within the meaning of 31 U.S.C. §3730(e)(4)(A). *See U.S.*

24

*ex rel. Pentagen Technologies Intern. Ltd. v. CACI Intern., Inc.*, 1996 WL 11299, *9-10 (S.D.N.Y.

1996), in which Judge Carter reasoned:

> The phrase does not refer to documents not yet in the public domain but
> which can be pulled into the public domain-- accessible--as the result of
> access mechanisms such as the FOIA law. Therefore, "if [the documents] are
> not yet in the public eye, no rational purpose is served--and no 'parasitism'
> deterred--by preventing a *qui tam* plaintiff from bringing suit based on their
> contents." *Springfield*, 14 F.3d at 653. *Based upon this reasoning, Pentagen's*
> *reliance, if any, on allegations or transactions--or information without which*
> *it would not have thought of the allegations--contained within documents*
> *obtained under the FOIA does not compromise the court's jurisdiction*
> *because the documents acquired under the FOIA are not publicly disclosed*
> *within the meaning of § 3730(e)(4)(A).*

*See also U.S. ex rel. Yannacopolous v. Gen. Dynamics*, 315 F.Supp.2d 939, 950-52 (N.D.Ill. 2004)

(finding that FOIA documents are not considered publicly disclosed, outlining policy reasons, textual

reasons and quoting supportive legislative history); *U.S. ex rel. Bondy v. Consumer Health Found.*, 28

Fed.Appx. 178, 181 n.2 (4th Cir. 2001) (unpublished) (finding that FOIA information is "not among

the items listed" in the statute and "therefore does not operate as a jurisdictional bar"); *Catholic*

*Healthcare West*, 445 F.3d at 1152 (finding that "a response to a FOIA request is not necessarily a

report or investigation, although it can be, if it is from one of the sources enumerated in the statute").

Cases in which other Circuits have held otherwise are entirely distinguishable.[28]

Furthermore, those sources of information, including the FOIL requests, upon which Relator

may have relied in bringing this FCA litigation, are not among the enumerated sources in the statute

and therefore do not trigger the jurisdictional bar. *See John Doe*, 960 F.2d at 323 (finding that the

---

[28] *U.S. ex rel. Mistick PBT v. Hous. Auth. of City of Pittsburgh*, 186 F.3d 376, 382-85 (3d Cir. 1999); *U.S. ex rel.*
*Reagan v. E. Tex. Med. Ctr. Reg'l. Heathcare Sys.*, 384 F.3d 168, 175-76 (5th Cir. 2004); *U.S. ex rel. Burns v. A.D.*
*Roe Co.*, 186 F.3d 717, 723-24 (6th Cir. 1999). In each of those cases, plaintiff/relators invoked the federal FOIA
statute to secure administrative "reports" or "investigations" in the hands of a federal government agency, precisely
the types of documents that *are* identified in 31 U.S.C. §3730(e)(4)(A). For instance, the FOIA request in *Mistick*
was made to a federal agency and resulted in a federal agency's "administrative report" and "administrative
investigation," matters clearly within the plain language of the jurisdictional bar. *Mistick*, 186 F.3d at 381-85. In the
present case, the FOIL request was made to a county department and did not result in "administrative reports" or
"investigations" as defined by Section 3730(e)(4)(A). *See e.g.*, *U.S. ex rel. Dunleavy v. County of Del.*, 123 F.3d 734,
744-46 (3d Cir. 1997) (limiting the scope of "administrative" as a modifier of "report" and "investigation" to the work
product of the federal government, not municipal governments).

statute "furnishes an exclusive list of the ways in which a public disclosure must occur for the

jurisdictional bar to apply"). As the complaint and the attached declaration reveal, the information

underlying this litigation does not come from: 1) "a criminal, civil, or administrative hearing"; 2) "a

Congressional, administrative, or Government Accounting Office report, hearing, audit or

investigation"; or 3) "the news media." § 3730(e)(4)(A). The relator's own experience and private

interview are not enumerated sources in the statute. § 3730(e)(4)(A); *see Mikes*, 931 F.Supp. at 255.[29]

Thus, the allegations underlying the action are not based upon publicly disclosed information

in such a way as to bar this action.

