IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| The Inclusive Communities Project, Inc., | * | |
|      Plaintiff, | * | |
| v. | * | |
| | * | |
| The Texas Department of | * | |
| Housing and Community Affairs, and | * | |
| Michael Gerber, | * | Civil Action No. 3:08-CV-00546-D |
| Leslie Bingham-Escareño, | * | |
| Tomas Cardenas, | * | |
| C. Kent Conine, | * | |
| Dionicio Vidal (Sonny) Flores, | * | |
| Juan Sanchez Muñoz, and | * | |
| Gloria L. Ray in their official capacities, | * | |
|      Defendants. | * | |
| | * | |

## PLAINTIFF ICP'S BRIEF IN OPPOSITION TO MOTION TO DISMISS

### Table of Contents

**Section**                                                                      **Page No.**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Summary of ICP's responses to TDHCA's arguments for the motion to dismiss. . . . . . . . . . . . . 1

Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ICP's injuries, direct or indirect, satisfy the Article III injury requirement. . . . . . . . . . . . . . . . . . 3

TDHCA has not shown that either IRS or the City are Rule 19 required parties. . . . . . . . . . . . 8

     IRS is not a required party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     The City of Dallas is not a required party. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

-i-



Appendix 50

Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Evidentiary assertions without an appendix.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Conclusion on Rule 19 issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Table of Authorities

**Page No.**

### U.S. Constitution

Article III of the U.S. Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 6, 8

### Cases

*Association for Retarded Citizens of Dallas v. Dallas County Mental Health
& Mental Retardation Center Bd. of Trustees*, 19 F.3d 241 (5th Cir. 1994). . . . . . . . . . . . . . . . . 6

*Association of Community Organizations for Reform Now v. Fowler*,
178 F.3d 350 (5th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Audler v. CBC Innovis Inc.*, 519 F.3d 239 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Barrows v. Jackson*, 346 U.S. 249 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Buchanan v. Warley*, 245 U.S. 60 (1917). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*City of Dallas v. F.C.C.*, 165 F. 3d 341(5th Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477 (7th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . 20

*Eubank v. City of Richmond*, 226 U.S. 137(1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Garcia v. Boyar & Miller, P.C.*,  2007 WL 2428572 (N.D. Tex. 2007). . . . . . . . . . . . . . . . . . . 2

-ii-

*Geo-Tech v. Hamrick*, 886 F.2d 662 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979). . . . . . . . . . . . . . . . . . . . . . . . 7

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . 1, 6, 7, 8

*Miller v. City of Dallas*, 2002 U.S. Dist. LEXIS 2341 (N.D. Tex. 2002). . . . . . . . . . . . . . . . . 16

*Minton v. City of Fort Worth*, 786 S.W.2d 563
(Tex. Civ. App.-Fort Worth 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Philippines v. Pimentel*, ___ U.S. ___, 128 S.Ct. 2180 (2008). . . . . . . . . . . . . . . . . . . . . . . . . 3

*Power Equities, Inc. v. Atlas Telecom Services-USA, Inc.*,
2007 WL 43843 (N.D.Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

*Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . 8

*State of Washington ex rel. Seattle Title Trust Co. v. Roberge*,
278 U.S. 116 (1928). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*Walker v. City of Dallas*, 734 F.Supp. 1289 (N.D. Tex. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 19

**Federal Statutes**

26 U.S.C. § 42(d)(5)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 42(d)(5)(C)(i), (ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 42(m)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

26 U.S.C. § 42(m)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fair Housing Act, 42 U.S.C. § 3601, *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**State Statutes**

Section 4 of Acts 2003, 78th Leg., ch. 1106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tex. Gov't Code 2306.269(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Tex. Gov't Code § 2306.6703(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

Tex. Gov't Code § 2306.6710(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Tex. Gov't Code § 2306.6710(b)(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Tex. Gov't Code § 2306.6711(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Tex. Gov't Code § 2306.6718(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Tex. Gov't Code § 2306.6718(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Tex. Gov't Code § 2306.6718(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**State Regulations**

10 TAC § 1.32(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 1.32(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 1.32(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 50.6(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 50.6(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 50.16(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 50.16(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

10 TAC § 50.16(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Federal Rules**

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. P. 12(b)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 19, 21

Fed. R. Civ. P. 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

-iv-

Fed. R. Civ. P. 19(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 19(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Fed. R. Civ. P. 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2


**Local Rules**

N.D. Tex. Local Rule 7.1.i.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20


**Misc.**

The Advisory Committee Notes, Fed. R. Civ. P. 19, 1966, The Amended Rule . . . . . . . . . . . . . 2

