IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| The Inclusive Communities Project, Inc., | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | |
| The Texas Department of | * | |
| Housing and Community Affairs, and | * | |
| Michael Gerber, | * | Civil Action No. 3:08-CV-00546-D |
| Leslie Bingham-Escareño, | * | |
| Tomas Cardenas, | * | |
| C. Kent Conine, | * | |
| Dionicio Vidal (Sonny) Flores, | * | |
| Juan Sanchez Muñoz, and | * | |
| Gloria L. Ray in their official capacities, | * | |
| Defendants. | * | |
| | * | |

PLAINTIFF ICP'S APPENDIX IN SUPPORT OF
BRIEF IN OPPOSITION TO MOTION TO DISMISS

| Document No. | Document Name | page |
|---|---|---|
| 1 | Declaration of Michael M. Daniel | 2 |
| 2 | Declaration of Erin L. Eidenshink | 3 |
| 3 | ICP petition for rule-making filed with IRS | 4 |
| 4 | City of Dallas City Council Briefing Document on Tax Credit housing | 19 |
| 5 | excerpted portion of City of Dallas City Council Agenda and Briefing Documents for the January 23, 2008 City of Dallas City Council meeting | 44 |
| 6 | excerpted portion of the minutes of the City of Dallas City Council meeting held on January 23, 2008 | 56 |
| 7 | Signature and certificate of service | 58 |

-1-



EXHIBIT
A-7

Appendix 76

<u>Declaration of Michael M. Daniel</u>

My name is Michael M. Daniel. I am one of the attorneys for the plaintiff Inclusive

Communities Project, Inc. The documents in this appendix are correct copies of the original

documents.

Document No. 3  is an accurate copy of the text portion of the petition for rule-making

that was filed with IRS on behalf of ICP. The filed petition included a CD-Rom with relevant

documents. The CD-Rom is not filed with this Appendix but will be filed at the request of the

Court or the defendant. The petition was filed by mail on March 12, 2008.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July

17, 2008.

Michael M. Daniel

-2-

Appendix 77

<u>Declaration of Erin L. Eidenshink</u>

My name is Erin L. Eidenshink. I am employed by Daniel & Beshara, P.C. as an investigator and a researcher. I am 18 years of age or older and I have never been convicted of a felony or a misdemeanor involving a crime of moral turpitude.

Document No. 4 in this Appendix is a copy of a City of Dallas City Council Briefing Document. The document can be obtained from the Official City of Dallas Web site by following these links: http://www.dallascityhall.com/committee_briefings/housing.html to http://www.dallascityhall.com/committee_briefings/briefings0108/HSG_010708_TaxCredit.pdf.

Document No. 5 in this Appendix is copy of an excerpted portion of the City of Dallas City Council Agenda and Briefing Documents for the January 23, 2008 City of Dallas City Council meeting. The entire document can be obtained from the official City of Dallas Web site by following these links: http://www.ci.dallas.tx.us/cso/index.html to http://www.dallascityhall.com/council_briefings/agendas/agendas_0108/Final_Combined_012308.pdf.

Document No. 6 in this Appendix is a copy of an excerpted portion of the minutes of the City of Dallas City Council meeting held on January 23, 2008. The entire document can be obtained from the official City of Dallas Web site by following these links: http://www.ci.dallas.tx.us/cso/ccmin.shtml to http://www.ci.dallas.tx.us/cso/pdf/cc012308.pdf

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 17, 2008.

Erin L. Eidenshink

-3-

**Appendix 78**

DANIEL & BESHARA, P.C.
ATTORNEYS AT LAW
3301 Elm Street
Dallas, Texas 75226
(214) 939-9230
FAX (214) 741-3596 or (214) 939-9229

Michael M. Daniel

March 12, 2008

Commissioner of Internal Revenue
Attention: CC:LR:T
Washington, D.C. 20224

Re: petition for rulemaking involving 26 C.F.R. § 1.42-17 Qualified Allocation Plan

**Introduction**

This petition for rulemaking is filed pursuant to 5 U.S.C. § 553(e) and 26 C.F.R. § 601.601(c). The petition is filed on behalf of the Inclusive Communities Project, Inc.

Inclusive Communities Project, Inc. (ICP) is a Dallas, Texas based fair housing and civil rights organization. ICP is particularly focused on the issue of racial segregation and policies and practices which operate to exclude low income families from higher opportunity, predominately white areas of the Dallas metropolitan area. In furtherance of its mission, ICP assists Dallas Housing Authority Section 8 families, more than 85% of whom are Black, in finding housing opportunities in the suburban communities in the Dallas area. ICP's efforts include working with owners and developers of tax-exempt bond properties and Low Income Housing Tax Credit rental properties to make units available for ICP's clients. ICP performs these functions in connection with the public housing desegregation remedy in *Walker v. HUD*, Civil Action No. 85-1210 (N.D. Tex.).

