IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| The Inclusive Communities Project, Inc., | * | |
|     Plaintiff, | * | Civil Action No. |
| v. | * | 07-CV-945-L |
| The United States Department of | * | ECF |
| Housing and Urban Development, | * | |
|     Defendant. | * | |

PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION TO DISMISS

## Table of contents                                                                    page

Table of authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction and summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Despite the declaration filed by HUD, most of the facts in ICP's complaint
remain undisputed for the purpose of deciding HUD's motion to dismiss . . . . . . . . . . . . . . . . . . 3

HUD's agency action at issue in this case is subject to judicial review under the APA . . . . . . . 10

5 U.S.C. § 702 waives sovereign immunity whether or not the Complaint
states a claim for relief under the APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

HUD's refusal to use the statutorily required market areas to set Fair Market Rents
is arbitrary, capricious, an abuse of discretion and not in accordance with those statutes . . . . . 12

HUD's own standards for separate Fair Market Rent areas are met by the separate markets
in the Dallas area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

42 U.S.C. § 3608(e)(5) imposes a reviewable duty upon HUD . . . . . . . . . . . . . . . . . . . . . . 16

No other adequate remedy exists that would strip this court of jurisdiction . . . . . . . . . . . . . 18

Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

HUD's argument about standing for past injuries elevates a mention of the 50th
percentile into a separate request for relief that it now claims is moot . . . . . . . . . . . . . . 21



EXHIBIT
A-8

Appendix 134

HUD's use of the 12 county region is not a past action. The 2008 FMRs were
based on the 12 county region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

HUD incorrectly characterizes ICP's claim as based on a "general abstract injury."
ICP's suit challenges specific HUD actions that inflict specific injuries and adverse
effects upon ICP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

The need for private landlords in the Section 8 program does not eliminate
traceability or redressability since the failure to use market areas has a
determinative or coercive effect upon those landlords - if the Fair Market Rents
are too low to afford units in White areas, the landlords will not rent those units to
Section 8 families . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Certificate of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Appendix 135**

**Table of authorities**

<u>Cases</u>

*Adarand Constructors, Inc. v. Pena*,  515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Allen v. Wright*, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Anderson v. Jackson*, 2007 WL 458232 (E.D.La. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Barrera-Montenegro v. U.S.*, 74 F.3d 657 (5ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bennett v. Spear,* 520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20, 23, 24

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18, 20

*CCA Associates v. U.S.*, 75 Fed.Cl. 170 (Fed.Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Christopher Village, Ltd. Partnership v. Retsinas*, 190 F.3d 310 (5ᵗʰ Cir. 1999) . . . . . . . . 12, 16

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*,  417 F.3d 898 (8ᵗʰ Cir. 2005) 3, 17

*Delta Kappa Epsilon (DKE) Alumni Corp. v. Colgate University,*  492 F.Supp.2d 106
(N.D.N.Y.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Federal Election Commission v. Akins*, 524 U.S. 11 (1998) . . . . . . . . . . . . . . . . . . . . . . . 2, 23

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979) . . . . . . . . . . . . . . . . . . . . . . 22

*Godwin v. Secretary of Housing and Urban Development*, 356 F.3d 310 (D.C. Cir. 2004) . 18, 19

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Latinos Unidos De Chelsea En Accion (Lucha) v. Secretary of Housing and Urban Development*,
799 F.2d 774 (1ˢᵗ Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*MCG, Inc. v. Great Western Energy Corp.*,  896 F.2d 170 (5ᵗʰ Cir. 1990) . . . . . . . . . . . . . . . . 3

*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . 4

*N.A.A.C.P. v. Secretary of Housing and Urban Development,* 817 F.2d 149 (1st Cir.1987) . . . 17

*National Credit Union Admin. V. First National Bank & Trust Co.*, 522 U.S. 479 (1998) . . . . 23

*National Leased Housing Ass'n v. U.S. Dept. of Housing and Urban Development*,
2007 WL 148829 (D.D.C.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . 11, 17

*Panchakarla v. Gonzales*, 2007 WL 2325213 (N.D.Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . 3

*Paterson v. Weinberger* 644 F.2d 521 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

*Rapanos v. U.S.*, ___ U.S. ___, 126 S.Ct. 2208 (2006) . . . . . . . . . . . . . . . . . . . . . . . 14

*Shannon v. HUD*, 436 F.2d 809 (3rd Cir.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Transohio Savings Bank v. Director, OTS*, 967 F.2d 598 (D.C. Cir. 1992) . . . . . . . . . . . . . 18

*Thompson v. HUD*, 348 F.Supp.2d 398 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . . . . 22

*Trudeau v. Federal Trade Com'n.*, 456 F.3d 178 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . 2, 12

*Warner v. Cox*, 487 F.2d 1201 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . 3, 4, 7, 10, 13, 22

Statutes

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 551(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 551(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 12, 23

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

42 U.S.C. § 1437f(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 10, 11, 13

42 U.S.C. § 1437f(o)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 11, 13

42 U.S.C. § 3608(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 17, 18

Regulations

24 C.F.R. § 570.601(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

24 C.F.R. § 888.111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24 C.F.R. § 888.113(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 15

24 C.F.R. § 888.115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24 C.F.R. § 982.503(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Other authority

72 Fed. Reg. 38398, July 12, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

72 Fed. Reg. 55940, October 1, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23

HOUSE CONFERENCE REPORT NO. 93-1279 1974 U.S.C.C.A.N. 4449 (1974) . . . . . . . . 14

SENATE REPORT NO.  93-693 1974 U.S.C.C.A.N. 4273, 4315 (1974) . . . . . . . . . . . . . 2, 14

-v-

**Introduction and summary of argument**

HUD's motion should be denied.

