# Fair Housing Planning Guide

## Volume 1



EXHIBIT
tabbies*
A-15

U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

Appendix 197

**Childhood Is Without Prejudice/Children of Goodwill.** *Artist: William Walker*.  Originally painted in 1977, this mural was a gift of appreciation to the local school for promoting the ideals of racial harmony. The mural was restored in 1993 by Chicago Public Art Group artists Olivia Gude and Bernard Williams. William Walker, as conceiver and one of the artists on the **Wall of Respect** in 1967, is credited with being one of the founders of the modern community mural movement and the Chicago Public Art Group. *Photographer: Ron Testa.*

---

The Fair Housing Information Clearinghouse prepared this publication.

The Fair Housing Information Clearinghouse is operated by Circle Solutions, Inc., under contract number DU100C000018402.

# Fair Housing Planning Guide

## Volume 1

 U.S. Department of Housing and Urban Development
Office of Fair Housing and Equal Opportunity

# DEVOLVING FAIR HOUSING PLANNING

Devolution, "the transfer of power from a central government to local units," will serve to empower our American cities for years to come. HUD is committed to lead in this effort.

Perhaps nowhere in the Department's mission is the prospect of devolution more challenging than in fair housing. Since 1968 the Department has been under an obligation to affirmatively further fair housing in the programs it administers. Its failures to do so have come most dramatically when that policy is not embraced or is actively resisted by local communities. There are those who do not believe that "devolution" is compatible with strong and effective fair housing enforcement. They fear that without detailed and prescriptive directives, local communities will even more aggressively ignore the need for fairness and equal opportunity by individuals and groups who are covered by the Fair Housing Act. We all know that there is a basis for that concern.

However, we also know that the Department itself has not, for a number of reasons, always been successful in ensuring results that are consistent with the Act. It should be a source of embarrassment that fair housing poster contests or other equally benign activity were ever deemed sufficient evidence of a community's efforts to affirmatively further fair housing. The Department believes that the principles embodied in the concept of "fair housing" are fundamental to healthy communities, and that communities must be encouraged and supported to include real, effective, fair housing strategies in their overall planning and development process, not only because it is the law, but because it is the right thing to do.

As the Department works to foster effective fair housing strategies, it recognizes that, as in most things, the people most knowledgeable about fair housing problems facing their communities are the people who live in those communities. In the past, the Department has too often tried to prescribe national remedies for local situations. And too often, this has not worked because the communities were not involved in the decisionmaking process, and what started out as instruments of principle became rules of process that were to be minimized or even ignored. The result has been a failure by many communities to embrace their legal and moral obligation to ensure that persons are not denied housing opportunity in that community because of their race, ethnic origin, religion, disability, or the fact that they are a family with children. The goal of devolution of responsibility in the area of fair housing means that communities will have the authority and the responsibility to decide the nature and extent of impediments to fair housing and decide what they believe can and should be done to address those impediments.

How will it work, process-wise? The Department's commitment to devolved decisionmaking is reflected in its Consolidated Plan rule. For fair housing, that means that communities will continue to certify that they will affirmatively further fair housing as a condition of receiving Federal funds. However, in defining that concept the new rule offers both certainty and flexibility. Local communities will meet this obligation by performing an analysis of the impediments to fair housing choice within their communities and developing (and implementing) strategies and actions to overcome these barriers based on their history, circumstances, and experiences. In other words, the local communities will define the problems, develop the solutions, and be held accountable for meeting the standards they set for themselves. The hitch, if there is one, is that all affected people in the community must be at the table and participate in making those decisions. The community participation requirement will never be more important to the integrity, and ultimately the success, of the process.

*i*

**Appendix 200**

The Department's role will be to assist a community to fulfill its promise to its citizens. Already, the Department has conducted 22 training sessions nationwide attended by over 1,700 people representing CDBG and HOME grantees, public housing agencies, fair housing organizations, and housing industry groups. The sessions educate participants about the rights of their constituents to fair housing planning. While the Department does not require prior submission and approval of a jurisdiction's analysis of impediments to fair housing choice, it will promptly respond to complaints or concerns expressed by local citizens and groups. This may involve a review of the analysis and supporting documents. In addition, the Department will carefully review the performance indicators under the Consolidated Plan to measure the jurisdiction's progress toward meeting its goals.

Will devolution work? Will it be effective in addressing the fair housing problems in a community? HUD is committed to working with communities to make the process productive and the results real. The commitment the local communities bring to the task will tell the tale.

*ii*

**Appendix 201**

# FOREWORD

In response to requests from State, State-funded, and Entitlement jurisdictions, the Department of Housing and Urban Development (HUD) has developed this Fair Housing Planning Guide. Many of you requested information on fulfilling the fair housing requirements of the Consolidated Plan and Community Development Block Grant (CDBG) Regulations. (The Consolidated Plan Regulation uses the term "affirmatively furthering fair housing" and the CDBG Regulation uses the term "fair housing planning." This *Guide* uses "fair housing planning" to refer to the affirmative obligations of both regulations.)

This *Guide* is written to provide you with information on how to conduct an Analysis of Impediments to Fair Housing Choice (AI), undertake activities to correct the identified impediments, and the types of documentary records to be maintained. This Guide should be used by State, State-funded, and Entitlement jurisdictions along with applicable HUD regulations pertaining to fair housing.

HUD is indebted to the many State and Entitlement jurisdictions and their national associations that contributed to this *Guide*. Their input greatly enhanced this document.

This *Guide* consist of two volumes:

> Volume 1, The Fair Housing Planning Guide

> ■   Chapter 1 deals with the historical perspective of fair housing—where did we come from and where are we going.

> ■   Chapters 2, 3, 4, and 5 deal with how to prepare an AI, how to undertake activities to correct any identified impediments, and the types of documentary records to be maintained.

> Volume 2, The Fair Housing Planning Guide—Grantee Activities

> ■   Chapters 6 and 7 provide examples of activities that State and Entitlement jurisdictions have undertaken to affirmatively further fair housing, and information on how State and Entitlement jurisdictions may develop similar activities.

This is *your Guide*! Using it to your advantage will assist you in successful Fair Housing Planning.

All questions regarding Fair Housing Planning should be directed to your local HUD Office (see the Additional Resources section for telephone numbers and addresses).

# Table of Contents

**CHAPTER 1: FAIR HOUSING PLANNING: HISTORICAL OVERVIEW**

**1.1**   **INTRODUCTION** ............................................................................... 1-1

**1.2**   **HISTORICAL OVERVIEW** ................................................................ 1-1
Definition of Affirmatively Furthering Fair Housing ............................... 1-2
Applicability ............................................................................................ 1-3
Fair Housing Review Criteria .................................................................. 1-3
Certification to Affirmatively Further Fair Housing ................................ 1-4
Consolidated Plan/Fair Housing Planning .............................................. 1-4

**1.3**   **PURPOSE OF THE GUIDE** .............................................................. 1-5


**CHAPTER 2:  PREPARING FOR FAIR HOUSING PLANNING**


**2.1**   **INTRODUCTION** ............................................................................... 2-5

**2.2**   **FHP RESPONSIBILITIES FOR STATES AND ENTITLEMENTS** ................ 2-5

**THE THREE COMPONENTS OF FAIR HOUSING PLANNING**


***COMPONENT 1: ANALYSIS OF IMPEDIMENTS***
***TO FAIR HOUSING CHOICE***


**2.3**   **DEFINING THE AI** ............................................................................ 2-7
**2.4**   **PURPOSE** ......................................................................................... 2-8
Increasing Housing Choice ...................................................................... 2-8
Identifying Problems ................................................................................ 2-8
Assembling Fair Housing Information .................................................... 2-9

