Those involved in FHP must be familiar with the Consolidated Plan to avoid duplicating research, data, problems, findings, and conclusions. Additionally, jurisdictions should incorporate by reference the relevant portions of the Consolidated Plan containing the same background information used by the jurisdiction in FHP.

## Demographic Data

Most of the demographic data used in FHP are also used in developing the Consolidated Plan.

## Income Data

HUD provides census data for all State and Entitlement jurisdictions in connection with the Consolidated Plan. However, HUD may not be able to provide census data for certain groups or persons (because such data are not available from the Census Bureau). For example, the census does not report the income status of all people with disabilities. To the extent this information may be important in FHP, a jurisdiction might obtain information from local, State or national advocacy organizations, or from its Section 504 (of the Rehabilitation Act of 1973) self-evaluation or its PHA's Section 504 needs assessment.



## Employment

Data on employment centers are important for FHP and should focus on:

- The locations of job centers in the jurisdiction and in nearby jurisdictions which now offer or will offer jobs (including job training opportunities) to minorities, women and persons with disabilities at the lower-income levels of the wage/salary scale

- The geographic relationship of such centers to the current and planned locations of housing for lower-income households (employment opportunity/housing linkage impacts heavily on fair housing choice for lower-income persons)

- The need for accessible public transportation, including train or bus service, and subsidized low- or no-cost van pools to link job centers with lower-income housing locations (transportation services are essential where employment opportunities are not near lower-income housing supplies).

## Housing Profile

The Consolidated Plan contains information about housing conditions in the jurisdiction for lower-income minority and other lower-income households. If lower-income housing is in short supply, it should be the focus of the housing affordability strategy.

**Appendix 241**

In the AI, the jurisdiction should describe the degree of segregation and restricted housing by race, ethnicity, disability status, and families with children; how segregation and restricted housing supply occurred; and relate this information by neighborhood and cost of housing. This description should also discuss the extent to which a broad variety of accessible housing for persons with disabilities are distributed throughout the jurisdiction, demonstrating efforts made to provide such housing in an integrated setting.

## Maps

Maps are an effective planning and reporting tool. Maps can clearly depict spatial relationships and the interrelationship between various phenomena in particular locations or areas.

The jurisdiction should use maps to assist in showing:

- Housing/job/transportation relationships

- Areas of racial/ethnic integration and segregation

- Locations of choices, publicly assisted housing, and, where housing (other than assisted housing) for families with children or persons with disabilities is in short supply, the location of multifamily complexes providing housing for such families and persons.

## 2.18 EVALUATION OF JURISDICTIONS' CURRENT FAIR HOUSING LEGAL STATUS

As an introduction to the AI, jurisdictions should include information about:

- The number and types of complaints that have been filed alleging housing discrimination, including complaints in which the Secretary of HUD has issued a charge of discrimination or suit has been filed by the Department of Justice or private plaintiffs.

- The reasons for any trends or patterns and, in the section of the analysis describing impediments, the extent to which new or revised fair housing actions may be needed because of these trends.

- Discussion of other fair housing concerns.

## 2.19 DESCRIPTION OF IMPEDIMENTS AND CONCLUSIONS

Jurisdictions should discuss issues in each of the areas reviewed for the AI and finish with a

conclusion (e.g., because of a PHA's historical tenant and site selection policies and practices, the PHA's public housing developments are segregated by race or ethnicity). Conclusions require appropriate actions by the jurisdiction to assist in eliminating such problems.

## 2.20 ASSESSMENT OF CURRENT PUBLIC AND PRIVATE FAIR HOUSING PROGRAMS/ACTIONS IN THE JURISDICTION

Jurisdictions should briefly describe actions recently completed and currently underway. Details of specific accomplishments, actual or anticipated, that have promoted or will promote fair housing should be included together with any problems related to these actions.

## 2.21 CONCLUSIONS AND RECOMMENDATIONS



**Appendix 243**

Jurisdictions should summarize conclusions reached based on the AI, and describe in detail recommendations for resolution of the problems identified. This discussion is the link between the AI part of FHP and the actions underway and proposed to promote fair housing choice.

# CHAPTER 2—APPENDIX:
# SUGGESTED FORMAT FOR THE ANALYSIS OF IMPEDIMENTS

Jurisdiction Name:
Date:

I. **Introduction and Executive Summary of the Analysis**

    A. Who Conducted

    B. Participants

    C. Methodology Used

    D. How Funded

    E. Conclusions

        1. Impediments Found

        2. Actions To Address Impediments

II. **Jurisdictional Background Data**

    A. Demographic Data

    B. Income Data

    C. Employment Data

    D. Housing Profile

    E. Maps

    F. Other Relevant Data

III. **Evaluation of Jurisdiction's Current Fair Housing Legal Status**

    A. Fair housing complaints or compliance reviews where the Secretary has issued a charge of or made a finding of discrimination

    B. Fair housing discrimination suit filed by the Department of Justice or private plaintiffs

C.    Reasons for any trends or patterns

D.    Discussion of other fair housing concerns or problems

IV.    **Identification of Impediments to Fair Housing Choice**



A.    Public Sector

1.    Zoning and Site Selection

2.    Neighborhood Revitalization, Municipal and Other Services, Employment-Housing-Transportation Linkage

3.    PHA and Other Assisted/Insured Housing Provider Tenant Selection Procedures; Housing Choices for Certificate and Voucher Holders

4.    Sale of Subsidized Housing and Possible Displacement

5.    Property Tax Policies

6.    Planning and Zoning Boards

7.    Building Codes (Accessibility)

B.    Private Sector

Lending Policies and Practices

C.    Public and Private Sector

1.    Fair Housing Enforcement

2.    Informational Programs

3.    Visitability in Housing

D.    Where there is a determination of unlawful segregation or other housing discrimination by a court or a finding of noncompliance by HUD under Title VI of the Civil Rights Act of 1964 or Section 504 of the Rehabilitation Act of 1973, or where the Secretary has issued a charge under the Fair Housing Act regarding assisted housing within a recipient's jurisdiction, an analysis of the actions which could be taken by the recipient to help remedy the discriminatory condition, including actions involving the expenditure of funds by the jurisdiction.

V.    **Assessment of Current Public and Private Fair Housing Programs And Activities in the Jurisdiction**

VI.    **Conclusions and Recommendations**

VII.    **Signature Page**

Chief Elected Official

**Appendix 245**

# —NOTES—

**Appendix 246**

# Chapter 3
# Table of Contents

3.1    INTRODUCTION ................................................................................ 3-3

3.2    STATE RESPONSIBILITY: STATE LEVEL ..................................... 3-3

3.3    STATE RESPONSIBILITY: STATE-FUNDED JURISDICTIONS ................. 3-4

3.4    RESPONSIBILITY OF STATE-FUNDED
       JURISDICTIONS ............................................... 3-5

3.5    THE STATE-LEVEL AI ..................................... 3-6

3.6    AI AREAS FOR REVIEW:
       STATE LEVEL ................................................ 3-7
       Public Sector ...................................................... 3-7
       Private Sector ...................................................... 3-8
       Public and Private Sector ...................................... 3-9

3.7    AI AREAS OF REVIEW: STATE-FUNDED
       JURISDICTIONS

CHAPTER 3— APPENDIX A: STATE Examples of
Identified Impediments and Responsive Actions ............................... 3-11
       Example 1 .......................................................... 3-11
       Example 2 .......................................................... 3-12
       Example 3 .......................................................... 3-13
       Example 4 .......................................................... 3-14
       Example 5 .......................................................... 3-15
       Example 6 .......................................................... 3-15

**Appendix 247**

**CHAPTER 3— APPENDIX B: Survey of States Analysis of Impediments to
Fair Housing Choice** ................................................................................................. 3-17

**CHAPTER 3— APPENDIX C: Commonwealth of Pennsylvania
Analysis of Impediments to Fair Housing Choice** ................................................ 3-21
Background ................................................................................................................ 3-21
Work Plan for 1995 and 1996 .................................................................................. 3-21
Tentative Schedule .................................................................................................... 3-22
State-Level Review .................................................................................................... 3-22
Local Fair Housing Analysis Update ....................................................................... 3-24

**CHAPTER 3— APPENDIX D: STATE OF UTAH** .................................................. 3-27
Affirmatively Furthering Fair Housing Plan ........................................................... 3-27
Affirmatively Furthering Fair Housing Plan Outline for Utah ............................. 3-28

**CHAPTER 3— APPENDIX E: State of Indiana** ...................................................... 3-29
Indiana Department of Commerce Community Development
Block Grant (CDBG) Program Fair Housing Questionnaire ................................ 3-31

**CHAPTER 3—APPENDIX F: State of Montana** ..................................................... 3-35
Analysis of Impediments to Fair Housing Choice ................................................. 3-35
Summary ..................................................................................................................... 3-35
Section I: Impediments to Fair Housing Choice, Montana Human Rights
Commission ............................................................................................................... 3-36
     Fair Housing Enforcement ................................................................................ 3-36
     Impediments to Fair Housing Choice .............................................................. 3-37
Section II: Attributes of Population Experiencing
Unfair Housing Treatment ....................................................................................... 3-39
     1993 Montana Housing Survey ........................................................................ 3-39
     Gender by Income ............................................................................................. 3-41
     Race by Income ................................................................................................. 3-42
     Marital Status by Income .................................................................................. 3-43
     Age by Income ................................................................................................... 3-44
     Family Size by Income ...................................................................................... 3-45
     Home Buyers and Renters by Income .............................................................. 3-46
     Restrictions to Mobility .................................................................................... 3-47
     Conclusion ......................................................................................................... 3-48

**Appendix 248**

# CHAPTER 3:
## Fair Housing Planning Requirements and Guidelines for States and State-Funded Jurisdictions

## 3.1   Introduction

States have a dual responsibility when it comes to fair housing—a responsibility that pertains to the State as well as to State-funded jurisdictions that receive Community Development Block Grant (CDBG) program funding.

