**TABLE 5**

**Income Distributions by the Age of Respondent
for Those Who Cited Unfair Housing Treatment**

| Income Quartile | 16-30 Years | 31-59 Years | 60+ Years | Total % | Total Number |
|---|---|---|---|---|---|
| Extremely or Very Low Income | 25.00% | 21.42% | 1.79% | 48.21% | 27 |
| Low Income | 5.35% | 21.42% | 0.00% | 26.77% | 15 |
| Moderately Low Income | 3.75% | 3.57% | 0.00% | 7.14% | 4 |
| Other Income | 8.92% | 8.93% | 0.00% | 17.86% | 10 |
| Total | 43.00% | 55.00% | 1.79% | 100.00% | 56 |
| % of Surveyed Population | 10.00% | 61.00% | 29.00% | 100.00% | 1066 |



percent of the population in the sample (but are excluded from the following discussion).

Table 5 reveals that the largest group who reported unfair housing treatment is the 16 to 30 year old group. This is easily seen by comparing the age group by the percentage of total surveyed population. While the 16–30 year olds represent 10 percent of the population, 43 percent of those reporting unfair housing treatment are in this age bracket. A very interesting, although quite opposite, issue is evident in the data. While the over-60 group represents nearly 20 percent of all respondents, less than 2 percent have experienced unfair housing treatment within the last three years. This is largely due to the fact that most individuals in this age bracket tend to own their homes and have not had to make a recent housing choice.

## Family Size by Income

In order to explore the prevalence of unfair housing treatment toward large families, the distribution of children under 18 living with their parents was partitioned by income. Table 6 indicates that family households with four or more members have a higher incidence of unfair housing treatment. Typically, these households have two or more children. This is seen when comparing the percent of households experiencing discrimination to the survey total, by household size. The percent of the larger households (those with a family size of six or more members) reporting unfair housing

**TABLE 6**

**Number of Children in Household**
**For Those Who Cited Unfair Housing Treatment**

| Income Quartile | Family Size | | | Total % | Total Number |
|---|---|---|---|---|---|
| | 1-3 | 4-5 | 6 or More | | |
| Extremely or Very Low Income | 36.40% | 9.10% | 1.80% | 47.30% | 26 |
| Low Income | 18.20% | 9.10% | 0.00% | 27.30% | 15 |
| Moderately Low Income | 1.80% | 0.00% | 5.50% | 7.30% | 4 |
| Other Income | 10.90% | 0.00% | 7.30% | 18.10% | 10 |
| Total | 67.30% | 18.20% | 14.50% | 100.00% | 55 |
| % of Surveyed Population | 73.00% | 16.40% | 10.60% | | |

practices is higher than the other segments.

As is the case in all previous analyses, those households with extremely low or very low income have the highest incidence of housing discrimination. The above data continues to affirm the arguments stated previously which indicate that lower income people experience more barriers when acquiring a dwelling than other segments of the general population.

## Home Buyers and Renters by Income

Table 7 shows responses from both home buyers and renters who have experienced forms of unfair housing treatment. Clearly renters tend to experience the highest level of unfair housing treatment. While comprising nearly 18 percent of the respondent households, renters comprised some 67 percent of those experiencing fair housing non-compliance by rental providers. As noted earlier, the extremely or very low and low income households have the highest degree of

**TABLE 7**

**Home Owners and Renters by Income
Those Who Reported Unfair Housing Treatment**

| Income Quartile | Own | Rent | Others | Total % | Total Number |
|---|---|---|---|---|---|
| Extremely or Very Low Income | 13.00% | 33.30% | 1.80% | 48.10% | 26 |
| Low Income | 3.70% | 22.20% | 0.00% | 25.90% | 14 |
| Moderately Low Income | 1.80% | 1.80% | 3.70% | 7.40% | 4 |
| Other Income | 9.30% | 9.30% | 0.00% | 18.50% | 10 |
| Total | 27.80% | 66.60% | 5.50% | 100.00% | 54 |
| % of Surveyed Population | 76.60% | 17.60% | 5.80% | | |



discrimination; but it is these income renters with a very high prevalence of housing difficulty.

## Restrictions to Mobility

There are two generic forms of housing discrimination that have been framed by the Montana Housing Survey. One relates to those having faced a housing choice within the last three years, and made a choice, regardless of outcome. The second pertains to those who have been unable to exercise a choice.

To illustrate this point, consider homeowners and renters and length of stay at the residence. Table 8 shows a tabulation of those at their residence from 0–3 years and those who have been at their residence more than three years, all have indicated unfair housing treatment. Housing treatment that restricts mobility, interpreted here to be those unable to exercise a choice, should also be viewed as an impediment to fair housing. The results of this cross tabulation indicate that for those staying at their residence a longer period of time, it is homeowners who tend to feel that their choices are constrained. While insufficient data limits the degree to which this homeowner group can be disaggregated by gender, age, income, or race, the Advisory Council on Housing Discrimination did note that Native Americans have had difficulties moving from on-reservation to off-reservation housing. One can infer that homeowners who wish to move to

### TABLE 8

**Reported Unfair Treatment on the Short and Long Run
for Those Reporting Unfair Housing Treatment**

| Length of Stay | Own | Rent | Others | Total % | Total Number |
|---|---|---|---|---|---|
| 0-3 Years | 15.00% | 57.00% | 2.00% | 74.00% | 40 |
| More Than 3 Years | 13.00% | 9.00% | 4.00% | 26.00% | 14 |
| Total | 28.00% | 66.00% | 6.00% | 100.00% | 54 |
| % of Total Respondents | 76.00% | 18.00% | 6.00% | 100.00% | 1173 |

another residence also can experience impediments to fair housing choice. Therefore, it is not a phenomenon experienced only by renters.

## Conclusion

Since 1990, the housing market has tightened, with sharp increases in home and rental prices. Because of uncertain employment prospects and falling wage rates some households have faced a wide financial gap between the supply of affordable housing and the quantity demanded. As indicated in Montana's FY 94–98 CHAS "there appear to be mostly impediments, and few opportunities, to the development of affordable housing in the current housing market."[10]

The various analyses conducted in this document reveal that households with extremely low and very low income levels, who in fact have the highest need for affordable housing, are more susceptible to encountering unfair housing treatment. We also have established that there is some correlation between racial minorities, females, young adults, large families, and single persons and experiencing fair housing non-compliance.

A factor that needs to be carefully considered in looking at the impediments to fair housing is the degree to which household income plays an inherent role in this social problem. The previous analyses indicate that low income levels are highly correlated with unfair housing treatment. More importantly, level of income appears to be the single best indicator of the potential for experiencing impediments to housing choice, with particular attributes related to race, gender, age, and marital status compounding an already difficult situation for the low income household.

Still, there is a significant difference between real and perceived discrimination. The criteria used by many federal, state, and local governments to assist people in finding housing may inhibit their housing choice, but are not illegal. HUD guidelines regarding occupancy standards

---

[10] State of Montana CHAS, pg. 53.

limit certain households to what is considered standard housing. As an extreme example, a six-person family cannot be awarded a one-bedroom assisted housing unit, as the unit would be considered substandard for a family of that size. To some cultures and persons, this may seem an unfair practice. This may also seem unfair to large families, because there is a scarcity of suitable housing for this group. This illustrates that discrimination can sometimes be a matter of perception rather than reality. A better understanding of fair housing practices, as they relate to standard housing guidelines, needs to be disseminated.

Private fair housing organizations have been actively seeking federal funding. In July 1994, the Billings Fair Housing Alliance was awarded $30,000 under the Fair Housing Initiatives Program (FHIP), for continuing development. The Council for Concerned Citizens in Great Falls was awarded over $575,000 in FHIP funds, to be used for enforcement, education and outreach, and establishment of new fair housing organizations.

In the conclusion of its report, the Advisory Council on Housing Discrimination cited the severe lack of information among all citizens about fair housing laws and practices; lack of proper education regarding fair housing laws tends to be one of the strongest impediments to fair housing choice. To address the need for information, the council advised the Human Rights Commission to seek funding to institute on-going, wide-spread education and outreach programs to teach fair housing practices, as well as advising housing providers of the penalties for housing discrimination. Through workshops, presentations at schools, the HRC's toll-free phone number, and private fair housing groups, education of those who are willing to learn would be an effective tool against housing discrimination.

The Montana Department of Commerce (MDOC) fully supports this position. Indeed, MDOC intends to place greater efforts in outreach, education, and information dissemination related to fair housing, fair housing laws, and the rights and obligations of both housing consumers and housing providers.

In doing so, MDOC expects that long-term change can be implemented, although the short-term impact of such outreach and educational activities will initially result in an outcome similar to the experience the Human Rights Commission had in 1991. When additional efforts were made to educate citizens about fair housing issues, complaints regarding fair housing non-compliance rose. Furthermore, MDOC will measure its short-term performance in this effort by the degree that housing complaints rise. Over the long run, though, non-compliance issues are expected to decline significantly.

**Appendix 295**

# —NOTES—

# Chapter 4
# Table of Contents

**4.1    ENTITLEMENT REQUIREMENTS** ........................................................... 4-3

**4.2    THE AI** .............................................................................................. 4-4

**4.3    AI SUBJECT AREAS** ......................................................................... 4-5

Public Sector ...................................................................................... 4-5

Private Sector ..................................................................................... 4-6

Public and Private Sector .................................................................. 4-7

**CHAPTER 4 —APPENDIX: ENTITLEMENT EXAMPLES OF IDENTIFIED IMPEDIMENTS AND RESPONSIVE ACTIONS** ........................................... 4-9

Example 1 ............................................................................................ 4-9

Example 2 ............................................................................................ 4-10

Example 3 ............................................................................................ 4-11

Example 4 ............................................................................................ 4-12



# —NOTES—

Appendix 298

# Chapter 4:

## Fair Housing Planning Requirements and Guidelines for Entitlement Jurisdictions

## 4.1   ENTITLEMENT REQUIREMENTS

The Consolidated Plan's certification to affirmatively further fair housing (AFFH) requires Entitlement jurisdictions to undertake Fair Housing Planning (FHP). Since FHP is a component of the Consolidated Plan, the citizen participation requirement for the Consolidated Plan applies (24 CFR 91). FHP consists of the following:

**NOTE:**   *Since FHP and the Consolidated Plan are on a different time schedule for the first cycle, HUD does not expect the jurisdiction to follow the strict citizen participation requirements for their first Analysis of Impediments to Fair Housing Choice (AI). However, HUD does expect the jurisdiction to develop an AI that involves and addresses concerns of the entire community.*

1.   Conducting an AI.

   Suggests that Entitlement jurisdictions conduct their AI at the beginning of each Consolidated Plan cycle.