D.   <u>Even if the Court Were to Find That Relator's Lawsuit is Based Upon Publicly Disclosed
     Material Within the Jurisdictional Bar, Relator Is an Original Source</u>

If the Court should find that the allegations underlying this action have been "publicly

disclosed" within the precise contours of 31 U.S.C. §3730(e)(4), Relator nevertheless qualifies as an

"original source" of those allegations. In order to qualify as an original source, a relator must "(1)

have direct and independent knowledge of the information on which the allegations are based, and (2)

have voluntarily provided such information to the government prior to filing suit." 31 U.S.C.

§3730(e)(4)(B).[30] As in *Kennard v. Comstock Resources, Inc.*, Relator

> sorted through relatively obscure public documents and, together with [its
> own records], used these documents to discover and support [its] claim of the
> alleged fraud. It is important to note that none of the public documents
> disclosed the alleged fraud. It was only through independent investigation,

---

[29] Furthermore, the documents received pursuant to the FOIL requests have not been publicly disclosed in a manner listed in the statute. The statute explicitly states the manner in which the information must be publicly disclosed; applications, contracts, agreements, municipality reports, and the other records that emerged from the Relator's FOIL request do not fall into any of these categories. *See e.g., John Doe*, 960 F.2d at 323; *Catholic Healthcare W.*, 445 F.3d at 1156 (finding that an application is not an "enumerated source"). Defendant suggests that some of the documents are "administrative reports." § 3730(e)(4)(A). However, "'administrative' when read with the word 'report' refers only to those administrative reports that originate with the federal government." *See Dunleavy*, 123 F.3d at 745-46. None of the documents from the relator's FOIL requests originated with the federal government.

[30] The U.S. Supreme Court's recent decision in *Rockwell International Corp. v. United States*, 127 S.Ct. 1397 (2007), effectively overrules the "additional requirement" articulated in *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 17 (2d Cir. 1990). Justice Scalia's opinion for the Court reasons that it would be illogical to require a relator to prove that it was the source of information underlying publicly disclosed allegations, or those already known by the U.S. Government. Rather, a relator must only demonstrate that it has direct and independent knowledge of the information on which its *own* allegations are based, and have shared it with the U.S. Government.

26

> deduction, and effort that [plaintiff/relator] discovered the alleged fraud.
> Relator "ha [d] direct and independent knowledge of the fraud allegedly
> committed [since it] was [agency] responsible for ferreting it out in the first
> place." *Holmes*, 318 F.3d at 1207. Relator[ was] not just [an] assembler of
> information. ***This case would not exist but for Relator sniffing it out.***
> ***Through discovery and deduction, Relator ferreted out the alleged fraud in***
> ***this case and must, therefore, qualify as an original source.***

363 F.3d 1039, 1046 (10th Cir. 2004)

Here, the Relator has "direct and independent knowledge of the information on which the

allegations are based." § 3730(e)(4)(B). It had direct knowledge of the information independent from

the FOIL documents, and its own investigation "translated into some additional compelling fact" and

demonstrated "a new and undisclosed relationship between disclosed facts, that puts the government

on the 'trail' of fraud." *See Reagan*, 384 F.3d at 179. Finally, there is no question that the Relator here

"voluntarily provided the information to the government before filing." § 3730(e)(4)(B).[31]

## VII.   RELATOR HAS SATISFIED THE PLEADING REQUIREMENTS OF RULE 9(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendant's third point calls upon the Court to determine whether Relator has "state[d] with

particularity the specific statements or conduct giving rise to the fraud claim." *Gold v. Morrison-*

*Knudsen Co.*, 68 F.3d 1475 (2d Cir. 1995). While Relator avers that the allegations of its complaint

more than satisfy the requirements of Fed.R.Civ.P. 9(b), the Gurian Declaration (Ex. 1) provides

additional detail with respect to the admissions giving rise to the fraud claim. If the Court should so

order, Relator stands ready to amend its complaint to incorporate these more specific allegations.