-v-

### Summary of ICP's responses to TDHCA's arguments for the motion to dismiss

TDHCA's first argument is that ICP lacks standing because the only injuries ICP alleges are indirect and are the consequence of and flow from the injuries to ICP's clients. TDHCA asks for a Fed. R. Civ. P. 12(b)(1) dismissal for lack of jurisdiction on the grounds that these injuries as pleaded in the complaint are derivative and indirect. ICP's response is that the complaint alleges direct economic and other injuries to ICP caused by TDHCA's racial discrimination. These injuries satisfy Article III of the U.S. Constitution for ICP's standing under the Fair Housing Act and the civil rights statutes. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Rule 12(b)(1) motion should be denied.[1]

TDHCA's second argument is that both the Internal Revenue Service ("IRS") and the City of Dallas are required parties under Fed. R. Civ. P. 19(a) and since neither are parties to the case, it should be dismissed pursuant to Fed. R. Civ. P. 12(b)(7). TDHCA's argument is based solely on the assertion that complete relief cannot be accorded in the absence of IRS and the City of Dallas. In response, ICP will show that neither the complaint nor the facts outside the pleading cited by TDHCA support a finding that the IRS or the City are required parties. The IRS and the City are not needed for complete relief. But even if the IRS and the City are required parties, the motion does not even address the standards for dismissal under Rule 19. TDHCA provides no argument or authority on the Rule 19(b) standard for dismissal because a required party cannot be joined. Unless the absent and required parties cannot be joined and only if then the Court decides

---

[1] TDHCA does not argue that ICP does not have standing because of either the causation or redressability factors of Article III injury in fact. Motion page 3. ICP's complaint clearly alleges facts adequate to show the necessary causation and redressability. Complaint ¶¶ 1, 2, 12-13, 29-36.

-1-

that in equity and good conscience the case should not proceed in the absence of the parties, is

dismissal appropriate. *Power Equities, Inc. v. Atlas Telecom Services-USA, Inc.*, 2007 WL

43843, *4 (N.D.Tex. 2007); Fed. R. Civ. P. 19(b). If the Court does find that the IRS and the City

are required parties, ICP will not object to their joinder. The Rule 12(b)(7) motion should be

denied.

### Standard of review

The Rule 12(b)(1) part of TDHCA's motion to dismiss is a facial attack on the complaint

without supporting evidence outside the pleading.[2] The allegations in the complaint are assumed

to be true for purposes of evaluating the sufficiency of the complaint. If those allegations are

sufficient to allege jurisdiction, the motion must be denied. *Garcia v. Boyar & Miller, P.C.*,

2007 WL 2428572, 2 (N.D. Tex. 2007).

TDHCA's Rule 12(b)(7) motion is based solely on its argument that complete relief

cannot be accorded among those already parties.[3] This standard does not require the joinder of

other liable parties simply because they may also bear responsibility for the injuries. Joint

tortfeasors are permissive but not required parties to an action. The joinder for according

complete relief rule is designed to prevent the Court from having to grant "partial or "hollow"

rather than complete relief to the parties before the court. The Advisory Committee Notes, Fed.

R. Civ. P. 19, 1966, The Amended Rule; Fed. R. Civ. P. 19, 20. Once an absent party is

determined to be a required party that cannot be joined, the subsequent decision whether to allow

the case to proceed is based on complex factors and is usually case specific. Required persons

---

[2] TDHCA Motion pages 2-4.

[3] TDHCA Motion pages 5-9.

-2-

may turn out not to be required for the action to proceed after all. *Philippines v. Pimentel*, ___ U.S. ___, 128 S.Ct. 2180, 2188-2189 (2008). A motion that provides the basis only for determining that missing party is "required" and does not provide the basis for determining the other factors relevant to whether to dismiss the case must be denied. *Power Equities, Inc. v. Atlas Telecom Services-USA, Inc.*, 2007 WL 43843, 4 (N.D.Tex.) (N.D.Tex. 2007).

Rule 12(b)(7) motions, like other motions, can be supported by evidence not in the pleadings or already in evidence. But that evidence must be presented in an appendix. N.D. Tex. Local Rule 7.1.i.1.

**ICP's injuries, direct or indirect, satisfy the Article III injury requirement.**

ICP pleaded the following facts concerning its injuries:

• ICP's fair housing and civil rights mission include efforts to assist Black or African American Dallas Housing Authority Section 8 families in finding housing opportunities in the suburban communities in the Dallas area. Complaint ¶ 3.

• ICP's assistance includes efforts to make units in Low Income Housing Tax Credit assisted properties available for ICP's clients. Complaint ¶ 3.

• The Low Income Housing Tax Credit projects cannot refuse to rent to Section 8 tenants because the tenants are on the Section 8 voucher program. Tex. Gov't Code 2306.269(b). Complaint ¶ 3.

ICP's assistance includes negotiating with landlords as necessary to obtain units in the non-minority concentrated areas at rents that are affordable by the Section 8 families and eligible for the Section 8 subsidy. Complaint ¶ 30.