The Low Income Housing Tax Credit program administered by the Internal Revenue Service of the U.S. Department of the Treasury is currently the largest low income housing program supported by federal assistance. The Low Income Housing Tax Credit projects in Dallas, in Texas, and in the nation are largely racially segregated by location and by occupancy characteristics. The failure of the Internal Revenue Service to supervise, monitor, and oversee the states' qualified allocation plans for dispensing Low Income Housing Tax Credits has led to a racially segregated system of tax credit housing. Because Low Income Housing Tax Credit projects cannot refuse Section 8 clients because of their status as Section 8 voucher holders, the Low Income Housing Tax Credit projects should be a significant source of housing for ICP's Section 8 voucher clients. Instead, ICP is harmed by the lack of Low Income Housing Tax Credit projects available for its client families in desegregated areas of Dallas and the adjoining suburbs. The Internal Revenue Service's refusal to promulgate the rules overseeing the states' qualified allocation plans is directly impeding ICP's ability to locate desegregated housing for its Section 8 clients in predominantly White areas of Dallas and the suburbs. The failure by the Internal

-1-

4

**Appendix 79**

Revenue Service to issue rules governing the states' qualified allocation plans violates the congressional mandate to so regulate. The Internal Revenue Service has the legal obligation to eliminate the racial segregation and discrimination in the Low Income Housing Tax Credit projects caused by its failure to monitor and oversee the states' qualified allocation plans.

The proposed rule adds language to the currently reserved sections of a regulation involving the Low Income Housing Tax Credit program, 26 C.F.R. § 1.42-17 Qualified Allocation Plan. The proposed rule is a remedy for the Internal Revenue Service's failure to regulate the states' qualified allocation plans which govern the issuance of low income housing tax credits. The text of the proposed rule is set out. The explanation of the proposed rule and the need for the rule follow the text of the proposed rule. The documents referred to in the explanation of the proposed rule are included on the attached CD-Rom.

-2-

Appendix 80

Proposed rule:

26 C.F.R. § 1.42-17 Qualified Allocation Plan

(a) Requirements

(1) Preferences

In order to meet the definition of a "qualified allocation plan" for purposes of 26 U.S.C. § 42(m)(1)(A) and (B), the State plan must provide for a two-stage process for allocating housing credit dollars. In the first stage, the State shall apply the selection criteria to select projects that are eligible to receive housing credit dollars. In the second stage after the selection criteria have been used to select eligible projects, the State shall give a preference in the allocation of the actual amount of housing credit dollars to - -

(I) projects serving the lowest income tenants,

(ii) projects obligated to serve qualified tenants for the longest periods, and

(iii) projects which are located in qualified census tracts (as defined in 26 U.S.C. § 42(d)(5)(C)(ii)) and the development of which contributes to a concerted community revitalization plan. A "community revitalization plan" must include more than the construction of the proposed project as the sole activity in the plan. A "community revitalization plan" must include other elements for neighborhood improvements with goals such as increasing levels of private investment, and reducing levels of poverty and racial segregation.

The State plan may include selection criteria that are the same as these preference criteria but the State plan must still provide for the use of the preferences in the second stage of allocating the housing credit dollars.

(2) Selection criteria

(A) required selection criteria

In order to  meet the definition of a "qualified allocation plan" for purposes of 26 U.S.C. § 42(m)(1)(A) and (B), the selection criteria that must be used and included in a State plan are:

(I) project location criteria such as achieving a broad geographic distribution of project locations, or encouraging project locations in designated targeted areas

-3-

such as inner cites, Community Development Block Grant neighborhoods, distressed communities, pockets of poverty, and rural areas;

(ii) housing needs criteria such as: providing housing in areas with low rental vacancy rates, providing for an income mix of tenants within the project, or meeting State, regional, or local housing needs and priorities;

(iii) project characteristics, including whether the project includes the use of existing housing as part of a community revitalization plan, whether the project increases the stock of low-income housing, whether substantial rehabilitation expenditures are needed by the project, whether the project will promote energy conservation, whether the units will equal or exceed the quality of units in comparable non housing credit financed projects, and the type of financing;

(iv) sponsor characteristics, such as promoting nonprofit sponsorship and minority participation in development and management;

(v) tenant populations such as elderly, handicapped, disabled, homeless, large families, displaced people, and others facing discrimination in the rental housing market;

(vi) the preferential treatment of persons on public housing waiting lists;

(vii) tenant populations of individuals with children, and

(viii) projects intended for eventual tenant ownership.

(B) additional selection criteria

The State plan may also include additional selection criteria to determine housing priorities of the housing credit agency which are appropriate to local conditions. The federal selection criteria must be given priority over any additional State criteria. The additional selection criteria cannot be used to displace the use of the federal selection criteria. The additional selection criteria cannot be used to lower the priority given to the federal selection criteria relative to the additional criteria.

(C) local criteria must not displace agency decision authority

No local selection criteria, including any criteria for eligibility or initial qualifications to receive an allocation of housing tax credits, shall diminish the authority of the state housing credit agency to make the allocation decisions. A state plan may require the agency to give notice and opportunity for comment on pending applications to third parties such as elected officials and to the chief

-4-

7

**Appendix 82**

executive officer or the equivalent of the local jurisdiction within which the project is located. The state plan shall not diminish the responsibility and authority of the agency to act within the requirements of the Tax Code and other federal laws. The state plan shall not diminish the responsibility and authority of the state housing credit agency by adopting any criterion that makes third party support for the application a threshold or initial eligibility requirement or that awards or deducts points or other credits based on the content of comments or the identity of those submitting comments.

(3) approval by Internal Revenue Service

(A) Plans submitted for approval

The state shall submit each qualified allocation plan to the Internal Revenue Service for approval if that plan is different from the plan previously approved by the Internal Revenue Service or if no state plan has been approved by the Internal Revenue Service. If a qualified allocation plan is not approved within 30 days after submission, the state may continue to use the plan until notified by the Internal Revenue Service that the plan has been disapproved by the Internal Revenue Service.