HUD must use market areas as the basis for setting the rents in the Section 8 program. 42 U.S.C. § 1437f(o)(1)(B) incorporating 42 U.S.C. § 1437f(c)(1). Complaint ¶¶ 5, 36. Instead, HUD uses the Dallas metropolitan area, a region of 12 counties, or a subset of the metropolitan area, a region of 8 counties. Complaint ¶¶ 9, The metropolitan area is not a market area. Complaint, 9, 11-18. HUD's own research concludes that "Entire metropolitan areas (particularly the larger ones) also do not constitute single housing markets." Appendix page 26. By selecting this multi-county region instead of the actual market areas, HUD is able to apply a formula that calculates the maximum rent for the Section 8 program in the Dallas area based on the lower rents in predominantly minority markets where many of the neighborhoods are blighted and have inadequate public and private services and facilities. These market area rents are then applied by HUD to establish the maximum rent that can be paid under the Section 8 program in the higher rent predominantly White markets where there are few if any blighted neighborhoods and the public and private services and facilities are better than those in the minority blighted neighborhoods. Complaint ¶ 10.[1]

The disparity between the percent of units made available by the HUD rents in White areas compared to the percent in minority areas is large. In the City of Plano only 13% of the two bedroom units are available. Plano is 73% White. In contrast, 56% of the two-bedroom units in the City of Dallas are available for Section 8 based on HUD's calculations. Dallas is 35% White. Complaint ¶ 24.

---

[1] HUD calls the maximum rent the "Fair Market Rent" or "FMR." The rent is neither fair nor market as alleged in ICP's complaint.

-1-

HUD's rent-setting policy directly and adversely affects ICP by making it more expensive and more time consuming for ICP to help its clients find and retain rental housing in non-minority market areas. Complaint ¶ 35; Appendix pages 3, 5, 8. ICP claims that HUD's action violates the obligation in the Section 8 statutes to use market areas in setting the FMR and violates HUD's obligation under the Fair Housing Act to affirmatively further fair housing. Complaint ¶¶ 1-39. The Administrative Procedure Act provides ICP's claim for relief and waives sovereign immunity for the injunctive relief in the complaint. 5 U.S.C. § 702.

HUD's suggestion that the APA does not waive sovereign immunity is based on an argument that has already been rejected and is contradicted by the plain text of 5 U.S.C. § 702. *Trudeau v. Federal Trade Com'n.*, 456 F.3d 178, 183-87 (D.C. Cir. 2006). ICP's injuries satisfy the standing requirement for injury in fact. *Bennett v. Spear,* 520 U.S. 154, 167-68 (1997). Landlords who will not rent to a potential tenant who is unable pay the landlord's market rent are much more likely to rent to a potential tenant who can pay the market rent. ICP's declaration and HUD's documents establish the causal link between the amount of rent and landlord's willingness to rent. Appendix pages 2-4, 5-6, 7-8. The presence of third parties such as private landlords whose actions are directly affected by the rent levels set by HUD's Fair Market Rent levels do not eliminate the causation and redressability factors for ICP's standing. *Id.* at 168-69.

HUD's argument that Congress has not mandated the use of market areas in the setting of Fair Market Rents is contradicted by the legislative history, the text of the statutes, and HUD's own regulation. SENATE REPORT NO. 93-693 1974 U.S.C.C.A.N. 4273, 4315 (1974);[2] 42

---

[2] "It is intended that HUD will define the 'areas' for which fair market rents are to be determined in such a way as not to include in a single area communities which are characterized by significant differences in rentals or construction costs for comparable housing." SENATE REPORT NO. 93-693 1974 U.S.C.C.A.N. 4273, 4315 (1974).

-2-

Appendix 140

U.S.C. § 1437f(o)(1)(B); 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 888.113(a). These sources and others provide the Court with law to apply in the judicial review of HUD's action failing to use market areas when setting Fair Market Rents. HUD's argument that its obligation to affirmatively further fair housing is not subject to judicial review under the APA is not the law and has been rejected in other HUD cases. *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Authority*, 417 F.3d 898, 906-909 (8th Cir. 2005). Damage suits against the federal government and local suits against private landlords and public housing agencies cannot provide the relief requested in this case - requiring HUD to use market areas in the setting of Fair Market Rents for the Dallas area. These alternatives do not strip the Court of its jurisdiction to hear the APA claims. *Bowen v. Massachusetts*, 487 U.S. 879, 904-905 (1988). This brief also responds to HUD's other arguments.

### Argument

**Despite the declaration filed by HUD, most of the facts in ICP's complaint remain undisputed for the purpose of deciding HUD's motion to dismiss.**

Motions brought pursuant to Fed. R. Civ. P. 12(b)(1) address the jurisdiction of the court over the subject matter of the complaint. When deciding a Rule 12(b)(1) motion the district court may look at (1) the complaint alone, presuming the allegations to be true; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Barrera-Montenegro v. U.S.*, 74 F.3d 657, 659 (5th Cir. 1996); *MCG, Inc. v. Great Western Energy Corp.*, 896 F.2d 170, 176 (5th Cir. 1990), *citing Williamson v. Tucker*, 645 F.2d 404, 413-14 (5th Cir. 1981); *Panchakarla v. Gonzales*, 2007 WL 2325213, *2 (N.D.Tex. 2007).

The Fifth Circuit distinguishes between Rule 12(b)(1) motions to dismiss that are "facial

-3-

attacks" and "factual attacks" to the sufficiency of the jurisdiction for the complaint. "Facial attacks" go to the sufficiency of the pleadings and in deciding such motions, courts take the allegations in the complaint as true. In "factual attacks," evidence outside the complaint is raised and the court may decide the motion on the basis of undisputed and disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). When the defendant's Rule 12(b)(1) motion to dismiss raises factual issues, the plaintiff must have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence. *Id.* at 414; *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). This may include a hearing, affidavits, and testimony. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980).

In this case most of the facts set forth in the complaint are not disputed by HUD's declaration. Mr. Usowski describes himself in ¶ 1 and the Section 8 program in ¶ ¶ 2-3, 5-6. In ¶ 4 he makes conclusions of law about whether or not the Section 8 statutes establish a general standard requiring the use of market areas. Mr. Usowski claims that Congress has not done so. The plain text of the law shows that Congress has established a standard requiring the use of market areas.