**2.5**   **ESTABLISH A STRUCTURE FOR THE DEVELOPMENT OF THE AI** ..... 2-10
Factors to Consider ................................................................................. 2-10
Undertake Metrowide/Regional FHP ..................................................... 2-11
Establish Workable Procedures ............................................................... 2-12
Build Relationships and Communication ................................................ 2-12
Target Resources for Fair Housing Planning .......................................... 2-14

**Appendix 203**

**2.6     MODELS** ........................................................................... 2-14
        Fair Housing Working Group/Commission Model ................................... 2-14
        Contract Model .................................................................. 2-15
        Establish a Permanent Structure for Oversight Responsibilities ............... 2-16
        Flexibility .................................................................... 2-16

**2.7     IDENTIFICATION OF IMPEDIMENTS TO FAIR HOUSING CHOICE** ........ 2-16
        Description of Impediments to Fair Housing Choice ............................ 2-16
        Use Existing Studies .......................................................... 2-18
        Assess Prior and Current Actions to Affirmatively Further Fair Housing ....... 2-19
        Use Existing Organizational Relationships .................................... 2-20
        Use a Fair Housing Perspective ............................................... 2-20

**2.8     COMMUNICATE AI RESULTS** ...................................................... 2-21


**COMPONENT 2: TAKING ACTIONS TO ELIMINATE IDENTIFIED IMPEDIMENTS**

**2.9     INTRODUCTION** ................................................................. 2-21

**2.10    STEPS TO TAKE BEFORE DEVELOPING ACTIONS** ................................ 2-22
        Objectives .................................................................... 2-22
        Fair Housing Actions .......................................................... 2-22

**2.11    IMPLEMENTATION OF FAIR HOUSING ACTIONS** ................................. 2-23
        Self-Assessment ............................................................... 2-23
        Changes ....................................................................... 2-23

**2.12    EVALUATION OF FAIR HOUSING ACTIONS** ..................................... 2-24

**2.13    HUD EVALUATION** ............................................................. 2-24


**COMPONENT 3: MAINTENANCE OF RECORDS**

**2.14    INTRODUCTION** ................................................................. 2-25

**2.15    THE SUMMARY REPORT** ......................................................... 2-25

**2.16    DOCUMENTATION** ............................................................... 2-25
        Suggested Additional Documentary Support for Fair Housing Planning ........... 2-26

**Appendix 204**

**2.17    SUGGESTED AI FORMAT** ........................................................ 2-26
Demographic Data ....................................................................... 2-27
Income Data ................................................................................ 2-27
Employment ................................................................................ 2-27
Housing Profile ........................................................................... 2-27
Maps ............................................................................................ 2-28

**2.18    EVALUATION OF JURISDICTIONS' CURRENT FAIR HOUSING
         LEGAL STATUS** ............................................................... 2-28

**2.19    DESCRIPTION OF IMPEDIMENTS AND CONCLUSIONS** ........ 2-28

**2.20    ASSESSMENT OF CURRENT PUBLIC AND PRIVATE FAIR
         HOUSING PROGRAMS/ACTIONS IN THE JURISDICTION** ....... 2-29

**2.21    CONCLUSIONS AND RECOMMENDATIONS** ............................ 2-29

**CHAPTER 2—APPENDIX: SUGGESTED FORMAT FOR THE ANALYSIS
OF IMPEDIMENTS** ................................................................................ 2-30


**CHAPTER 3:  FAIR HOUSING PLANNING REQUIREMENTS AND GUIDELINES
             FOR STATES AND STATE-FUNDED JURISDICTIONS**

**3.1     INTRODUCTION** .................................................................... 3-3

**3.2     STATE RESPONSIBILITY: STATE LEVEL** ........................... 3-3

**3.3     STATE RESPONSIBILITY: STATE-FUNDED JURISDICTIONS** ........ 3-4

**3.4     RESPONSIBILITY OF STATE-FUNDED JURISDICTIONS** .......... 3-5

**3.5     THE STATE-LEVEL AI** .......................................................... 3-6

**3.6     AI AREAS FOR REVIEW: STATE LEVEL** ............................. 3-7
Public Sector .............................................................................. 3-7
Private Sector ............................................................................. 3-8
Public and Private Sector ......................................................... 3-9

**3.7     AI AREAS OF REVIEW: STATE-FUNDED JURISDICTIONS** ..... 3-10

**CHAPTER 3—APPENDIX A: STATE EXAMPLES OF IDENTIFIED
IMPEDIMENTS AND RESPONSIVE ACTIONS** ...................................... 3-11

**CHAPTER 3—APPENDIX B: SURVEY OF STATES ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE** ...................................................................... 3-17

**CHAPTER 3—APPENDIX C: COMMONWEALTH OF PENNSYLVANIA ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE** ................................. 3-21

**CHAPTER 3—APPENDIX D: STATE OF UTAH** ....................................................... 3-27

**CHAPTER 3—APPENDIX E: STATE OF INDIANA** .................................................. 3-29

**CHAPTER 3—APPENDIX F: STATE OF MONTANA** .............................................. 3-35

**CHAPTER 4:  FAIR HOUSING PLANNING REQUIREMENTS AND GUIDELINES FOR ENTITLEMENT JURISDICTIONS**

**4.1     ENTITLEMENT REQUIREMENTS** .................................................................. 4-3

**4.2     THE AI** ............................................................................................................ 4-4

**4.3     AI SUBJECT AREAS** ...................................................................................... 4-5
         Public Sector ..................................................................................................... 4-5
         Private Sector ..................................................................................................... 4-6
         Public and Private Sector ................................................................................ 4-7

**CHAPTER 4—APPENDIX: ENTITLEMENT EXAMPLES OF IDENTIFIED IMPEDIMENTS AND RESPONSIVE ACTIONS** ....................................................... 4-9

**CHAPTER 5:  DETAILED DISCUSSION OF AI AREAS FOR ENTITLEMENT, STATE, AND STATE-FUNDED JURISDICTIONS**

**5.1     INTRODUCTION** ............................................................................................. 5-3
         AFFH and Affordable Housing ...................................................................... 5-4

**5.2     PUBLIC SECTOR** ........................................................................................... 5-4
         Zoning and Site Selection ............................................................................... 5-6
         Neighborhood Revitalization, Municipal and Other Services, and the
         Employment-Housing-Transportation Linkage ........................................... 5-9
         PHA and Other Assisted/Insured Housing Provider Tenant Selection
         Procedures; Housing Choices for Certificate and Voucher Holders ....................... 5-12
         Sale of Subsidized Housing and Possible Displacement ........................... 5-17
         Property Tax Policies ...................................................................................... 5-18
         Planning and Zoning Boards ........................................................................ 5-19
         Building Codes (Accessibility) ..................................................................... 5-19

**5.3**     **PRIVATE SECTOR** .................................................................... 5-19
           Lending Policies and Practices .......................................................... 5-19

**5.4**     **PUBLIC AND PRIVATE SECTOR** ................................................ 5-28
           Fair Housing Enforcement ................................................................ 5-28
           Information Programs ....................................................................... 5-29
           Visitability in Housing ..................................................................... 5-31

**ACRONYMS** ................................................................................................. A-1

**ADDITIONAL RESOURCES** .................................................................. AR-1

—NOTES—



# CHAPTER 1:
## Fair Housing Planning:
## Historical Overview

## 1.1  INTRODUCTION

The Department of Housing and Urban Development is committed to eliminating racial and ethnic segregation, illegal physical and other barriers to persons with disabilities and other discriminatory practices in housing. Additionally, the Department will use all of its programmatic and enforcement tools to achieve this goal. The fundamental goal of HUD's fair housing policy is to make housing choice a reality through Fair Housing Planning (FHP).