In meeting their dual responsibility, States must:



1.  Ensure that State-funded jurisdictions comply with their certifications to affirmatively further fair housing (AFFH) (e.g., overall policy, educate State-funded jurisdictions regarding AFFH.

2.  Undertake Fair Housing Planning (FHP) at the State level (e.g., statewide development impact fees, State regulation of real estate agents; see Section 3.6 for more examples).

This chapter discusses the dual fair housing responsibility of States. The Chapter focuses first on State-level requirements (24 CFR 570.487(b)), and then on the responsibilities of State-funded jurisdictions. This chapter concludes with a discussion on the special considerations for States and certain State-funded jurisdictions in conducting the Analysis of Impediments to Fair Housing Choice (AI).

## 3.2   STATE RESPONSIBILITY:  STATE LEVEL

The Consolidated Plan's certification to AFFH requires States to undertake FHP. Since FHP is a component of the Consolidated Plan, the citizen participation requirement for the Consolidated Plan applies (24 CFR 91). FHP consists of the following:

NOTE: *Since FHP and the Consolidated Plan are on a different time schedule for the first cycle, HUD does not expect the jurisdiction to follow the strict citizen participation requirements for the first AI. However, HUD does expect the jurisdiction to develop an AI that involves and addresses concerns of the entire community.*

1. Conducting an AI.

   HUD suggests that States conduct their AI at the beginning of each Consolidated Plan cycle (e.g., once every 3 to 5 years).

2. Taking appropriate actions to overcome the effects of any impediments identified through the AI.

   HUD suggests that actions to address the identified impediments should have measurable results. Additionally, before taking such actions, HUD suggests that States establish a prioritized list of impediments to address. The list should contain specific milestones and timetables.

3. Maintaining the following records:

   – Documentation of the AI

   – Actions taken in this regard.

   HUD suggests the State maintain the following additional records to further support its AFFH certification:

   – Studies evaluating the effectiveness of the actions

   – Summaries or transcripts of all public meetings, hearings, and citizen comments/input

   – FHP summary reports (e.g., a summary of the AI, the actions taken in the previous program year, and an analysis of the impact of those actions). The FHP summary report is part of the Consolidated Plan Performance Report required by 24 CFR 91.520.

## 3.3   STATE RESPONSIBILITY: STATE-FUNDED JURISDICTIONS

States must ensure that State-funded jurisdictions comply with their certifications to affirmatively further fair housing. To do so, States should:

- Require all State-funded jurisdictions to take actions that promote fair housing choice at the local level and that have measurable results.

- Provide guidance and technical assistance to State-funded jurisdictions in conducting an AI (for those jurisdictions where the State has determined that one will be conducted).

- Provide guidance and technical assistance to those State-funded jurisdictions that the State has determined do not have to complete an AI; such guidance should include fair housing training and education for citizens as well as ensuring that fair housing complaints are quickly addressed.

States have flexibility in prescribing how State-funded jurisdictions are to address their AFFH certification obligations. Thus, States could determine that a State-funded jurisdiction shall not conduct an AI, but rather take specific actions that promote fair housing choice.

Finally, States could (but are not required to) direct State-funded jurisdictions in a metropolitan area, as a condition of their eligibility for funding, to cooperate with Entitlement jurisdictions in joint (e.g., metrowide) FHP activities. Participation in the undertaking of fair housing activities could also be identified by the State as a condition of State funding eligibility.



Since States have a continuing relationship with many State-funded jurisdictions as they carry out activities, States have an opportunity to develop a strong hands-on relationship with their State-funded jurisdictions in affirmatively furthering fair housing. This proactive role by the States fosters a unique working partnership with the localities and their community leaders through education, capacity building, and training on Federal and State fair housing laws and procedures.

Conversely, all States work with newly funded localities every year. The State should determine how such localities should take actions to comply with their certification to affirmatively further fair housing.

States should consider State-funded jurisdictions to have met their AFFH certification if the jurisdictions have carried out the State-approved actions. In turn, HUD will evaluate the State's records of monitoring efforts to determine State performance in requiring and evaluating the actions of State-funded jurisdictions in affirmatively furthering fair housing.

## 3.4   RESPONSIBILITY OF STATE-FUNDED JURISDICTIONS

States, as required by 24 CFR 570.487(b)(4) of the CDBG regulation, are required to assure that units of local government funded by the State comply with their certifications to affirmatively further fair housing. In accordance with instructions from the State, State-funded jurisdictions shall undertake FHP to develop proposed actions having measurable AFFH results at their local level. These actions may be Fair Housing Planning through the conduct of an AI and the taking of actions to address identified impediments. Or they could be a series of actions to be taken by the State-funded jurisdiction without the additional requirement of conducting an AI.

NOTE: HUD encourages States to encourage State-funded jurisdictions to consult the chapters in this Guide pertaining to Entitlement jurisdictions for additional guidance on specific actions.

## 3.5   THE STATE-LEVEL AI

As indicated in Section 3.2, States are required to undertake FHP. One component of FHP is the AI, which is a disclosure and review of impediments to fair housing choice.

Impediments to fair housing choice include actions or omissions in the State that:

- Constitute violations, or potential violations, of the Fair Housing Act

- Are counter-productive to fair housing choice, such as NIMBYism:

    - Community resistance when minorities, persons with disabilities and/or low-income persons first move into White and/or moderate- to high-income areas

    - Community resistance to the siting of housing facilities for persons with disabilities based on their disabilities

- Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin.

The scope of the AI should be broad. Thus, the review of housing should not be limited to housing assisted or subsidized by the Federal or State government. Rather, the AI should assess all types of housing within the State in order to determine whether there are any impediments to fair housing choice.

States can use available data, such as census reports and housing surveys, to gauge whether impediments to fair housing choice exist and whether there are State regulatory policies, practices, and procedures that encourage segregation by race, income, and/or disability.

Actually determining whether State regulations promote or allow segregation on the basis of race, disability or income, and the degree to which these regulations have this effect, usually requires a more detailed analysis than what can be achieved through available secondary sources. Secondary sources, nonetheless, should be used at a minimum to identify "red flags" that can be examined in more detail.

Upon completion of their AIs, States should take actions that are responsive to the identified impediments.

## 3.6   AI AREAS FOR REVIEW: STATE LEVEL

A State-level analysis should include, but not be limited to, a review for impediments in the following areas:

### Public Sector

1.  State building, occupancy, health, and safety codes (including accessible design) that may affect the availability of housing for minorities, families with children, and persons with disabilities.

    Such information should be available through a review of State laws and ordinances relating to these subjects.

2.  State policies and actions affecting the approval of sites and other building requirements used in the approval process for the construction of public (assisted) and private housing such as:

    –   Equalization of municipal services

    –   State tax policy

    –   Demolition and displacement decisions pertaining to assisted housing and the removal of slums and blight (e.g., relocation policies and practices affecting persons displaced by urban renewal, revitalization, and/or private commercialization or gentrification in low-income neighborhoods).

    Such information should be available from the State housing authority/finance agency responsible for site selection and through a review of State laws and ordinances relating to these subjects.

3.  Statewide policies concerning community development and housing activities such as:

    –   Multifamily rehabilitation

    –   The application of site and neighborhood standards for new construction activities

    –   The application of accessibility standards for new construction and alterations

    –   Activities causing displacement (e.g., revitalization of neighborhoods, property tax increases)



      &#8212;   Demolition of low-income housing which affects opportunities of minority households to select housing inside or outside areas of minority concentration or individuals with disabilities to select housing that is accessible and is in accessible locations.

4.     Statewide policies that restrict the provision of housing and community development resources to areas of minority concentration, or policies that inhibit the employment of minority persons and individuals with disabilities.

5.     Public policies that restrict the interdepartmental coordination between other State/local agencies in providing housing and community development resources to areas of minority concentration or to individuals with disabilities.

6.     Statewide planning, financing, and administrative social actions related to the provision and siting of public transportation and social services that may inhibit or concentrate affordable housing opportunities for persons with disabilities.

7.     Policies and practices affecting the representation of all racial, ethnic, religious, and disabled segments of the community on statewide advisory boards, commissions, and committees.

## Private Sector

1.     State banking and insurance laws and regulations pertaining to the financing/refinancing, sale, purchase, rehabilitation, and rental of housing that may affect the achievement of fair housing choice within the State.

     Such policies and practices, to the extent they are expressly stated in writing, should be available upon request from State licensing and other agencies that regulate banks, other financial institutions, and insurance firms operating within the State.

     The Home Mortgage Disclosure Act (HMDA) may provide additional data on the lending practices of specific banks.

2.     State laws and regulations covering the sale of housing that may allow or promote real estate practices such as steering or blockbusting, deed restrictions, and discriminatory housing brokerage services.

3.     State laws and regulations covering housing rentals, trust or lease provisions, and conversions of apartments to all-adult.

4.     State and local laws that conflict with the accessibility requirements of federal laws.

5.  State and local laws or other policies and practices that have the effect of restricting housing choices for persons with disabilities.

6.  Availability and dissemination of information on the availability of programs that may be used to provide financial assistance for modification to privately owned housing to make such housing accessible to persons with disabilities and their families.

## Public and Private Sector

1.  The nature, extent, and disposition of housing discrimination complaints, violations, or suits against private parties within the State or in State-funded units of general local government; other evidence of private housing discrimination occurring within the State; information on any contract conditions related to fair housing considerations placed by HUD on the State; or information on any failure of the State in complying with its AFFH certification. Such information should be available from HUD, the Department of Justice, State (and local) fair housing enforcement agencies, the State Attorney General, and private fair housing groups operating within the State.