2.   Taking appropriate actions to overcome the effects of any impediments identified through the AI.

   HUD suggests that actions to address any identified impediments should have measurable results. Additionally, before taking such actions, HUD suggests that jurisdictions establish a prioritized list of impediments to address. The list should contain specific milestones and timetables.



3.   Maintaining the following records:

   –   Documentation of the AI

   –   Actions taken in this regard.

HUD suggests the Entitlement jurisdiction maintain the following additional records to further support its AFFH certification:

–   Studies evaluating the effectiveness of the actions

–   Summaries or transcripts of all public meetings, hearings, and citizen comments/input

–   FHP summary reports (e.g., a summary of the AI, the actions taken in the previous program year, and an analysis of the impact of those actions). The FHP summary report is part of the Consolidated Plan Performance Report required by 24 CFR 91.520.

HUD urges all Entitlement jurisdictions to participate in metrowide or regional FHP with neighboring jurisdictions.

## 4.2   THE AI

The AI is a comprehensive review of a jurisdiction's laws, regulations, and administrative policies, procedures, and practices affecting the location, availability, and accessibility of housing, as well as an assessment of conditions, both public and private, affecting fair housing choice.

The AI is a review of impediments to fair housing choice in the public and private sector. Impediments to fair housing choice are any actions, omissions, or decisions taken because of race, color, religion, sex, disability, familial status, or national origin that restrict housing choices or the availability of housing choices, or any actions, omissions, or decisions that have the effect of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex, disability, familial status, or national origin. Policies, practices, or procedures that appear neutral on their face but which operate to deny or adversely affect the provision of housing to persons of a particular race, color, religion, sex, disability, familial status, or national origin may constitute such impediments.

Impediments include actions or omissions in the jurisdiction's public or private housing sector that:

■   Constitute violations, or potential violations, of the Fair Housing Act

■   Are counterproductive to fair housing choice, such as NIMBYism:

–   Community resistance when minorities, persons with disabilities and/or low-income persons first move into White and/or moderate- to high-income areas

–   Community resistance to the siting of housing facilities for people with disabilities in residential neighborhoods based on their disabilities

#     Have the effect of restricting housing opportunities on the basis of race, color, religion, sex, disability, familial status, or national origin.

Upon completion of its AI, a jurisdiction should take actions that are responsive to any identified impediments. The AI should encompass all housing within a jurisdiction and should not be limited to housing assisted or subsidized by the Federal, State, or local government.

# 4.3 AI SUBJECT AREAS

## Public Sector

1.  Local building, occupancy, and health and safety codes that may affect the availability of housing for minorities, families with children, and persons with disabilities, such information should be available through a review of local laws and ordinances relating to these subjects.

2.  Public policies and actions affecting the approval of sites and other building requirements used in the approval process for the construction of public (assisted) and private housing such as:

    −    Requirements for the provision of essential municipal services (e.g., water, sewage, electricity, public transportation, roads)

    −    Real estate property tax assessments

    −    Building codes

    −    Accessibility standards that do not meet the accessibility requirements of the Fair Housing Act (42 U.S.C. 3604, Section 804(f)(3)(C))

    −    Equalization of municipal services

    −    Local zoning laws and policies (e.g., minimum lot size requirements, dispersal requirements for housing facilities for persons with disabilities in single-family zones, and restrictions on the number of unrelated persons in dwellings based on size of unit or number of bedrooms)

    −    Demolition and displacement decisions pertaining to assisted housing and the removal of slums and blight (e.g., relocation policies and practices affecting persons displaced by urban renewal, revitalization, and /or private commercialization or gentrification in low-income neighborhoods).

    Such information should be available from the jurisdiction's housing authority/ finance agency responsible for site selection and through a review of local laws and ordinances relating to these subjects.



**Appendix 301**

3.    The administrative policies concerning community development and housing activities, such as:

–    Multifamily rehabilitation

–    The application of site and neighborhood standards for new construc tion activities

–    Activities causing displacement (e.g., revitalization of neighborhoods, property tax increases, and demolition of subsidized housing) which affect opportunities of minority households to select housing inside or outside areas of minority concentration or individuals with disabilities to select housing that is accessible and is in accessible locations.

4.    Public policies that restrict the provision of housing and community development resources to areas of minority concentration, or policies that inhibit the employment of minority persons and individuals with disabilities.

5.    Public policies that restrict the interdepartmental coordination between other local agencies in providing housing and community development resources to areas of minority concentration or to individuals with disabilities.

6.    Planning, financing, and administrative actions related to the provision and siting of public transportation and supportive social services that may inhibit or concentrate affordable housing opportunities for persons with disabilities.

7.    Policies and practices affecting the representation of all racial, ethnic, religious, and disabled segments of the community on planning and zoning boards and commissions.

## Private Sector

1.    The sale or rental of housing and real estate practices such as:

–    Steering or blockbusting

–    Deed restrictions

–    Trust or lease provisions

–    Conversions of apartments to all-adult

–    Inaccessible design

–    Property management firm's "occupancy quotas."

2. Banking and insurance policies and practices pertaining to the financing, sale, purchase, rehabilitation, and rental of housing that may affect the achievement of fair housing choice within the jurisdiction; such policies and practices, to the extent they are expressly stated in writing, should be available upon request from banks and other financial institutions, and insurance firms operating within the jurisdiction; the Home Mortgage Disclosure Act (HMDA) may provide additional data on the lending practices of specific banks.

3. The discriminatory provision of housing brokerage services.

4. Availability of, and dissemination of information on the availability of, programs that may be used to provide financial assistance for modifications to privately owned housing to make such housing accessible to persons with disabilities and their families.

## Public and Private Sector

1. The nature, extent, and disposition of housing discrimination complaints, violations, or suits against private housing providers within the jurisdiction; other evidence of private housing discrimination occurring within the jurisdiction; information on any contract conditions related to fair housing considerations placed by HUD on the jurisdiction; or information on any failure by the jurisdiction in complying with its AFFH certification should be available from HUD, the Department of Justice, and local fair housing enforcement agencies, and private fair housing groups operating within the jurisdiction.

2. Evidence of segregated housing conditions and the housing desegregation plans or efforts of HUD or other Federal agencies should be available from census maps, the records of public housing authorities, HUD, and local housing agencies.

3. The delivery system for programs providing social services to families with children and persons with disabilities.

4. Information regarding financing assistance for dwellings may be available from Fair Housing Initiatives Program (FHIP) recipients engaged in special projects and activities to address property insurance and mortgage lending discrimination such as:

   – Discriminatory lending patterns, practices, and disclosures

   – Discriminatory appraisal and insurance underwriting practices

   – Disinvestment and insurance redlining practices.



5.   Other laws, policies, and practices affecting the location, cost, and availability of housing and related information should be available from the local housing authorities/finance agencies and human rights agencies.

6.   Where there is a determination of unlawful segregation or other housing discrimination by a court or a HUD Administrative Law Judge, or a finding of noncompliance with Title VI or the Fair Housing Act by HUD regarding assisted housing within a jurisdiction, an analysis of the actions that could be taken by the jurisdiction to help remedy the discriminatory condition, including actions involving the expenditure of funds made available under CDBG or other programs to rehabilitate housing units or redress neighborhood deficiencies; the provision of economic development programs for occupants of assisted housing; and development and implementation of a fair housing information program for municipal officials and employees having duties related to fair housing, zoning, planning, assisted housing, and community/economic development.

**Appendix 304**

## CHAPTER 4–APPENDIX: ENTITLEMENT EXAMPLES OF IDENTIFIED IMPEDIMENTS AND RESPONSIVE ACTIONS

The purpose of FHP is to foster a careful examination of those factors which restrict or preclude fair housing choice. FHP also brings about meaningful and substantial actions by the Entitlement jurisdiction which respond directly to any identified impediments. The following examples are intended to highlight the types of actions which entitlements might take in response to specific impediments. Entitlement jurisdictions should not interpret the examples as the only response to the given set of impediments.

## Example 1

### *Impediments*

Jurisdiction X is a suburban bedroom community of 75,000, just outside a major midwestern industrial city with a 40-percent minority population. Jurisdiction X's population is 60 percent White, and 90 percent of its housing stock is single family ownership. The average household income is 150 percent of the median income for the standard metropolitan statistical area (SMSA). Jurisdiction X's AI documented four principal impediments to fair housing choice:

1. The city's single family half-acre zoning requirement makes the cost of land prohibitive for the development of housing affordable to low- and moderate-income households, 60 percent of which are Black and Hispanic in the SMSA.

2. There is a reluctance on the part of local landlords to rent to persons receiving Government housing assistance.

3. A majority of persons receiving housing assistance are minority.

4. Recent home purchases by Black families appear to have provoked White homeowners in the surrounding neighborhood to place their homes on the market.

### *Actions to Eliminate Impediments*

In response to these impediments, Jurisdiction X has prioritized the following as actions to be taken:

1. City Council plans to enact an ordinance requiring that, as of X date, all new developments of 10 or more units include a 10-percent set-aside of "moderately priced dwelling units" (MPDUs), to be reserved for sale to households with incomes at or below 80 percent of the SMSA median.