Construing Rule 9(b), the Second Circuit has said that "the complaint must: (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and

---

[31] The Relator's disclosure was clearly voluntary in the sense that (1) it was not part of any contractual obligation to
disclose, *Ex rel. Biddle v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 161 F.3d 533, 540-41 (9th Cir. 1998); (2) it was
clearly cooperative and not compelled by subpoena, *U.S. ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Group, Inc.*,
370 F.Supp.2d 18, 40 (D.D.C. 2005); and (3) it was of its own initiative. *See U.S. ex rel. Barth v. Ridgedale Elec. Inc.*,
44 F.3d 699, 704 (8th Cir. 1995).

when the statements were made, and (4) explain why the statements were fraudulent." *Acito v.*

*IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995)(internal citation omitted).

The complaint, especially as supplemented by the attached declaration, meets each of the *Acito*

requirements. First, the complaint provides adequate detail about the certifications and claims Relator

alleges are fraudulent. Courts have not required relators in FCA cases to name each and every instance

of falsity or fraud. *See, e.g., United States ex rel. Karvelas v. Melrose-Wakefield Hospital,* 360 F.3d

220, 231 (1st Cir. 2004)(requiring relator only to "describe with particularity some of the documents

containing false claims for payment that the defendants allegedly submitted to the United States.")

The complaint alleges that "throughout the false claims period, Westchester applied each year

for federal funds," Complaint ¶ 20, and "made claims for payment of grant funds…throughout the

false claims period." Complaint ¶ 26. The scope of Relator's allegations is broad, covering each and

every time during a six-year period that Defendant made an express or implied certification to HUD

that it was affirmatively furthering fair housing, or would do so in the future. Complaint ¶¶ 10, 23, 27,

30, 69. While the precise number of such claims or certifications is not yet known, for each of the six

years of the false claim period (commencing April 1, 2000), Defendant's false claims would have

appeared at least twice on five-year Consolidated Plans, annually on Consolidated Plan One Year

Action Plans, Consolidated Annual Performance and Evaluation Reports ("CAPERs"), and requests

for payment or approval and applications for federal assistance with respect to each of the following

federal housing and community development programs: CDBG, HOME, Emergency Shelter Grants,

Supportive Housing Program, Shelter + Care and Housing Opportunities for People with AIDS. On

information and belief, therefore, Defendant made false certifications or claims in at least 48 separate

instances.

Second, the complaint adequately alleges the "identity of the speaker" as being Westchester

County itself (the entity ultimately responsible for the conduct of the CDBG program), Complaint ¶¶

20, 26, 27, and the Gurian Declaration specifies that the County official making the critical revelations

set forth in the complaint was Norma Drummond.  Defendant's suggestion that "the complaint effectively requires the County to try to fill in the blanks in order to defend itself from these spurious allegations," Def. Memo at 21, is disingenuous.  Defendant's own exhibits to its Memorandum reference the July 7, 2005 meeting between Norma Drummond and Craig Gurian.  Def. Mem. Ex. H. It was at that meeting that the fraud was revealed.  The Gurian Declaration (Ex. 1) makes clear that Ms. Drummond was the source of the disclosures triggering this litigation.  There had been, and is now, no question about the "identity of the speaker."

Third, the complaint adequately pleads "where and when the statements were made."  They were made in each of Defendant's written submissions to HUD over a six year period, presumably at intervals specified by HUD.  Complaint ¶¶ 2, 20, 23, 26.

Finally, as outlined in Section IV, above, the complaint goes to great lengths to explain why the statements were fraudulent.

Having satisfied each element of Rule 9(b), as interpreted by the Second Circuit in *Acito*, Relator prays that the Court deny the motion to dismiss on this ground as well.  In the alternative, if the Court grants the motion with respect to this point, Relator prays for leave, and a reasonable time within which, to amend its complaint.

## CONCLUSION

For the foregoing reasons, Relator prays that this Court deny the motion to dismiss.

Dated:  May 25, 2007

Respectfully submitted,

 /s/ Michael Allen
Michael Allen, *admitted pro hac vice*
Stephen M. Dane, *admitted pro hac vice*
John P. Relman, *admitted pro hac vice*
RELMAN & DANE, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C.  20036-2456
Telephone: 202/728-1888
FAX: 202/728-0848
Counsel for Plaintiff/Relator

29

### CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2007, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which sent notification of such filing to counsel for Westchester

County, New York.

/s/ Carlee Hobbs
Carlee Hobbs

**Appendix 41**