• The financial assistance provided for these families by ICP includes the payment of

-3-

application fees, security deposits and utility deposits in order to assist families moving into housing that provides desegregative housing opportunities in non-minority, non-poverty concentrated areas. Where such assistance is necessary to make the desegregative move possible. ICP also makes landlord incentive bonus payments to landlords who agree to rent to ICP's clients. Section 8 families may also receive ICP assistance in the form of a contribution to their reasonable moving expenses in order to make a move in an eligible area.  The assistance is provided to secure desegregative housing opportunities in non-minority, non-poverty concentrated areas for ICP's Section 8 client families. Complaint ¶ 30.

• The Low Income Housing Tax Credit projects that take DHA Section 8 voucher participants are a significant source of units used in the DHA Section 8 program. However, the large majority of those tax credit units with Section 8 Voucher families are currently segregated in minority areas in the City of Dallas. The DHA March 2006 Section 8 occupancy report showed that:

A. 20% or 3,348 of the 16,190 DHA March 2006 Section 8 voucher households were in Low Income Housing Tax Credit units.

B. Only 80 of the 3,348, 2%, were in 70% or more White census tracts.

C. More than 2,375 of the 3,348, 71%, were in zero to 30% White tracts. Complaint ¶ 33.

Since the Low Income Housing Tax Credit units cannot refuse to accept Section 8 and the units usually rent for amounts less than Section 8 maximum rents, it is possible for ICP to obtain these units for its clients using fewer person hours of assistance and at a lower out of pocket cost. But since most of the Low Income Housing Tax Credit units are in minority areas and thus are

-4-

not eligible for ICP's assistance, ICP must rely on the non-tax credit, private market in the predominantly White areas. The private landlords in those areas are reluctant to accept Section 8 and do so only at a higher cost to ICP and its clients. The lack of Low Income Housing Tax Credit units in White areas injures ICP in its capacity providing assistance to minority clients seeking housing in those areas. Complaint ¶ 34.

TDHCA's discriminatory decisions that have disproportionately denied tax credits for units in predominantly White areas have directly and adversely affected ICP by:

A. reducing the number of units that ICP can use to help its clients find housing in non-minority concentrated market areas,

B. increasing the amount of time per client that ICP must spend in order to help its clients find and retain modest rental housing in non-minority concentrated areas,

C. increasing the amount of financial assistance that ICP must spend because of the higher rents and other costs in the non-Low Income Housing Tax Credit units in order to help its clients find and retain modest rental housing in non-minority concentrated market areas, and

D. discouraging families with which ICP works from choosing dwelling units in market areas that offer racially integrated housing because of the cost factors involved in such a choice. Complaint ¶ 36.

The complaint alleges that TDHCA's decisions allocating Low Income Housing Tax Credits have injured ICP by making ICP's mission to provide desegregated, racially integrated housing opportunities to the predominantly Black or African American DHA Section 8 Housing Choice Voucher program more difficult and expensive. TDHCA's decisions causing the lack of units in predominantly White areas have caused ICP to spend more money in the financial

-5-

assistance and more staff time in the mobility assistance necessary to keep the lack of Low

Income Housing Tax Credit units in White areas from denying ICP's clients housing in those

areas. By spending the additional financial assistance and by providing the additional staff time

for mobility counseling, ICP is able to provide some housing opportunities in White areas. If the

Low Income Housing Tax Credit units were available in these areas, ICP would not have to pay

the higher costs necessary to obtain units from private, non-tax credit landlords. Thus, the desired

result for ICP's clients is achieved only at the higher costs paid by ICP, a cost made necessary by

TDHCA's actions. This injury is enough for standing. *Havens*, 455 U.S. at 379; *Association of

Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 361-362 (5th Cir. 1999)

(ACORN's expenditure of funds for activities that would not have been necessary had State

complied with the law provided adequate injury for standing purposes).

TDHCA's distinction between "direct" and "indirect" injuries is not relevant to the injury

inquiry under Article III of the U.S. Constitution. It does not matter if the injury is direct or

indirect for Article III purposes. *Village of Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S. 252, 261 (1977). Similarly, for Article III purposes, either an

economic injury or an injury to a specific interest or mission of the plaintiff. *Id.* at 262-264. ICP's

injuries are both economic and to its specific interest and mission. Each type of injury is enough

for standing under Article III without regard to prudential, judge made limitations on jurisdiction.

*Havens Realty Corp.*, 455 U.S. at 379.[4]

Nor does ICP have to itself be a member of the group protected by the statute. The

_____

[4] ICP is not relying on the time and litigation costs of this case for its Article III standing. *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center Bd. of Trustees*, 19 F.3d 241, 243-244 (5th Cir. 1994).

-6-

Supreme Court has also held that a plaintiff need not be a member of a protected class to bring

suit under the Fair Housing Act, so long as the plaintiff suffered an actual injury due to the

defendant's alleged discriminatory conduct. *Gladstone Realtors v. Village of Bellwood*, 441 U.S.