(B) Criteria for approval of state qualified allocation plans.

The Internal Revenue Service shall review the qualified allocation plan to determine whether the provisions of the plan comply with the Tax Code and Internal Revenue Service regulations. In addition, the Internal Revenue Service shall review each plan in a manner to comply with the Internal Revenue Service's obligation to affirmatively further fair housing. This review will take into account not only whether the plan and the administration of the plan will comply with the law including the Fair Housing Act provisions 42 U.S.C. § 3604 through § 3607 but also whether the approval of the plan will approve a course of action that would limit the supply of genuinely open housing or whether the approval of the plan will increase the supply of genuinely open housing as required by 42 U.S.C. § 3608(d). If there is an existing pattern of racial or ethnic segregation in either the geographic distribution of or the occupancy patterns of a state's Low Income Housing Tax Credit projects, then the state plan must include remedial steps designed to eradicate the effects of the segregation. In order to make this review possible, each state housing credit agency shall submit an annual report to the Internal Revenue Service containing the following information for each project that has received Low Income Housing Tax Credits from the state agency:
(A) the street address, census tract, municipality, county, and state in which the property is located;
(B) the telephone number of the property management or leasing agent;

-5-

8

**Appendix 83**

(C) the total number of units, reported by bedroom size;

(D) the total number of units, reported by bedroom size, designed for individuals who are handicapped as defined by 42 U.S.C. § 3602(h) and the number of these individuals served annually;

(E) the rent for each type of rental unit, reported by bedroom size;

(F) the number of occupants of the project by race and ethnicity by the race and ethnicity of the head of each household occupying a dwelling unit,

(G) the number of units in each project that meet the definition of "housing for older persons" in 42 U.S.C. § 3607(b)(2);

(H) the number of units occupied by individuals receiving government-supported housing assistance and the type of assistance received;

(I) the number of units occupied by individuals and families of extremely low income, very low income, low income, moderate income, and other levels of income;

(J) the year the project began accepting tenants;

(K) whether the project was in a difficult development area or a qualified census tract when the housing tax credits were allocated and whether the project received a higher amount of credits because of its location in a difficult development area or a qualified census tract; and

(L) the total number of projects and the total number of units in those projects for each census tract in which the projects are located and the racial and ethnic composition of each such census tract.

-6-

**Appendix 84**

**Explanation for the proposed rule:**

*Compliance with 26 U.S.C. § 42(m).*

There is a need for Internal Revenue Service supervision, monitoring, and oversight of the states' qualified allocation plans. Using these plans, the states dispense hundreds of millions of dollars in federal tax credits. The Internal Revenue Service does not currently even have a regulation covering the state housing credit agency's compliance with the qualified allocation plan provisions of the Tax Code. The current Internal Revenue Service regulation for Qualified Allocation Plans is "Reserved."

> 26 C.F.R. § 1.42-17 Qualified Allocation Plan
> (a) requirements
> (1) In general [Reserved].
> (2) Selection criteria [Reserved].

While Congress intended to give the states some flexibility in adapting the Low Income Housing Tax Credit program to local circumstances, it mandated use of federal preferences and selection criteria in state qualified allocation plans.[1] The seriousness of the requirement is shown by the penalty for noncompliance with the federal requirements - the tax credits issued are zero. 26 U.S.C. § 42(m)(1)(A). The Internal Revenue Service has abdicated its regulatory role for 20 years by the failure to issue regulations monitoring the states qualified allocation plans.

The United States General Accounting Office("GAO") found a need for improved Internal Revenue Service oversight and supervision of the state housing tax credit agencies' compliance with the Tax Code. The GAO found that either regulatory action or legislation could supply the necessary oversight and supervision. The Internal Revenue Service did not disagree with the need for the oversight and supervision but expressed a desire for new legislation rather than proceeding by regulation.  The Internal Revenue Service did not contest that it could proceed with regulations; it just stated that it preferred to wait for future legislation, if any. GAO/CGD/RCED-97-55, "Tax Credits Opportunities to Improve Oversight of the Low-Income Housing Program," March 1997, pages 6,10-13, 96, 99, 113-120. There has been no subsequent legislation and the Internal Revenue Service has not acted.

The Congressional failure to act since the GAO report is readily explainable. Congress had already passed legislation requiring the Internal Revenue Service to promulgate regulations to prevent noncompliance with the provisions of 26 U.S.C. § 42.

---

[1] The language in (a)(2)(A) of ICP's proposed rule includes the text of the 26 U.S.C. § 42(m) required selection criteria and the additional language from the legislative history. HOUSE REPORT NO. 101-247 H.R. REP. 101-247, *1177-1198 (1989); HOUSE CONFERENCE REPORT NO. 101-386, *538, 1989 U.S.C.C.A.N. 3018, **3141 (1989).

-7-

n) Regulations.--The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this section, including regulations--
. . .
(3) preventing the avoidance of the rules of this section, and
(4) providing the opportunity for housing credit agencies to correct administrative errors and omissions with respect to allocations and record keeping within a reasonable period after their discovery, taking into account the availability of regulations and other administrative guidance from the Secretary. 26 U.S.C.A. § 42(n).

There is no justification for the Internal Revenue Service's refusal to regulate given the clear Congressional mandate to do so.