> Except as provided under subparagraph (D), the payment standard for each size of dwelling unit in **a market area** shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit in the **same market area** and shall be not less than 90 percent of that fair market rental. 42 U.S.C. § 1437f(o)(1)(B). (emphasis added).

> The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types **in the market area** suitable for occupancy by persons assisted under this section . . . . 42 U.S.C. § 1437f(c)(1).(emphasis added).

This is a dispute of law, not facts.

-4-

Mr. Usowski gives his version of HUD's history of setting Fair Market Rents in the Dallas area in paragraphs 7 through 21. While he glosses over the use of the 12 county area to set the Fair Market Rent levels for the Dallas area, he does not contradict ICP's statement that

> "Rather than use market areas to establish the fair market rental, HUD uses U.S. Census data for a 12 county region that is not a market area. The twelve counties are Collin, Dallas, Delta, Denton, Ellis, Hunt, Kaufman, Johnson, Parker, Rockwall, Tarrant, and Wise." Complaint ¶ ¶ 9-13.

Nor does he contradict ICP's statement that the eight county region used in the Fair Market Rent determination is not a market area. Complaint ¶ 14. Nowhere in his declaration does Mr. Usowski make the claim that HUD does use market areas to determine the Fair Market Rent levels for the Dallas area. Mr. Usowski does not mention that the 2008 FY Fair Market Rent levels for the three ($1,156) and four ($1,401) bedroom units are still below the FY 2003 Fair Market Rent for the three ($1,176) bedroom units and below the FY 2004 Fair Market Rent four ($1,425) bedroom units. Appendix pages 9-12.

Mr. Usowski implies that there is little difference between using the 12 county region and the eight county region to compute Fair Market Rents. Declaration ¶ 21. The implication is based on a 1.8% difference in one set of data used in the calculations. Mr. Usowski does not calculate the difference in the actual Fair Market Rents using the different regions. But even if he had done so, it would be irrelevant. The issue in this lawsuit is not the amount of the single Fair Market Rent level that is used throughout the eight county area. Rather, the issue is there should be separate Fair Market Rent levels for each rental housing market in that area. Some of the resulting Fair Market Rent levels for the separate rental housing markets will be higher than the eight county FMR and some will be lower. But the levels will better reflect the market rents in market areas. This was the conclusion of both the U.S. Comptroller General and the U.S.

-5-

Government Accounting Office when they studied HUD's Fair Market Rent setting process in 1977 and in 1994. Complaint ¶¶ 28-29.

Mr. Usowski discusses the Office of Management and Budget (OMB) designated metropolitan areas as if it were just understood that these areas should be used in setting Fair Market Rents. He does not disclose OMB's strong warning against using the areas it has determined are solely appropriate for statistical analysis for program purposes.

> Nonstatistical Program Uses of the Statistical Area Definitions. In periodically reviewing and revising the definitions of these areas, OMB does not take into account or attempt to anticipate any nonstatistical uses that may be made of the definitions, nor will OMB modify the definitions to meet the requirements of any nonstatistical program. Thus, OMB cautions that Metropolitan Statistical Area and Micropolitan Statistical Area definitions should not be used to develop and implement Federal, state, and local nonstatistical programs and policies without full consideration of the effects of using these definitions for such purposes. These areas are not intended to serve as a general-purpose geographic framework for nonstatistical activities, and they may or may not be suitable for use in program funding formulas. Appendix page 13.

Mr. Usowski mentions the controversy concerning the proposed 2004 changes in Fair Market Rent area designations. He does not mention that the U.S. Senators for Connecticut protested HUD's proposal to use countywide instead of city based Fair Market Rent areas in Connecticut. Appendix pages 16-18. Mr. Usowski does note that the changes were not implemented. Connecticut still has Fair Market Rent areas based on cities, not the MSA or county-wide areas. Appendix pages 19-20.

HUD bases its argument that granting ICP's requested relief would result in fewer vouchers and fewer families housed on Mr. Usowski's statement this would be the result of higher Fair Market Rents. ICP is not seeking higher Fair Market Rents but is seeking Fair Market Rents that are based on market areas, not statistical areas. The General Accounting Office found that the use of market areas would result in some higher and some lower rent levels with no net

-6-

effect on the number of households served.

> For those smaller areas where FMR levels increase as a result of the change, either program costs would rise or the number of assisted households served at current budget levels would diminish. Conversely, for those smaller areas where FMR levels decreased, program costs would decrease or, given a steady budget level, the number of households being served would rise. Overall, these cost increases and decreases **could tend to net out and have little impact** on the total amount of assistance payments. U.S. GAO, "Rental Housing Use of Smaller Market areas to Set Rent Subsidy Levels Has Drawbacks" June 1994, p.28, Appendix page 22. (Emphasis added.)

The following facts from ICP's complaint are not disputed by HUD. As such, those facts should be taken as true by the Court in deciding the motion to dismiss. *Williamson v. Tucker,* 645 F.2d at 413-14.

ICP assists DHA Section 8 families who choose to lease dwellings in non-minority areas with counseling and financial assistance. Complaint ¶ 1. DHA's Section 8 population is 86% Black and 6% White. There are DHA Section 8 households in Collin and Denton Counties. Complaint ¶¶ 6, 7.

HUD uses twelve counties to establish a single FMR for the eight county Dallas FMR area. HUD does not dispute that the twelve county area is not a single market area. HUD does not dispute that the eight county Dallas FMR area is not a single market area. Complaint ¶¶ 9, 11, 12-18.

By selecting this multi-county region instead of the actual market areas, HUD is able to calculate the maximum rent for the Section 8 program in the Dallas area based on the lower rents in predominantly minority markets where many of the neighborhoods are blighted and have inadequate public and private services and facilities. This rent is then applied by HUD to establish a single FMR that covers the eight county Dallas area and is applied in the higher rent predominantly White markets where there are few if any blighted neighborhoods and the public

-7-

and private services and facilities are better than those in the minority blighted neighborhoods. Complaint ¶ 10.

HUD's policy and decisions make approximately 70% of the rental units in predominantly minority areas available for occupancy by persons assisted under Section 8. Complaint ¶ 23. HUD's policy and decisions make only 30% of the rental units in predominantly White areas available for occupancy by persons assisted under Section 8. Complaint ¶ 22.