## 1.2  HISTORICAL OVERVIEW

Provisions to affirmatively further fair housing (AFFH) are principal and long-standing components of HUD's housing and community development programs. These provisions flow from the mandate of Section 808(e)(5) of the Fair Housing Act which requires the Secretary of HUD to administer the Department's housing and urban development programs in a manner to affirmatively further fair housing.

HUD's housing and community development program regulations, handbooks, and notices interpret the statutory requirement in specific standards that State and Entitlement jurisdictions and HUD-assisted/insured housing providers must meet or actions they must take. Depending on the HUD housing or community development program, HUD interpretations include:

- ■ Site and neighborhood standards

- ■ Affirmative fair housing marketing requirements

- ■ The equal housing opportunity component of the Administrative Plan in the Section 8 Certificate and Housing Voucher Programs

- ■ Tenant selection and assignment criteria (including criteria relating to the operation of preferences)

- ■ Fair housing advertising

- ■ Program accessibility, including physical accessibility for persons with disabilities

- ■ Accessible communications

- ■ Reasonable accommodations.

**Appendix 209**

In its community development (CD) programs, HUD has strongly encouraged:

1.    The adoption and enforcement of State and local fair housing laws

2.    The reduction of separation by race, ethnicity, or disability status.

HUD Community Planning and Development (CPD) programs include:

- Community Development Block Grant (CDBG)

- Home Investment Partnership (HOME)

- Emergency Shelter Grant (ESG)

- Housing Opportunities for Persons with AIDS (HOPWA).

The CDBG program contains a regulatory requirement to affirmatively further fair housing based upon HUD's obligation under Section 808 of the Fair Housing Act. The CDBG regulation also reflects the CDBG statutory requirement that the grantees certify that they will affirmatively further fair housing. The HOME program regulation states the statutory requirement from the Comprehensive Housing Affordability Strategy (CHAS) that the jurisdictions must affirmatively further fair housing.

Through its CPD programs, HUD's goal is to expand mobility and widen a person's freedom of choice.

The Department also requires CD grantees (those State and Entitlement jurisdictions that administer the above identified CPD Programs) to document AFFH actions in the CDBG and CHAS annual performance reports that are submitted to HUD.

## Definition of Affirmatively Furthering Fair Housing

The extent of the AFFH obligation has never been defined statutorily. However, HUD defines it as requiring a grantee to:

1.    Conduct an analysis to identify impediments to fair housing choice within the jurisdiction

2.    Take appropriate actions to overcome the effects of any impediments identified through the analysis

3.    Maintain records reflecting the analysis and actions taken in this regard.

HUD interprets those broad objectives to mean:

- Analyze and eliminate housing discrimination in the jurisdiction

- Promote fair housing choice for all persons

- Provide opportunities for inclusive patterns of housing occupancy regardless of race, color, religion, sex, familial status, disability and national origin

- Promote housing that is structurally accessible to, and usable by, all persons, particularly persons with disabilities

- Foster compliance with the nondiscrimination provisions of the Fair Housing Act.

Legislative changes in HUD programs[1] and subsequent HUD program regulations require CD grantees to certify that they will affirmatively further fair housing as part of the obligations assumed when they accept HUD program funds.

## Applicability

Although the grantee's AFFH obligation arises in connection with the receipt of Federal funding, its AFFH obligation is not restricted to the design and operation of HUD-funded programs at the State or local level. The AFFH obligation extends to all housing and housing-related activities in the grantee's jurisdictional area whether publicly or privately funded.

## Fair Housing Review Criteria

In 1988, HUD developed Fair Housing Review Criteria (24 CFR 570.904 (c)) which described the activities that the Department deemed acceptable in reviewing CDBG Entitlement grantees' AFFH performance. The criteria stated that, absent independent evidence to the contrary, if grantees conducted an Analysis of Impediments to Fair Housing Choice (AI) and took actions to address any identified impediments, HUD would presume that they had met their AFFH certification.

In 1992, as part of the regulations for the CHAS required by Congress in the National Affordable Housing Act of 1990 (NAHA), HUD referenced the Fair Housing Review Criteria as a means

---

[1] Sections 104(b)(2) and 106(d)(5) of the Housing and Community Development Act of 1974, as amended, specifically require CDBG Program grantees to certify they will affirmatively further fair housing. Congress reiterated this affirmative obligation in Section 105(b)(13) of the National Affordable Housing Act of 1990 (NAHA).

Also in NAHA, Congress makes clear that one of the Act's principal objective is "to improve housing opportunities for all residents of the United States, particularly members of disadvantaged minorities, on a nondiscriminatory basis."

**Appendix 211**

for Entitlement jurisdictions to take a more coordinated approach to their fair housing efforts (24 CFR 91.21(e)). Similarly, in 1992, HUD further defined the AFFH role of State CDBG grantees and State-funded jurisdictions in the Department's State CDBG regulations (24 CFR 570.487(b)).

## Certification to Affirmatively Further Fair Housing

Since 1983, the CDBG statute has contained a requirement that the grantee certify that it will affirmatively further fair housing. This requirement was not reflected in regulations until 1988 (24 CFR 570.303(d)). In addition, the CHAS statute, enacted in 1990, requires a certification by the jurisdiction that it will affirmatively further fair housing as part of the CHAS. The two statutes contain different language on acceptance of the certification. The CHAS statute at Section 104(21) defines the term "certification" to be:

- A written assertion

- Based on supporting evidence

- Available for inspection by the Secretary, the Inspector General and the public

- Deemed accurate for purposes of this Act unless the Secretary determines other-wise after:

    1. Inspecting the evidence

    2. Providing due notice and opportunity for comment.

However, with the Consolidated Plan, the acceptance of certifications and the definition of certification is the same for both certifications.

## Consolidated Plan/Fair Housing Planning

In 1995, HUD published a rule consolidating the CHAS, the community development plan (required for the CDBG program), and the submission and reporting requirements for the four community development formula grant programs (CDBG, HOME, ESG, and HOPWA) into a single plan—the Consolidated Plan.

As part of the Consolidated Plan, grantees will submit an AFFH certification which requires them to undertake FHP through:

    1. The completion of an AI

2.    Actions to eliminate any identified impediments

3.    Maintenance of AFFH records.

As with consolidated planning, the Department encourages multiple jurisdictions in metropolitan areas or regions to consult with one another and initiate metropolitan areawide or regionwide FHP.

## 1.3    PURPOSE OF THE GUIDE

This Guide is designed to offer guidance in complying with a certification required by the Consolidated Plan that it (the State or Entitlement jurisdiction) will affirmatively further fair housing, which means (among other things) that it will conduct the analysis of impediments to fair housing choice within the jurisdiction.

Specifically, this Guide provides:

■    Suggested sources of relevant demographic information and data

■    Suggested sources of authoritative studies of housing discrimination, lending, and other fair housing issues

■    Methods for obtaining diverse citizen participation in the development, implementation, and evaluation of FHP

■    A suggested outline, methodology, and format for FHP

■    Specific questions geared to focusing the AI to relevant issues/concerns

■    Potential sources of assistance for developing the AI and sample remedies, corrective actions, and solutions

■    Examples of measurable results

■    Examples of actions taken by State and Entitlement jurisdictions that affirmatively further fair housing

■    Suggestions for complying with fair housing requirements for persons with disabilities.

The Department encourages State and Entitlement jurisdictions to establish strong performance goals to measure the success of FHP. HUD expects jurisdictions to take this Guide seriously and use it to meet their AFFH certification requirements. The Department considers the achievement of measurable results as the basis of successful FHP.