2.  Evidence of segregated housing conditions (in the non-entitlement areas), and the housing desegregation plans or efforts of HUD or other Federal agencies. Such data should be available from census maps, the records of public housing authorities, HUD, and State housing agencies.

3.  The delivery system for statewide programs (as related to HUD program funding) providing social services to families with children and persons with disabilities.

4.  Provision of financing assistance for dwellings, such as discriminatory lending patterns, practices, and disclosures; discriminatory appraisal and insurance underwriting practices; disinvestment and insurance redlining practices. Such information may be available from Fair Housing Initiatives Program (FHIP) recipients engaged in special projects and activities to address property insurance and mortgage lending discrimination.

5.  Other State laws, policies, and practices affecting the location, cost, and availability of housing. Such information should be available from the State housing finance agencies and State human rights agencies.

6.  Where there is a determination of unlawful segregation or other housing discrimination by a court or a HUD Administrative Law Judge, or a finding of noncompliance with Title VI or the Fair Housing Act by HUD regarding assisted housing within a State, an analysis of the actions which could be taken by the State to help remedy the discriminatory condition, including actions involving the expenditure of funds made available under CDBG, or other funds to rehabilitate



**Appendix 255**

housing units or redress neighborhood deficiencies; the provision of economic development programs for occupants of assisted housing; and development and implementation of a fair housing information program for municipal officials and employees having duties related to fair housing, zoning, planning, assisted housing, and community/economic development.

The State should not only analyze what the State can do to correct that violation, but also should ensure that the same violation is not happening elsewhere within the State.

## 3.7   AI AREAS OF REVIEW: STATE-FUNDED JURISDICTIONS

State-funded jurisdictions that are directed by the State to conduct an AI are encouraged to consult the chapters in this Guide pertaining to Entitlement jurisdictions for guidance. HUD suggests that at a minimum, AI areas for review should include the following:

- ■   Review of local planning/zoning and land use controls for evidence of restrictions that impede fair housing choice

- ■   Review of lending practices of financial institutions serving the community for evidence of discriminatory patterns

- ■   Review of sales and rental practices within the community for discriminatory patterns

- ■   Review of areas of minority and disabilities concentrations for patterns of discrimination, e.g., lending, rentals, or sales

- ■   Review of the quality of services provided to areas with high concentrations of minority persons, persons with disabilities and large families.

Following are several appendices that contain sample impediments and actions to eliminate them, a listing of proposed State actions regarding the analysis of impediments to fair housing choice, and actual examples of State AI actions.

**Appendix 256**

# CHAPTER 3—APPENDIX A:
# STATE EXAMPLES OF IDENTIFIED IMPEDIMENTS AND RESPONSIVE ACTIONS

The purpose of FHP is to foster a careful examination on a statewide basis of those factors which restrict or preclude fair housing choice. FHP also brings about meaningful and substantial actions by the State which respond directly to the identified impediments. The following examples are intended to highlight the types of actions which States might take in response to specific impediments. States should not interpret the examples as required actions nor as the only response to the given set of impediments.

## Example 1

## Impediments

State X is a southern State with a diversified economy, including major agricultural, tourism, financial, and military sectors. Its population is 25 percent Hispanic, 10 percent African-American, and 35 percent 62 years of age and older. It has a number of major metropolitan areas that are racially and ethnically diverse. The State's AI documented the following principal impediments to fair housing choice that are common to a number of the metropolitan areas within the State:



1.  The conflict between African-American populations and newly arrived Hispanic populations contributes to segregated housing patterns and prevents members of both segments from considering moving outside their own neighborhoods.

2.  The suburban jurisdictions of many of the State's major cities have exclusionary zoning ordinances that preclude the construction of affordable multifamily housing and keep out lower-income and minority persons.

3.  The State does not have any laws or policies dealing with the treatment of persons with mental or physical disabilities, a fact which encourages a hostile attitude in most local jurisdictions toward the existence of housing facilities for persons with disabilities, drug and alcohol treatment centers, and community-based mental health facilities.

## Actions to Eliminate Impediments

In response to these impediments, State X has prioritized the following as actions to be taken:

1.  The Governor plans to create a commission that will recommend ways by X date to defuse potential conflicts between African-Americans and newly arrived immigrant populations.

**Appendix 257**

2.   The State Human Rights Office will review all local zoning ordinances for their effects on the ability of low-income and minority families to obtain suitable housing in the suburbs, the construction of affordable housing for low-income persons, the potential for their disparate impact, and report their conclusions and recommendations to the Governor by X date.

3.   The Governor will propose amending and pursue passage of a new State fair housing act to prohibit discrimination on the basis of disability and familial status, thus making it substantially equivalent in those respects to the Fair Housing Act, and will also propose amending and pursue passage of the State's home rule statutes to prohibit localities from refusing to consider applications for permits from locally-based organizations desiring to set up facilities geared toward persons with physical and mental disabilities.

4.   The State will provide X number of technical assistance training hours to its State recipients on their Fair Housing Planning activities.

## Example 2

## Impediments

State Y is a Midwestern agricultural State with several major cities that have histories of hostile race relations. The AI describes in these major cities racially segregated housing patterns that have existed for several generations:

1.   Neither the State nor the local governments has done anything to address these issues.

2.   The AI also documents the results of extensive interviews with all segments of the real estate community and community leaders of all races and ethnic groups; these interviews and surveys reveal that all parties concerned feel comfortable with the status quo of segregated housing patterns, racial hostility as it relates to housing issues, and the lack of any resolve to tackle these problems.

3.   Furthermore, the State has no infrastructure to enforce its fair housing law or prevent the intimidation of minority families or families with disabilities that want to move into nontraditional settings.

## Actions to Eliminate Impediments

In response to these impediments, the State plans to:

1.   Enact legislation by X date which will prescribe serious criminal penalties for persons convicted of forcibly preventing families from moving into the neighborhood of their choice because of their race, color, religion, sex, disability, familial status, or national origin.

2.    Convene X number of workshops around the State which will address the subject of housing segregation and discrimination.

3.    Establish a State Fair Housing Commission X days after enactment of a substantially equivalent fair housing law that will work with local governments to eliminate their housing segregation problems.

4.    Get expert advice from at least X number of organizations within and outside of the State (e.g., National Fair Housing Alliance; National Association for the Advancement of Colored People, National Urban League, Disability Rights Action Coalition for Housing, National Council on Independent Living, National Association for the Deaf, etc.) regarding other actions to pursue.

5.    Provide X number of technical assistance training hours to its State recipients on their FHP activities.

## Example 3

### Impediments

State Z is a major Western industrial and agricultural State that has the country's largest population of foreign-born persons. Its major cities have large racially and ethnically identifiable sections, in which live large numbers of Hispanic, Asian, and African-American households with incomes at 80 percent or below the local median family income.

The AI identified the following impediments:



1.    The local fair housing agencies are under-funded and ill-equipped to enforce their local fair housing ordinances.

2.    The mass exodus of nonminority middle-class families from many cities in the State has contributed to racially segregated housing patterns and an atmosphere of intolerance toward nonwhite families of any income level who move into nonminority sections.

3.    The State does not have an enforceable site selection policy for affordable housing that will compel its major cities to select sites for affordable housing located outside of minority or low-income areas or allocate such housing on a metropolitanwide basis.

## Actions to Eliminate Impediments

In response to these impediments, the State will do the following:

**Appendix 259**

1. Increase funding by X percent for existing local fair housing and human rights agencies through a program similar to the Federal Fair Housing Assistance Program (FHAP) and the Fair Housing Initiatives Program (FHIP), with funding to come from both State and Federal sources.

2. Enact legislation by X date mandating site selection policies for affordable housing for all localities of 50,000 or more in population. The goal is to deconcentrate communities by race and income and encourage the construction of affordable single-family and multifamily housing throughout the jurisdiction.

3. Convene X number of workshops in the State's major metropolitan areas to strongly encourage metrowide solutions to housing discrimination and segregation.

4. Provide X number of technical assistance training hours to State recipients on their FHP activities.

## Example 4

## Impediments

State A reviews the zoning ordinances of each locality within its jurisdiction (or requests the localities to do the same) to determine whether the local ordinances are inconsistent with the disability related prohibitions of the Fair Housing Act and other federal civil rights laws. The Fair Housing Act regulations prohibit the use of discriminatory terms and conditions on the basis of disability. Also, regulations implementing Title II of the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973 prohibit discrimination against qualified persons with disabilities.

The AI identified the following impediment:

> State A determined from its review that several of its localities have zoning ordinances which appear to violate federal civil rights laws by placing restrictions on the location and/or size of housing facilities for persons with disabilities.

## Actions to Eliminate Impediments

In response to this impediment, the State plans to:

1. Inform the applicable localities of its findings and advise the jurisdictions with problem zoning ordinances of their obligations to amend their ordinances.

2. Monitor the ordinance amending effort until all those ordinances have been completed.

## Example 5

**Appendix 260**

## Impediments

State B has a sizable elderly and/or disabled population. The State documents in it's AI that several localities found the lack if accessible single family dwellings constitutes an impediment.

## Actions to Eliminate Impediments

In response to the impediments, the State proposed several strategies for increasing the availability of accessible single-family units state-wide, including:

> Establishing locally based modification loan/grant funds to provide assistance to elderly disabled persons who wish to make the home they own or rent accessible.

## Example 6

## Impediments

State W is a southeastern state where a considerable amount of new construction of multifamily residential housing is being built. Several impediments related to housing needs for persons with disabilities were identified in the State's AI.



The AI identified the following impediments:

1.  Persons with disabilities had the highest percentage of "worst case housing needs".

2.  Federal and State fair housing enforcement information indicates a high degree of noncompliance with Section 504 of the Rehabilitation Act in both public housing and assisted housing programs.