2. Council will introduce a bill, by X date, making it unlawful to refuse to rent based on a household's source of income.



3.   The city and its housing agency will work to dispel the perception that assisted housing is just for minorities by conducting X number of forums to inform the public on assisted housing opportunities and report its conclusions and recommendations to the Chief Elected Official by X date. The City will target nonminority households.

4.   Working with the Council of Churches, local real estate brokers, and a private fair housing organization, the City Housing Commission plans to hold X number of "neighborhood forums." City representatives will meet with local White residents in neighborhoods experiencing racial change to allay fears and counter the "white flight" syndrome. The Commission will report its conclusions and recommendations to the Chief Elected Official by X date.

## Example 2

### Impediments

Jurisdiction Y is a southeastern city of 750,000, with a Black population of 100,000 and an Asian population of 25,000. The city's housing profile is 50 percent single family homeownership and 50 percent rental housing, the latter evenly divided between single family and multifamily dwellings. Jurisdiction Y's AI produced the following:

1.   A 6-month testing program, conducted as part of the city's AI by a private fair housing organization under contract with the city, documented both widespread discriminatory steering of minority homeseekers by real estate brokers and a high incidence of racially motivated false denials of housing availability and other discriminatory practices by local apartment owners and managers.

2.   There are significant numbers of abandoned and condemned housing units where large numbers of minorities reside, resulting in declining neighborhoods and a loss in commercial and employment opportunities.

3.   Most of the city's Section 8 certificate and voucher holders live in racially identifiable neighborhoods by either renting in-place or by renting elsewhere in their racially identifiable communities.

### Actions to Eliminate Impediments

In response to these impediments jurisdiction Y has taken the following actions:

1.   The City Council has enacted a fair housing ordinance, modeled on the Federal Fair Housing Act, established a City Commission on Human Rights (CCHR) to enforce the Act, and appropriated sufficient funds to staff the CCHR.

**Appendix 306**

2.  The City Council, by resolution, has further directed the CCHR to contract with one or more private fair housing groups for an ongoing real estate brokerage and apartment management testing program.

3.  The city has targeted the minority area for reinvestment activities such as rehabilitation and, as necessary, demolition of vacant housing and the construction of replacement housing.

4.  The city will offer economic incentives for housing developers/sponsors, businesses (for commercial and employment opportunities), bankers, and other interested entities that assist in the revitalization effort.

5.  The city also will utilize strategies that increase the housing choice for Section 8 certificate and voucher holders through mobility counseling and programs such as establishment of a metropolitan clearinghouse for public and assisted housing.

## Example 3

### *Impediments*

Jurisdiction Z is a major central city in the northeast, population 1.5 million, with a minority population of 600,000 (400,000 Black, 150,000 Hispanic, 50,000 other); 80 percent of the city's minority households are at or below the low-income level.

The jurisdiction's AI identified the following impediments to fair housing choice:

1.  The city's public housing projects are highly segregated, with three of four projects being 98 percent Black and Hispanic, and the fourth, an elderly project, 70 percent White.

2.  There is a consent decree settling a complaint alleging that the Public Housing Agency (PHA) was in violation of the Fair Housing Act and Title VI because of discriminatory tenant selection and assignment practices and unequal maintenance practices. The decree requires the PHA to take steps to integrate its projects, equalize the services provided to all projects, and demolish and replace 15 percent of its vacant units, presently uninhabitable.

3.  A review of HMDA data reveals that Blacks in the city are rejected for home mortgage and rehabilitation loans at twice the rate of Whites of similar income.

4.  A comprehensive review of police assignments and the delivery schedule of other city services documents that there are markedly fewer police patrols in neighborhoods with predominantly Black and Hispanic residents than in neighborhoods where the residents are White. Trash collections and city bus runs are 40 percent less frequent in these same minority neighborhoods.



## Actions to Eliminate Impediments

Jurisdiction Z has prioritized the following actions to eliminate the identified impediments:

1.  The city plans to rezone, by X date, several nonracially impacted neighborhoods in order to make possible the construction of scattered site public housing replacement units by the PHA.

2.  The City Comptroller will conduct X number of meetings with the leading banks in the city covered by the city's HMDA review; the city will present its HMDA analysis to the banks and encourage them to establish a "second look" procedure, adopt more flexible underwriting guidelines, and conduct X number of fair housing and sensitivity training hours for its staff.

3.  The Mayor has directed the Police Commissioner to reorganize, by X date, the patrol assignment schedule to increase police coverage in minority neighborhoods, and has increased the budgets by X amount for the Sanitation and Transportation Departments to provide for X number of additional trash collections and bus routes in those minority neighborhoods presently underserved.

# Example 4

## Impediments

Jurisdiction A is a small northeastern city that has very old housing stock. The city has a sizable elderly and/or disabled population. There is a tremendous demand for accessible housing from the elderly/disabled residents, but there is only a small number of accessible rental units in the city. There are even fewer single family homes that are accessible.

The AI identified the following impediment:

The city's lack of accessible multi-family and single-family units.

## Actions to Eliminate Impediments

Jurisdiction A plans to take the following actions to eliminate the impediments it identified:

1.  The city adopted an accessibility standard for making newly constructed multifamily dwellings accessible consistent with the accessibility requirements of the Fair Housing Act.

2.  The city also amended its zoning code to grant a "density bonus" to developers that build single family homes. This bonus would allow developers to build more single family homes per acre than permitted by the zoning code of the developer will make xx% of the homes "visitable." "Visitability" means that: 1)

**Appendix 308**

at least one entrance is at grade (no steps), approached by an accessible route; and 2} the entrance door and all interior doors on the first floor are at least 34 inches wide, offering 32 inches of clear passage space. The "visitablilty" concept recognizes that persons with disabilities should be able to enjoy the same privileges of accessibility to other homes outside of their own residence.

3.      The city established a Section 8 modification fund to assist disabled/elderly persons who possess Section 8 certificates or vouchers. The city in cooperation with the housing authority will provide a certificate/voucher holder a CDBG grant of up to $5,000 to make a unit accessible to meet his/her needs.



—NOTES—

**Appendix 310**

# Chapter 5
# Table of Contents

**5.1    INTRODUCTION** ................................................................................. 5-3
AFFH and Affordable Housing ............................................................. 5-4


**5.2    PUBLIC SECTOR** ............................................................................... 5-4
Zoning and Site Selection ..................................................................... 5-6
    Suggested Questions ........................................................................ 5-6
    Possible Actions to Be Taken by the Jurisdiction ............................ 5-8

Neighborhood Revitalization, Municipal and Other Services, and the
Employment-Housing-Transportation Linkage ..................................... 5-9
    Suggested Questions ...................................................................... 5-11
    Possible Action to Be Taken by the Jurisdiction ........................... 5-12

PHA and Other Assisted/Insured Housing Provider Tenant Selection
Procedures; Housing Choices for Certificate and Voucher Holders ....... 5-12
    Suggested Questions ...................................................................... 5-13
    Possible Actions to Be Taken by the Jurisdiction .......................... 5-16

Sale of Subsidized Housing and Possible Displacement ....................... 5-17
    Suggested Questions ...................................................................... 5-17
    Possible Action to Be Taken by the Jurisdiction ........................... 5-18

Property Tax Policies ........................................................................... 5-18
    Suggested Questions ...................................................................... 5-18
    Possible Action to Be Taken by the Jurisdiction ........................... 5-19

Planning and Zoning Boards ................................................................ 5-19
    Suggested Questions ...................................................................... 5-19
    Possible Action to Be Taken by the Jurisdiction ........................... 5-19

Building Codes (Accessibility) ............................................................ 5-19
    Suggested Questions ...................................................................... 5-19
    Possible Action to Be Taken by the Jurisdiction ........................... 5-20



**Appendix 311**

| | | |
|---|---|---|
| 5.3 | **PRIVATE SECTOR** | 5-20 |
| | Leading Policies and Practices | 5-20 |
| | Suggested Questions | 5-23 |
| | Possible Actions to Be Taken by the Jurisdiction | 5-27 |
| 5.4 | **PUBLIC AND PRIVATE SECTOR** | 5-28 |
| | Fair Housing Enforcement | 5-28 |
| | Suggested Questions | 5-28 |
| | Possible Actions to Be Taken by the Jurisdiction | 5-29 |
| | Information Programs | 5-29 |
| | Suggested Questions | 5-30 |
| | Possible Actions to Be Taken by the Jurisdiction | 5-31 |
| | Visitability in Housing | 5-31 |
| | Suggested Questions | 5-31 |
| | Possible Action to Be Taken by the  Jurisdiction | 5-32 |

**Appendix 312**

# Chapter 5:

## Detailed Discussion of AI Areas For Entitlement, State, and State-Funded Jurisdictions

### 5.1    Introduction

This chapter provides guidance to jurisdictions in deciding the scope and focus of their Analyses of Impediments to Fair Housing Choice (AIs).

NOTE:          *This Chapter is not intended to be prescriptive or required, but to provide suggested approaches to analyze the areas covered by Fair Housing Planning (FHP).*

The areas covered include:

■    What impediments, if any, to fair housing choice exist in the area under the jurisdiction's control

■    Whether an impediment has already been analyzed or is in need of initial or further analysis

■    Which impediments are more severe and their order of priority for analysis

■    What affirmatively further fair housing (AFFH) actions have been taken by the jurisdiction and which ones should be continued, strengthened, initiated, or ended.

NOTE:          *Chapter 3 contains the dual responsibility for States.  This chapter discusses obligations of Entitlement jurisdictions and may provide examples of activities that States may determine that State-funded jurisdictions can take as part of their obligations to AFFH.*

The discussion of specific areas under each of the major headings "Public Sector," "Private Sector," and "Public and Private Sector" is divided into three subsections:



Appendix 313

- A general discussion of the subject
- Suggested questions the jurisdiction can ask to determine current policies, procedures, and activities

- Actions by the jurisdiction: whenever the jurisdiction decides that a particular action would be appropriate, but is one for which an entity other than the jurisdiction itself has or should have responsibility, the jurisdiction should determine what steps it can take to support such action, including who, in the jurisdiction's governmental structure, should provide such support.