91, 103 n. 9 (1979).

In addition to satisfying the injury requirement for the Fair Housing Act, ICP also

satisfies the injury requirement for its Equal Protection and 42 U.S.C. § 1982 claims. Even

before the rulings in *Havens* and *Bellwood* eliminated the applicability of prudential limitations

in Fair Housing Act cases, the U.S. Supreme Court had already found that prudential limitations

to jurisdiction are also satisfied by injuries from racial discrimination that bars the exercise of

basic property rights such as buying and leasing property. A White seller suffered enough of an

injury by being denied the right to sell his land to an African American buyer to have standing to

challenge the ordinance prohibiting the sale. *Buchanan v. Warley*, 245 U.S. 60, 72-73 (1917). A

White seller also had standing to challenge the restrictive covenants that would have kept her

from selling to a Black purchaser. *Barrows v. Jackson*, 346 U.S. 249, 254-260 (1953). Similarly,

a White threatened with expulsion from a residential social club because of his advocacy on

behalf of a Black property owner had standing to challenge both his expulsion and the refusal to

allow the admission of the Black property owner. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S.

229, 236-237 (1969).

ICP is directly involved in helping its clients lease property in White areas. Because of

TDHCA's discrimination, ICP must pay more to obtain the units for their clients. ICP has

satisfied the standing requirements as set out in the cited cases for its Equal Protection and 42

U.S. § 1982 claims for relief.

-7-

TDHCA does not cite a single case involving the issue of standing to challenge racial segregation or other forms of racial discrimination under the Fair Housing Act, 42 U.S.C. § 3601, *et a seq.* or any other civil rights statute. There is U.S. Supreme Court precedent directly on a point for the issue of the type of injury required for a fair housing organization to have standing to challenge racial discrimination affecting the organization's clients. That precedent makes it clear that TDHCA's cases involving direct and indirect injuries are irrelevant to the Article III standing issue in this case. *Havens Realty Corp.*, 455 U.S. at 379; *Village of Arlington Heights*, 429 U.S. at 261.

TDHCA's cases do not apply to ICP's injury in this case. For example, the TDHCA cited case *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 247-248 (5th Cir. 2008) does not reject standing in any fact situation similar to this case. Rather, in *Audler*, the Fifth Circuit rejects the "juridical link" doctrine of imputed injury in class action cases. The *Garzes v. Lopez*, 2008 WL 2337277 at *2 (5th Cir. 2008) (unpublished) opinion rejected a First Amendment retaliation claim by an insurance agent on the grounds that it failed to meet the judicial prudential standard because it was derivative. *Id.* The plaintiffs in *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315, 319-320 (5th Cir. 2002) were not asserting injuries or wrongs to themselves but to others and were unable to identify any injury suffered by them. These cases do not support the dismissal of ICP's claims. ICP has alleged that it suffers direct economic and mission related injuries from TDHCA's actions. Complaint ¶¶ 29-36. The allegations are sufficient for Article III injury purposes. *Havens Realty Corp.*, 455 U.S. at 379; *Village of Arlington Heights*, 429 U.S. at 261.

**TDHCA has not shown that either the IRS or the City are Rule 19 required parties.**

<u>IRS is not a required party</u>

-8-

*Summary*

TDHCA's argument claims that the developers are responsible for the location of the units. This argument ignores TDHCA's role in deciding which of the proposed developments it will approve for tax credits. TDHCA claims the IRS is a required party because there are incentives in the Tax Code for developers to place Low Income Housing Tax Credit units in minority areas. The alleged incentives, low land costs and eligibility for increased tax credits, have not prevented developers from proposing locations in predominantly White areas only to have those proposals rejected by TDHCA. Complaint ¶ ¶ 20, 21. A remedy that corrects the discrimination can be accomplished in the existing legal and financial framework of the Tax Code. The tax credit programs in other states have operated under the same constraints without creating the same high degree of segregation found in the Texas program. Complaint ¶ 14. Although IRS is not a required party, ICP has a pending petition for IRS rule-making on the issues of racial segregation and racial discrimination in the Low Income Housing Tax Credit program. Appendix pages 4-18. ICP would not object to joinder of the IRS.

*Argument*

TDHCA attempts to place the blame for the segregation on the location choices made by the developers applying for the Low Income Housing Tax Credits. TDHCA argues that:

> The location choices are entirely selected by the developer prior to any application being made to TDHCA for tax credits, and may be based on how the developer believes the low income development will work best for their particular financial needs. TDHCA does not actively solicit applications from developers for any particular area or region but does provide notice of the application round and its rules. Motion page 6.