The need for improved oversight by the Internal Revenue Service has not diminished in the ten years since the GAO report. The Tax Code authorizes only notice to and an opportunity to comment by the mayor or other chief executive officer of the local jurisdiction within which a housing tax credit is proposed. 26 U.S.C. § 42(m)(1)(A)(ii). However, all but 12 state plans delegate all or part of the decision whether to allocate Low Income Housing Tax Credits to local political subdivisions and local private homeowner or neighborhood associations. Poverty & Race Research Action Council and Lawyers' Committee for Civil Rights Under Law, "Building Opportunity: Civil Rights Best Practices in the Low Income Housing Tax Credit Program," October 2006, pages 12-13 [Poverty & Race Research]. The delegation may be absolute as in Arizona where if local government support is not given, then the application is automatically denied. Arizona 2007 Qualified Allocation Plan, page 6 (included on the enclosed CD-Rom). It may be a partial delegation as in Texas where 76 of the 217 available selection criteria points are awarded or denied based on the support or opposition of elected officials and adjoining homeowner/neighborhood associations. Texas 2008 QAP ¶ 50.9(i)(2), (5), (6), (18). (included on the enclosed CD-Rom).

The limitation in the Low Income Housing Tax Credit program on the weight to be given to local jurisdictions is significantly different from the local approval process mandated by Congress for tax-exempt private activity bonds. Under the TEFRA provisions, at least one governmental unit with jurisdiction over the area in which the bond project is located must approve the issuance of the bonds. 26 U.S.C. § 147(f)(2)(A)(ii). Congress clearly knew how to require or allow local approval of tax exempt bond housing financial assistance but chose not to do so for the housing tax credit program. There is no legal basis for the Internal Revenue Service's allowing the states to circumvent the housing tax credit program limitations on the effect of objections by local governments. By doing so, the states have transformed a federal program giving away federal tax dollars into a local program that still gives away federal tax dollars but uses narrow, parochial, and often discriminatory concerns that contradict the Congressional determinations of the federal interests that justify the use of federal tax credits.

-8-

11

**Appendix 86**

The states consistently violate other provisions of the program. The Tax Code requires that a state QAP include a selection criterion that includes the use of public housing waiting lists to give those on the lists a preference for units in housing tax credit developments. 26 U.S.C. § 42(m)(1)(C)(vi). Some state plans such as Texas's omit this federally mandated selection criterion completely. Texas 2008 QAP ¶ 50.9(I). The effect is to eliminate a selection criteria that gave preference to the predominantly minority families on public housing waiting lists. Other state plans all but omit this selection criterion by providing for the award of only one or two selection points for the presence of this factor. The one or two points are de minimis out of a hundred or more selection points available in these plans. Poverty &Race Research, pages 19-20.

Congress clearly required that compliance with the required provisions for the QAP was a precondition for issuance of valid federal tax credits. 26 U.S.C. § 42(m)(1)(A). The Internal Revenue Service' refusal to regulate compliance violates the Congressional mandate.

### Compliance with the Fair Housing Act and other laws

*The Low Income Housing Tax Credit program is racially segregated.*

The Internal Revenue Service regulated Low Income Housing Tax Credit program is marked by racial and ethnic segregation and other forms of racial and ethnic discrimination. The discrimination is so clear that the State of Texas has recognized that its Low Income Housing Tax Credit program perpetuates racial segregation in large urban areas such as Dallas. The "Department" referred to in the following finding is the Texas Department of Housing and Community Affairs (TDHCA). The state's distribution of the credits is governed by the Department's Qualified Allocation Plan (QAP).

> The Department's funding allocations, as well as the allocations under the Bond Review Board's (BRB) Bond Program should promote racial integration, however, the continued failure of these entities to evaluate the implications of prior and current funding decisions permits the Department and the BRB to disproportionately allocate federal low income housing tax credit funds and the tax-exempt bond funds to developments located in impacted areas (above average minority concentration and below average income levels).

> Furthermore, QAP provisions requiring multiple notifications to state and local political officials and neighborhood organizations are feared to enable "Not-In-My-Backyard" (NIMBY) opposition to developments that are proposed in non-impacted areas (above average minority concentration and below average income levels).

> The vast majority of low income housing tax credits and tax-exempt bonds that fund developments in the Dallas, Fort Worth, Austin and Houston metropolitan areas have been placed in impacted areas.

-9-

**Appendix 87**

. . .

The Department's funding decisions arise directly out of the QAP. In recent years, the QAP has continued to place low income individuals in impacted areas, further adding to the concentration problem in most cities today. House Committee On Urban Affairs Texas House of Representatives, "Interim Report 2006 A Report to the House of Representatives 80th Texas Legislature", December 6, 2006, Robert Talton, Chairman, Findings page 48.

The Low Income Housing Tax Credit units in the Dallas area are segregated by location and by occupancy characteristics. While only 45% of all rental units are in tracts where over 50% of the population is minority, 65% of all housing tax credit units in the Dallas PMSA are in those tracts. U.S. Department of Housing and Urban Affairs Office of Economic Affairs, "Updating the Low-Income Housing Tax Credit (LIHTC) Database Projects Placed in Service Through 2003," January 2006 [Update 2003], page 130.