HUD's rent setting formula and its application to the Dallas area Section 8 program steers Black DHA Section 8 participants into the predominantly minority areas of the City of Dallas and away from and out of the predominantly White suburban cities. Complaint ¶ 25. HUD's racial steering makes dwelling units unavailable to Black DHA Section 8 participants and perpetuates racial segregation in the City of Dallas and in the Dallas area. Complaint ¶ 26.

In 1977, the U.S. Comptroller General disapproved HUD's decision to use metropolitan areas and other multi-county regions to set rent levels for the Section 8 program because it ignored important distinctions between metropolitan central cities and suburban areas as well as among suburban areas. The Comptroller General recommended the development of separate rent schedules for individual housing submarket areas instead of one rent schedule for an entire SMSA or county group. Complaint ¶ 28.

In 1994, the U.S. Government Accounting Office found that if fair market rents for the Section 8 program were based on smaller geographic areas rather than the multi-county region then rent levels would better reflect the rent levels typically prevailing in thouse smaller areas. Complaint ¶ 29.

HUD's record of its FMR decision on HUD's website contains no facts showing that HUD has ever considered the effects of its policy and decisions selecting the multi-county areas

-8-

instead of market areas on the availability of dwellings in predominantly White areas for the

Black DHA Section 8 voucher program participants. Complaint ¶ 30.

HUD does not dispute that it first used the 12 county region as the basis for setting

Section 8 maximum rents in the Dallas area on Feb. 1, 2006. Complaint ¶ 31.

HUD does not contest the facts setting forth ICP's standing showing that ICP seeks to

create and obtain affordable housing opportunities in non-minority concentrated areas for Section

8 families. ¶ 32. ICP provides financial assistance to assist Section 8 voucher holders to find

housing in non-minority areas of the Dallas region. The mobility assistance includes negotiating

with landlords as necessary to obtain units in eligible areas at rents that are affordable by Section

8 families and eligible for the Section 8 subsidy. Complaint ¶¶ 33, 34. By making standard

quality, non-luxury rental housing unavailable in non-minority areas, HUD's rent setting policy

directly and adversely affects ICP. The policy reduces the number of units that ICP can use to

help its clients find housing in non-minority concentrated market areas, increasing the amount of

time per client that ICP must spend in order to help its clients find and retain modest rental

housing in non-minority areas. It increases the amount of financial assistance that ICP must

spend in order to help its clients find and retain modest rental housing in non-minority areas. The

policy discourages families with which ICP works from choosing dwelling units in market areas

that offer racially integrated housing because of the cost factors involved in such a choice.

Complaint ¶ 35.

The statements in HUD's brief that "plaintiff cannot show..." a fact or set of facts does

not make the issue a disputed fact if HUD has provided no evidence in contradiction. Since HUD

has not disputed the majority of the facts in ICP's complaint, the Court should accept those facts

as true for purposes of deciding the motion to dismiss. The Court should consider the evidence

submitted by ICP on the few facts that are in dispute. *Williamson v. Tucker*, 645 F.2d at 414;

*Paterson v. Weinberger,* 644 F.2d at 523.

**HUD's agency action at issue in this case is subject to judicial review under the APA.**

The APA makes "agency action" or failure to act judicially reviewable. 5 U.S.C. § § 704, 706. HUD implements the rent setting obligations in the Section 8 program statute through statements of general applicability thus meeting the definition of "rule" as a type of "agency action." 5 U.S.C. § 551.

The Section 8 statute requires HUD to set Fair Market Rents using the publication and public comment procedures in the Federal Register on an annual basis. 42 U.S.C. § 1437f(c)(1). HUD proceeds under specific regulations setting out the methodology for determination of Fair Market Rents. 24 C.F.R. §§ 888.111, 888.113, 888.115. The regulatory method requires the use of market areas defined as "the geographic area in which rental housing units are in competition." 24 C.F.R. § 888.113(a). HUD's publication of proposed and final rents states it is doing agency action. The most recent publication of the proposed Fair Market Rents is labeled as "ACTION: Notice of Proposed Fiscal Year (FY) 2008 Fair Market Rents (FMRs)." 72 Fed. Reg. 38398-38403, July 12, 2007. The most recent publication of the final Fair Market Rents is labeled as "ACTION: Notice of Final Fiscal Year (FY) 2008 Fair Market Rents (FMRs)." 72 Fed. Reg. 55940-55945, October 1, 2007.

The final notices of Fair Market Rents are HUD's statement of its approval of the Fair Market Rents for the operation of the Section 8 program throughout the entire United States. The notices are given to implement the specific statutory mandates to set annual fair market rents and to use the Federal Register publication and comment procedures in setting the annual fair market rents. 42 U.S.C. § 1437f(o)(1)(B); 42 U.S.C. § 1437f(c)(1). The final notice is HUD's approval

-10-

for the prices that can be paid for housing using the subsidy provided by Section 8 vouchers.

Under the APA, the definition of "agency action" includes the whole or part of an agency rule. 5 U.S.C. § 551(13). "Rule" means an agency statement of general applicability and future effect designed to implement law or policy and includes the approval of future prices. 5 U.S.C. § 551(4). ICP claims that HUD has taken agency action through its determination of and approval of Fair Market Rents in annual statements published in the Federal Register. ICP claims that this agency action was arbitrary, capricious, an abuse of discretion and not in accordance with two specific laws. ICP claims that the action was not in accordance with the obligation to use market areas when setting Fair Market Rents set out in 42 U.S.C. § 1437f(o)(1)(B) standing alone and as it incorporates 42 U.S.C. § 1437f(c)(1). ICP also claims that the action was not in accordance with the 42 U.S.C. § 3608(e)(5) obligation to affirmatively further fair housing. ICP is asking the Court to set aside the agency action not in accordance with law and compel the agency action using the market areas and affirmatively furthering fair housing. Complaint ¶¶ 38, 39. The agency action and the allegation of agency action taken in violation of the law and the refusal to take the agency action provided for by law in this case supply the elements that were missing in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-63 (2004).