**Appendix 213**

—NOTES—

**Appendix 214**

# Chapter 2
# Table of Contents



**2.1   INTRODUCTION** ............................................. 2-5

**2.2   FHP RESPONSIBILITIES FOR STATES
AND ENTITLEMENTS** ................................... 2-5


**THE THREE COMPONENTS OF
FAIR HOUSING PLANNING**


***Component 1:  Analysis of Impediments
to Fair Housing Choice*** ............................................. 2-7

**2.3   DEFINING THE AI** ........................................................................... 2-7

**2.4   PURPOSE** ..................................................................................... 2-8

Increasing Housing Choice ............................................................... 2-8

Identifying Problems ........................................................................ 2-8

Assembling Fair Housing Information .................................................. 2-9


**2.5   ESTABLISH A STRUCTURE FOR THE
DEVELOPMENT OF THE AI** .......................................................... 2-10

Factors to Consider ....................................................................... 2-10

Undertake Metrowide/Regional FHP .................................................. 2-11

Establish Workable Procedures ........................................................ 2-12

Build Relationships and Communication ............................................. 2-12

Target Resources for Fair Housing Planning ....................................... 2-14


**2.6   MODELS** ..................................................................................... 2-14

Fair Housing Working Group/Commission Model .................................. 2-14

Contract Model ............................................................................. 2-15

Establish a Permanent Structure for Oversight Responsibilities ............... 2-16

Flexibility ..................................................................................... 2-16

**Appendix 215**

**2.7** **IDENTIFICATION OF IMPEDIMENTS TO FAIR HOUSING CHOICE** ........ 2-16

Description of Impediments to Fair Housing Choice ............................................ 2-16

Use Existing Studies .................................................................................. 2-18

Assess Prior and Current Actions to Affirmatively Further Fair Housing ............. 2-19

Use Existing Organizational Relationships ........................................................ 2-20

Use a Fair Housing Perspective ...................................................................... 2-20

**2.8** **COMMUNICATE AI RESULTS** ....................................................... 2-21

***Component 2: Taking Actions to Eliminate
Identified Impediments*** ..................................................................... 2-21

**2.9** **INTRODUCTION** ............................................................................ 2-21

**2.10** **STEPS TO TAKE BEFORE DEVELOPING ACTIONS** ................................. 2-22

Objectives ................................................................................................. 2-22

Fair Housing Actions ................................................................................... 2-22

**2.11** **IMPLEMENTATION OF FAIR HOUSING ACTIONS** ..................................... 2-23

Self-Assessment .......................................................................................... 2-23

Changes ................................................................................................... 2-23

**2.12** **EVALUATION OF FAIR HOUSING ACTIONS** ............................................ 2-24

**2.13** **HUD EVALUATION** ........................................................................ 2-24

***Component 3: Maintenance of Records*** .............................................. 2-25

**2.14** **INTRODUCTION** ............................................................................ 2-25

**2.15** **THE SUMMARY REPORT** ................................................................... 2-25

**2.16** **DOCUMENTATION** ......................................................................... 2-25

Suggested Additional Documentary Support for Fair Housing Planning ............... 2-26

**Appendix 216**

**2.17    SUGGESTED AI FORMAT** ............................................................... 2-26

    Demographic Data ............................................................................. 2-27

    Income Data ...................................................................................... 2-27

    Employment ...................................................................................... 2-27

    Housing Profile ................................................................................. 2-27

    Maps .................................................................................................. 2-28

**2.18    EVALUATION OF JURISDICTIONS' CURRENT
    FAIR HOUSING LEGAL STATUS** ................................................. 2-28

**2.19    DESCRIPTION OF IMPEDIMENTS AND CONCLUSIONS** ......................... 2-28

**2.20    ASSESSMENT OF CURRENT PUBLIC AND PRIVATE
    FAIR HOUSING PROGRAMS/ACTIONS IN THE
    JURISDICTION** ............................................................................... 2-29

**2.21    CONCLUSIONS AND RECOMMENDATIONS** ............................................ 2-29

**CHAPTER 2—APPENDIX:  SUGGESTED FORMAT FOR THE
ANALYSIS OF IMPEDIMENTS** ................................................................... 2-30



**Appendix 217**

—NOTES—

# Chapter 2:

## Preparing for Fair Housing Planning



## 2.1 Introduction

*This Chapter is applicable to both State and Entitlement jurisdictions.*

This Chapter provides a generic discussion on the Fair Housing Planning (FHP) responsibilities for State and Entitlement jurisdictions. It also provides suggestions on how these jurisdictions can carry out their FHP responsibilities.

*Distinctions between the FHP responsibilities for State and Entitlement jurisdictions are contained in Chapters 3 and 4, respectively.*

This Chapter also discusses the three components of FHP applicable to both State and Entitlement jurisdictions.

## 2.2 FHP Responsibilities for States and Entitlements

The Consolidated Plan's certification to affirmatively further fair housing requires States and Entitlement jurisdictions to undertake FHP. Since FHP is a component of the Consolidated Plan, the citizen participation requirement for the Consolidated Plan applies (24 CFR 91).

NOTE:     *Since FHP and the Consolidated Plan are on a different time schedule for the first cycle, HUD does not expect the jurisdiction to follow the strict citizen participation requirements for their first Analysis of Impediments to Fair Housing Choice (AI). However, HUD does expect the jurisdiction to develop an AI that involves and addresses concerns of the entire community. FHP consists of the following (FHP requirements in italicized type):*

**Appendix 219**

1.  *The Analysis of Impediments to Fair Housing Choice.*

    HUD suggests that jurisdictions conduct or update their AI at least once every 3 to 5 years (consistent with the Consolidated Plan cycle).

2.  *Actions to overcome the effects of identified impediments.*

    HUD suggests jurisdictions organize these actions into a prioritized list of specific actions:

    –   With milestones, timetables, and measurable results

    –   To be undertaken by the jurisdiction in each of the 4 years following completion/update of the AI

    –   That are in response to the impediments identified in the AI

    –   That follow public meetings, which may be held during the development of the Consolidated Plan.

3.  *Maintain records to support the AFFH certification.*

    This supporting documentation includes:

    –   The AI

    –   Actions undertaken to eliminate any identified impediments.

    HUD suggests the following as additional types of supporting documentation:

    –   Transcripts of public hearings and citizen comments/input

    –   Progress reports (which should be kept available for public review).

States have a dual responsibility as it relates to FHP. Their responsibilities include:

1.  Undertaking FHP at the State level

2.  Ensuring that State-funded jurisdictions comply with their AFFH certification.

NOTE: *Those State and Entitlement jurisdictions that have previously completed an AI and have begun taking actions to address any identified impediments are not required to complete a new analysis at this time.*

*Instead, those jurisdictions are encouraged to update their AIs consistent with this Guide.*

**Appendix 220**

However, all AIs, whether new or updated, must be completed by February 6, 1996 (of this current Consolidated Plan cycle) as stated in the Preamble to the Consolidated Plan Regulations. Subsequent AIs must be completed/updated in accordance with future timeframes for the Consolidated Plan.

AIs are not to be submitted to, or be approved by, HUD. However, HUD could request submission of the AI in the event of a complaint or as part of routine monitoring.

Instead of submitting its AI to HUD, a jurisdiction would provide HUD with a summary of the AI plus the jurisdiction's accomplishments for the past program year as part of the performance report required by the Consolidated Plan regulation (24 CFR 91.520(a)). (See Sections 2.13 and 2.15 for further discussion on this matter.)