3.  The results of testing done by a local fair housing organization indicate that of several thousand newly built housing units, 95% of the units are not in compliance with the accessibility requirements of the Fair Housing Act, which applies to all residential buildings having four or more units and which are built for first occupancy after March 13, 1991.

## Actions to Eliminate Impediments

In response to these impediments, the State plans to:

1.  Set up a commission that will work with the various public and assisted housing providers and the federal and State fair housing enforcement offices to develop an action plan for meeting the unmet housing needs of persons with disabilities.

2.    Implement a training program for public and assisted housing providers on requirements of Section 504, the Fair Housing Act, the Americans with Disabilities Act, the Architectural Barriers Act, and the State's barrier-free building code.

3.    The State department that is in charge of construction code compliance and enforcement will implement a plan that will provide (a) education to the building industry on the accessibility requirements of the Fair Housing Act, and (b) add to the existing building permit and review process a review of compliance with these accessibility requirements with the provision that no certificate of occupancy will be issued until all requirements have been met.

## CHAPTER 3—APPENDIX B:

Chart supplied by Council of State Community Development Agencies (COSCDA)—
August 4, 1995

# SURVEY OF STATES
# ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE

| STATE | STARTED "AI" PROCESS? | AGENCY | CONTACT | COMMENTS |
|---|---|---|---|---|
| Alabama | Yes | Department of Economic and Community Affairs | Paula Murphy 205-242-5462 | |
| Arizona | No | Department of Commerce | Rivko Knox 602-280-1361 | |
| Arkansas | No | Industrial Development Commission | Bill Young 501-682-5193 | |
| California | No | Department of Housing and Community Development | Bill Pavao 916-327-8887 | |
| Colorado | No | Department of Local Affairs | Terry Chavez 303-866-2771 | Will do the AI in house |
| Connecticut | No | Department of Housing | Larry Lusardi 203-566-5310 | |
| Delaware | No | Delaware State Housing Authority | Rourke Moore 302-739-4263 | Will do the AI in house. Has already completed an AI of local zoning laws. |
| Florida | No | Department of Community Affairs | Tom Pierce 904-922-5434 | Will probably hire a consultant to do the statewide AI. Currently, local applicants are rated on fair housing performance in CDBG application process. |
| Georgia | No | Department of Community Affairs and the Georgia Housing Finance Agency | Chantel Matthews or Don Watt 404-656-6200 | DCA and Georgia HFA will work together in preparing AI. |
| Idaho | No | Department of Commerce | Jan Blickenstaff 208-334-2470 | Combining with all Entitlement communities to do one large study, probably with the aid of a consultant. Will start in about a month. |
| Illinois | No | Department of Commerce and Community Affairs and the IL Dept. of Human Rights | Mark Gauss 217-785-6193 or Bill Pluta 312-836-5383 | May Contract with IL Dept. of Human Rights, using CDBG funds, to do State AI. |



| STATE | STARTED "AI" PROCESS? | AGENCY | CONTACT | COMMENTS |
|---|---|---|---|---|
| Indiana | Yes | Department of Commerce | Betty Beecher-Smith 317-232-8333 | Working in conjunction with State civil rights commission to do statewide AI Surveying all 576 local communities. |
| Iowa | No | Department of Economic Development | Anna Smith 515-242-4812 | |
| Kansas | No | Department of Commerce and Housing | Don Brake 913-296-3528 | Will do AI in house. |
| Kentucky | Yes | Department of Local Government | Scott Kimmich 502-573-2382 | Contracted with State Commission of Human Rights to do AI. |
| Louisiana | Yes | Office of Community Development | Suzie Elkins 504-342-7412 | Currently requires grantees to do local AI. Hired a consultant to do statewide AI. |
| Maine | Yes | Department of Economic and Community Development | Aaron Shapiro 207-624-6800 or Suzanne Guild 207-626-4615 | Dept. of Econ. & Comm. Dev and ME State Hsg. Authority are working together to do statewide AI. The agencies plan to meet with their regional HUD field office this week to discuss the AI process. |
| Maryland | No | Department of Housing and Community Development | Ron Waters 410-514-7224 | Will send out RFP 9/95 to hire a consultant to do statewide AI. |
| Massachusetts | No | Department of Community Affairs | Toni Hall 617-727-0494, x428 | MA Commission Against Discrimination will take the lead. |
| Minnesota | No | Department of Trade and Economic Development | Leona Humphrey 612-297-4740 | Will probably do the AI in conjunction with the MN HFA. |
| Mississippi | No | Department of Economic and Community Development | Willie Horton 601-949-2223 | Will hire a consultant to do the statewide AI |
| Missouri | Yes | Department of Economic Development | Marilyn Graham 314-751-3600 | Will do session on AI for local grantees at annual application meeting on August 15/16. Has developed a checksheet and questionnaire to distribute to the grantees concerning the AI. The statewide AI will be completed using the results from the questionnaire as well as with assistance from the State Human Rights Committee. |
| Montana | Yes | Department of Commerce | Gus Byron 406-444-4477 | Hired a consultant to do AI. |
| Nebraska | No | Department of Economic Development | Danielle Hill 410-514-7224 | Received award of $30,000 under HUD's Super NOFA to do statewide AI. Sent out RFP for a consultant to do the AI. |
| Nevada | No | Committee on Economic Development | Audrey Allan 702-687-4325 | Nevada Fair Housing Council will send out RFP for a consultant to do AI. |

Appendix 264

| STATE | STARTED "AI" PROCESS? | AGENCY | CONTACT | COMMENTS |
|---|---|---|---|---|
| New Hampshire | Yes | Office of State Planning | Bill Ray 603-271-2155 | Will use a portion of its HUD super NOFA award to hire a consultant to do the statewide AI. |
| New Jersey | No | Department of Community Affairs | Shari Malnak 609-984-8453 | DCA will probably do the statewide AI in house. |
| New Mexico | No | State Housing Division | Sam Vivian 505-827-7124 | |
| New York | No | Division of Housing and Community Renewal | Brian McCarthy 518-473-2528 | |
| North Carolina | No | Department of Commerce | Donna Moffitt 919-733-2850 | May contract with a university to do the AI. |
| North Dakota | No | Office of Intergovernment Assistance | Linda Reagan 701-328-2094 | Will probably do AI in house. |
| Ohio | Yes | Department of Development | Bill Graves 614-466-2285 | Implemented statewide Fair Housing Assistance Program, using CDBG funds. The program awards funds to local communities to do AI and other activities to Affirmatively Further FH. |
| Oklahoma | No | Department of Commerce | Vaughn Clark 405-841-9370 | May contract with State human rights agency or Universitiy of Oklahoma to do AI. |
| Pennsylvania | Yes | Department of Community Affairs | Ed Geiger 717-783-3910 | Has prepared draft outline of statewide AI. Currently, all 207 of the State's jurisdictions are required to do local AI. |
| Rhode Island | No | Office of Intergovernment Relations | Jeff Gofton 401-277-2895, x319 | |
| South Carolina | No | Division of Economic Development | Dick Scott 803-734-0420 | |
| South Dakota | No | Division of Rural Community Development | Steve Harding 605-773-5651 | Will probably work closely with State housing finance agency to undertake statewide AI. |
| Tennessee | No | Department of Economic and Community Development | Paula Lovett 615-741-6201 | Will require FY95 grantees to do AI. |
| Texas | No | Department of Housing and Community Affairs | Christina Jackson 512-475-3833 | |
| Utah | Yes | Department of Community and Economic Development | Richard Walker 801-538-8730 | Regional Planning Councils will prepare AI for their region and submit to the State by the end of the year. |
| Vermont | No | Department of Housing and Community Affairs | Pat Peterson 802-828-3217 | |



| STATE | STARTED "AI" PROCESS? | AGENCY | CONTACT | COMMENTS |
|---|---|---|---|---|
| Virginia | No | Department of Housing and Community Development | Todd Christensen 804-371-7061 | Currently, all State recipients are required to carry out at least one activity designed to AFFH during each year that their grant is in effect. |
| Washington | No | Department of Commerce Trade and Economic Development | Charmaine Stouder 206-586-1243 | Has sent out RFP to hire a consultant to do the State AI. |
| West Virginia | No | West Virginia Development Office | Larry Long 304-558-4010 | |
| Wisconsin | No | Department of Development | Marti Wilson 608-266-5842 | |
| Wyoming | No | Community Development Authority | Jim Casey 307-265-0603 | |

## CHAPTER 3—APPENDIX C:

Information supplied by COSCDA—June 7, 1995

### COMMONWEALTH OF PENNSYLVANIA
### ANALYSIS OF IMPEDIMENTS TO FAIR HOUSING CHOICE

June 7, 1995

### Background

The U.S. Department of Housing and Urban Development (HUD) requires that each state conduct an analysis to identify impediments to fair housing choice within the state. The Commonwealth also must take appropriate actions to overcome the effects of any impediments identified through that analysis.

HUD's definition of "fair housing choice" means the ability of persons, regardless of race, color, religion, sex, handicap, familial status, or national origin, of similar income levels to have available to them the same housing choices.



In 1991, the Department of Community Affairs (DCA) required all 207 jurisdictions entitled to receive an annual allocation of state-administered Community Development Block Grant funds under state Act 179 to submit a Fair Housing Analysis to DCA. The analysis required that these communities review and identify housing needs among low- and moderate-income households, minority groups, and other protected classes of people such as the elderly and persons with disabilities. The analysis included data on population, employment/transportation, housing, public policies, real estate, lending institutions, and community institutions. In addition, the analysis included findings of problems and impediments, a course of action to address impediments to fair housing, and a schedule to resolve those problems.