## AFFH and Affordable Housing

Clarification of the distinction between AFFH actions and affordable housing activities is often necessary. The two concepts are not equivalent but they are also not entirely separate. When a jurisdiction undertakes to build or rehabilitate housing for low- and moderate-income families, for example, this action is not in and of itself sufficient to affirmatively further fair housing. It may be providing an extremely useful service by increasing the supply of decent, safe, and sanitary affordable housing. Providing adequate housing and improving existing neighborhoods are vital functions and should always be encouraged.

Additionally, the provision of affordable housing is often important to minority families and to persons with disabilities because they are disproportionately represented among those that would benefit from low-cost housing. When steps are taken to assure that the housing is fully available to all residents of the community, regardless of race, color, national origin, gender, handicap, or familial status, those are the actions that affirmatively further fair housing.

## 5.2   PUBLIC SECTOR

This section focuses on possible actions or omissions in the public sector (including public housing, community development, transportation, and community services) that may affect housing choice. A determination should be made to see if any action or omission is influenced by public policies, practices, and procedures such as:

1. Building, occupancy, and health and safety codes that may affect the availability of housing for minorities, families with children, and persons with disabilities

2. Site selection for the construction of public (e.g., assisted) and private housing, such as those relevant to:

   – Zoning, housing lot sizes, number of persons per bedroom requirements, and other factors

   – Provision of essential municipal services

      &ndash;    Real estate property tax assessments affecting the cost of new construction

      &ndash;    Physical access, and location of housing for persons with disabilities

3. Comparative quality and array of municipal and State services across neighborhoods in local jurisdictions or among communities or regions across State jurisdictions (degree of equalization of services)

4. Demolition, displacement of residents and businesses, development of single and multifamily housing, and rehabilitation and revitalization of declining and deteriorated neighborhoods through private or public activities that impact on housing choice (such as policies that determine the future income mix of housing to be available)

5. Creation of job and training opportunities that affect, or can be affected by, the location of housing opportunities for lower-income families and persons, particularly minorities, persons with disabilities, and women.

6. Provision of public transportation services that can improve access to jobs, training opportunities, housing and community services for minority families, families with children, and persons with disabilities

7. Promotion of coordination and cooperation among jurisdictions in surrounding metropolitan or regional areas in planning and carrying out housing and housing-related activities

8. Interdepartmental cooperation, communication, and coordination in planning and executing housing, community development, community services, and transportation programs

9. Selection of members of official and other community planning and zoning boards and commissions

10. Public housing agency (PHA) and other housing assistance provider policies and procedures for:

      &ndash;    Selecting individuals and families to receive the benefits of Federal, State, or local publicly assisted housing programs that provide rental or ownership opportunities for lower-income persons and families

      &ndash;    Advertising rental vacancies to the public and establishing and maintaining waiting lists

      &ndash;    Assisting certificate and voucher holders to find suitable rental units throughout the jurisdiction.



**Appendix 315**

## Zoning and Site Selection

Local government policies that limit or exclude housing facilities for persons with disabilities or other housing for homeless people from certain residential areas may violate the provisions of the Fair Housing Act. This is because they may indirectly discriminate against persons with disabilities and minorities, many of whom are homeless. Building codes which require certain amenities or setbacks also affect the feasibility of providing low- and moderate-income housing development.

Even where zoning or other government policies are permissive, neighborhood residents often resist placement of certain types of housing in their area. The attitude of local government officials, public pronouncements of general policy, and careful planning and implementation of individual housing efforts by providers are key aspects for overcoming resistance of this kind.

Placement of new or rehabilitated housing for lower-income people is one of the most controversial issues communities face. If fair housing objectives are to be achieved, the goal must be to avoid high concentrations of low-income housing. Whether the persons to be served are families with children, persons with disabilities, homeless persons, or lower-income minorities, many communities feel strongly that housing for these persons should be provided but "not in my back yard" (NIMBY). This attitude seriously affects the availability of housing for people in these groups and is one of the most difficult challenges jurisdictions encounter in promoting fair housing objectives.

HUD has regulations governing the selection of sites for certain HUD-assisted housing programs. These regulations are flexible and express the goal previously stated. Jurisdictions should strive to meet the intent and spirit of these regulations in providing or approving sites for all of the low- and moderate-income housing developed in the community.

For jurisdictions located in metropolitan areas, serious consideration should be given to ways they can participate in cooperative, interjurisdictional planning for construction of assisted housing.

## *Suggested Questions*

- Are there concentrations of low- and moderate-income housing in one or more localities or neighborhoods within the jurisdiction's geographic area?

- Are current zoning and other policies and procedures promoting this pattern or exerting

a neutral effect on the existence of such concentrations?

■  Is the jurisdiction aware of and has it evaluated the management policies and procedures of assisted housing providers (those providing housing to persons with disabilities and homeless persons) to determine if problems exist that have led or could lead to general public, specific neighborhood, or other types of opposition to such housing?

■  Has the jurisdiction adopted policies and procedures that promote the placement of new or rehabilitated housing for lower-income households (including minorities, families with children, and persons with physical or other disabilities) in a wide spectrum of neighborhoods?

■  What is the impact of the jurisdiction's zoning ordinance(s), building codes, and other land use or fiscal policies on the provision of lower-income housing?

■  If there is vacant or other land that can be developed within the jurisdiction's geographic area, do zoning regulations permit medium- and high-density residential development for such land, or only low-density housing (and accompanying high cost)?

■  Do requirements for minimum street frontage, front yard setbacks, side yard dimensions, or amenities (e.g., landscaping or air conditioning), or for offsite improvements such as restrictions on the level of density that is possible for new housing development limit affordibility to higher-income households?

■  Do zoning requirements in one or more areas typically favor conventional single family homesite designs over cluster development?

■  Do zoning, subdivision, or occupancy ordinances or regulations define the term "family" narrowly so as to prevent unrelated individuals from sharing the same home?

■  Do zoning, subdivision, or occupancy regulations include provisions that permit housing facilities for persons with disabilities in a wide array of locations to prevent their concentration?

■  Should zoning, occupancy or building ordinances, or codes or regulations be changed to provide for more inclusive development of housing for lower-income people and families, including persons with disabilities?

■  Should the jurisdiction adopt incentives to promote mixed-income housing development, such as increasing the number of new units that can be built in a given development in exchange for dedication of a certain percent of the units for low-



and moderate-income households?

■   Should the jurisdiction use a transfer tax on the sale of property, or establish another dedicated revenue source or sources tied to development of higher-income housing or commercial property to raise funds for lower-income housing construction or rehabilitation?

■   Are there court decisions or settlements that affect the jurisdiction's zoning, building, occupancy, or other policies and regulations relating to the provision of housing for lower-income households and persons with disabilities?

■   What is the result of these decisions or settlements, and has the jurisdiction met all legal requirements?

■   If entities such as the PHA or other assisted, HUD-insured, or private-market housing providers are subject to one or more court decisions or settlements relating to housing site selection, have they met the legal requirements of these decisions or settlements?

■   Does the jurisdiction participate in a metropolitan or regional council of governments, planning commission(s), or other intergovernmental organizations?

■   Do these organizations focus on housing and housing-related issues and problems from a metropolitan or regional perspective?

■   Can the jurisdiction participate with other governments in the metropolitan or regional area through one or more of these organizations, or a different organizational structure, to design and implement a metrowide or regionwide FHP process?

## Possible Actions to Be Taken by the Jurisdiction

■   Consider specific changes that should be made in zoning or building occupancy ordinances or regulations to foster inclusion of lower-income housing, including housing accessible to persons with disabilities and families with children in developments intended for households with higher incomes.

■   Consider specific changes that should be made in policies and procedures, other than those relating to zoning and building occupancy, to promote greater variation in the location of lower-income housing in neighborhoods.

**Appendix 318**

# Neighborhood Revitalization, Municipal and Other Services, and the Employment-Housing-Transportation Linkage

One aspect of fair housing choice is neighborhood revitalization and the provision of good services to areas in which low- and moderate-income families live. Blacks, Hispanics, other urban minorities and persons with disabilities who are most concentrated in such neighborhoods—will benefit from better neighborhood environments so critical to good housing.

Frequently, the quality or extent of public services and facilities varies dramatically among residential neighborhoods. Public services and facilities include schools, recreational facilities and programs, social service programs, parks, roads, transportation, street lighting, trash collection, street cleaning, crime prevention, and police protection activities. Lower-income, densely populated residential areas too often lack the level and array of services that are provided in less impacted, more affluent neighborhoods. Jurisdictions should strive to equalize services as part of FHP.

To encourage a greater racial/ethnic and economic mix of residents in lower-income neighborhoods, jurisdictions might design a strategy that combines a magnet school program with enhanced services and facilities in neighborhoods surrounding magnet schools. This would attract a wide variety of families as renters and owners of vacant and available housing in these areas. As an adjunct to this strategy, or as a separate effort, a jurisdiction might work with the local PHA to create magnet public housing developments to improve housing and neighborhood conditions for current residents and attract a greater mix of tenants to fill vacant units. Jurisdictions should also strive to secure good services and facilities in neighborhoods where economic development efforts for creating jobs and enhancing small business opportunities are under way. Better overall living environments buttress economic objectives.

HUD is currently working to design and implement broad-based initiatives in several parts of the country to end segregation in low-income public housing developments. One initiative aims to raise the level of conditions in and around public housing complexes where minority households reside to a level at least equivalent to other public housing in the area. One key way that PHAs obtain local jurisdiction cooperation and assistance in this effort is to enter into cooperative agreements.

These initiatives come in response to court decisions and are part of settlements to remedy discriminatory conditions. Nonetheless, other jurisdictions can look at these initiatives for ideas to incorporate in FHP actions.