This argument omits the major actor in the process that determines where Low Income Housing Tax Credit units are built. Developers do not choose the location for the units by simply

-9-

putting it in the application for the Low Income Housing Tax Credit units. There are many more applications for receive Low Income Housing Tax Credits than those that are approved. The location in an application is just a proposal. That proposal does not result in any units being built in the area selected by the developer unless TDHCA approves the application and awards an allocation of tax credits for those units at that location. The TDHCA decision determines whether or not the units will be built in the location proposed by the developer. ICP has specifically alleged that the discriminatory pattern of tax credit units is caused by a discriminatory TDHCA decision process. Complaint ¶¶ 20, 21. TDHCA takes the proposals for locations made by developers and through its decisions granting or denying tax credits determines which of the proposals will receive tax credits and thus where the tax credit units will be built.

TDHCA argues that there are two incentives for developers to put in Low Income Housing Tax Credit applications for units in minority locations. TDHCA claims since these incentives cannot be overcome under the existing federal law governing Low Income Housing Tax Credits, the IRS is a required party. The first incentive is the incentive of low-cost land since the cost of land is not included in the formula by which the amount of tax credits is calculated. The second incentive is the potential increase in the amount of tax credits that projects located in Qualified Census Tracts may be eligible to receive. Therefore, according to TDHCA, complete relief cannot be accorded because of these location incentives and thus IRS is a required party.

> Unless these provisions are removed from the federal statute, TDHCA has no legal ability to overcome the limitations of the program for the need to purchase inexpensive land for financial feasibility or the attraction of developers to the additional 30% boost to the property for developing in QCTs and DDAs that are overwhelmingly located in low income and minority areas. Motion pages 6 and 7.

Neither factor is a barrier to complete relief. The "all other things being equal"

-10-

Appendix 64

desirability of low-cost land does not require a change in the Tax Code in order for there to be a

complete remedy for TDHCA's discriminatory approval and denial decisions. While low-cost

land may reduce the costs of development, the same factors that make land cheap will frequently

limit the amount of rent that can be charged and thus limit the income side of the financial

feasibility equation. The factors that may make land more expensive in some areas may also

make it possible to charge more rent than in low cost areas. The increased income will thus

enhance financial feasibility.

Whether because of the higher rents available or for other reasons, the requirement for

financial feasibility has not prevented developers from proposing locations for Low Income

Housing Tax Credit units in White areas. The problem has been TDHCA's disproportionate

denial rate for those proposals compared to the denial rate for proposals in minority areas.

> 20. TDHCA disproportionately refuses to approve Low Income Housing
> Tax Credit funding for non-elderly projects in predominantly White census
> tracts compared to its approval rate for predominantly White elderly
> projects in predominantly White census tracts. From 1999 through 2006,
> TDHCA awarded tax credits for approximately 67% of the elderly units in
> applications for 90% or greater White census tracts. TDHCA awarded tax
> credits for only 32% of the non-elderly units in applications for 90% or
> greater White census tracts during the same period.

> 21. TDHCA disproportionately refuses to approve Low Income Housing
> Tax Credit funding for non-elderly projects in predominantly White census
> tracts compared to its approval rate for non-elderly projects in minority
> census tracts. From 1999 through 2006 TDHCA awarded tax credits for
> only 32% of the Non-elderly units in all applications for 90% or greater
> White census tracts. During the same period, TDHCA awarded tax credits
> for approximately 47% of the non-elderly units in all applications for 0%
> to 10% White census tracts. Approximately 2% of all approved
> non-elderly units were in 90% or greater White census tracts.
> Approximately 27% of all approved non-elderly units were in 0 to 10%
> White census tracts. Complaint ¶¶ 20, 21.

-11-

A remedial order ending TDHCA's disproportionate denial rate for proposals in White areas and requiring other actions within TDHCA's legal authority can be entered without the addition of IRS as a party. The Tax Code's requirement for financial feasibility does not restrict the Court from granting complete relief.

The increased basis and the resulting increase in Low Income Housing Tax Credits available in the Qualified Census Tracts ("QCT") do not require the IRS's presence for complete relief. TDHCA's argument that the QCTs offer an incentive for development that cannot be overcome fails on two points. The incentive power of the QCT is limited by its discretionary status. And, like the financial feasibility argument, the QCT incentive does not explain TDHCA's disproportionate denial rate for proposals in White areas. Complaint ¶¶ 20-21. That denial rate can be remedied without IRS's presence in the case.

The increased amount of tax credits in QCTs is not a matter of right under either federal or state law and thus projects in QCTs do not always seek or obtain the additional tax credits. The federal statute refers only to an increase in the amount of the "eligible" basis upon which the amount of the credits may be calculated. 26 U.S.C. § 42(d)(5)(C)(i), (ii). This increase in the eligible basis is subject to an offset if the project receives other federal funds. 26 U.S.C. § 42(d)(5)(A). Such federal funding is common in the high poverty, low income areas containing many of the Qualified Census Tracts. The possible increase in the eligible basis for Qualified Census Tracts is subject to the federal law specifically limiting the housing credit dollar amount allocated to a project. The amount of tax credits cannot exceed the amount the housing credit agency determines is necessary for the financial feasibility of the project and its viability as a qualified low-income housing project throughout the credit period. 26 U.S.C. § 42(m)(2).