The concentration of the Low Income Housing Tax Credit units in the City of Dallas shows that race was at least one factor in the allocation of the tax credits. While 19% of all renter occupied units in the City of Dallas are located in 70% to 100% White census tracts, only 2.9% of TDHCA's Low Income Housing Tax Credit units in the City are in 70% to 100% White census tracts. A corresponding disparate distribution is found in the City of Dallas minority concentrated census tracts. 85% of TDHCA's Low Income Housing Tax Credit units in the City are in 0% to 30% White census tracts. Only 51% of all renter occupied units in the City are in these minority concentrated census tracts. The availability of the increased basis for housing tax credit in Qualified Census Tracts does not explain the disparities. Even if the units that have actually sought and received a Qualified Census Tract basis increase are excluded from the calculations, the disparities exist. Over 50% of the non-QCT basis units in the City of Dallas are in census tracts that are from 0% to 10% White. Only 22% of all rental units in the City of Dallas are in those tracts.

TDHCA's use of race as a factor in its decisions to allocate Low Income Housing Tax Credits subjects the minority residents of those units in the City of Dallas to severe conditions of slum and blight. The Low Income Housing Tax Credit projects in the City of Dallas are located in minority neighborhoods with high crime, high poverty, high percentages of low income populations, blight caused by industrial uses and obnoxious facilities such as illegal landfills. The educational, employment, and quality of life conditions in those neighborhoods are substantially inferior to the conditions in which low income Whites receive affordable housing assistance.

The segregation and other forms of discrimination are not limited to Texas and Dallas. The U.S. Government Accounting Office studied public housing authorities that had developed public housing and Low Income Housing Tax Credit projects. The GAO found that the federal Low Income Housing Tax Credit units were more likely than traditional public housing to be developed on single sites in predominantly minority neighborhoods. GAO/RCED-93-31, "Public

-10-

13

**Appendix 88**

Housing Low-income Housing Tax Credit as an Alternative Development Method," July 1993, pages 2-3, 8. The location of public housing projects was usually the direct result of *de jure* racial segregation. Discrimination in Federally Assisted Housing, House Subcommittee on Housing and Community Development, "Discrimination in Federally Assisted Housing Programs," Report 99-83, Part 1, 99th Cong., 1st and 2nd Sess. 1-2, 20-61. The fact that the housing tax credit units are more likely to be segregated than public housing units shows the need for the Internal Revenue Service to affirmatively further fair housing in the tax credit program.

The GAO did a subsequent study of the racial occupancy characteristics of the Low Income Housing Tax Credit projects. The study reported that:
  • few projects in White areas had minority residents,
  • most of the projects in metropolitan areas were either predominantly white or predominantly minority, and
  • most of the projects in non-metropolitan areas were predominantly white.  GAO/RCED-00-51R, "Subject: Tax Credits: Characteristics of Tax Credit Properties and Their Residents", January 10, 2000, page 3.

The current and readily available facts also show a high degree of racial segregation in the geographic distribution of many states' Low Income Housing Tax Credit program units. The most recent year for which Low Income Housing Tax Credit project location by race of census tracts was studied and reported on by the U.S. Department of Housing and Urban Development included projects placed in service from 1992 through 2003. Update 2003. The report compared the percent of housing tax credit units in census tracts where the population was over 50% minority with the percent of all rental units in census tracts where the population was over 50% minority. Update 2003, pages 76-78.

The national difference between the percent of Low Income Housing Tax Credit units in 50% or more minority tracts (42%) and the percent of all rental units in those tracts (32%) is 10%. Yet the same comparison in all of the states shows that nearly half the states (23) exceed the national difference. Four jurisdictions exceed the national difference by more than 20 points - Connecticut, Arizona, the District of Columbia, and Massachusetts. Four exceed the national difference by between 10 and 20 points - Mississippi, Georgia, Ohio, and Missouri. Six states exceed the national difference by between 5 and 9 points - North Carolina, New Mexico, Pennsylvania, Tennessee, Texas, and South Carolina. Update 2003, pages 76-78.  64% of LIHTC units in Texas are in census tracts where more than 50% of the population is minority. Only Connecticut, California, New Mexico, Washington, D.C., and Hawaii had higher percentages of LIHTC units in census tracts with 50% or greater minority population than Texas.  Update 2003, page 130. These are differences far in excess of those that have been found to be evidence of purposeful discrimination. *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (U.S. 1977).

-11-

14

**Appendix 89**

*IRS has the legal obligation to eliminate the segregation and other discrimination from the Low Income Housing Tax Credit program.*

The Internal Revenue Service is bound by the affirmatively further fair housing provision of the Fair Housing Act, 42 U.S.C. § 3608(d). Executive Order 12892, 59 Fed. Reg. 2939, January 17, 1994. The obligation applies to the Internal Revenue Service and to all "who are supervised or regulated under, agency programs and activities relating to housing and urban development . . . ." *Id.* at §§ 2-202, 2-203. *In re 2003 Low Income Housing Tax Credit Qualified Allocation Plan*, 848 A.2d 1 (2004), *certif. denied*, 861 A.2d 846 (2004); Orfield, "Racial Integration and Community Revitalization: Applying the Fair Housing Act to the Low Income Housing Tax Credit," 58 Vand. L. Rev. 1747, 1764-1772 (2005). This obligation requires the Internal Revenue Service to prevent discrimination in its programs. But, in addition, the Internal Revenue Service must take the actions necessary to increase the number of the units that offer racially and ethnically integrated housing choices for tenants participating in the housing tax credit program. *N.A.A.C.P. v. Secretary of Housing and Urban Development*, 817 F.2d 149, 156 (1st Cir. 1987); Roisman, "MANDATES UNSATISFIED: THE LOW INCOME HOUSING TAX CREDIT PROGRAM AND THE CIVIL RIGHTS LAWS," 52 U. Miami L. Rev. 1011 (1998). The obligation also prohibits actions that violate the equal protection provision of the Fifth Amendment to the United States Constitution as well as the federal civil rights laws applicable to housing and housing financial assistance provided by the federal government. *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983); *N.A.A.C.P.*, 817 F.2d at 155; *Young v. Pierce*, 628 F.Supp. 1037, 1057 (E.D.Tex. 1985).