The issue of whether there is law to enforce under the APA is addressed below.

**5 U.S.C. § 702 waives sovereign immunity whether or not the Complaint states a claim for relief under the APA.**

The waiver of sovereign immunity in 5 U.S.C. § 702 is general in its scope and is not even limited to suits that state a claim under the other provisions of the APA.

> . . . An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United

-11-

States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States. . . .5 U.S.C. § 702.

ICP's complaint is just such an action claiming that an agency, HUD, acted and failed to act in an official capacity as the official agency charged with the duty to use market areas to determine fair market rents. Sovereign immunity has been waived for ICP's complaint. Whether or not there is an APA claim is a different issue that is subject to different arguments and authorities. HUD's argument combining the question of whether an APA claim is present and the waiver of sovereign immunity is the same argument that has consistently been rejected by the courts. *Trudeau,* 456 F.3d at 183-187. HUD's brief gave no reason why this same argument in this case should receive different treatment.

**HUD's refusal to use the statutorily required market areas to set Fair Market Rents is arbitrary, capricious, an abuse of discretion and not in accordance with those statutes.**

ICP is not asking the Court to set a Fair Market Rent for the Dallas area Section 8 programs.[3] Rather, ICP is asking the Court to order HUD to use market areas as required by statute when it sets fair market rents for the numerous markets in the Dallas area. That issue is within the scope of judicial review under the APA. *Christopher Village, Ltd. Partnership v. Retsinas,* 190 F.3d 310, 315-16 (5th Cir. 1999). Judicial review is available when "HUD ignores a plain statutory duty . . . ." *Id.* at 315-16. HUD is ignoring a plain statutory duty to use market areas when setting the Fair Market Rents. That issue is subject to judicial review just as the duty

---

[3] ICP's complaint asks for injunctive relief prohibiting HUD from using non-market areas for rent setting, compelling HUD to use market areas for rent setting, compelling HUD to set separate rent levels for separate rental markets in order to provide equal access to predominantly White rental housing markets and compelling HUD to consider fair housing opportunities when it sets Section 8 rent levels. Complaint ¶¶ 39B-39D. None of the relief asks the Court to set fair market rents. Complaint ¶¶ 39A-39G.

-12-

to consider a request for a rent increase was subject to judicial review in *Christopher* even though the request to determine the lawfulness of a particular rent was not subject to judicial review.

HUD does not dispute, for purposes of its 12(b)(1) motion, ICP's allegations that the 12 county and eight county regions that HUD uses to set Fair Market Rents are not market areas. Complaint ¶¶ 9-11, 16.[4] The issue at this stage is whether the HUD determination of the area to use to set Fair Market Rents is so committed to agency discretion as to preclude judicial review under 5 U.S.C. § 701(a)(2). The statute at issue does not leave HUD any discretion. It must use market areas in its fair market rent determinations. The Section 8 voucher statute provides not only that HUD must use a market area, but that the rent standard must apply to units in the same market area.

> Except as provided under subparagraph (D), the payment standard for each size of dwelling unit in **a market area** shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit in the **same market area** and shall be not less than 90 percent of that fair market rental. 42 U.S.C. § 1437f(o)(1)(B). (emphasis added).

The subsection (c) referred also requires the use of the market area.

> The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental dwelling units of various sizes and types **in the market area** suitable for occupancy by persons assisted under this section . . . . 42 U.S.C. § 1437f(c)(1).(emphasis added).

When Congress passed the fair market rent statute, it stated that its intent was for HUD to avoid using in a single fair market rent area communities which were significantly different in rental and construction costs.

---

[4] The undisputed allegations should be accepted as true for purposes of determining this motion. *Williamson v. Tucker*, 645 F.2d at 413-14.

-13-

It is intended that HUD will define the 'areas' for which fair market rents are to be determined in such a way as not to include in a single area communities which are characterized by significant differences in rentals or construction costs for comparable housing. SENATE REPORT NO. 93-693 1974 U.S.C.C.A.N. 4273, 4315 (1974).

The undisputed allegations in the complaint show that HUD's 12 county and eight county FMR regions include in a single area communities that are characterized by significant differences in rentals. Complaint ¶¶ 11-13, 18.

Congress was clear that "each housing market" was to have its own fair market rentals.

The Senate bill required HUD to determine fair market rentals in each housing market area required to obtain adequately maintained and managed private existing and new rental housing; and on the basis of such determinations, public housing agencies or HUD would establish fair market rentals for assisted units. The House amendment required HUD to establish fair market rentals in each housing market area for new and existing units of various sizes and types suitable for occupancy for low-income families.
The conference report contains the House provisions. The conferees believe that the establishment of realistic fair market rentals will be a prime factor in the success or failure of the new housing assistance program. In establishing such rentals, the HUD Secretary is expected to take into account factual data, analyses, and recommendations from community sources familiar with prevailing rents and costs in various market areas; and he should take into account the need to provide housing with suitable amenities and sound architectural design. HOUSE CONFERENCE REPORT NO. 93-1279 1974 U.S.C.C.A.N. 4449, 4465 (1974).[5]

The undisputed allegations of the complaint make it clear that the 12 county and eight county areas are separate and various housing markets that do not have their own fair market rent determinations. Complaint ¶¶ 14-15.

HUD's own regulations further define "market areas" for purposes of fair market rent determinations. "FMRs are housing market-wide estimates of rents that provide opportunities to

---

[5] This and the other legislative history, the text of the statutes, and HUD's failure to show the necessary evidence of acquiescence prevent any inferences from Congressional inactivity. *Rapanos v. U.S.*, ___ U.S. ___, 126 S.Ct. 2208, 2230-2232 (2006).

-14-

rent standard quality housing throughout the geographic area in which rental housing units are in competition." 24 C.F.R. § 888.113(a).

HUD's own analysis states that large metropolitan areas are not housing markets.