As part of Fair Housing Planning, State and Entitlement jurisdictions should seek input and cooperation from other governmental agencies, community and business organizations. The involvement of these agencies can greatly assist the elimination of fair housing impediments in areas such as sales and rental of housing, lending, employment, education, social services, transportation, law enforcement, and land use laws. Additionally, jurisdictions that foresee possible future impediments should take specific actions to prevent or ameliorate those impediments.

## THE THREE COMPONENTS OF FAIR HOUSING PLANNING

The following sections discuss the three components of Fair Housing Planning: the AI, the actions to be taken, and the maintenance of records. These components track the Consolidated Plan's regulatory requirements at 24 CFR 91.225(a)(1), 91.325(a)(1), and 91.425(a)(1)(I).

## COMPONENT 1: ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE

## 2.3   DEFINING THE AI

The AI is a review of impediments to fair housing choice in the public and private sector. The AI involves:

- A comprehensive review of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices

- An assessment of how those laws, etc. affect the location, availability, and accessibility of housing

- An assessment of conditions, both public and private, affecting fair housing choice for all protected classes

- An assessment of the availability of affordable, accessible housing in a range of unit sizes.

**Appendix 221**

Impediments to fair housing choice are:

- Any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin which restrict housing choices or the availability of housing choices

- Any actions, omissions, or decisions which have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin.

## 2.4   PURPOSE

The scope of the AI is broad. It covers the full array of public and private policies, practices, and procedures affecting housing choice.

The AI:

- Serves as the substantive, logical basis for FHP

- Provides essential and detailed information to policy makers, administrative staff, housing providers, lenders, and fair housing advocates

- Assists in building public support for fair housing efforts both within a State or Entitlement jurisdiction's boundaries and beyond.

### Increasing Housing Choice

Equal and free access to residential housing (housing choice) is fundamental to meeting essential needs and pursuing personal, educational, employment, or other goals. Because housing choice is so critical, fair housing is a goal that Government, public officials, and private citizens must achieve if equality of opportunity is to become a reality.

### Identifying Problems

State and Entitlement jurisdictions must become fully aware of the existence, nature, extent, and causes of all fair housing problems and the resources available to solve them. Without this information, a State or Entitlement jurisdiction's FHP will fall short of measurable results. Such jurisdictions may waste energy and resources that they could have used more effectively with careful planning and execution. A properly completed AI provides this information.

NOTE: *This Guide recommends the same type of problem-analysis and problem solving approach to FHP that is already required for the Consolidated Plan. Thus, a good deal of the information that can be used for FHP already exists and has been analyzed for community development purposes.*

## Assembling Fair Housing Information

The information needed for conducting an AI includes the following. Note that it is not a conclusive list of data items, nor are all of them relevant to States. (See Chapter 3 for a specific discussion on States and State-funded jurisdictions.)

The generic data items are:



- Public policies, practices, and procedures involving housing and housing-related activities

- Zoning and land use policies, tax assessment/abatement practices

- The nature and extent of fair housing complaints/suits or other data that may evidence a State or Entitlement jurisdiction's achievement of fair housing choice

- Demographic patterns

- Home Mortgage Disclosure Act (HMDA) data

- Results of testing

- Results of Fair Housing Initiative Program (FHIP) grants

- Patterns of occupancy in Section 8, Public and Assisted Housing, and private rental housing.

NOTE: *HUD does not require State and Entitlement jurisdictions to commence a data collection effort in order to complete an AI. It believes such jurisdictions can use existing available data.*

*Data sources include HUD and other Federal agency databases and studies, State and local information sources, private housing industry reports, and college and university studies.*

> *However, HUD does expect State and Entitlement jurisdictions to review its existing data collection systems (e.g., collection systems for HUD reports) to determine the extent to which they provide adequate information on certain groups or persons (e.g., persons with disabilities and families with children)— prohibited bases added to Federal protection by the Fair Housing Amendments Act.*

HUD has provided all Entitlement jurisdictions with the new consolidated planning computer software package that will assist them in designing and developing their Consolidated Plan. The software package includes a project information input component, selected 1990 U.S. Census household data by race, HUD-generated income and poverty data, and a mapping component. The data populates the mapping component to create both a tabular report and a geodemographic presentation of the Entitlement jurisdiction. This geodemographic presentation then allows for a spatial analysis and a site and neighborhood standard review of the jurisdiction with the existing and proposed projects included. The Entitlement jurisdiction, the Department, and the local communities will utilize the tables and maps to assist in implementing their FHP and preparing AIs. (A State version of the consolidated planning computer software is currently under development.)

Approaching the AI in the manner described in this Guide will provide State and Entitlement jurisdictions with a comprehensive picture of the status of fair housing at local, regional, and State levels. With this information, all elements in a community can work to implement the actions that State and Entitlement jurisdictions design to eliminate any identified impediments to fair housing choice.

## 2.5   Establish a Structure for the Development of the AI

State and Entitlement jurisdictions should establish a structure for the AI that clearly spells out the responsibilities, objectives, measurable results, and lines of communication and coordination. The chief executive should articulate these factors and they should be endorsed by all those cooperating in the analysis.

### Factors to Consider

The Consolidated Plan requires jurisdictions to identify an appropriate entity to lead and coordinate consolidated planning and the submission of the document to HUD. Jurisdictions may wish to have this entity assume the same responsibility for the AI.

This basic structure may work well because the substantive areas that are the subject of community planning and development relate closely or overlap with several of those that are appropriate for AI examination.

The AI can be conducted by the jurisdiction, local colleges, universities, local fair housing and industry groups, or any combination thereof. Jurisdictions should consider metrowide or regional FHP before structuring the AI.

## Undertake Metrowide/Regional FHP

An affirmative, metrowide/regional approach to the HUD-assisted family housing programs is encouraged for States and a consortia of local governments (to include State-funded and Entitlement jurisdictions) in metropolitan areas.



Through metrowide/regional FHP, jurisdictions can:

- Overcome spatial separation and segregation by making all assisted housing available in the metropolitan area a resource to be used through establishment of a consolidated waiting list for assisted housing which overcomes jurisdictional and artificial program delivery barriers.

- Affirmatively further fair housing throughout the metropolitan area, thereby integrating waiting lists, broadening the housing choices available to all those eligible for assisted housing, and encouraging applicants to consider racially non-impacted locations (an area where the racial or ethnic group is less then 30%) and participation in programs typically avoided.

- Make public housing a path to social and economic mobility, rather than housing of last resort by targeting selected developments for modernization and for other improvements and facilities to make them attractive to current residents and to suburban residents; this also counterbalances concerns that only suburban housing opportunities are being offered.

- Secure the cooperation of other important actors whose impact upon fair housing is substantial, including jobs, schools, transportation, and social services (e.g., private providers using HUD-assisted and -insured programs, important industries in the area who can provide job opportunities, and Government and not-for-profit agencies that provide social services).

- Serve as a model approach to other situations where housing within a metropolitan area is segregated by jurisdiction and by program.

- Break down the statistically shown racial disparity between HUD's public housing program and its Section 8 Existing Housing program. Through metrowide/regional FHP jurisdictions can encourage minorities to consider assisted programs other than public housing, encourage non-minorities to consider public housing opportunities that arise sooner than Section 8 units, and encourage all to consider desegregating moves within assisted and insured programs, whether public, not-for-profit, State/local or privately provided, by establishing a one-stop, metropolitan

area-wide housing assistance, marketing, information, counseling, and referral center.

■ Discourage discrimination in all programs by encouraging all persons regardless of race, color, religion, sex, disability, familial status, or national origin to consider all housing options.