### Work Plan for 1995 and 1996

During 1995, DCA will require each community to update their analysis by incorporating 1990 Census data (if not included in the 1991 analysis), describe the actions taken to address fair housing impediments, assess the progress or effectiveness of those actions, and identify any new impediments and/or corrective actions the community will undertake. (The instructions issued to local government grantees are attached.)

Simultaneously, DCA will conduct a review of relevant state-level data regarding fair housing choice. DCA will gather this information from other state agencies and statewide organizations which represent protected classes of people. DCA will gather data on fair housing problems/issues, complaints about fair housing choice, and any actions taken to resolve problems or further fair housing choice. (The survey process is attached.)

DCA will aggregate the results of the state-level review. DCA will identify trends, statewide problems, and common solutions among the updated local fair housing analyses. DCA will combine both the statewide and local results. Before the analysis is finalized, the statewide and local findings will be reviewed with the Pennsylvania Housing Advisory Committee (PHAC) at an open meeting. A draft of the Commonwealth's Analysis of Impediments will be shared with the PHAC before it is finalized.

## Tentative Schedule

June 15, 1995   Issue instructions on updating local fair housing analyses and finalize workplan for state-level review

Dec. 1, 1995   Updated local fair housing analyses due to DCA

May 1, 1996   Analysis of Impediments completed

## State-Level Review

The U.S. Department of Housing and Urban Development (HUD) requires the Commonwealth to analyze relevant state-level data on impediments to fair housing choice. These impediments could consist of real estate agent practices, rental management practices, banking practices, or insurance practices which limit people of the same income levels from having the same housing choices.

In order to solicit information about impediments to fair housing choice, the Department of Community Affairs will survey other state agencies which serve and advocacy groups which represent classes of people which are protected by federal fair housing laws. DCA also will survey state regulatory agencies which monitor financial institutions and housing professionals as well as the state's fair housing enforcement agency.

The following state service agencies will be surveyed by DCA:

Heritage Affairs Commission
African American Commission
Latino Affairs Commission

**Appendix 268**

Commission on Women
Department of Aging
Department of Public Welfare
– Office of Mental Health
– Office of Mental Retardation
– Office of Social Programs
   Community Services Program for Persons with Physical Disabilities
   Bureau of Blindness and Visual Services
– Office of Children Youth & Families
– Developmental Disabilities Planning Council
Department of Labor and Industry

The following state regulatory agencies will be surveyed:

Pennsylvania Human Relations Commission
Department of Banking
Department of Insurance
Department of State
– Real Estate Commission
– Real Estate Appraisers Board

DCA will survey the following advocacy groups:

American Association of Retired Persons
National Association for the Advancement of Colored People
Hispanics/Latino Community Groups*
Asian/American Community Groups*
United American Indians of the Delaware Valley
Council of Three Rivers American Indian Center
Commissioners of Pennsylvania Heritage Affairs Commission*
National Organization for Women
Pennsylvania Council of Churches
Pennsylvania Catholic Conference
Pennsylvania Jewish Coalition
Organizations representing Muslim and other religions*
Pennsylvania Coalition of Citizens with Disabilities
Pennsylvania Alliance for the Mentally Ill
Pennsylvania Mental Health Consumers Association
Pennsylvania Association of Resources for People with Mental Retardation
Independent Living Council
Council on the Blind
Pennsylvania Partnership for Children
Pennsylvania Builders Association
Pennsylvania Manufactured Housing Association
Pennsylvania Manufactured Home Owners of America
Pennsylvania Association of Realtors



**Appendix 269**

Pennsylvania Bankers Association
Pennsylvania Association of Community Bankers
Pennsylvania Association of Housing and Redevelopment Agencies
Local Human Relations Commissions
Fair Housing Councils

DCA will conduct a written survey of all the state agencies and organizations listed above. The groups listed above with an asterisk may require a two-phase survey. The first phase would be a preliminary survey to identify the most relevant groups. The second phase would include the detailed survey with the groups identified.

In addition, DCA will conduct interviews and meetings with the state regulatory agencies in order to seek more detailed information and collaborate on ways to further fair housing choice.

The written survey and interviews will seek information on:

1.     Problems restricting fair housing choice.

       The survey will request quantitative data on the number of complaints or possible violations of fair housing laws which may have occurred in Pennsylvania by county.

2.     Issues affecting fair housing choice.

       The survey will ask about issues which affect housing choices, even if those issues are not directly related to fair housing. The analysis will look for trends which indicate a fair housing problem even if the survey respondents do not identify it as such.

3.     Existence and results of any complaint process.

       The survey will identify any formal or informal data on fair housing complaints. The analysis of this information will be broken out by urban and rural areas.

4.     Any actions taken to correct or further fair housing choice.

       The survey will seek information to create an inventory of programs, services, and initiatives in Pennsylvania designed to encourage acceptance of protected classes. The list of these actions may include training/educational programs, counseling regarding professional ethics, and advertising/media campaigns to encourage diversity.

## Local Fair Housing Analysis Update

Grantees must update their 1991 fair housing analysis and the implementation of the actions that have been undertaken to determine if any changes need to be made to the analysis or the types of actions being undertaken.

Grantees that utilized the 1980 census data must now update their analysis using 1990 census data. A review of actions taken to combat identified impediments must be undertaken to determine if they have alleviated the impediments or whether further actions or new actions need to be undertaken. In addition, grantees should determine if any new impediments to fair housing choice have arisen and what actions they will undertake to combat these new impediments.

This update must be completed and submitted to the Department of Community Affairs by December 1, 1995.

## CHAPTER 3—APPENDIX D:



# —NOTES—

**Appendix 272**

(Example of Metrowide AI)
Information supplied by COSCD—August 4, 1995

# STATE OF UTAH

## Affirmatively Furthering Fair Housing Plan

In the absence of specific, HUD mandated guidelines concerning the Affirmatively Furthering Fair Housing Plan (AFFHP), the State of Utah decided to approach this plan in a consistent, local government manner as we do much of our consultation with the CDBG program generally. The state has put together a general outline of the kind of information which we desire to have in the plan and work directly with the seven regional planning agencies in the state to develop meaningful plans at the local level which has the very important buy in of local government. We used a portion of our one per cent (1%) Technical Assistance set-aside to fund a portion of this study. Other local funds paid for the remainder of the study. The T.A. funds were used to identify how low and moderate income persons could better access public housing funds as well as private funds to assist them in finding suitable housing by choice.



The scope of work in each of the regional agency's contracts includes the following components; the content has been reviewed by the HUD area office. The intent of this analysis is to perform a "comprehensive review of policies, practices and procedures that affect the location, availability and accessibility of housing and current residential patterns and conditions." The emphasis and the justification for using T. A. funds for this purpose is to allow low income people to first find housing and then to determine how to access CDBG funds as well as other financial resources to assist in making it more affordable. The lending practices of financial institutions are integral to making these determinations in all communities. The analysis will include an evaluation of lending practices in communities, lending practices in certain parts of communities (redlining of neighborhoods), lending practices based on sex, race, national origin, or disability, lending practices for certain types of housing, i.e; multiple family rental units. At the same time the study will also include an analysis of real estate sales practices from the same perspectives to determine biases in any of these categories. Zoning practices will also be evaluated in terms of exclusions or biases in any of these categories. Zoning practices will also be evaluated in terms of exclusions or biases of certain kinds of housing in the communities. These subjects are all identified as "barriers to fair housing choice" for lower income families and constitute the focus of the study.

Once the barriers are evaluated then the region will identify strategies to address the identified problem areas. The evaluation will be done in conjunction with area banks, real estate companies, developers, contractors, local government officials, non-profit entities, low income persons, and other interested parties. The study will include interviews, statistical reviews, data collection from various sources, reviews of policy documents and procedures manuals, discrimination complaints, etc. There is also a requirement to create a public participation program to obtain public input on the plan. Included with this narrative is a copy of a typical study outline generated by our regional agencies.

At the same time that this is going on, the regions are conducting a study of the effectiveness of Utah's non-profit organizations. They are looking at how to make the existing agencies better

and the creation of agencies where there are needs which are not being met by existing non-profits. There are no neighborhood or even community based development areas as well. There may be real opportunities for the creation of these entities in order to maximize the resources necessary to meet the needs of special populations.

## Affirmatively Furthering Fair Housing Plan (AFFHP) Outline for Utah

1.  Introduction

2.  Provide a general housing status statement

3.  Identify and evaluate policies and practices involving lending agencies (i.e., banks, mortgage Companies, Credit Unions, other financial institutions, housing agencies, and low-income groups), including geographic limitations, low-income limitations, and race

4.  Identify and evaluate rental policies and practices involving property management agencies, including geographic limitations, low-income limitations, and race

5.  Describe lending agency loan limitations by housing type and costs

6.  Identify Fair Housing or Housing Discrimination complaints which involves lending institutions and rental property management agencies and describe the results

7.  For each community, evaluate the limitation of multi-family unit construction in viable locations

8.  Evaluate the lending practices within each community

9.  Evaluate housing choice for persons holding certificates and vouchers

10. Evaluate sales practices of subsidized housing units

11. Identify any housing displacement, and if displacement is achieved in accordance with federal and state law

12. Determine financial limitations for developers who strictly construct single-family homes. Determine financial capabilities for developers who construct multi-family housing

13. Determine Action plan—goals and policies (cover all issues identified in the Assessment)

14. Provide Fair Housing Public scoping meeting minutes

# CHAPTER 3—APPENDIX E:

Information supplied by COSCDA—August 4, 1995

## STATE OF INDIANA

The housing survey was conducted in two phases. The first phase was initiated in July 1992. The purpose of the survey was to get some level of understanding from our subgrantees about housing and civil rights laws. Since the majority of our subgrantees receive Community Development Block Grants (CDBG), funds for infrastructure, community revitalization, and purchase of fire fighting equipment, the State realized being the recipient of federal funds, we were obligated to emphasize to subgrantees the importance of complying with and understanding of Federal/State Fair Housing/Civil Rights regulations. Below is an analysis of the State's survey:

A total of 528 surveys were mailed to cities/ towns and counties eligible to apply for CDBG funds. To date our office has received a total of 208 responses, a response rate of 39 percent. Of the 528 surveys mailed, 372 were sent to towns, 64 were mailed to Cities and 92 were sent to Counties around the state.