Several universities in various cities have undertaken revitalization efforts in surrounding lower-income areas to reverse neighborhood decline. For such projects to be successful in promoting fair housing objectives, housing opportunities must be preserved for low- and moderate-income households that wish to remain in the area. Permanent displacement should be minimized. To the extent displacement occurs or current residents desire to relocate outside the area, housing opportunities should be made available in other viable neighborhoods, especially nonminority neighborhoods, in addition to whatever opportunities are available to those displaced within the



area. Those responsible for the project should involve neighborhood residents in the planning and implementation to ensure adequate representation of neighborhood residents and business interests.

Initiatives to revitalize neighborhoods are severely constrained by the unwillingness of many financial institutions to invest in declining and deteriorated neighborhoods. The presence or absence of sustained residential and commercial investment by banks and other financial institutions in low-income and minority neighborhoods is the most important factor in maintaining neighborhood vitality. Without investment in mortgage and home improvement loans, residential areas decline rapidly. Without investment in small and disadvantaged businesses, many neighborhood commercial enterprises cannot thrive.

The policies and actions of financial institutions are often rooted in attitudes about the profitability of investments in lower-income and minority neighborhoods—attitudes based more on lending traditions than on solid information about business prospects in such areas.

The Community Reinvestment Act of 1977 (CRA) is intended to counter these attitudes and the policies and practices that result from them by mandating affirmative lending actions by banks and other lending institutions. Jurisdictions can use their influence to make sure that a full array of banking services are established in convenient locations throughout neighborhoods that currently lack them. Lenders that have taken these steps have learned that good business opportunities await institutions that reach out to serve pent-up demand in these areas.

The Federal Government has taken steps to strengthen community reinvestment. In July 1993, President Clinton called for funding for community development banks and for CRA regulatory reforms. In September 1994, the President signed the Community Development Financial Institutions bill to create a mechanism for giving community development financial institutions over $300 million in grant funds. Bank regulatory agencies also issued a second set of proposed CRA regulatory reforms. Among the proposed provisions are several that will require reporting on lending activities by race and gender of loan recipients (e.g., loans to small businesses). Jurisdictions can use this information in analyzing impediments to fair housing and assessing accomplishments of institutions subject to CRA reporting and performance standards.

While policies and programs to promote better living conditions in lower-income, minority neighborhoods is a significant part of a comprehensive approach to furthering fair housing for lower-income minorities, jurisdictions should not focus solely on linking such efforts. Jurisdictions should extend efforts to provide lower-income housing opportunities for minorities, families with children, and persons with disabilities to nonminority and more economically advantaged neighborhoods. This aspect of FHP will always be more effective in metropolitan areas if metropolitan jurisdictions work together to design and carry out actions.

Linking strategies to expand lower-income housing opportunities in nontraditional areas with activities to create new or expanded job opportunities not only helps lower-income families, but may help control local labor shortages. Many suburban localities experience labor shortages in

the kinds of entry-level and other jobs many low- and moderate-income persons need to become self-sufficient or to improve their economic status. By linking housing with employment, suburban communities can improve their local labor supply.

## Suggested Questions

■  Where are municipal and other services (transportation, social services, schools, health services, hospitals, banks, and other lending institutions) located in the jurisdiction?

■  Are such services equally distributed throughout the geographic area of the jurisdiction?

■  Does the jurisdiction obtain reports from banks and other financial institutions showing their investments in lower-income neighborhoods? Do these data indicate the location, race, and ethnicity of loan recipients?

■  What types of funding mechanisms and programs have been successful and why?

■  What can the jurisdiction learn from efforts in other communities, and what sources of information are available?

■  What efforts have been made by the government, businesses, and other entities in the jurisdiction and surrounding communities to link transportation and job creation initiatives with improved and more broadly distributed housing opportunities for lower-income persons and families at the metropolitan or other regional level? What are the results of these efforts?

■  Does the jurisdiction have a strategy to revitalize or enhance lower-income neighborhoods or communities that looks to all possible resources including private investment programs, such as those developed by banks and other financial institutions to meet the objectives of CRA? (For a detailed discussion of lending policies and procedures and ways in which jurisdictions can influence them, see the discussion on the Private Sector.)

■  If the jurisdiction has an established strategy, what are the results and what additional elements, if any, should be added to strengthen the strategy?

■  What financial resources (public, for-profit, and nonprofit) are available from sources inside and outside the jurisdiction to fund low- and moderate-income housing, community facilities and services, and small and disadvantaged business opportunities in neighborhoods in need of revitalization?



**Appendix 321**

■ Are accessible transportation services available in all areas or are those services restricted to a few areas, thus clustering persons with disabilities and limiting their housing choices?

## *Possible Action to Be Taken by the Jurisdiction*

■ Identify specific steps that will be taken to strengthen the fair housing aspect of community revitalization activities in poorer neighborhoods through equalizing services, revising displacement policies and procedures, initiating or strengthening agreements with banks and other lending institutions subject to CRA, creating job-housing and education-housing linkages in and outside such neighborhoods, or other appropriate actions.

## PHA and Other Assisted/Insured Housing Provider Tenant Selection Procedures; Housing Choices for Certificate and Voucher Holders

HUD is undertaking several initiatives to change the manner in which the public housing and Section 8 certificate and voucher programs have operated in providing housing choices to minority homeseekers. One such initiative is the metrowide or regional FHP. Jurisdictions that participate will work together to establish a centralized, consolidated applicant database through which applicants will be selected to receive housing assistance in all of the assisted housing programs in the metropolitan area. The process is intended to provide an expanded selection of offers to persons eligible for housing assistance while at the same time allow them to select an opportunity through the program for which they have expressed a preference (for example, the Section 8 existing housing or voucher programs, public housing, or project-based Section 8 programs).

Jurisdictions are encouraged to establish a nonprofit clearinghouse mechanism to administer the process. The clearinghouse would provide counseling and other services, if possible, to encourage participants to look for and select housing in a wide variety of locations, including those outside low-income and minority areas.

HUD encourages jurisdictions to build on initiatives arising out of proposed or final court orders or settlement agreements. One such initiative has been underway in the Chicago metropolitan area for a number of years. Several recent agreements anticipate the establishment of fair housing centers to serve as focal points for many or all of the activities related to promoting mobility and fair housing choice. These centers will be established in response to court-required mandates to end racial segregation, particularly in low-income public housing. However, their elements can be replicated in other areas.

HUD is also funding a demonstration project in Chicago to test one aspect of the metropolitanwide consolidated applicant database. In the Affirmative Fair Housing Marketing (AFHM) Reinvention Lab Project, the aim is to obtain participation of as many federally assisted and insured housing providers (both rental and sales) as possible in a unified and centrally administered affirmative marketing process. Providers that will be recruited to participate currently must develop and implement individual AFHM plans. Those providers participating in the AFHM Reinvention Lab Project will no longer have to do so.

**Appendix 322**

Additional information about these and other programs to foster mobility and broader housing choices for lower-income persons and families is provided in Volume 2, Chapter 7.

HUD also encourages jurisdictions to adopt initiatives that will expand housing choices for persons with disabilities so that persons with disabilities will have the same ranges of housing choices as persons without disabilities. There are a number of initiatives that jurisdictions may adopt to expand housing choice for persons with disabilities. For example, some jurisdictions have set up 3-way partnership programs that involve the PHA and the private landlords that participate in the PHA's Section 8 Certificate and Voucher program, and the state or local department that administers the CDBG, to provide funds for the removal of architectural barriers in the housing projects operated by the private landlords that participate in the Section 8 certificate/voucher program to make these projects accessible to people with disabilities.

HUD urges metropolitan jurisdictions cooperating in FHP to consider all alternatives that could strengthen metrowide mobility for lower-income households.

## *Suggested Questions*

- What are the application and tenant selection and assignment policies of assisted housing providers (including PHAs)?

- Is there a pattern in one or more assisted housing developments of concentration of tenants by race or ethnicity?

- Do the tenant selection policies and procedures of HUD-assisted multifamily housing providers, including PHAs, exclude—or limit the participation of—persons with disabilities in housing developments they manage?

- If the answer to either of the two preceding questions is yes, how do these policies and procedures specifically affect the manner in which applications for housing are treated and applicants rejected or selected as tenants?

- Are the policies and procedures consistent with the requirements of Federal, State, and local law and HUD regulations and guidance?

- If a HUD-assisted (including PHAs) or HUD-insured housing provider has been found in noncompliance with one or more civil rights laws or regulations, has the provider initiated appropriate corrective actions?

- Are there any court suits involving the tenant application, selection, and assignment policies and procedures of any of these providers?

- If court orders relate to any of these policies or practices, what is the status of



actions to comply with the orders, and what are the results?

■   If there are concentrations of racial or ethnic groups in one or more public housing developments, has the PHA undertaken any efforts designed specifically to desegregate these developments, such as make changes to its tenant selection and assignment plan (TSAP)?

■   If there are racial or ethnic concentrations does PHA policy permit applicants or transfers to state a preference for one or more projects or developments?

■   Does PHA policy permit applicants to reject several unit offers without losing their place on the waiting list? What are the bases for rejecting an offer of a public housing unit? Are they narrowly construed, or so broad that an applicant could easily reject a unit in a project in which his or her race does not predominate?

■   What is the pattern, by location and family type, of minority and nonminority certificate and voucher holders who rent units under the Section 8 certificate and voucher housing assistance program?

■   Are minorities located primarily in minority neighborhoods and Whites in predominantly White neighborhoods regardless of family type (large, small, or elderly family)?

■   If the answer to the previous question is yes, what specific steps does the local PHA take to promote housing choices for certificate and voucher holders?

■   Are certificate and voucher holders using the certificates and vouchers they receive from the local PHA outside its geographic jurisdiction?