-12-

**Appendix 66**

TDHCA's own rules for determining the amount of tax credits show that TDHCA can control the incentive value of the eligibility for increased tax credits in Qualified Census Tracts without a change in federal law. TDHCA does not require or allow the Qualified Census Tract credit increase just because the project is in such a tract. The amount of tax credits are determined by TDHCA's discretion using one of three methods for calculating the amount.  One method is the program limit method based "on the current program rules at the time of the underwriting." 10 TAC § 1.32(c)(1). The second method is the Gap method used to determine the amount necessary to fill any funding gap. 10 TAC § 1.32(c)(2). The third method is to simply award the amount requested by the developer. 10 TAC § 1.32(c)(3). But the amount chosen cannot be more than the dollar amount TDHCA determines is necessary for the financial feasibility and the long term viability of the Development throughout the affordability period. Tex. Gov't Code § 2306.6711(b); 10 TAC § 50.16(b).

In addition, TDHCA caps the total amount of tax credits for any single development at $1,200,000 without making any exception for applications seeking to use the additional tax credit eligibility for units in QCTs. 10 TAC § 50.6(d). TDHCA further limits the eligibility for the QCT increase by eliminating eligibility for the increase in census tracts that already have a concentration of LIHTC units. 10 TAC § 50.6(g). The combination of these requirements can and does cap the LIHTC entitlement well short of the 130% for which a project may be eligible. TDHCA also reserves itself the discretion to award additional tax credits when it decides such credits are necessary to either maintain financial feasibility or correct previous errors. 10 TAC § 50.16(i), (j).

But whatever the incentive power of the ACT provision, it has not prevented developers

-13-

from proposing locations in White areas. The problem has been TDHCA's disproportionate

denial rate for those proposals compared to the denial rate for proposals in minority areas.

Complaint ¶¶ 20, 21. Other states operating under the same federal law have been able to achieve

fewer segregated results. Complaint ¶ 14 points out that only Connecticut, California, New

Mexico, Washington, D.C., and Hawaii has higher percentages of Low Income Housing Tax

Credit units in census tracts with 50% or greater minority population than Texas. TDHCA's

disproportionate denial rate for proposals in White areas is within the reach of complete relief

without the addition of the IRS as a party.

A remedial order can be framed without amending the Tax Code and without joining the

IRS as a defendant for purposes of defending the Tax Code from amendment. If necessary for

complete relief, TDHCA's own limits on the award of the discretionary QCT increase can be

maintained and further limits imposed. If the incentive of the QCT increase in credits needs to be

reduced, it can be done without adding the IRS.

The remedy for the discriminatory behavior is not a ban on the approval of Low Income

Housing Tax Credits for units in QCTs or other minority areas. Even if complete relief is

granted, tax credits will continue to be approved for units in those areas. Plaintiff's prayer for

relief asks that the approval rate for units in minority census tracts not exceed the approval rate

for units in non-minority tracts and that TDHCA not approve more low income units in minority

areas than in non-minority areas. Rather than asking the Court to prohibit the approval of units in

QCTs or minority areas, Plaintiff is asking the Court to order TDHCA to increase the number of

units in predominantly White areas and to impose standards that prohibit the approval of tax

credits for units in areas that are unsafe and unsuitable for family life. Complaint, prayer for

relief.

ICP has filed a petition for rule-making with the IRS alleging that the IRS has failed to
eliminate racial segregation and other discrimination from the Low Income Housing Tax Credit
program. Appendix pages 4-18. The IRS has not responded to the petition or taken any public
action to begin the rule-making process. If the Court decides the IRS is a required party, ICP does
not object to the IRS being made a party to the case.

<u>The City of Dallas is not a required party.</u>

*Summary*

The City's authority to exclude Low Income Housing Tax Credit units, its zoning power,
and its ability to finance affordable housing are unlikely to be obstacles to complete relief. The
City states that it will no longer exercise the veto. Appendix pages 44-57, see resolution page 51
and minutes showing adoption of the resolution page 57. Non-tax credit developers of rental
housing in predominantly White areas have been able to find a substantial amount of
appropriately zoned land and there is no reason to expect that developers of remedial housing
will not be able to do the same. If zoning becomes a remedial issue, then the City can be made a
party. Complaint ¶ 16.  The City's financing for affordable units is only a small percent of the
Low Income Housing Tax Credit units in the City and would not be a significant source of
remedial units. Appendix pages 19, 41-43. If the Court decides that the City is a required party,
ICP does not object to its joinder as a party.