The evidence of the discrimination in the Low Income Housing Tax Credit program is set out above. The Internal Revenue Service's affirmatively further fair housing obligation applies whether or not the differences are the result of illegal discrimination. The First Circuit has set out the legal obligations of a federal agency subject to the duty to affirmatively further fair housing.

> . . . an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply. If HUD is doing so in any meaningful way, one would expect to see, over time, if not in any individual case, HUD activity that tends to increase, or at least, that does not significantly diminish, the supply of open housing. *N.A.A.C.P.*, 817 F.2d at 156.

The Internal Revenue Service thus has the obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing in its Low Income Housing Tax Credit program and to assess positively those aspects of a proposed course of action that would increase that supply. If the Internal Revenue Service were doing so in any meaningful way, one would expect to see, over time, if not in any individual case, the Internal Revenue Service activity that tends to increase, or that at least does not significantly diminish, the supply of open housing in the housing tax credit program. This is the standard in

-12-

**Appendix 90**

the regulation proposed by ICP.

*The proposed regulation implements IRS' obligation to affirmatively further fair housing.*

The proposed regulation would bring the Internal Revenue Service into compliance with its obligation to affirmatively further fair housing. Under the regulation, the Internal Revenue Service would have the information concerning the racial effects from the operation of each state's qualified allocation plan (QAP). The reporting requirement is part of the duty to affirmatively further fair housing. A necessary prerequisite for fulfilling the duty to affirmatively further fair housing is to obtain the information relevant to that duty. *Shannon v. U.S. Department of Housing and Urban Development*, 436 F.2d 809, 821 (3d Cir.1970); *Young v. Pierce*, 628 F.Supp. 1037, 1054 -1055 (E.D.Tex.1985); Roisman, 52 U. Miami L. Rev. at 1044.

The second part of the obligation is substantive. The Internal Revenue Service has the obligation to make decisions that replace segregated housing with integrated housing. *N.A.A.C.P.*, 817 F.2d at 155. The Internal Revenue Service's approvals of the state QAPs would take both the information and the obligation into account. The review would take place at the same time as the Internal Revenue Service is reviewing the QAPs for compliance with the relevant provisions of the Tax Code.

**Conclusion**

The Low Income Housing Tax Credit program is the nation's major program for the development of affordable low income rental housing. The Internal Revenue Service is the only federal agency with the authority and the obligation to regulate the program. Its failure to use the authority and to comply with the obligation is shown by the racial segregation in the housing developed without the required oversight. The proposed regulations remedy the failure to act by adopting regulations. Adopting the regulation is only a first step. Until the Internal Revenue Service requires Texas and the other states to comply with 26 U.S.C. § 42(m), relevant regulations, and the obligation to affirmatively further fair housing, the injuries to ICP will continue.

The law requires prompt notice of action on the petition. 5 U.S.C. § 555(e). ICP will assume that the petition is denied after the passage of ninety days from the date the petition is received unless an earlier notice is given.

-13-

**Appendix 91**

Respectfully submitted,

DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596

By _____
    Michael M. Daniel
    Laura B. Beshara
    Attorneys for the Inclusive Communities Project, Inc.

Enclosure

cc w/ enclosure: Elizabeth K. Julian, President, The Inclusive Communities Project, Inc.

Documents included on the attached CD-Rom:

GAO/RCED-00-51R, "Subject: Tax Credits: Characteristics of Tax Credit Properties and Their Residents", January 10, 2000, on the CD-Rom as "163154GAO.pdf".

GAO/CGD/RCED-97-55, "Tax Credits Opportunities to Improve Oversight of the Low-Income Housing Program," March 1997, on the CD-Rom as "g597055.pdf".

GAO/RCED-93-31, "Public Housing Low-income Housing Tax Credit as an Alternative Development Method," July 1993, on the CD-Rom as "149549GAO.pdf".

Poverty & Race Research Action Council and Lawyers' Committee for Civil Rights Under Law, "Building Opportunity: Civil Rights Best Practices in the Low Income Housing Tax Credit Program," October 2006, on the CD-Rom as "Building Opportunity.pdf".

U.S. Department of Housing and Urban Affairs Office of Economic Affairs, "Updating the Low-Income Housing Tax Credit (LIHTC) Database Projects Placed in Service Through 2003," January 2006, on the CD-Rom as "report9503 all lihtc.pdf".

House Committee On Urban Affairs Texas House of Representatives, "Interim Report 2006 A Report to the House of Representatives 80th Texas Legislature", December 6, 2006, Robert Talton, Chairman, on the CD-Rom as "hcua interim rpt2006.pdf".

Texas 2008 QAP, as "Texas 2008 QAP.pdf".