> An important issue is what constitutes a rental housing market, that is, within what group of properties are price adjustments made. Clearly, there is no single national rental housing market. **Entire metropolitan areas (particularly the larger ones) also do not constitute single housing markets.** U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Targeting Housing Production Subsidies Literature Review," page 6, 2003. (Emphasis added). Appendix page 26.

It is undisputed that HUD's own market studies of the Dallas area make it clear that neither the 12 county nor the eight county metropolitan wide areas used by HUD for fair market rent determinations are market areas. Complaint ¶¶ 14-15.

The U.S. Comptroller General and the U.S. Government Accounting Office have criticized HUD's use of multi-county regions on the grounds that the rents set for those regions do not correspond to the fair market rents for the separate market areas in those regions. Complaint ¶¶ 28, 29.

The determination of housing market areas is a subject familiar to courts in a variety of contexts, including claims against the government and claims arising under anti-trust laws. *CCA Associates v. U.S.*, 75 Fed.Cl. 170, 202-203 (Fed.Cl. 2007); *Delta Kappa Epsilon (DKE) Alumni Corp. v. Colgate University*, 492 F.Supp.2d 106, 113-14 (N.D.N.Y.2007). HUD's determination that it has the discretion to chose non-market areas when the statute requires using market areas is no more removed from judicial review that HUD's determination that "fiscal year" meant "calendar year." *National Leased Housing Ass'n v. U.S. Dept. of Housing and Urban Development*, 2007 WL 148829, *18 (D.D.C.2007). HUD has chosen to depart from the statute and withhold action legally required - the use of market areas to determine fair market rents. The

-15-

HUD action is subject to judicial review and relief. *Christopher Village, Ltd. Partnership*, 190

F.3d at 315-16.

**HUD's own standards for separate Fair Market Rent areas are met by the separate markets in the Dallas area.**

HUD argues that ICP cannot enforce the 5% difference standard that HUD uses when it

wants to split an area off into another Fair Market Rent Area. HUD brief page 19. ICP is not

citing the standard to enforce it, only to show that by HUD's own standards, the 12 county and

eight county regions include several market areas, not just one. Complaint ¶¶ 15-18. HUD does

not dispute these facts.

**42 U.S.C. § 3608(e)(5) imposes a reviewable duty upon HUD.**

ICP's complaint alleges that HUD has breached its specific duty to use "market areas" in

its Fair Market Rent determinations. Complaint ¶¶ 36, 38. ICP's complaint further alleges that

HUD has breached the specific duty to consider the effects of its decisions on those Fair Market

Rent determinations on the racial composition of the areas affected by those determinations and

on the housing choices available to Black DHA Section 8 voucher program participants. The

complaint alleges that HUD did not consider those effects. Complaint ¶ ¶ 30, 37, 38. ICP seeks

specific relief for HUD's violation of its duty to consider the effects of its Fair Market Rent

market area determinations on racial composition and integrated housing choices - the use of

market areas and consideration of fair housing when setting the maximum rents. Complaint ¶ 39.

The source of HUD's duty to consider the racial effects of its actions is 42 U.S.C. §

3608(e)(5).[6] A wide variety of federal courts have held that HUD's implementation of this duty is

_____

[6] "The Secretary of Housing and Urban Development shall– . . . (5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter 42 U.S.C.A. § 3608(e)(5)."

-16-

subject to judicial review. *Latinos Unidos De Chelsea En Accion (Lucha) v. Secretary of Housing and Urban Development,* 799 F.2d 774, 791-792 (1st Cir. 1986)(cases collected); *Thompson v. HUD*, 348 F.Supp.2d 398, 422 (D. Md. 2005).[7] The line of cases begins with *Shannon v. HUD*, 436 F.2d 809 (3rd Cir.1970). The most recent case is *Anderson v. Jackson,* 2007 WL 458232, *2 (E.D.La. 2007). The leading case is *N.A.A.C.P. v. Secretary of Housing and Urban Development,* 817 F.2d 149, 157-160 (1st Cir.1987)(Judge Breyer).

The HUD brief does not identify a single case specifically holding that HUD's duty to affirmatively further fair housing is not subject to judicial review under the APA. HUD instead relies on an argument by analogy from a case in which the U.S. Supreme Court held that the Administrative Procedure Act did not provide for judicial review of the government's decision to allow off road vehicles into wilderness areas. HUD brief, pages 21-23 citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004). Nor does HUD's brief identify the cases in which the same arguments made here were rejected. *Darst-Webbe*, 417 F.3d at 906-909; *Anderson v. Jackson*, 2007 WL 458232, *2 (E.D.La. 2007).

The opinions cited above show there is law to apply in the judicial review of HUD's duty to affirmatively further fair housing. In addition, HUD itself has set out the meaning of affirmatively furthering fair housing in its own regulations. Affirmatively furthering fair housing means at least that a government must look for barriers to fair housing in its jurisdiction and take appropriate actions to overcome the effects of those barriers. 24 C.F.R. § 570.601(a)(2). In this case ICP alleges that a very specific action was unlawfully withheld. HUD did not take into

---

[7] HUD admitted liability under 42 U.S.C. § 3608(e)(5) in the *Walker v. HUD* litigation involving DHA's public housing and Section 8 program. Findings of Fact and Conclusions of Law: HUD Motion to Modify Remedial Order Affecting HUD, page 3 ¶ 2, filed June 12, 1996 Civil Action 3:85-CV-1210-R (N.D. Tex.). Appendix page 29.

-17-

consideration the effects of its Fair Market Rent market area determinations on racial

composition and integrated housing choices before it selected the multi-county region to use as a

single "market area" for determining fair market rents for the Section 8 program for the Dallas

area. These factors distinguish 42 U.S.C. § 3608(e)(5) from the non-reviewable decision to allow

off road vehicles into wilderness areas. *Darst-Webbe*, 417 F.3d at 906-909.