Metrowide/regional FHP includes an analysis that identifies both State and Entitlement jurisdictional and regional impediments to fair housing choice and the appropriate actions to remove them.

A key aspect of metrowide/regional FHP is the creation of a centralized and consolidated applicant database for all assisted housing programs operating in the metropolitan/regional area which can be metro/regionally administered.

## Establish Workable Procedures

State and Entitlement jurisdictions should have workable procedures that:

■ Accommodate diverse views and interests

■ Provide for input from persons who have only a limited time to meet, deliberate, review written materials, and any other necessary functions

■ Provide for convenient, accessible meeting places and times

■ Provide for conflict resolution and decision making in the event the initial conflicts can not be resolved.

## Build Relationships and Communication

The AI structure should provide for effective, ongoing relationships with *all* elements of the community with clear and continuous exchange of concerns, ideas, analysis, and evaluation of results. Involvement by the chief executive is necessary whether the State or Entitlement jurisdiction is conducting the AI on its own or is participating with other jurisdictions in a metrowide/regional AI.

This linkage with the chief executive is important because it is the chief executive that has the ultimate responsibility for the State or Entitlement jurisdiction's FHP. This official should ensure, through focus groups, an advisory commission, town meetings, or other effective means, that regular contact and working arrangements are created and maintained with:

■   *Fair Housing Organizations*

Fair housing organizations, including human relations commissions and voluntary, nonprofit organizations focusing on fair housing problems

■   *Other Governments*

Other governments in the metropolitan area or region (even if the jurisdiction is not participating in metropolitan or regionwide FHP)

■   *Advocacy Groups*



Advocacy groups and organizations that have among their concerns the needs (including housing needs) of particular segments of the population, such as people with disabilities; families with children; immigrants and homeless persons; and specific racial or ethnic groups (Blacks, Hispanics, Native Americans, Asian Americans, Alaskan Natives)

■   *Housing Providers*

Housing provider representatives, in particular those who are aware of, and can speak to, the problems of providing moderate- and low-cost housing in the community; and representatives of landlords/owners

■   *Banks and Other Financial Institutions*

Banks and other financial institutions that can provide loans (including residential) and other financial support to improve homes or areas of the community where living conditions have deteriorated

■   *Educational Institutions*

Educational institutions and their representatives, including the administrators and teachers/professors who can assist in conducting studies and developing educational activities for delivery in formal and informal settings

■   *Other Organizations*

Other organizations and individuals, such as neighborhood organizations and representatives, that can provide information, ideas, or support in identifying impediments to fair housing choice at the neighborhood or other geographic level and in developing and implementing actions to address these problems

■   *General Public*

Communication with the general public is essential. HUD encourages State and Entitlement jurisdictions to follow the citizen participation and consultation procedures identified in Subpart B of the Consolidated Plan regulation for communicating with the public on FHP. Additionally, jurisdictions should encourage the participation of diverse population groups, and take steps to ensure that communications and activities are accessible to persons with disabilities.

## Target Resources for Fair Housing Planning

Community Development Block Grant program (CDBG) and HOME Investment Partnership (HOME) administrative and planning funds may be used for FHP. State and Entitlement jurisdictions should provide administrative, financial, and other support for the AI. (Other activities associated with FHP may be covered under the administrative cost category.)

The type of support jurisdictions can give depends on what kinds and amounts of resources are or can be made available. If funds are available to cover the costs of staffing the analysis effort, preparing various documents, and other functions the jurisdiction should provide them.

Administrative support through staffing services can be helpful. Volunteer assistance can be solicited from the organizations and institutions represented in the AI structure.

Maximizing these resources is fundamental to viable FHP. This is done to:

■   Obtain as much information as possible on fair housing problems

■   Develop a realistic, comprehensive set of actions and measurable results

■   Implement these actions within an optimal timeframe for each action

■   Evaluate measurable results.

## 2.6   MODELS

### Fair Housing Working Group/Commission Model

State and Entitlement jurisdictions may establish a body made up of representatives from diverse population groups, housing industry, and fair housing groups to assist in FHP. Whether the organization should be a working group or commission depends on the length of time the chief executive or governing body desires to have the organization in place. The characteristics of a working group and a committee are as follows:

■ A working group ordinarily has a well-defined, short life-span, and once its work is completed, it disbands.

■ A committee ordinarily carries out long-term activities to accomplish its objectives.



A community might begin with a working group that identifies and analyzes impediments and develops a plan. Once this is accomplished, elements of the working group might evolve into an ongoing committee or commission to oversee implementation of FHP.

One advantage of this model is that it is the direct responsibility of top policy makers. This relationship reinforces the commitment of the community to FHP. Providing administrative, financial, or other support to the working group or commission may be critical in ensuring that its mandate is fulfilled.

## Contract Model

For State and Entitlement jurisdictions with limited staff resources, it may not be possible to provide services such as staff support or regular participation in fair housing working groups/commission meetings. Contracting for an analysis may be a workable alternative. Such jurisdictions will want to weigh potential costs and benefits.

The jurisdiction should make sure that the contractor is knowledgeable about fair housing and has experience in dealing with fair housing-related issues.

Executive oversight of the analysis, interest in its conclusions, and commitment to appropriate, measurable actions to eliminate impediments are essential if FHP is to yield a measurable result:

■ State and Entitlement jurisdictions should consider funding fair housing groups and organizations to conduct the AI. These groups have proven to be effective in uncovering and addressing housing discrimination. Also, they are experienced in designing remedies and programs of outreach and education which help prevent discrimination from occurring.

■ State and Entitlement jurisdictions should consider funding other types of organizations (e.g., colleges, universities, and housing organizations) to conduct the AI, if the experience and capacity of the organization is strong.

With this model, the contractor should provide a process for obtaining input from the organizations and institutions that have housing-related activities, programs, and interests. (See Additional Resources for a list of organizations and institutions.)

State and Entitlement jurisdictions should make sure that the contract holds the contractor responsible for contacting and working with these groups. The public should be aware that the jurisdiction is undertaking this effort using contractor services and that the jurisdiction invites input from all citizens in the community, especially those for whom fair housing issues are important.

**Appendix 229**

## Establish a Permanent Structure for Oversight Responsibilities

Regardless of the model selected, there should be a structure for overseeing completion of the AI and the implementation of actions to overcome the impediments identified as a result of the analysis. The recommended solutions are likely to involve long-term and short-term actions.

A Human Relations Commission (HRC) may serve in this capacity. HRCs have civil rights enforcement responsibilities in a number of areas, including housing rights.

The State or Entitlement jurisdiction's community development agency/department might perform the oversight function once implementation of the actions is underway.

## Flexibility

Jurisdictions may want to develop variations or combinations of these models other than those described here. Whichever model is selected by the jurisdiction, HUD suggests the following objectives:

- ■ Firm and continued commitment by those responsible at the top level of State and local government to the analysis, planning, and implementation necessary to achieve fair housing goals

- ■ Oversight by the executive level to ensure an ongoing fair housing program

- ■ A comprehensive analysis and a carefully structured plan for addressing impediments that are firmly grounded in the AI's conclusions

- ■ Effective actions based on a realistic assessment of available resources

- ■ Identification of measurable results.

## 2.7   IDENTIFICATION OF IMPEDIMENTS TO FAIR HOUSING CHOICE

Jurisdictions should examine a wide array of issues in order to identify and address impediments to fair housing choice.

## Description of Impediments to Fair Housing Choice

Impediments to fair housing choice are defined as:

■ Any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin that restrict housing choices or the availability of housing choice

■ Any actions, omissions, or decisions that have this effect.