Out of the 372 surveys to towns throughout the state, 120 surveys have been received, or 32 percent. At the time the surveys were sent, 56 towns had one or more open CDBGs with the state. At the time of the survey, 29 towns had fair housing ordinances on the books, 28 percent of the respondents. There were 38 towns which had at least 1 percent of African Americans residing in the town, or 31 percent. There were 45 towns which had a percentage of Hispanics residing in their community, 37 percent. There were 67 communities that have subsidized housing, 55 percent. There were 21 towns which had scattered site housing, 17 percent. There were two towns which had received fair housing or equal employment opportunity (FH/EEO) complaints in the last two years, 1 percent. Of the total 120 respondents, there were 13 towns which have procedures in place to handle FH/EEO complaints, 10 percent. One town in Southern Indiana indicated they have personnel procedures in place to handle Civil Rights disputes. There were 49 towns, 40 percent, with housing for their senior citizens.

Of the 64 surveys sent to cities throughout the state, 49 responded, or 76 percent. There were 33 cities, or 50 percent, which had one or more open CDBG grants with the State. There were 32 cities, or 48 percent, that have a fair housing ordinance on the books. One city at the time of survey had a fair housing ordinance pending. There were 36 cities, 66 percent, which reported an African American population within their community. There were 29 cities, 51 percent, which reported having a percentage of Hispanic Americans residing in the community. There were 34 cities, 53 percent, with Asian Pacific Americans residing in the community. There were 40 cities, 62 percent, which reported having subsidized housing within their community. There were 23 cities, 35 percent, which had scattered site housing units in their community. One city reported a total of 20 scattered site housing units. Eight cities reported having received FH/EEO complaints in the last two years, the least being one complaint, the most being 25. There were 22 cities, 34 percent, that have a procedure in place for FH/EEO complaints. There were 43 cities, 67 percent, which have senior housing in their community.

There were 92 surveys mailed to County Commissioners around the State. Of the 92 surveys,

**Appendix 275**

there were 33, 35 percent, which responded. Of the 92, at the time the survey was received by the state, there were 15, 16 percent, which had an open CDBG. There were 12 counties, 13 percent, which have Fair Housing Ordinances on the books. There were 26 counties, 28 percent, which have a Native American population. There were 23, 25 percent, that had Hispanic Americans residing in the Counties. The counties that reported 20, 21 percent, had a population of Asian Pacific Americans. There were 19 counties, 20 percent, which have subsidized housing. There were 10 counties, 10 percent, which reported having scattered site housing. Three counties reported having received FH/EEO complaints within the last two years. Nine counties, 9 percent, have procedures in place for handling FH/EEO complaints. One County has procedures in place to oversee EEO complaints. There were 22 counties, 23 percent, which have senior housing.

Methodology: The Community Development Division designed a simple survey document which would demonstrate the degree of sophistication, knowledge or attention given to the subject of Fair Housing and Equal Opportunity. (See Attached Document). The agency has since identified other questions which need to be included for a more accurate description of impediments.

Surveys were mailed to current and future recipients of CDBG dollars. The most difficult of the problems to overcome was the widely held perception that few or no African Americans meant that no FH/EEO problems existed.

There will probably be consultants hired to complete the analysis in order to fulfill the need to identify all impediments to fair housing—including zoning, housing patterns, educational and cultural obstacles, etc.

**Appendix 276**

## INDIANA DEPARTMENT OF COMMERCE
## COMMUNITY DEVELOPMENT BLOCK GRANT (CDBG) PROGRAM
## FAIR HOUSING QUESTIONNAIRE

The guarantee of civil rights has a constitutional as well as a statutory base. Several laws overlap in their coverage of certain actions and activities. In order to determine the level of understanding and compliance with these laws, the Grants Management Staff is determining the degree of success to which the dissemination of civil rights, MBE/WBE and EEO information is being understood and utilized. Additionally, the community will benefit, because each community's Civil Rights Officer will need to identify and verify the existence and location of information relevant to compliance with Civil Rights Laws.

The attached informal questionnaire is due on or before March 10, 1994. Please return the completed questionnaire to:



> Ms. Lori Thurman
> Civil Rights Fair Housing Coordinator
> Grants Management Office
> Indiana Department of Commerce
> One North Capitol Avenue, Suite 700
> Indianapolis, IN 46204

Please contact Ms. Thurman at (317) 232-8355 if there are any questions. Thank you.

NAME OF GRANTEE UNIT OF GOVERNMENT: _____



**Appendix 277**

*Chapter 3: Planning Requirements and Guidelines*

TELEPHONE NUMBER:  (   ) _____
NUMBER OF CFF/IDIP GRANTS CURRENTLY OPEN: _____
NAME OF CIVIL RIGHTS OFFICER: _____
    YEARS OF EXPERIENCE: _____
DOES YOUR LOCAL GOVERNMENT HAVE THE FOLLOWING:
        YES        NO
FAIR HOUSING ORDINANCE ____ AFFIRMATIVE ACTION PLAN __ __
EQUAL OPPORTUNITY ORDINANCE __ __
NAME OF THE LARGEST CITY CLOSE TO YOUR TOWN OR TOWN OR COUNTY?
_____

ESTIMATE AS NEARLY AS POSSIBLE THE PERCENT OF EACH OF THE
FOLLOWING GROUPS IN YOUR CITY/TOWN/COUNTY:

WHITE AMERICAN: _____ AFRICAN AMERICAN: _____
NATIVE AMERICAN: _____ HISPANIC AMERICAN: _____
ASIAN/PACIFIC AMERICAN: _____ OTHER: _____

ESTIMATE AS NEARLY AS POSSIBLE THE PERCENT OF LOW/MODERATE INCOME
FAMILIES OR INDIVIDUALS IN YOUR CITY/TOWN/COUNTY:

            VERY LOW: _____ LOW: _____ MODERATE: _____

HAS THE COMMUNITY JOINED FORCES WITH ANY OTHER GROUP, AGENCY OR
ORGANIZATION TO PROMOTE FAIR HOUSING?

            YES: _____ NO: _____

HAS THE COMMUNITY IDENTIFIED OR SOUGHT TO IDENTIFY ANY
IMPEDIMENTS TO FAIR HOUSING?

            YES: _____ NO: _____ (IF YES, EXPLAIN)

_____
_____
_____
_____

DOES YOUR COMMUNITY HAVE, OR HAVE ACCESS TO A CIVIL RIGHTS
COMMISSION/OFFICE? YES: _____ NO: _____

DOES YOUR COMMUNITY HAVE SUBSIDIZED HOUSING:
            YES: _____ NO: _____

LIST THE NAMES AND ADDRESS OF EACH HOUSING COMPLEX.

        NAME OF COMPLEX: _____

**Appendix 278**

ADDRESS: _____

NAME OF COMPLEX: _____
ADDRESS: _____

NAME OF COMPLEX: _____
ADDRESS: _____

DOES THE COMMUNITY INCLUDE EEO/FAIR HOUSING LOGOS OR LANGUAGE IN ALL ITS MARKETING AND ADVERTISING FOR BIDS, HOUSING AND EMPLOYMENT? (ENCLOSE SAMPLE, ANY AD WILL SUFFICE.)

YES: _____ NO: _____

DOES THE COMMUNITY HAVE A PROCEDURE IN PLACE FOR CIVIL RIGHTS COMPLAINTS: (ENCLOSE SUMMARY OF COMPLAINT PROCEDURE.)

YES: _____ NO: _____

HAVE THERE BEEN ANY FAIR HOUSING OR EQUAL OPPORTUNITY COMPLAINTS IN THE LAST TWO YEARS?   YES: _____ NO: _____

IF YES HOW MANY: _____

HAVE THERE BEEN ANY OTHER EFFORTS TO AFFIRMATIVELY FURTHER FAIR HOUSING? (I.E. HOUSING WORKSHOPS, SEMINARS, OUTREACH, TRAINING, ETC.) LIST EFFORTS:

_____
_____
_____
_____



**Appendix 279**

DOES THE COMMUNITY HAVE SCATTERED SITE HOUSING?

YES: _____ NO: _____

DOES THE COMMUNITY HAVE HOUSING FOR SENIOR CITIZENS:

YES: _____ NO: _____

COMMUNITIES ARE REMINDED THAT ALL RECIPIENTS OF FEDERAL FUNDS MUST COMPLY WITH FAIR HOUSING/EEO REGULATIONS, REGARDLESS OF THE TYPE OF GRANT AWARDED. THIS MEANS THAT RECIPIENTS OF FEDERAL FUNDS TO IMPROVE OR ADD INFRASTRUCTURE, PURCHASE FIRE FIGHTING EQUIPMENT, CONSTRUCT PUBLIC FACILITIES, IMPLEMENT ECONOMIC DEVELOPMENT PROJECTS, ETC, MUST AFFIRMATIVELY FURTHER FAIR HOUSING. CONTACT YOUR CIVIL RIGHTS OFFICER IF YOU HAVE QUESTIONS.