■   Are Section 8 certificates and vouchers transportable across PHA and other administering agency boundaries? Does the PHA (or other agency) that administers these programs in the jurisdiction's area actively promote mobility through cooperative efforts with other agencies in the metropolitan area or region? What are the results of these efforts?

■   Does the jurisdiction actively support any of the efforts enumerated above?

■   If so, in what ways? Do they include cooperative efforts with surrounding jurisdictions?

■   Do the policies and procedures of the PHA or other administering agency in the grantee's jurisdiction, or PHAs or agencies administering one or more assisted housing programs in neighboring jurisdictions, discourage or reject applications from lower-income households that do not reside in their jurisdiction by imposing

residency or other local preferences?

■ Does the PHA assist certificate or voucher holders who have received their certificates or vouchers from PHAs in other jurisdictions? In what ways?

■ Does the PHA assist certificate or voucher holders who are persons with disabilities? (HUD regulations implementing Section 504 of the Rehabilitation Act of 1973 at 24 CFR 8.28(a)(3) require PHAs to assist persons with disabilities in locating available accessible dwelling units.)

■ Does the PHA help all certificate and voucher holders find suitable housing?

■ Does this help include providing up-to-date information—to minority homeseekers in particular—about the various facilities and services that are available in all neighborhoods in which housing suitable to the needs of certificate or voucher holders is available? (Facilities and services include schools, day care, health and welfare and other social service agencies, employment centers, and public transportation.)

■ Does the PHA encourage certificate and voucher holders, particularly minorities, to look for housing in neighborhoods that are not traditional residential areas for the holder in question?

■ Does the PHA assist the search process in any other ways, such as:

   – Calling to confirm the availability of units located in nontraditional neighborhoods?

   – Helping with transportation costs or providing transportation service for those interested in housing in nontraditional neighborhoods?

   – Providing a master list of the names and addresses, number of units, and other data on multifamily developments in a metropolitan or other regional area that makes units available to Section 8 participants?

   – Providing clear information to all participants concerning their housing rights and the steps they should take, including requesting assistance from the PHA in the housing search, if they believe they have encountered housing discrimination?

■ Has the jurisdiction evaluated the performance of the agency that administers the Section 8 certificate and voucher programs in its area to determine what results have been achieved under the equal housing opportunity component of the Administrative Plan?

■ What steps does the PHA take to promote the availability of accessible housing resources suitable for Section 8 participant families in which one or more persons



**Appendix 325**

are mobility impaired?

■   What steps does the PHA take to help certificate or voucher holders with other types of disabilities find housing and to promote housing choice for such persons?

■   What are the PHA and other assisted/insured housing provider policies for admitting persons with mental or other nonphysical disabilities? Are these persons restricted to certain projects? Are the policies consistent with HUD guidance and requirements? Does the jurisdiction actively support these steps? In what ways?

■   Has the PHA in the jurisdiction completed its Section 504 (of the Rehabilitation Act of 1973) assessments of need for housing or other assistance among households with members who are disabled and the plans for meeting these needs?

■   Has the jurisdiction completed its self-evaluation consistent with Section 504 of the Rehabilitation Act of 1973?

■   Has the PHA or HUD assisted housing provider completed a self-evaluation of its policies, procedures and practices to determine whether they may adversely impact persons with disabilities during the application or tenanting process? If so, has the recipient corrected all identified deficiencies, pursuant to 24 CFR 8.51?

■   Has the PHA conducted a needs assessment to identify need for accessible units and does it have a transition plan to assure access?

■   Have HUD-assisted housing providers reviewed their housing program as required by Section 504 and has it carried out the steps in its transition plan to assure full accessibility of the program?

■   What steps has the PHA taken to assure that persons with disabilities have access to the same range of housing choices and types as are offered to persons without disabilities?

■   What steps has the PHA taken to identify funding resources and develop programs, in partnership with other public or private agencies and with private landlords participating in the Section 8 certificate and voucher program, to provide funds and incentives for making privately-owned housing units accessible to persons with disabilities?

■   Has the PHA implements policies and procedures for assuring that Fair Market Rents are adjusted, as permitted by HUD regulations, to allow persons with disabilities to use certificates and vouchers in order to rent accessible, private sector housing units?

## *Possible Actions to Be Taken by the Jurisdiction*

- In light of the jurisdiction's analysis of applicant and tenanting practices in HUD-assisted and -insured housing developments, consider instituting changes to promote more inclusive tenancy patterns. For example:

  - Limit the application of residency or other local preferences in order to provide greater opportunity to nonresident applicants

  - Change low income public housing program TSAP policies and procedures to eliminate project preferences; restrict the bases for rejecting unit offers

  - Encourage the PHA to undertake efforts to desegregate its housing programs, for example, by consolidating public housing and Section 8 waiting lists

  - Revise policies relating to persons with disabilities to make them fully consistent with HUD/civil rights requirements

- Regularly monitor tenant characteristics data for the HUD-assisted and -insured housing developments as one means of evaluating marketing policies, procedures, and practices

- Provide support to the PHA in their desegregation efforts

- Encourage the PHA to utilize scattered-site, low-density housing acquisition as a means to deconcentrate racially impacted public housing.

## Sale of Subsidized Housing and Possible Displacement

In the sale of subsidized housing, the objective should be to preserve lower-income housing opportunities to the maximum extent feasible. However, if any displacement of current minority or disabled low-income families occurs, the objective then should be to provide other housing opportunities to displaced households by giving them a real choice to relocate inside and outside minority neighborhoods or in buildings that are predominantly occupied by minorities or persons with disabilities. Because a relocation plan often places sole reliance on the provision of certificates or vouchers to displaced households, a good program to promote real choice in the use of certificates and vouchers is essential.

### *Suggested Questions*



**Appendix 327**

■ If PHA or other HUD-assisted or -insured housing providers (such as Section 8 housing owners) have sold or plan to sell housing projects, what policies and procedures are in place to provide alternative housing to displaced tenant households?

■ Are steps taken to ensure that such households are provided a varied choice of replacement housing, particularly to give minority displaced households an opportunity to select housing outside—not just inside—minority-concentrated areas?

■ Does the jurisdiction have a specific displacement policy? Are housing providers required to implement this policy when selling housing? (See Anti-displacement and Relocation Plan requirements in the Consolidated Plan Regulation at 24 CFR 91.255(a)(2)).

■ Are steps taken to ensure that persons with disabilities can choose housing in a wide variety of accessible locations?

### *Possible Action to Be Taken by the Jurisdiction*

■ Policies and procedures should be adopted or changed by the jurisdiction, PHA, or other entities to ensure that displaced tenants in HUD assisted and -insured housing will be provided opportunities to select replacement housing in a full range of neighborhoods.

## Property Tax Policies

Tax forgiveness, delay, or other tax relief policies can help lower-income homeowners keep their homes. Programs of this kind can be part of an overall, much larger strategy to promote fair housing because they help to preserve homeownership opportunities for groups like minority families and elderly homeowners who otherwise would have only rental options.

Tax relief can take the form of delayed payments. Property taxes become, in effect, a lien on the property to be paid at the time of sale or inheritance. Alternatively, interest-free payments can be spread over months, permitting smaller monthly payments for those who qualify. Jurisdictions can explore various options.

### *Suggested Questions*

■ Has the jurisdiction adopted property tax relief policies and provisions in its local (or State) tax codes?

■ If so, do these policies and provisions benefit lower-income homeowners, particularly minority households including children or persons with disabilities?

### *Possible Action to Be Taken by the Jurisdiction*

■ Consider initiating or broadening property tax relief provisions as a means of preserving lower-income homeownership opportunities, especially if such provisions would be beneficial to minority households, elderly households, or households with one or more members who are disabled.

## Planning and Zoning Boards

Jurisdictions should pay close attention to the importance of the relationship between the membership of planning and zoning boards and the decisions they make regarding neighborhood revitalization activities and lower-income housing site selection. Diversity in representation of citizens in the community, including lower-income racial and ethnic groups, gender categories, persons with disabilities, and families with children should be a basic element of a jurisdiction's efforts to AFFH.

### *Suggested Questions*

■ What is the makeup of local planning and zoning boards by race, ethnicity, gender, disability, and familial status?

■ If membership is not representative of the various classes of citizens specifically protected by Federal, State, and local fair housing laws, what policies and procedures operate in the jurisdiction to select such membership?

### *Possible Action to Be Taken by the Jurisdiction*

■ Policies and procedures for selecting persons to serve as members on planning and zoning boards should be changed, if needed, in order to provide for an overall membership that is representative of all segments of the community.

## Building Codes (Accessibility)

Jurisdictions should include in their AI a review of the State and local building codes to determine if they have incorporated accessibility requirements of Section 504, the Fair Housing Act, Title II of the Americans with Disabilities Act, etc. for both multifamily and single family housing.



### Suggested Questions

■ Has the jurisdiction adopted a State or local building code that has incorporated the accessibility provisions of the most recent edition of the American National Standards Institute A117.1 and Usable Building and Facilities or one of the three model building codes (current edition)?

### Possible Action to Be Taken by the Jurisdiction

■ Consider taking steps to adopt a model building code (for example, The Standard Building Code, 1997 Edition, published by Southern Building Code Conference International) current edition, which has incorporated requirements for accessible design in residential housing and public facilities.

## 5.3   PRIVATE SECTOR

Under the broad term "private sector" are many specific aspects of the jurisdiction's housing market that should be examined to determine whether fair housing objectives are being served. The following housing market issues and activities are included under this heading:

1. Banking and insurance policies and practices pertaining to the financing, sale, purchase, rehabilitation, and rental of housing that may affect the achievement of fair housing choice

2. The sale and rental of housing and real estate practices such as blockbusting, deed restrictions, trust or lease provisions, conversions of apartments to all-adult occupancy, inaccessible design, or management firm "occupancy quotas"

3. Availability of programs that may be used to provide financial assistance to modify privately owned housing to make it accessible to persons with disabilities and their families and dissemination of information about such programs

4. The discriminatory provision of housing brokerage services.

Government policies and procedures that regulate, monitor, or otherwise impact rental, sales, and property insurance practices can play a significant role in promoting fair housing choice. Jurisdictions should seriously consider reviewing their current policies and procedures in light of private sector practices to determine what, if any, changes might be made to strengthen their role where private sector practices appear to discriminate or otherwise contribute to restricted housing choice.