*Argument*

State law does require developers desiring to build in cities which have more than twice
the state per capita average of housing tax credit and bond units to obtain a resolution from the

-15-

governing body of the community where the developer desires to build. Tex. Gov't Code §

2306.6703(a)(4). The City of Dallas qualifies under this provision, as it has more than twice the

per capita average of affordable housing supported by tax credits and private activity bonds.

However the City has only qualified under this provision since the statute took effect in 2003.[5]

As pointed out in the Motion, the City has approved only one application since the statute took

effect. Motion page 7-8. Most of the units in minority areas were already in place before the City

received the per capita exclusion power. Complaint ¶ 16.

 The information that TDHCA provides in the Motion concerning the City's exercise of

this power is out of date. The City's current position is stated in its 01/23/08 resolution.

Appendix pages 51, 57. The City of Dallas will no longer enforce its per capita exclusionary

power against all Low Income Housing Tax Credit units but will rather makes its determination

on the need for the units in the specific market area.[6] The current City position contradicts

TDHCA's stated reason for its assertion that the City is a required party.

 The City of Dallas does have zoning power. There is substantial evidence to support a

conclusion that the City has in the past exercised that zoning power in a racially discriminatory

manner. *Miller v. City of Dallas*, 2002 U.S. Dist. LEXIS 2341, **21-30 (N.D. Tex. 2002).

However rental housing in the City of Dallas is distributed on a less racially concentrated basis

than TDHCA's Low Income Housing Tax Credit units. The complaint alleges that:

 16. While 19% of all renter occupied units in the City of Dallas are located in

---

[5] Section 4 of Acts 2003, 78th Leg., ch. 1106 provided that the provision did not affect
applications submitted before September 1, 2003.

[6] The City's resolution is conditioned upon TDHCA's agreement to require Low Income
Housing Tax Credit developers to provide at least $40,000 for social services to Low Income
Housing Tax Credit residents. Appendix page 51 Section 2.

-16-

predominantly White 70% to 100% White census tracts, only 2.9% of TDHCA's Low Income Housing Tax Credit units in the City are in those 70% to 100% White census tracts. A corresponding disparate distribution is found in the City of Dallas minority concentrated census tracts. While only 51% of all renter occupied units in the City are in minority concentrated census tracts with a population of from 0% to 30% White, 85% of TDHCA's Low Income Housing Tax Credit units in the City are in those 0% to 30% White census tracts. While 14% of all renter occupied units in Dallas County are located in 70% to 100% White census tracts, only 2.8% of TDHCA's tax credit units in Dallas County are in 70% to 100% White census tracts. While only 38% of all renter occupied units in Dallas County are in 0% to 30% White census tracts, 71% of TDHCA's tax credit units in Dallas County are in 0% to 30% White census tracts. Complaint ¶ 16.

There is at least a presumption that the City's zoning would support a similar future development of Low Income Housing Tax Credit units in non-minority areas. TDHCA has not presented any facts to show otherwise.

TDHCA argues that it wants the City joined because the City and the Dallas Housing Authority both have the power to issue tax exempt bonds that can be combined with LIHTCs for affordable housing. TDHCA motion pages 8-9. Presumably TDHCA thinks these bonds would be necessary for complete relief although the motion does not explicitly make this point. Given the small scale of the bond funding provided by The City and DHA for Low Income Housing Tax Credit units compared to the amount of bond funding and tax credits available from TDHCA, neither the City nor DHA are likely to be necessary sources of funding for a remedy. According to the City of Dallas study done earlier this year, there are 21,688 Low Income Housing Tax Credit or bond funded rental housing units in the City of Dallas. The City has provided bond funding for 14.5% (3,152) of these units and DHA has provided bond funding for 4.6% (994) of these units. TDHCA has funded the rest. Appendix pages 41-43.

The last paragraph of the portion of the TDHCA motion on failure to join required parties includes the statement that:

-17-

> . . . Moreover, before any decision can be made by TDHCA concerning the
> granting of tax credits, any applicant must have submitted it development plan to
> the municipality for approval. Importantly, it is this municipal control that
> ultimately informs where and to what extent low-income housing gets developed
> in the City of Dallas, not TDHCA. Motion page 9.

If this is just a restatement of the argument based on the per capita exclusionary power of

the City of Dallas under Tex. Gov't Code § 2306.6703(a)(4), then ICP would not need to add to

its response on this issue. But if TDHCA is making a more sweeping statement that without

regard to the per capita exclusionary power, the municipality always has the final say on where

and whether a Low Income Housing Tax Credit unit is developed, then a response is necessary.

Neither federal nor state laws give municipalities any such approval or veto power over

the application for or location of a Low Income Housing Tax Credit application for units within

the municipality. Federal law requires only notice to the City, not deference. 26 U.S.C. §

42(m)(1)(A)(ii). The state law and the state's plan for allocation of the tax credits also require

notice but, except under Tex. Gov't Code § 2306.6703(a)(4), do not cede decision making or

veto power to municipalities. Tex. Gov't Code § 2306.6718(a), (b). The Code gives local

neighborhood organizations and the State House of Representatives member and the State Senate

member the power to influence TDHCA's decisions by allocating plus or minus points

depending on the support or opposition from the organizations or the elected state officials. Tex.