2007 Arizona QAP as "ArizonaQAP2007.pdf".

-14-

OFFICIAL USE

| Postage | $ | 1.48 |
| Certified Fee | | 2.65 |
| Return Receipt Fee (Endorsement Required) | | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 6.28 |

Postmark Here

Sent To
Commissioner of Internal Revenue
Street, Apt. No.; or PO Box No.
Attn: CC:LR:T
City, State, ZIP+4
Washington D.C. 20224

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Commissioner of Internal
Revenue
Attention: CC:LR:T
Washington, D.C. 20224

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee

B. Received by ( Printed Name )      C. Date of Delivery

Commissioner of Correspondent

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:            ☐ No

Office
MAR 1 8 2008

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered        ☒ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

PS Form 3811, August 2001          Domestic Return Receipt          2ACPRI-03-P-4081

# Dallas Tax-Exempt Bond and Low Income Housing Tax Credit Multifamily Projects



A Briefing To The

Housing Committee
January 7, 2008
Housing Department

**Appendix 94**

# PURPOSE: KEY FOCUS AREA: ECONOMIC DEVELOPMENT

☐ Advise the Committee that we will be bringing forward projects for consideration of approval for the pre-application waiver for 9% tax credits for a briefing to the Housing Committee on February 4, 2008 for a City Council vote on February 13, 2008 and provide additional information on project

■ Those applications that are granted a waiver will be briefed with a recommendation to support or not support their 9% tax credits to the Housing Committee on March 3, 2008 for a City Council vote on March 26, 2008

■ We expect to receive at least two applications and could receive as many as five applications

2

20

**Appendix 95**

# Texas Department of Housing and Community Affairs
## Filing Periods for 9% Tax Credit Applicants for 2008

- [ ] Pre-applications for 9% Tax Credit Applications are due on January 7, 2008

- [ ] Final applications for 9% Tax Credit Applications are due on February 29, 2008

- [ ] Resolution from the City of Dallas approving the application and the support of the 9% tax credits is due to TDHCA by April 1, 2008

- [ ] Final Decision by TDHCA at the end of July, 2008

3

**Appendix 96**

# Benefits of the Tax Credit Program

☐ The following are the benefits that can be received from the participation in the tax credit program:

- Provides the best product opportunity to obtain an "A" quality product in an economically depressed area

- Best rental housing alternative available for low income persons because it address the housing needs of families at or below 30%, 50% and 60% of the Area Median Family Income

- Tax credit projects maintain higher occupancy rates than the market due to their high quality

- The City requires a minimum of $40,000 or $200 per unit, whichever is greater, to be spent on providing social services at no charge to the tenants residing at the tax credit projects

- Programs required 30 year compliance period to assist in maintaining the quality of the projects

- Due to the high quality of institutional investors and large bank lenders and their underwriting, there is rarely a default

4

**Appendix 97**

# Texas Department of Housing and Community Affairs "Two Times Per Capita" State Average for Tax Credits and Tax Exempt Bonds

☐ Since January 1, 2004, pursuant to the state's "two times the per capita" state average of tax credits and tax-exempt bonds, it is required that all applicants that are applying for either tax credits or tax-exempt bonds get an approval from the local subdivision which includes the City of Dallas

■ Without the City of Dallas' support the project will not be approved by TDHCA

■ The City of Dallas is currently at 2.15 and if the per capita reaches 1.99 the approval will no longer be required

5

Appendix 98

# Additional Approval Requirement

☐ City took action to reduce the number of applications received due to market conditions in 2005

☐ The pre-application waiver process requires the developer to complete a questionnaire containing 26 questions with attachments with a $500 fee

■ The project is briefed to the Housing Committee and then receives a City Council vote to grant the waiver

■ If the waiver is granted, then the applicant will submit a copy of their 9% tax credit application with a $1,500 fee or their tax-exempt bond application with the appropriate Dallas Housing Finance Corporation fees

　☐ The project will for a second time be briefed to the Housing Committee and then receive a City Council vote to approve the project, to support the approval of the tax credits and, if tax-exempt bonds are involved, to support the approval for the issuance of the tax-exempt bonds

☐ This restriction eliminated the over supply by 2007

6

24

# Market Condition Comparison

☐ Understanding Dallas' tax-exempt bond and tax credit multifamily market in 2005 compared to the changes that have occurred in 2007

■ In 2005 there were fifteen projects (2,925 units) under construction and in 2007 there are only three projects (544 units) under construction

☐ In 2005, an additional six projects (846 units) had not closed on their interim construction loans with one construction closing pending for City Walk at Akard in 2007; and

☐ In 2005, ten projects (1,986 units) that had not reached stabilization and in 2007 only 6 projects (964 units) had not reached stabilization

☐ The overall average gross occupancy level in 2005 city-wide was 92.2% and in 2007 it increased to 94.3% average gross occupancy city-wide

☐ **The average occupancy for tax credit financed projects that have reached stabilization is currently 96%**

☐ Includes projects with bonds issued by the TDHCA, the Dallas Housing Finance Corporation (DHFC) and Housing Options, Inc. (Dallas Housing Authority)

7

**Appendix 100**

# Map of Tax Credit Financed Projects Since 1988



Dallas Low Income Housing Tax Credit Projects

Appendix 101

# Market Analysis

☐ The main submarkets with concentrations of tax credit financed projects are South Dallas, Southwest Dallas and Oak Cliff

- ■ The weighted average occupancy level for tax credit transactions in South Dallas is currently 94% versus the gross market average of 89.5%

- ■ The weighted average occupancy level for tax credit transactions in Southwest Dallas is 97% versus the gross market average of 91.7%

- ■ The weighted average occupancy level for tax credit transactions in Oak Cliff is 97% versus the gross market average of 93.7%