### No other adequate remedy exists that would strip this court of jurisdiction.

There must be a "special and adequate review procedure" available before a district court

loses its jurisdiction under the APA. *Bowen*, 487 U.S. at 904-905. HUD's proposed lawsuits by

ICP against HUD for money damages in the Claims Court are the same remedy rejected by the

U.S. Supreme Court in *Bowen*. *Id*. at 904-905. Whether or not there would be Tucker Act or

other money claims for past damages, no court would have jurisdiction under the Tucker Act to

provide the requested injunctive relief. *Id*. at 904-905. The Tucker Act waives sovereign

immunity only for damages in contract. *Transohio Savings Bank v. Director, OTS*, 967 F.2d 598,

607 (D.C. Cir. 1992).Unlike the defense contractor in *Warner v. Cox*, 487 F.2d 1201 (5th Cir.

1974), ICP is not suing to require the United States to pay vast sums of money to ICP in advance

of the date set by a contract between ICP and the United States.

HUD argues that the local public housing authorities can be sued under the Fair Housing

Act for HUD's failure to use market areas when setting Fair Market Rents and for HUD's failure

to affirmatively further fair housing in its determination of what areas to use in setting those rents

citing *Godwin v. Secretary of Housing and Urban Development*, 356 F.3d 310, 312-13 (D.C. Cir.

2004) and similar cases. The cited opinions do not apply to this case. For example, in *Godwin*,

the plaintiff had filed an administrative complaint with HUD and against a private party for a Fair

Housing Act violation. When HUD held that the administrative complaint did not have merit, the

-18-

plaintiff sued HUD under the APA for review of the decision not to pursue the administrative

case. The courts quite reasonably held that suing HUD would not remedy the discrimination

alleged to have been caused by the private party. The availability of a Fair Housing Act case

against the party causing the discrimination was an adequate remedy that precluded APA review.

*Godwin*, 356 F.3d at 312-13.

The local public housing authorities do not cause the discrimination nor do they have the

authority to provide a remedy. They have the discretion to set rents at up to 110% of HUD's Fair

Market Rents. The PHAs must have HUD approval for rents above 110% up to 120%. 24 C.F.R.

§ 982.503(c). HUD has not granted this approval for DHA's regular Section 8 Voucher program.

Appendix pages 31-33, 34, 35-40. But even if HUD approved rents more than 110% of the HUD

Fair Market Rents, it would not provide a remedy because the rents in the various parts of the

HUD FMR area vary by more than 20%. The two bedroom recent mover rent in the 2000 U.S.

Census is the underlying basis for HUD Fair Market Rent calculations. Appendix pages 41, 45,

51-52. The median two bedroom recent mover rent in the 2000 U.S. Census for Plano is 23%

higher than the PMSA rent. The median two bedroom rent for Coppell is 27% higher than the

PMSA rent. Appendix pages 56-59, 60, 63, 67. [8]

No local public housing authority has the either the duty or the obligations assigned to

HUD under the statutes involved in this case. Lawsuits against the Dallas Housing Authority, the

McKinney Housing Authority, the Garland Housing Agency, the Mesquite Housing Agency, the

Fort Worth Housing Authority, and the myriad other public housing agencies in the area will do

nothing to require HUD to follow its statutory mandate to use market areas when determining the

---

[8] HUD did grant a 125% increase for 3,200 Walker Settlement vouchers as part of the
settlement in the Walker v. HUD case. Appendix page 5.

-19-

Fair Market Rents that are used by those local agencies. A lawsuit against one of these agencies claiming that it had the power to set its own Fair Market Rents using the market areas within its area of operation would be dismissed as frivolous. These suits are not the special and adequate review procedure that can cause a district court to lose its jurisdiction under the APA. *Bowen*, 487 U.S. at 904-905.

ICP is not charging private landlords with discrimination. It is not discriminatory to refuse to rent a dwelling unit for less than the market rent being charged to other tenants. The private landlords do not have the duty or authority to set Fair Market Rents. The private landlords do not have the obligation to affirmatively further fair housing. A suit against an entity that has not been the cause of the injury is not an adequate remedy that would deprive this Court of its jurisdiction. *Bowen*, 487 U.S. at 904-905.

**Standing**.

HUD's refusal to use market areas directly and adversely affects ICP by A) reducing the number of units that ICP can use to help its clients find housing in non-minority concentrated market areas, B) increasing the amount of time per client that ICP must spend in order to help its clients find and retain modest rental housing in non-minority concentrated areas, C) increasing the amount of financial assistance that ICP must spend in order to help its clients find and retain modest rental housing in non-minority concentrated market areas, and D) discouraging families with which ICP works from choosing dwelling units in market areas that offer racially integrated housing because of the cost factors involved in such a choice. Complaint ¶ 35. ICP's complaint, ¶ 35, alleges the requisite injury in fact. *Bennett,* 520 U.S. at 167-68.

ICP is not seeking to establish standing based on the claims of its clients.

-20-

**HUD's argument about standing for past injuries elevates a mention of the 50th percentile into a separate request for relief that it now claims is moot.**

HUD's argument that ICP's request for the Court to order HUD to use the 50th percentile standard is moot is not directed at any actual relief sought by ICP. While the 50th percentile standard is mentioned in the prayer for relief, Complaint ¶ 39D, it is in the context of requesting relief that will give DHA's Black Section 8 voucher program participants equal access to rental housing in the White rental housing markets.[9] The issue of the 50th percentile standard is not moot. The issue has not yet been raised in the case.

**HUD's use of the 12 county region is not a past action. The 2008 FMRs were based on the 12 county region.**

HUD's use of the 12 county region as the basis for setting Fair Market Rents in the eight county region continues. The calculation for the Fiscal Year 2008 Fair Market Rents states:

> Therefore, HUD assigns Dallas, TX HUD Metro FMR Area the 2000 Census Base Rent of Dallas-Fort Worth-Arlington, TX MSA for purposes of computing the Proposed FY 2008 FMRs. Appendix page 67.

Although Mr. Usowsky's declaration does not highlight the continued use of the 12 county region, it does not deny it. ICP is not asking for relief from solely past actions. HUD continues to use the 12 county region as the basis for setting Fair Market Rents.