Policies, practices, or procedures that appear neutral on their face, but which operate to deny or adversely affect the availability of housing to persons because of race, ethnicity, disability, and families with children may constitute such impediments.

Impediments to fair housing choice include actions or omissions in the State or Entitlement jurisdiction that:



■ Constitute violations, or potential violations, of the Fair Housing Act

■ Are counterproductive to fair housing choice, such as:

— Community resistance when minorities, persons with disabilities and/or low-income persons first move into white and/or moderate- to high-income areas

— Community resistance to the siting of housing facilities for persons with disabilities because of the persons who will occupy the housing

■ Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin.

While the scope of examination is broad, nearly all State and Entitlement jurisdictions have looked at some of the problems in achieving fair housing choice. Many of these jurisdictions have devoted resources and efforts to an analysis of their nature, extent, and possible solutions.

Since 1974, for example, Entitlement jurisdictions have developed Housing Assistance Plans (HAP) to guide the use of federally assisted housing resources. The HAP requirement was deleted in 1990 by the Cranston-Gonzalez National Affordable Housing Act of 1990 (NAHA) and was replaced by the Comprehensive Housing Affordability Strategy (CHAS).

The Consolidated Plan consolidates into a single document the CHAS, the community development plan, and the submission requirements for the CDBG, HOME, Emergency Shelter Grant (ESG), and Housing Opportunities for Persons with AIDS (HOPWA) programs. The Consolidated Plan more clearly ties the needs assessment, housing market analysis, and the strategy for addressing needs and achieving housing and community development objectives to the use of the program funds. Many of the fair housing-related problems revolving around the issue of choice in low- and moderate-income housing programs are already addressed in the Consolidated Plan.

The Consolidated Plan contains data and other information on:

- Affordable housing needs for different categories of residents

- Homeless needs

- Public housing needs

- Lead-based paint removal needs

- Housing market analysis (housing market characteristics in terms of supply, demand, condition, type, and housing cost)

- Barriers to affordable housing (an explanation of how the cost of housing or the incentives to develop, maintain, or improve affordable housing are affected by public policies, particularly those of the local jurisdiction. Such policies include tax policy, land use controls, zoning ordinances, building codes, fees and charges, growth limits, and other policies that affect the return on residential investment)

- Citizen comments relating to fair housing issues

- Areas of minority concentration

- Identification of special needs populations or those with a disproportionate need for housing

- Identification of housing needs of persons with disabilities.

## Use Existing Studies

Identify impediments by first examining studies that relate to fair housing, access to housing, or other housing problems. If a State or local government has undertaken a study, either directly or through a contract with another entity, presumably governmental staff are fully aware of it. To determine if other studies exist, State and Entitlement jurisdictions should contact fair housing and other organizations such as councils of government or regional or State planning organizations.

A number of studies also are available through HUD USER, a reference system for research studies done by HUD. HUD USER can be reached at 1-800-245-2691 (TTY: 1-800-877-8339). Some examples of publications available through this system are listed in the Additional Resources found at the end of this Guide.

HUD strongly encourages State and Entitlement jurisdictions to become familiar with all studies that apply to their community and region as a first step in planning an AI. Jurisdictions should not waste effort restudying and reanalyzing problems for which good information already exists. Instead, they need to plan and carry out actions to address the problems.

If jurisdictions have not already done so, they should carefully consider the conclusions and recommendations of other housing studies prior to deciding what to study in the AI. Some examples are studies that focus on:



- Housing problems for families created by the presence of lead-based paint in houses built before 1950

- Problems faced by immigrant populations whose language and cultural barriers combine with a lack of affordable housing to create unique fair housing impediments

- Lending and property insurance practices

- Discrimination in housing

- Problems of providing housing for persons with disabilities in residential neighborhoods

- Problems faced by Blacks and Hispanics in securing mortgage loans as indicated in numerous audits, surveys, and other research on lending practices

- Problems faced by Section 8 Certificate and Voucher holders in exercising opportunities to select housing on a metropolitan-wide basis

- Availability of accessible housing[1] .

Many other local and regional studies have been completed that provide information but are too numerous to describe here.

## Assess Prior and Current Actions to Affirmatively Further Fair Housing

Jurisdictions should have full knowledge of all of the activities that have recently been completed or are underway to affirmatively further fair housing. The chief executive and administrative staff know the strengths and weaknesses of activities that the State or Entitlement jurisdiction has initiated, or in some direct fashion, supported. However, this knowledge should extend well beyond this arena to actions taken by housing industry members, private organizations and foundations, the public housing agency (PHA), neighborhood groups, regional organizations, and others to further fair housing objectives.

---

[1]Accessible means that the dwelling unit or facility is located on an accessible route and when designed, constructed, altered or adapted can be approached, entered, and used by individuals with physical disabilities (24 CFR 8.3).

## Use Existing Organizational Relationships

Examine the current organizational relationships that exist in communities and regions that specifically promote fair housing goals. For example, some communities have a Community Housing Resource Board (CHRB), an organization initially fostered by HUD for the purpose of providing program implementation and monitoring assistance to housing industry groups that had signed Voluntary Affirmative Marketing Agreements (VAMAs) with HUD. FHIP, established in 1987, includes an Education and Outreach initiative; CHRBs are eligible to apply for FHIP funding. Many CHRBs have received funding under FHIP and funding from CDBG jurisdictions.

NOTE: *As a result of the Department making revisions to its VAMAs, the Department no longer has a contractual agreement to mandate CHRB involvement in VAMA implementation activities. However, under the revised VAMAs, signatories are required to formulate relationships with fair housing, civil rights, and other groups interested in fair housing to seek their assistance in VAMA implementation; and at the discretion of these signatories, CHRBs may continue to provide such assistance.*

Some communities are served by fair housing organizations that conduct a wide array of activities such as:

- ■   Enforcement of fair housing laws

- ■   Counseling

- ■   Technical training for housing industry representatives and organizations

- ■   Fair housing audits

- ■   Education and outreach activities geared to the general public

- ■   Advocating for disability rights and accessible housing.

Some jurisdictions contract with these organizations to carry out the jurisdiction's procedures for AFFH. In other jurisdictions, there has been a mix of activities; some are carried out directly by the Government and others through contract.

## Use a Fair Housing Perspective

Where the community planning and development perspective looks directly at needs for housing and possible barriers to meeting those needs, the fair housing perspective focuses as much on the causes of needs of groups or persons protected by the Fair Housing Act as it does on the needs themselves. Thus, the explanation of barriers to affordable housing to be included in the Consolidated Plan may contain a good deal of relevant AI information but may not go far or deep enough into factors that have made poor housing conditions more severe for certain groups

**Appendix 234**

in the lower-income population than for others. Jurisdictions should be aware of the extent to which discrimination or other causes that may have a discriminatory effect play a role in producing the more severe conditions for certain groups.

## 2.8   COMMUNICATE AI RESULTS

Once the AI is completed, HUD encourages jurisdictions to communicate conclusions and recommendations to top policy makers, key Government staff, community organizations, and the general public. Jurisdictions should:



- ■   Provide a copy to organizations and individuals participating in the AI process and other organizations focusing on housing issues

- ■   Advise the general public by holding meetings or other public forums in accessible meeting facilities with sign language interpreters and other accommodations made available

- ■   Provide a means other than public forums for other citizen participation (e.g. written comments, comment via the electronic media) regarding the conclusions and recommended actions resulting from the AI

- ■   Publicize key aspects of the AI

- ■   Utilize alternative formats (e.g. braille, large type, tapes or readers) for persons with visual impairments

- ■   Have sufficient copies on hand to distribute to the public, upon request

- ■   Brief key officials and staff in the Government as well as community organizations that express an interest.