**Appendix 280**

## CHAPTER 3—APPENDIX F:

Information supplied by COSCDA—August 4, 1995

## STATE OF MONTANA

### Analysis of Impediments to Fair Housing Choice

The purposes of this report are to review the 1991 Montana Advisory Council on Housing Discrimination's report entitled *Equal Housing Opportunity in Montana? A Study of Housing Discrimination*, prepared for the Governor and the Human Rights Commission, and to examine data gathered via the 1993 Montana Housing Survey. The objective is to present a discussion of the results of these findings as they pertain to the possibility of unfair housing practices. This report will suggest avenues for minimizing or eliminating impediments to fair housing choice, where they exist.

### Summary

Over the last few years, as the housing market has tightened with rising prices and falling vacancy rates, the perception of ongoing unfair housing practices has become more widespread. Review of available data suggests that there are impediments to fair housing choice, particularly as related to "fair housing non-compliance, especially for racial minorities and women."[1] Inspection of the data also reveals that the single strongest factor relating to unfair housing practices appears to be income. Lower income households experience the greatest level of discrimination. But when coupled with additional attributes such as race, family size, marital status, or age of householder, the incidence of fair housing non-compliance rises significantly.

Overcoming unfair housing practices is an important issue to the State of Montana. The State feels that most unfair practices, though not all, are the result of ignorance. Therefore, the State intends to step up its outreach and educational efforts, thereby increasing the awareness of fair housing laws and the rights of both housing providers and consumers, whether they be renters, landlords, or real estate sellers. The State realizes that by increasing knowledge of fair housing issues, an increase in fair housing complaints is likely in the short run; but in the long run, fair housing non-compliance is expected to fall appreciably.

---

[1]The 1993 Montana Housing Survey, pg. 1.

## Section I: Impediments To Fair Housing Choice, Montana Human Rights Commission

The Montana Human Rights Commission, to whom most formal complaints of discrimination are directed, received only nine complaints of housing discrimination each year for the first 12 years of its existence. In 1991, the number of complaints rose to 106. This was the year the Commission sponsored its Fair Housing Compliance Workshops.

Earlier, in 1983, the Commission began to participate in a memorandum of understanding for joint fair housing enforcement activities with the U.S. Department of Housing and Urban Development (HUD). The Commission applied for and received a grant from HUD to help develop private fair housing enforcement in three cities: Billings (the Billings Fair Housing Alliance), Great Falls (Council for Concerned Citizens), and Missoula (the Missoula Fair Housing Board). These groups performed tests in their local rental markets to gauge the extent of housing discrimination against American Indians. The organizations completed a total of 60 tests. Such tests gauged the response of landlords and other offerors of housing to inquiries about their housing by two persons with one varying characteristic: in this case, their race. In over 50 percent of the tests conducted, the minority tester experienced discrimination.[2] It was through this participation that the Commission gained an understanding of the nature and extent of housing discrimination.

### Fair Housing Enforcement

Fair housing enforcement activities in Montana typically have focused on the rental housing, because most complaints filed are from that sector of the housing market. The Commission has not had a single complaint filed against a bank or other financial institution for housing discrimination, although some homeowners face constraints to mobility and believe these restraints are due to unfair housing practices. Only two complaints have been filed against a real estate firm (both filed against the same firm).

Between May 1988 and May 1991, the Commission received 140 housing complaints. Discrimination because of race or national origin was a factor cited in about half of those cases. The fact that a family had children was cited in nearly 30 percent of the cases, and sex discrimination was listed in one of each five of the charges. In more than 10 percent of the cases, the charge was made by or on behalf of a person with a disability. In 82 percent of cases by disabled persons, their handicap status was alleged to be the only factor considered in the denial of housing. Between 1987 and 1991, the number of housing discrimination complaints filed with the Commission doubled each year. It is not believed that there had been a sharp rise in discrimination, but rather that the laws had changed and incidents of housing discrimination were more often reported due to a better knowledge of housing rights and laws by those seeking housing.

---

[2]In any single test (lacking bias), using two subjects, one of a minority race and another not a minority, the minority tester.

**Appendix 282**

Specific requests to the Human Rights Commission for a task force on housing discrimination came out of a 1989 conference on fair housing in Montana. Other requests for assistance in educating housing providers about fair housing laws were also received. As a response to such requests, the Human Rights Commission, in cooperation with Montana Governor Stan Stephens and the U.S. Department of Housing and Urban Development (HUD), initiated the 1991 Fair Housing Project. The Commission received a $75,000 grant from HUD to carry out the activities of the project.

As a part of the Fair Housing Project, Governor Stephens appointed a nine-member Advisory Council on Housing Discrimination to study the problem of discrimination in Montana, prepare a report of their findings, and make recommendations to his office and the Commission. The Fair Housing Project collected information at Fair Housing Compliance Workshops, which were held in 10 towns across the state. In conjunction with the workshops, the Montana Human Rights Commission's Fair Housing Project staff developed, wrote and published an Equal Housing Training Manual for use by state fair housing trainers.[3] The manual included a list of current resources and organizations available to help promote equal housing opportunities.



The report produced by the Advisory Council, Equal Housing in Montana? A Study of Housing Discrimination,[4] listed several impediments to fair housing that limited choice. The barriers ranged from ignorance of fair housing laws to pervasive negative attitudes and racial bias. The impediments to fair housing choice noted in the study can be broken down into three main issues: education, process difficulties, and bias. These differ both in the type of barrier and the method of overcoming them.

## Impediments To Fair Housing Choice

### *Lack of Education*

Educational differences fall into two categories: persons offering housing and persons seeking housing. Until the 1991 series of workshops was begun, a landlord's only ongoing source of education in fair housing issues were general and infrequent media reports, summary presentations by professional organizations, and being named as party to a fair housing violation. Although many groups provide education to their members, not all of the landlords belong to these groups. Also, there have been many changes to fair housing law since 1988, and the information that many had been using was out of date. According to the council's report, the problem of outdated information

---

[3] Copies of this manual can be obtained from Ms. Joan Schneider, Administrative Secretary, Montana Human Rights Commission, (406) 444-3870.
[4] *Equal Housing Opportunity in Montana? A Study of Housing Discrimination* for Governor Stan Stephens and the Montana Human Rights Commission, January 1992.

**Appendix 283**

affects not only private parties, but also has impacted some local and state government agencies charged with enforcing fair housing laws. Occasionally, a city or county government will pass a restrictive ordinance or covenant covering the type of households permitted in certain locations. The council's report asserted that these restrictions are usually illegal under the fair housing laws.[5]

The council report also noted that persons seeking housing can be victims of misinformation and lack of information about their housing rights. It is difficult to combat housing discrimination if people who are discriminated against are not aware that the practice is illegal. According to the Council, some newspapers have printed illegally discriminatory advertisements, especially advertisements banning families with children. Other advertisements expressed preferences based on sex or religious belief. The presence of such advertisements may lead people to believe that these practices are allowed by law; they are not. Education for both housing providers and consumers can greatly reduce such discriminatory practices.

## Enforcement Processes

Investigation, review, and enforcement processes are very slow. This leads to impediments in the process of eliminating unfair housing practices. These impediments may take the form of delays in the Human Rights Commission's investigation of a claim, or an unwillingness to report discriminatory practices. The first refers to persons who know that they are victims of illegal discrimination, yet choose to do nothing about it. For example, people in small communities may be unwilling to risk the notoriety that often accompanies filing a formal complaint. Also, Native Americans often are wary of non-Indians, and tribal governments are reluctant to rely on state laws and enforcement methods. Housing discrimination for Native Americans moving from reservations to outside towns and cities restricts their mobility. There is some evidence that this type of practice occurs, as addressed in the Montana Housing Survey, reported in Section II of this narrative.

In the fair housing workshops, people testified that it was often difficult to get an attorney to handle housing cases, as many are uninformed about housing laws or are unwilling to accept an unpopular case. The length of time between filing and resolution also deters some from filing complaints.

The success of the enforcement activities of private fair housing groups in education and outreach has overwhelmed the resources of the Human Rights Commission. In 1991, a complaint would take six months to a year before the Commission could reach a decision on the case. As filing of complaints increased rapidly in the past few years, the waiting time before a solution was reached has also grown. The increased caseload also meant that other fair housing activities, such as preventive education, might be ignored or offloaded.

---

[5]*Equal Housing Opportunity in Montana?*, pg. 41.

**Appendix 284**

## Bias

Finally, bias and its accompanying stereotypes are an impediment to fair housing choice. This includes those who knowingly discriminate. Housing providers at the Fair Housing Workshops gave several reasons they had used in discriminating against someone who was looking for housing:

- ■ Some of my best tenants are Indian, but I always have to tell them 'no rain dances' so they understand about living in my place.

- ■ There's no way a single mother who works all day can keep her kids from tearing up my place.

- ■ I'd rather rent to single men, if it's a single girl, then she has her boyfriends up there all the time.

The impediments of bias and stereotype can be the most pervasive, and are difficult to correct. As the council's study concludes, "the necessity of effective enforcement cannot be discounted. Prejudice and bigotry, though less overt today, are too often present when housing decisions are made."[6]



## Section II: Attributes of Population Experiencing Unfair Housing Treatment

### 1993 Montana Housing Survey

In 1993, the Montana Department of Commerce implemented a mail survey of randomly selected citizens of the state. While several aspects related to housing were queried, one specific question addressed housing discrimination. This question asked respondents if they had experienced any unfair treatment related to housing (been denied or discouraged from a unit based on race, sex, family status, etc.) within the last three years. It is important to keep in mind that the figures included herein, and those derived from the survey, can be generalized to the state. For example, according to 1990 Census figures, slightly over half of Montana households earned less than $25,000 a year. The findings of the 1993 Montana Housing Survey reflect similar figures, with more than 50 percent of the households making an income below $25,000.[7] Hence, the characteristics reflected in the sample responses are presumed to be indicative of the characteristics

---

[6]*Equal Housing Opportunity in Montana?*, pg. 29.