## Lending Policies and Practices

**Appendix 330**

Until very recently, mortgage lending and real estate appraisal policies and practices were openly discriminatory. Decisions as to property values, lending criteria, and related factors frequently rested on the race or ethnicity of the applicant and the racial or ethnic identity of the neighborhood in which the subject property was located. Lending policies and practices also treated applicants differently based on gender. Because of the close relationship between mortgage lending and appraisal activities, the policies and practices in one area significantly impact those in the other area.

Appraisal and lending criteria that look at age, size, or minimum value of a dwelling in light of "stability" factors—such as whether the neighborhood is homogeneous or changing culturally or socially—may be more recent iterations of previous policies and criteria that referred openly to neighborhood stability or change in terms of racial characteristics. Intentional or inadvertent discrimination may result from the application of these criteria or from a variety of other factors, some of which may be very difficult or impossible to detect in a fair housing review by a regulatory or other agency.

Lending policies and requirements related to credit history, current credit rating, employment history, and general character of applicants permit lenders to use a great deal of discretion and in the process deny loans even though the prospective borrower would have been an acceptable risk. In October 1992, the Federal Reserve Bank of Boston released a study of 131 Boston area lenders that shows that the subjectivity built into the loan process is a principal cause of discrimination in lending. The study is based on the review of 3,062 loan applications. The study concluded that, after controlling for all objective indicators of applicant risk, lenders still rejected members of minority groups 56 percent more often than otherwise identical Whites.[1] For Whites, "compensating factors" are considered that result in loan approval at a much higher rate than for Blacks or Hispanics.

Studies such as this clearly point to the need for affirmative action by lenders themselves to look at their policies and practices and change the manner in which judgments are made by every person who plays a role in the lending process.

Lenders may apply different terms for different applicants or for dwellings in different neighborhoods. Frequently, the terms offered to Blacks or other minority borrowers have been less favorable than those offered to nonminority borrowers. Often, however, the less favorable terms have been the only ones available in the neighborhoods in which the minority borrowers reside, or in which the dwellings they plan to purchase are located. These most often have been minority neighborhoods. Often also, the limited lending options available in such neighborhoods have been offered by lenders who operate only in such areas.

Because some banks or savings and loan institutions in cities will not make loans in minority neighborhoods, minority borrowers cannot benefit from competitive loan offerings available in the larger market.



---

[1] Carr, James H. and Megbolugbe, Issac F. *The Federal Reserve Bank of Boston Study on Mortgage Lending Revisited.* Fannie Mae Office of Research; February, 1994, p. v. See the Appendix for further discussion of the Fannie Mae study, which confirms the findings of the Boston Federal Reserve Bank report and addresses the criticism voiced by some against that report

**Appendix 331**

Prescreening processes that are not documented by a written record are another means by which lenders may treat loan applicants differently. Those not passing the prescreening "test" will not appear in lender files as applicants because no application would be filed.

Because bias—including the bias of wanting to do business only with the type of clientele the bank or other lending institution has traditionally served and knows—is so ingrained in the perceptions about "acceptable" locations, properties, and borrowers, lenders and appraisers should take affirmative steps to:

■ Review every standard, criterion, and policy

■ Rewrite those standards, criteria, and policies that appear to be carryovers from openly race-based appraisal and lending practices

■ Train all staff responsible for lending and appraisal activities

■ Monitor implementation of the new policies and criteria to assure that personal biases do not distort the intended effect of the new standards, however inadvertent that effect might be.

The results of HUD's Housing Discrimination Study (HDS) conducted in 1989 describe the treatment of Black and Hispanic homeseekers qualified to buy or rent the average housing unit advertised in a major metropolitan newspaper. HDS audits focus on the marketing stage of a housing market transaction and do not observe unfavorable treatment in mortgage transactions or decisions to accept a potential tenant's application.[2]

The audits providing the data for HDS occurred in 25 metropolitan areas in the United States. A list of these areas and the names of all HDS reports can be found in the Additional Resources section of this Guide. HUD encourages all jurisdictions, and particularly those in the 25 areas audited, to use HDS as an important resource of information on discrimination in housing. The conclusions in this study can provide valuable information on impediments that exist to fair housing at the point when they determine what rental and sales housing is available in the market.

Because real estate brokers are often the first and most important contact with the potential homebuyer, the services they provide are critical in advancing, restricting, or denying fair housing choice. The broker is in a position to influence buyer considerations about the type and location of housing the buyer may find desirable, as well as provide key information about financing alternatives. Few communities have eliminated all kinds of broker practices that either are intended to restrict fair housing choice or have this effect. Thus this is an area in need of careful examination.

Multifamily housing complexes currently restricted to or planned specifically for adult-only occupancy may not be in compliance with the requirements of the Fair Housing Act. Jurisdictions should be aware of these requirements and the extent to which multifamily complexes in their

---

[2]U.S. Department of Housing and Urban Development. *Housing Discrimination Study, Incidence and Severity of Unfavorable Treatment.* October, 1991; p. xxi.

area that are covered by the requirements of this Act are conforming to HUD regulations.

Few jurisdictions require regular reports from housing providers on characteristics such as the race, ethnicity, familial or disability status of people who are interested in, apply for, or become tenants in multifamily rental complexes. However, these reports can be a significant means of furthering fair housing. They can deter discriminatory rental practices as well as indicate which housing providers might be audited to determine if discriminatory practices are occurring. Similar reports might be required of brokers and sellers of subdivision homes regarding prospective and actual homebuyers.

Finally, covenants recorded in deeds or placed in other documents which restrict purchase or occupancy on the basis of race, ethnicity, disability status, or families with children are illegal and unenforceable, except in the limited situations specified under the Fair Housing Act. Where a local jurisdiction continues to record deeds with racially restrictive covenants, it is subject to a finding that such an act is discriminatory. While such covenants are clearly unenforceable, they nonetheless should be purged from the files or a statement appended to each such deed indicating that any such covenant is clearly invalid.

## *Suggested Questions*

■   Is there evidence of discrimination in mortgage lending, property appraisal, home improvement loans or other housing-related policies, standards, and procedures used by lenders and appraisers in the jurisdiction or nearby jurisdictions?

■   What is the evidence and what specific types of problems does it indicate?

■   Has the jurisdiction reviewed lending and appraisal practices through formal surveys or informal means to address the following questions:

  --   Have lenders, appraisers, and private mortgage insurers operating in the jurisdiction examined their policies, procedures, and practices for possible differential treatment of applicants for home mortgage loans, home insurance, or home improvement loans based on race, ethnicity, gender, disability status, and families with children? (Many policies and practices may be carryovers from discriminatory antecedents that do not openly appear to be based on discriminatory intentions but nonetheless have a discriminatory effect.)

  --   Have lenders, appraisers, or private mortgage insurers removed old policies, standards, and procedures because of their association with discriminatory antecedents, and have they adopted new policies, procedures, and standards for loan origination and processing, assessing borrower credit-worthiness, appraising the value of the collateral (appraiser's responsibility) and



**Appendix 333**

selecting appraisers (lender's responsibility), underwriting decisions, and providing private mortgage insurance (private mortgage insurer's responsibility) and selecting a private mortgage insurer (lender's responsibility)?

– Are loan officers, other lending personnel, appraisers, and private insurer staff fully trained in how to apply the new policies and standards, and are they aware of the reasons they have been developed?

– Do lenders, appraisers, and private mortgage insurers regularly monitor the application of these new policies and standards to determine if they are followed as intended?

– Do lenders hire fee appraisers or refer customers to an approved list of appraisers and set clear requirements regarding the standards that are acceptable for appraisers to use? Do lenders do so for private mortgage insurers as well?

– Do lenders disclose the full appraisal report to the borrower or the determination made by the private mortgage insurer regarding the lender's request for insurance for the borrower?

– Do lenders use a prescreening process and, if so, document the results, place the documentation in the applicant's file, and make the document available to the applicant?

– Do lenders examine their conventional mortgage and home improvement loan profiles to determine whether there are neighborhoods that are underrepresented or not represented in these profiles?

– Do lenders use the population and housing characteristics data that is available from the Federal financial regulatory agencies and their own Home Mortgage Disclosure Act (HMDA) data to determine whether there are neighborhoods that are underrepresented or not represented in these profiles?[3]

– Do lenders compare the home improvement loan profile to the mortgage loan profile to determine if the former, which is usually a short-term consumer loan, is made more frequently to minorities in minority neighborhoods and to homeowners in mixed neighborhoods than mortgage loans?

– Are any lending institutions aggressively marketing the availability of mortgage and home improvement loans in minority neighborhoods and encouraging minorities to apply?

---

[3] 12 U.S.C.A. SS 2801-2809 (1980 Supp.).

**Appendix 334**

–    Do the lending institutions that market loans to minorities provide such loans in all areas of the community, or only in minority neighborhoods?

–    Are loans aggressively marketed to women and persons with disabilities?

■    Does the jurisdiction regularly monitor reports of financial institutions subject to HMDA?

■    If so, what are the results, and does the jurisdiction act upon this information in any specific way? For example, does the jurisdiction use this information as an incentive by depositing public funds in banks with the best performance records?

■    Has the jurisdiction asked for data from lenders or home insurance providers relative to home mortgage and improvement loans and home insurance on the race, color, religion, sex, disability status, and families with children status of applicants, approved borrowers and insurance policy holders, and rejected applicants?

■    Does the jurisdiction obtain information on the location of the properties that are the subject of approved and rejected home mortgage, home improvement, and commercial loan applications?