Gov't Code § 2306.6710(b)(1)(B), (F). The Code does not even give municipalities or municipal

officials this influence. If the mayor or the county judge oppose a Low Income Housing Tax

Credit application, TDHCA must contact the mayor or county judge and offer to conduct a

physical inspection of the development site and consult with the mayor or county judge before

the application is scored. No more than consultation and inspection is required. Tx. Gov't Code §

-18-

2306.6718(d).

If TDHCA has given an informal or unofficial veto to municipalities or municipal officials, and this veto is an obstacle to a remedy, the solution is not the joinder of the municipality. The solution is an order prohibiting such an unauthorized delegation of power. *State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 118-119, 121-122 (1928); *Geo-Tech v. Hamrick*, 886 F.2d 662, 663-664 (4th Cir. 1989). A city's use of building lines set by two thirds of the private property owners was delegation of the "power to virtually control and dispose of the property rights of others." *Eubank v. City of Richmond*, 226 U.S. 137, 143-144 (1912). An ordinance requiring approval of two-thirds of the property owners for a replat of property was a delegation of the power to decide the application to those who objected. *Minton v. City of Fort Worth*, 786 S.W.2d 563, 565 (Tex. Civ. App.-Fort Worth 1990). A landfill permit statute that permitted disapproval of an application for a permit based on "adverse public sentiment" was the grant of a veto to private citizens. *Geo-Tech*, 886 F. 2d at 663-664. *C.f. City of Dallas v. F.C.C.*, 165 F.3d 341, 357 (5th Cir. 1999)(requiring consent of existing operators before licensing new applicants).

If City of Dallas' zoning or other development related decisions do become a barrier to a complete remedy in this case in the future, the City can then be made a party. *Walker v. City of Dallas*, 734 F.Supp. 1289, 1290 (N.D. Tex. 1989). If the Court decides that the City is presently a required party, ICP will not object to joining the City as a party to the case.

**Evidentiary assertions without an appendix**

TDHCA's arguments on the Fed. R. Civ. P. 12(b)(7) and Rule 19 issues depend in part on assertions about facts not in the pleading or otherwise in the record. These assertions include the

-19-

asserted necessity for low-cost land in order to develop Low Income Housing Tax Credit units (Motion page 6), the correlation between low cost land, Qualified Census Tracts, Difficult Development areas and low income and minority areas (Motion page 7), the existence of a historical incentive effect of low-cost land and the possible increase in tax credits for Qualified Census Tracts on actual developer decisions (Motion page 6), the City of Dallas' position on allowing Low Income Housing Tax Credit units within the City (Motion pages 7-8), the provision of bonds for affordable housing by the City of Dallas and Dallas Housing Authority (Motion page 8). These assertions are not properly before the Court because they are based on evidence that is not included in an appendix to the motion. A party who relies on documentary (including an affidavit, declaration, deposition, answer to interrogatory, or admission) or non-documentary evidence to support or oppose a motion must include such evidence in an appendix. Local Rule 7.1.i.1.

ICP disputes the facts asserted by TDHCA and has presented its own evidence in an Appendix in support of ICP's opposition to the motion to dismiss. The Court may consider the evidence in ICP's Appendix. *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479-80 nn. 2, 4 (7th Cir.2001).

**Conclusion on Rule 19 issues.**

TDHCA has not met its burden to show that the IRS and the City of Dallas are required parties. It completely fails to even discuss the factors necessary to determine whether or not the case should be dismissed in the absence of required parties. A motion that provides the basis only for determining that missing party is "required" and does not provide the basis for determining the other factors relevant to whether to dismiss the case must be denied. *Power Equities, Inc. v.*

-20-

*Atlas Telecom Services-USA, Inc.*, 2007 WL 43843, *4 (N.D.Tex.) (N.D.Tex. 2007). Even if the

IRS and the City of Dallas are required parties, ICP does not object to their joinder. There is no

basis for dismissal of the ICP complaint under Fed. R. Civ. P. 12(b)(7).

### Conclusion

The Court should deny the motion to dismiss

Respectfully Submitted,

/s/ Michael M. Daniel
Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiff

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorney for Plaintiff

### Certificate of Service

I hereby certify that on July 17, 2008 I electronically submitted the foregoing document
with the clerk of the court for the U.S. District Court, Northern District of Texas, using the
electronic case files system of the court. The electronic case files system sent a "Notice of
Electronic Filing" to the following individual who has consented in writing to accept this Notice
as service of this document by electronic means: Timothy E. Bray, Assistant Attorney General,
State of Texas.

s/ Michael M. Daniel

-21-

Appendix 75