9

Appendix 102

# Market Analysis

□ According to M/PF research in Third Quarter 2007

■ Robust leasing occurred as stricter underwriting regulations eased the general outflow of apartment renters to single family ownership

■ Property teardowns had become quite frequent in North Texas — apartment deliveries at 8,400 with removals estimated at 6,000 — the removals were commonly older apartment tear downs to be replaced by luxury apartments instead of affordable housing

■ North Texas' Financial Activities segment continues to log meaningful performance change during the past 12 months with 7,500 jobs added in Dallas

10

28

Appendix 103

# Current Multifamily Program Policy

☐ The following priorities for any new application "preliminary approvals"

   ■ #1 priority - Demolition/Reconstruction

   ■ #2 priority - rehabilitation projects

   ■ #3 priority - special needs projects such as seniors, AIDS or other disabilities, including housing for the homeless on an individual basis;or

   ■ #4 priority - Not accept any applications for tax credit financed projects for new construction of housing for low and moderate income households until October, 2006, after an annual review of the multifamily criteria has been conducted, unless special circumstances exist (i.e. part of Master Plan Development, Transit Development, etc.).

☐ **The applicant submits a package along with an initial waiver fee of $500 in addition to all other required fees for the approval process.**

☐ Continue to use existing Multifamily Project Review Criteria approved on October 8, 2003, amended on December 8, 2004 and then amended again on January 11, 2006

11

**Appendix 104**

# City's Letter to TDHCA

☐ City's letter to TDHCA dated July 12, 2005 stated that the City would not be reviewing any tax credit or tax-exempt bond projects until the FBI work was completed and TDHCA is still operating under the assumption that Dallas is not open to approving applications for projects

12

# Recommendation

- Dallas City Council approval to modify Priority #4 of Policy to read:

  □ Priority #4 - new construction of housing for low and moderate income households with priority given to Master Plan Developments and Transit Developments

- Dallas City Council approval to send a letter to TDHCA advising them of the change and inform them that the City is willing to review applications on all tax credit transactions individually based upon supply and demand needs in the project's submarket

13

31

# Next Steps

☐ City Council vote on January 23, 2008 for the two
  Council Actions

14

# Addendum – Market Analysis

| M/PF Research | | Dallas Area |
|---|---|---|
| **3rd Quarter 2007** | | **3rd Quarter 2007** |
| | Existing Apartment Units | 394,943 |
| | Annual Apartment Completions | 7,231 |
| | Apartment Unit Absorption | 2,650 |
| | Average Gross Occupancy | 94.3% |
| | Average Monthly Rent | $745 |
| **3rd Quarter 2008 Forecast** | | **3rd Quarter 2008 Forecast** |
| | Annual Apartment Completions | 7,380 |
| | Apartment Unit Absorption | 6,100 |
| | Average Gross Occupancy | 94.1% |

15

33

# Occupancy Comparison of Projects Approved Since 2001 – South Dallas

| Projects per South Dallas Submarket | Address | Council District | # of Units | Occupancy of Project | Submarket Occupancy |
|---|---|---|---|---|---|
| 1. Ewing Villas | 801 S. Ewing Ave | CD 4 | 80 Units | 91% | 89.5% |
| 2. Rosemont Pemberton Hill | 220 Stoneport | CD 5 | 236 Units | 83% | 89.5% |
| 3. Rosemont @ Oak Hollow | 2965 E. Ledbetter | CD 5 | 220 Units | 92% | 89.5% |
| 4. Prairie Commons | 9600 Military Parkway | CD 5 | 72 Units | 100% | 89. 5% |
| 5. Rosemont @ Cedar Crest | 3303 Southern Oaks Blvd. | CD 7 | 256 Units | 90% | 89.5% |
| 6. Sphinx @ Murdeaux | 7400 Loop 12 | CD 8 | 240 Units | 99% | 89.5% |
| 7. Rosemont @ Meadow Lane | 4701 Meadow Lane | CD 7 | 264 Units | 91% | 89.5% |
| 8. Frazier Fellowship | 4700 – 4900 Hatcher | CD 7 | 76 Units | 100% | 89.5% |
| 9. Sphinx @ Delafield | 8200 Hoyle Ave. | CD 4 | 204 Units | 100% | 89.5% |

16

34

# Occupancy Comparison of Projects Approved Since 2001 – South Dallas

| Projects per South Dallas Submarket | Address | Council District | # of Units | Occupancy of Project | Submarket Occupancy |
|---|---|---|---|---|---|
| 10. Rosemont @ Mission Trails | 330 E. Camp Wisdom | CD 5/ CD 8 | 250 Units | 95% | 89.5% |
| 11. The Masters | 1180 N. Masters | CD 8 | 144 Units | 96% | 89.5% |
| 12. Champion Homes of Pecan Grove | 3111 Simpson Stuart Road | CD 8 | 250 Units | 96% | 89.5% |
| 13. Rosemont @ Sierra Vista | 9901 Scyene Road | CD 5 | 250 Units | 96% | 89.5% |
| 14. St. Augustine Seniors | N.E. Corner Bruton & St. Augustine | CD 5 | 150 Units | 98% | 89.5% |
| 15. Pleasant Village | 378 N. Jim Miller | CD 5 | 200 Units | 99% | 89.5% |
| 16. Grove Village | 7203 S. Loop 12 | CD 5 | 232 Units | 95% | 89.5% |

17

**Appendix 110**