**HUD incorrectly characterizes ICP's claim as based on a "general abstract injury." ICP's suit challenges specific HUD actions that inflict specific injuries and adverse effects upon ICP.**

HUD's argument divides the set of possible claims related to HUD's into only two categories. One category is claims by holders of or applicants for Section 8 vouchers. The other

---

[9] The request for HUD to use the 50th percentile as a standard for setting rents in the different rental markets merely keeps the status quo because this is the percentile that HUD currently uses in the Dallas area when setting the FMR.

category is a "sweeping request to generally eradicate the effects of discrimination" which does not confer standing. The set of claims is not so simple. ICP claims that HUD's refusal to use market areas when HUD sets Fair Market Rents injures ICP in very specific ways. HUD's refusal to use market areas directly and adversely affects ICP by A) reducing the number of units that ICP can use to help its clients find housing in non-minority concentrated market areas, B) increasing the amount of time per client that ICP must spend in order to help its clients find and retain modest rental housing in non-minority concentrated areas, C) increasing the amount of financial assistance that ICP must spend in order to help its clients find and retain modest rental housing in non-minority concentrated market areas, and D) discouraging families with which ICP works from choosing dwelling units in market areas that offer racially integrated housing because of the cost factors involved in such a choice. Complaint ¶ 35. Since HUD has not contested these facts, then for purposes of this motion, these facts must be taken as true. *Williamson v. Tucker*, 645 F.2d at 413-14.[10]

These injuries are not abstract injuries all citizens share. These injuries are just as direct and just as specific as the injuries that serve to satisfy the constitutional standing requirement for fair housing organizations. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110-13 (1979); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 208, 211-12 (1972). The APA has similar language giving effect to Congressional intent to include all who have constitutional standing within the statutory standing for the APA. Congress gave the right to APA judicial review to every person

---

[10] HUD has done nothing to put these facts in dispute for purposes of the Rule 12(b)(1) motion. The statement in the brief that ICP cannot show these facts is the opinion of HUD's attorney and is not enough to erase the presumption of truth that otherwise attaches for a facial attack by a 12(b)(1) motion. *Williamson v. Tucker*, 645 F.2d at 413-414.

-22-

"adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702. The U.S. Supreme Court

gives this provision a generous interpretation given the obvious intent of Congress. *Federal*

*Election Commission*, 524 U.S. at 19-20 (1998); *National Credit Union Admin. V. First National*

*Bank & Trust Co.*, 522 U.S. 479, 488 (1998). ICP's complaint, ¶ 35, alleges the requisite injury

in fact. *Bennett,* 520 U.S. at 167-68. HUD has not challenged ICP's status as within the zone of

interests of both the Section 8 statutes and the Fair Housing Act provision involved in this

lawsuit. ICP has standing.

**The need for private landlords in the Section 8 program does not eliminate traceability or redressability since the failure to use market areas has a determinative or coercive effect upon those landlords - if the Fair Market Rents are too low to afford units in White areas, the landlords will not rent those units to Section 8 families.**

HUD argues that since landlords have the last word on whether to rent to a Section 8

family and since there is no obligation to lease to a Section 8 family, there is no traceability or

redressability for ICP's standing. Even if the rent is raised for units in White areas, HUD argues

that ICP cannot be guaranteed that its clients will be able to rent those units. HUD's argument

imposes a requirement of certainty of results that is not required for standing.

For example, a contractor who wants to bid for government contracts but will be

disadvantaged by minority and gender based preferences still has standing to challenge those

preferences. The fact that the contractor may not be the low bidder or otherwise qualify for

contracts even if the challenged preferences are removed does not eliminate standing for

injunctive relief. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211 (1995). Similarly, the

fact that a challenged biological opinion was advisory and not conclusive did not eliminate the

traceability and redressability standing elements for those who stood to be injured if the opinion

was adopted. In so holding, the U.S. Supreme Court made the distinction between injury that is

-23-

the result of third parties not before the court and injury produced by determinative or coercive effect upon the action of such third parties. *Bennett v. Spear,* 520 U.S. 154, 168-69 (1997).

In this case, ICP has plead that HUD's action has just such a determinative or coercive effect upon landlords in predominantly White areas. Complaint ¶ 35. HUD has already found that the effect of rent levels facilitates the placement of Section 8 families into predominantly White areas by making those families more competitive in the Dallas rental market. Appendix page 5. HUD's Section 8 Manual recognizes that the effect of rents being too low for a given market is that families may have a hard time finding acceptable units in more desirable areas, housing choices will be narrowed, and "the PHA's effort to affirmatively further fair housing will be undermined." Appendix page 8. ICP's experience shows that if the relief is granted and the Section 8 rents in White areas are based on the market rents for those areas, the success rate for ICP's placement of Section 8 families will increase. The absence of such market rents is a cause of the inability to place Section 8 families with landlords in those areas. ICP states that in at least 20 instances over the past few months, the only factor that kept its clients from obtaining a specific unit in a predominantly White area was the amount of rent that could be paid under the existing Fair Market Rent scheme. Appendix page 3.

The effect of setting Fair Market Rents on market rents in market areas on the probability of Section 8 families being able to obtain housing in those areas is not speculative. HUD knows and states that it is not speculative. ICP knows and states that it is not speculative. The facts based on the experience of landlord behavior when confronted with a possible tenant who can pay the rent and with a possible tenant who cannot pay the rent are not speculative. HUD's cases are those finding the possible effects of judicial action suspending tax benefits to hospitals and withdrawing tax breaks to racially discriminatory schools were too speculative to support

-24-

standing. *See Allen v. Wright*, 468 U.S. 737 (1984); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976). Those cases do not show that the effect of offering market rent to a landlord instead of offering less than market rent deprives ICP of standing.

**Conclusion**

HUD's motion should be denied. The Court has jurisdiction to decide HUD's duty to use market areas for rent setting and to affirmatively further housing.

Respectfully Submitted,

s/ Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiffs

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorneys for Plaintiffs

Certificate of Service

I hereby certify that on October 22, 2007 I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system sent a "Notice of Electronic Filing" to the following individual who has consented in writing to accept this Notice as service of this document by electronic means: James D. Todd Jr.

s/ Michael M. Daniel

-25-

Appendix 163