Obtaining strong and broad-based support for the ensuing fair housing actions is critical to the long-term success of the grantee's efforts to affirmatively further fair housing.

### *COMPONENT 2: TAKING ACTIONS TO ELIMINATE IDENTIFIED IMPEDIMENTS*

## 2.9   INTRODUCTION

Before developing actions to eliminate the effects of any impediments identified through the AI (fair housing actions), the jurisdiction should:

- ■   Ensure that diverse groups in the community are provided a real opportunity to

> take part in the developmental process

■ Create the structure for the design and implementation of the actions.

State and Entitlement jurisdictions should determine whether the structure will be the same as for the AI part of FHP. If not, it should decide which individuals or organization(s) will have primary responsibility.

The jurisdiction should provide guidance to ensure that those responsible have designed actions that include input from all the organizations and individuals it believes should be part of designing the actions.

These steps can occur before the AI is fully completed to expedite development of the fair housing actions.

## 2.10  STEPS TO TAKE BEFORE DEVELOPING ACTIONS

# Objectives

The jurisdiction should define a clear set of objectives with measurable results that it intends to achieve. The sole measure of success for FHP is the achievement of results. These objectives should be directly related to the conclusions and recommendations contained in the AI.

For each objective, the jurisdiction should have a set of goals. These might be the completion of one or more discrete actions, or set of actions, which serve as milestones toward achieving each objective.

# Fair Housing Actions

■ List fair housing action(s) to be completed for each objective.

■ Determine the time period for completion.

■ Identify resources from local, State, and Federal agencies or programs as well as from financial, nonprofit, and other organizations that have agreed to finance or otherwise support fair housing actions.

■ Identify individuals, groups, and organizations to be involved in each action and define their responsibilities. Obtain written commitments from all involved, as a formal recognition of their agreement to participate in the effort in the manner indicated. HUD recommends that jurisdictions specify these commitments in the appropriate contracts that may arise in connection with the fair housing actions.

**Appendix 236**

■ Set priorities. Schedule actions for a time period which is consistent with the Consolidated Plan cycle.

## 2.11  IMPLEMENTATION OF FAIR HOUSING ACTIONS

In order to bring the hard work of planning and analysis to fruition, it is essential that the jurisdiction implement its fair housing actions. The jurisdiction can more readily achieve effective implementation of the actions, if it has:



■ Defined objectives with measurable results

■ Designed achievable actions, supported by all key elements in the community and designed to address real fair housing problems

■ Assessed its FHP activities on a regular basis to assure consistent oversight of, and interest in, the efforts of all individuals and organizations engaged in fair housing actions.

Government officials should exercise an appropriate level of leadership, as may be required, to resolve conflicts and oversee the implementation of corrective actions, changes, or additions in fair housing actions.

## Self-Assessment

FHP should include a process for monitoring the progress in carrying out each action and evaluating its effectiveness. The process should identify:

■ The entity conducting the assessment (jurisdiction or third-party contractor)

■ The specific assessment activities (e.g., survey, on-site review, telephone interview)

■ The standards or criteria to be used to determine the effectiveness/ineffectiveness of an action

■ Any additional areas that require study and analysis or surface as a result of implementing the action

■ Any recommendations for addressing additional areas.

## Changes

FHP should include a process for making "mid-course" corrections, changes, or additions as the

planned actions are underway.

The importance of continuing oversight by top grantee officials cannot be overemphasized.

NOTE: *Research for this guide revealed that few jurisdictions had a system in place through which the mayor or other top officials exercised clear and direct oversight or even had significant knowledge of fair housing activities and results.*

Officials should require regular reports on the implementation of fair housing actions. They should take direct responsibility for resolving any problems as quickly as possible so that fair housing efforts may proceed smoothly.

## 2.12  EVALUATION OF FAIR HOUSING ACTIONS

FHP should be evaluated as a whole. HUD expects jurisdictions to carry out effective fair housing actions over a long period of time. Therefore, jurisdictions should carefully evaluate the results of:

- The AI

- The milestones and timetables

- The fair housing actions.

With this information, jurisdictions will be in the best possible position to evaluate their fair housing performance.

## 2.13  HUD EVALUATION

AIs will not generally be submitted to HUD for review. Instead, as part of the Consolidated Plan performance report, the jurisdiction will provide HUD with a summary of the AI and the jurisdiction's accomplishments during the past program year. The Department could request the AI in the event of a complaint and could review the AI during routine on-site monitoring. In addition:

- If HUD's year-end review suggests that the AI or actions taken were inadequate, HUD could require submission of the full AI and other documentation.

- If, after reviewing all documents and data, HUD concludes that the AI was substantially incomplete or the actions taken were plainly inappropriate to address the identified impediments, the Department would provide notice to the jurisdiction that it believes the AFFH to be inaccurate and would provide the jurisdiction an opportunity to comment.

- If, after the notice and opportunity to comment is given to the jurisdiction, HUD determines that the AFFH certification is inaccurate, HUD will reject the certification. Rejection of the certification renders the Consolidated Plan

substantially incomplete and constitutes grounds for HUD to disapprove the Consolidated Plan.

HUD will work with the jurisdiction to determine actions necessary to make the certification accurate and the Consolidated Plan complete. The actions may take the form of a special assurance which describes the actions to make the AI complete or describes actions to overcome the effects of identified impediments and which includes a timetable for accomplishing these actions.

NOTE: *A jurisdiction cannot receive its CDBG, HOME, ESG, or HOPWA program grants until the Consolidated Plan is approved.*



## COMPONENT 3: MAINTENANCE OF RECORDS

## 2.14  INTRODUCTION

This section provides guidance on the kinds of data and other information that should be maintained in the jurisdiction's records as documentation of FHP. It provides information on the summary that State and Entitlement jurisdictions submit to HUD each year of the Consolidated Plan cycle.

## 2.15  THE SUMMARY REPORT

At the end of the first program year after implementation of the FHP process, the jurisdiction submits to HUD:

- ■   A summary of the AI

- ■   Actions taken the previous year

- ■   An analysis of their impact.

As part of the jurisdiction's annual performance report for its Consolidated Plan, the jurisdiction will report on its actions to affirmatively further fair housing. The jurisdiction will provide a summary of its AI and a description of the actions taken during the past program year, along with an analysis of the impact of the actions.

## 2.16  DOCUMENTATION

Each jurisdiction must maintain records to support its AFFH certification.

**Appendix 239**

NOTE: *The records must reflect the analysis and actions in this regard (24 CFR 91.225(a)(1), 91.325(a)(1), and 91.425(a)(1)(I)).*

This supporting documentation includes:

- ■   The AI

- ■   Actions undertaken to eliminate identified impediments.

Jurisdictions must also have available documentation of their actions to affirmatively further fair housing during the time that they are conducting the AI. All documentation must be available for public review.

# Suggested Additional Documentary Support For Fair Housing Planning

As further support for AFFH certification and FHP efforts, HUD suggests that jurisdictions include the following documentation in their records:

- ■   A description of the nature and extent of the chief executive or governing body's commitment to FHP

- ■   A description of the financial and in-kind support for FHP, including funds or services provided by the jurisdiction, nonprofit organizations, private individuals, colleges, universities, contractors, and staff support

- ■   A list of groups participating in the formulation of FHP

- ■   Transcripts of public meetings/forums and citizen comments/input. (The Department encourages jurisdictions to schedule these meetings to coincide with those for the Consolidated Plan.)

- ■   Progress reports.

## 2.17   SUGGESTED AI FORMAT

Jurisdictions should provide background data and other information that serve as bases for identifying impediments and making conclusions. The Consolidated Plan contains some of this information.