[7]The 1993 Montana Housing Survey, pg. 35.

[8]The 1993 Montana Housing Survey, pgs. 40–43. Since some questions in the survey were answered by more respondents than others, the number of tabulations might vary slightly.

**TABLE 1**

**Frequency of Unfair Housing Treatment
1993 Montana Housing Survey**

| Have You Experienced Unfair Housing Treatment? | Frequency | Percentage |
|---|---|---|
| Yes | 57 | 4.70% |
| No | 1,052 | 85.90% |
| Missing | 11 | 9.40% |
| **TOTAL** | 1,224 | 100.00% |

of Montana's population.[8]

Table 1 shows the number and percent of respondent households indicating unfair housing treatment. Here, 57 of the 1,224 total respondents reported having experienced unfair housing treatment, nearly 5 percent of Montana's households. At first glance, it would appear that less than 5 percent of the population has experienced this form of discrimination. But to gain a better understanding of the situation for those who responded "yes," more detailed breakdowns were performed. Taking the analysis the additional step is particularly important when considering that not every respondent had to face a housing choice within the last three years.

The first step in this process was to separate household income into four categories. Montana's median family income (MFI), as presented in the FY 94 Comprehensive Housing Affordability Strategy (CHAS), was used as the basis for this classification.[9] The first group whose income is below or equal to 50 percent of the MFI is identified as *extremely and very low income* group; the second group with a household income of above 50 percent but less than 80 percent of MFI is the *low income* group; the third are those whose incomes fall above the 80 percent mark but no more than 95 percent of the MFI, who are classified as *moderately low income*. All those whose income is above 95 percent of MFI are aggregated in a fourth group, *other income*. For the purposes of this discussion, these groups will be termed "quartiles." Typically the respondent was the head of household.

The distributions of the income quartiles were then correlated with several attributes of the respondent (a process called cross tabulation). These attributes relate to gender, race, marital

---

[9] State of Montana CHAS, pg. 19.

status, age, family size, and tenure (renters and homeowners). Each is presented below.

## Gender by Income

After segregating the data by income and beginning the analysis of those who reported experiencing discriminatory practices, the data was further partitioned by gender. Table 2 shows the results of this cross tabulation. Out of the 52 respondents who reported discrimination, 25, or 48 percent, were *extremely or very low income* households. The second largest group of those who experienced unfair treatment were in the *low income* group. Taken together with the *moderately low income* group, these households comprised about 85 percent of all people facing forms of perceived housing discrimination. Obviously economic discrimination is strongly correlated with fair housing non-compliance.

Yet more worrisome issues arise when looking more specifically at the gender cross tabulation. While it is important to note that there were far more male respondents than female respondents (230 females responded while 904 males responded), an equal number of males and females claimed discrimination. This implies that females have, in relative terms, higher rates of unfair housing treatment than males. Table 2 notes that while nearly 20 percent of the respondents were women, half of those reporting discrimination were women. Moreover, a higher incidence of females than males reported unfair treatment in the low and extremely or very low income



**TABLE 2**

**Gender by Income**
**Those Who Reported Unfair Housing Treatment**

| Income Quartile | Male | Female | Total% | Total Number |
|---|---|---|---|---|
| Extremely or Very Low (up to $14,021) | 19.23% | 28.85% | 48.08% | 25 |
| Low Income ($14,022 to $22,414) | 13.45% | 15.38% | 28.83% | 15 |
| Moderately Low Income ($22,415 to $26,640) | 5.80% | 1.92% | 7.72% | 4 |
| Others ($26,641 or more) | 11.52% | 3.85% | 15.37% | 8 |
| Total % of Those Reporting Unfair Treatment | 50.00% | 50.00% | 100.00% | 52 |
| % of Surveyed Population | 80.10% | 19.90% | 100.00% | |

categories.

One can see that female heads of household with low and extremely or very low incomes tend to

face greater barriers to housing choice than their male or female counterparts with higher incomes.

## Race by Income

According to the 1993 Montana Housing Survey, 95 percent of Montana's population is white. The major ethnic minorities are Native Americans composing about 4 percent of the population. Other minorities are Blacks and Pacific Islanders, who count for less than 1 percent of the population. The distribution of these various racial groupings in the survey is as follows: Whites: 1,103; Blacks: 2; Native Americans: 44; and Pacific Islander: 5. It would appear that Native Americans and other minorities are slightly under-represented in the survey when compared to the 1990 Census counts. There, Native Americans comprised about 6 percent of the state's population. This implies that the following narrative also under-represents the situation for Native Americans and other racial minorities in Montana.

By looking at the race by income distribution presented in Table 3, below, 56 respondents reported unfair housing treatment. Over 14 percent of this group were Native Americans; this contrasts sharply with the fact that the percent of Native Americans responding to the survey was only 3.4 percent (noted in the last row of Table 3), and that Native Americans comprise about 6 percent of Montana's population.

When viewing this data within the income quartiles, the statistics become even more severe. For example, of all those reporting unfair treatment, 39 percent were extremely or very low income white households, but 9 percent were Native American households. This indicates that of those extremely low income households reporting discriminatory practices, nearly one in five were

face greater barriers to housing choice than their male or female counterparts with higher incomes.

## Race by Income

According to the 1993 Montana Housing Survey, 95 percent of Montana's population is white. The major ethnic minorities are Native Americans composing about 4 percent of the population. Other minorities are Blacks and Pacific Islanders, who count for less than 1 percent of the population. The distribution of these various racial groupings in the survey is as follows: Whites: 1,103; Blacks: 2; Native Americans: 44; and Pacific Islander: 5. It would appear that Native Americans and other minorities are slightly under-represented in the survey when compared to the 1990 Census counts. There, Native Americans comprised about 6 percent of the state's population. This implies that the following narrative also under-represents the situation for Native Americans and other racial minorities in Montana.

By looking at the race by income distribution presented in Table 3, below, 56 respondents reported unfair housing treatment. Over 14 percent of this group were Native Americans; this contrasts sharply with the fact that the percent of Native Americans responding to the survey was only 3.4 percent (noted in the last row of Table 3), and that Native Americans comprise about 6 percent of Montana's population.

When viewing this data within the income quartiles, the statistics become even more severe. For example, of all those reporting unfair treatment, 39 percent were extremely or very low income white households, but 9 percent were Native American households. This indicates that of those extremely low income households reporting discriminatory practices, nearly one in five were

**TABLE 3**

**Race by Income**
**Those Who Experienced Unfair Housing Treatment**

| Income Quartile | White | Native American | Other | Total% | Total Number |
|---|---|---|---|---|---|
| Extremely or Very Low Income | 39.20% | 8.96% | 0.00% | 48.16% | 27 |
| Low Income | 23.20% | 1.78% | 1.78% | 26.76% | 15 |
| Moderately Low Income | 7.20% | 0.00% | 0.00% | 7.20% | 4 |
| Other Income | 14.30% | 3.58% | 0.00% | 17.88% | 10 |
| Total | 83.90% | 14.32% | 1.78% | 100.00% | 56 |
| % of Surveyed Population | 94.60% | 3.80% | 1.60% | 100.00% | |



Native American, a far cry from the 6 percent of the population that Native Americans comprise.

Similar to when viewing the data by gender, lower income households encounter more unfair treatment than others. Seventy-five percent of those reporting unfair treatment across all racial classifications were low-, very low-, or extremely low-income. However, what can be deduced from the above is that nonwhite minorities with lower income levels tend to encounter more impediments to fair housing choice than other race and income segments of the population.

### Marital Status by Income

In this section, an evaluation of marital status by income quartile is conducted. Table 4 presents the cross tabulation, as well as the percent of the surveyed population represented by each marital status group. The highest percent of those experiencing unfair housing treatment were married couples. However, married couples were also the largest respondent group. A more interesting view is seen when comparing the percent of unfairly treated respondents to the total respondents within each marital group. Here, nearly 9 percent of those experiencing discriminatory treatment were separated persons, although they make up only 1.7 percent of the respondent population, over a 5 to 1 ratio. Similar circumstances apply to the "never married" and "divorced" segments

**TABLE 4**

**Marital Status by Income**
**Those Reporting Unfair Housing Treatment**

| Income Quartile | Married | Separated | Divorced | Widowed | Never Married | Total % | Total Number |
|---|---|---|---|---|---|---|---|
| Extremely or Very Low Income | 12.50% | 3.57% | 10.71% | 3.57% | 17.86% | 48.21% | 27 |
| Low Income | 7.14% | 5.36% | 10.71% | 0.00% | 3.57% | 26.79% | 15 |
| Moderately Low Income | 5.36% | 0.00% | 0.00% | 0.00% | 1.79% | 7.14% | 4 |
| All Other | 17.86% | 0.00% | 0.00% | 0.00% | 0.00% | 17.86% | 10 |
| TOTAL | 42.86% | 8.93% | 21.43% | 3.57% | 23.21% | 100.00% | 56 |
| % of Survey Respondent | 68.70% | 1.70% | 12.40% | 7.60% | 9.70% | | |

of the population.

When viewing each marital group by the income quartile, the extremely or very low income and low income segments include the bulk of those who have experienced forms of unfair housing treatment. In particular, the never married have a very high incidence of impediments to housing choice if they are in the extremely or very low income quartile.

What can be deduced from the above is that single people, whether separated, divorced, or never married, are more likely to encounter unfair treatment in housing than other marital categories. Combining that with a lower income level increases the chances for encountering unfair housing treatment.

## Age by Income

The ages of respondents were categorized into four subgroups: below 15, 16 to 30, 31 to 59, and finally 60 years and above. The largest age group comprised those persons between 31 and 59 years of age, who constituted about 60 percent of the surveyed population. The second largest group was the above 60 years old segment. The third group, the youngest, counted for about 10