■    Has the jurisdiction developed and implemented any steps to foster conventional lending and other banking services in neighborhoods that appear to be underserved or to specific groups of citizens that appear to be underserved? If so, what are the results of these steps?

■    Is there evidence of racial steering or blockbusting by real estate brokers as indicated in fair housing complaints, audits, or other sources (such as press reports) originating in the jurisdiction or surrounding jurisdictions? If so, what steps has the jurisdiction taken to require corrective actions on the part of those conducting these practices?

■    In the absence of a willingness to take corrective action, if applicable, what sanctions has the jurisdiction taken, or could it take (such as restricting or withdrawing a license) against the people or agencies engaging in these practices?

■    Is there evidence of restrictive covenants, trusts, or lease provisions in use in the community that would exclude sale to or occupancy by a particular group of potential buyers or renters based on race, color, religion, sex, disability status, or familial status?

■    Are covenants that contain such restrictions recorded in deeds on file in the



jurisdiction's records office?

■   Is there any evidence from complaints, audits, or other sources that landlords of privately owned rental housing or their management agents are limiting occupancy in multifamily housing complexes through use of occupancy quotas or other practices to deny or restrict available housing to people based on race, color, religion, sex, disability status, or familial status?

■   Has the jurisdiction reviewed written rental and sales policies of real estate brokers and other members of the housing industry—such as large landlords or management companies—to determine whether they are consistent with applicable Federal, State, and local fair housing laws?

■   Have there recently been incidents of negative community attitudes resulting from moves by Blacks, Hispanics, or other minorities into White neighborhoods, or vice versa? To the establishment of housing facilities for persons with disabilities (in particular mental disabilities or persons in recovery from drug abuse) in certain areas?

■   Does the jurisdiction have a regular program to collect summary data from landlords and managers of rental housing on the racial, ethnic, gender, familial, and disability status of tenants and applicants for rental housing in the jurisdiction?

■   Does the jurisdiction use this information in connection with fair housing audits of rental housing, or to target review of rental and management policies of private landlords and managers and publicly assisted housing providers as a part of its fair housing enforcement or education and outreach efforts?

■   Have the real estate firms in the jurisdiction carefully examined their business relationships with mortgage lending institutions to assure that these institutions do not restrict their lending activities to certain areas of the community (such as neighborhoods in which minorities do not reside)?

■   Do lenders use statistical profiles and credit scores, when making loans without looking at the financial circumstances of the individual family?

■   Do the formal training and licensing requirements for real estate brokers that are applicable in the jurisdiction and surrounding jurisdictions include a requirement for demonstrated knowledge of all applicable fair housing laws?

■   Is there any evidence that minority brokers are excluded from participation in multiple listing services in the jurisdiction or surrounding jurisdictions?

■   Is there any evidence that minority participation in real estate brokers associations is excluded or restricted? Participation by persons with disabilities? Participation by women?

■ Is there evidence that real estate offices services are assigning sales personnel based on their race, ethnicity or disability and the racial or ethnic composition of neighborhoods in which they operate?

■ Are the opportunities for minorities, women, and persons with disabilities to become brokers available on the same basis as opportunities for Whites, males, and persons without a disability?

■ Are there specific programs to attract minorities, women, and persons with disabilities to careers as brokers and to provide training and other assistance for this purpose?

■ Are there boards of real estate brokers in the jurisdiction, or in nearby jurisdictions, that are signatory to a Voluntary Affirmative Marketing Agreement (VAMA) with HUD?

■ Is there an active Community Housing Resource Board (CHRB) or other fair housing organization in the jurisdiction that monitors this agreement? (Other housing industry elements such as builder, appraiser, and apartment owner associations may be signatory to similar agreements. These also may be monitored by a local CHRB or other fair housing organization.)

■ Does the jurisdiction support this monitoring activity financially or in other ways, including participating as a member of the organization or providing staff support services?

## *Possible Actions to Be Taken by the Jurisdiction*

■ Identify specific steps that the jurisdiction should take based on an examination of sales and rental practices including real estate broker practices such as adoption and dissemination of anti-redlining or anti-blockbusting policies, establishing reporting requirements for housing providers in the jurisdiction, establishing a stronger public education effort regarding the protection under fair housing laws, or other actions.

■ Identify steps that the jurisdiction should take to promote specific efforts to make brokerage services more inclusive and fully consistent with the requirements and objectives of fair housing laws.

■ Identify steps that the jurisdiction should take to promote cooperative efforts with other nearby communities to foster open and fair sale and rental practices and services on a metropolitan or other regionwide basis.



Appendix 337

- Identify specific actions that the jurisdiction should take regarding restrictive covenants, leases, or other restrictive provisions recorded in deeds or restrictions that seem to be enforced in single family housing developments, condominiums, or rental complexes.

- Identify specific actions that the jurisdiction should take to encourage the lending and appraisal industries to promote fair lending and appraisal self-monitoring programs, revisions to lending and appraisal policies, procedures and standards, and training of lending institution officers and staff.

- Identify steps that the jurisdiction should take to develop and implement conventional lending and banking services in neighborhoods that appear to be underserved or to specific groups of citizens, such as African Americans, Hispanics, Native Americans, persons with disabilities, or families with children.

- Identify specific actions that the jurisdiction should take to encourage insurance providers to promote fair home and commercial property insurance policies and procedures.

- Encourage lending institutions to negotiate Fair Lending-Best Practices Agreements with HUD.

## 5.4   PUBLIC AND PRIVATE SECTOR

### Fair Housing Enforcement

Effective fair housing enforcement lies at the heart of a comprehensive program to affirmatively further fair housing. The structure of this program varies among communities based on community size and resources. Chapter 7 contains enforcement program guidance to assist the jurisdiction in determining what the most suitable program is for the jurisdiction.

To assure good standing for HUD's Community Planning and Development (CPD) programs, the jurisdiction should address any and all concerns expressed by HUD in contract conditions that relate to fair housing and equal opportunity performance as required by the laws and regulations governing these programs. These concerns include any and all court decisions relating to fair housing and other civil rights laws to which the jurisdiction or the PHA is subject.

### *Suggested Questions*

- What is the structure of and process in the jurisdiction's fair housing enforcement program?

- Is it the most appropriate structure and process for the jurisdiction and does it conform fully to HUD requirements (i.e., enforce a substantially equivalent fair housing law)?

- Is the enforcement program efficient and effective in providing complainants and

**Appendix 338**

respondents with an objective and fair process for pursuing and settling housing complaints?

■ Does the jurisdiction require reports regarding fair housing complaints from the enforcement agency and use them in fair housing enforcement-related activities such as audits or Government-supported education and outreach activities?

■ Has a court determined that housing discrimination has occurred in any aspect of the jurisdiction's community development or housing programs, or the programs administered by PHA in the jurisdiction?

■ What have the CDBG grantee and subrecipients done to bring their programs into compliance with Section 504 of the Rehabilitation Act of 1973 as amended?

■ Has HUD made a finding of violations of the Fair Housing Act, Title VI, or Section 504, or regulations implementing these laws, in any federally funded housing or housing-related activities in the jurisdiction?

■ If so, has the jurisdiction designed and implemented appropriate actions to address the court determination or HUD finding?

■ Has the jurisdiction ensured that all appropriate officials and employees, including subgrantee and PHA officials and employees, are fully aware of the required actions and their responsibilities?

■ If HUD has placed contract conditions on grants or loans awarded to the jurisdiction, or denied funding because of evidence of a violation of one or more applicable civil rights laws, has the jurisdiction taken all the steps required to meet the stipulations in these contract conditions or to remove the basis for funding denial?

## Possible Actions to Be Taken by the Jurisdiction

■ Consider changing the structure or process for enforcing applicable fair housing laws in the jurisdiction, based on the results of the jurisdiction's enforcement program.

■ Undertake specific actions to address one or more court findings, contract conditions, or a funding denial because of housing-related civil rights violations or problems in the jurisdiction.



**Appendix 339**

## Information Programs

This section focuses on fair housing information programs for jurisdiction officials, employees, and citizens of the community. This Guide does not specifically highlight fair housing education and outreach activities in those sections that discuss impediments, but it frequently mentions such efforts in examples of actions to implement AI conclusions.

All jurisdictions, regardless of whether they have completed an AI, should be conducting education and outreach activities. FHP is not comprehensive if it fails to address the lack of knowledge in the general public and among Government and other community officials and leaders about actions constituting discriminatory behavior, fair housing laws, and fair housing objectives.

Nearly every community has these kinds of activities occurring in its geographic area. Chapter 7 contains an extensive description of education and outreach activities currently underway in a number of communities. The variety is very broad. However, jurisdictions should regularly assess the effectiveness of such activities in informing people of their rights and responsibilities and in reducing the kinds of prejudice and intolerance that lead to discriminatory actions. (See Chapter 7 for specific suggestions for teaching tolerance in school.)

Specific efforts to change the way programs have been administered are essential in situations where a determination of unlawful segregation or other housing discrimination is made by a court or where HUD makes a finding of noncompliance regarding assisted housing within a jurisdiction. These programs should describe clearly and completely each of the steps the jurisdiction and other affected administering agencies are undertaking to address the determination or finding. They should emphasize those actions that will entail revising or developing new policies and procedures in response to court or HUD requirements.

## *Suggested Questions*

- What specific types of activities have been undertaken by the jurisdiction, and other entities in the jurisdiction—such as a human relations commission and other fair housing organizations—to provide information to the general public, Government officials and staff, community leaders, and others regarding fair housing laws and objectives?

- Are these activities confined largely to National Fair Housing Month (April), or is there a comprehensive set of activities going on throughout the calendar year?

- How effective is each of these activities in increasing knowledge of the laws, reducing discriminatory behavior, or achieving other worthy results?

- Has the jurisdiction implemented specific fair housing information programs for officials and employees having duties that impact on fair housing such as developing zoning policies, planning assisted housing, and community and economic