THE STATE OF TEXAS

COUNTY OF DALLAS

BEFORE ME, the undersigned authority, a notary public in and for the State of Texas, on this day appeared MaryAnn M. Russ who is personally known to me, and who, after being duly sworn according to law, upon oath deposed and said:

My name is MaryAnn M. Russ. I am the President and Chief Executive Officer for The Housing Authority of the City of Dallas, Texas ("DHA") and reside in the State of Texas. I am competent to testify, and I have personal knowledge of all the matters stated herein, and they are true and correct.

DHA's mission is to provide quality, affordable housing to low-income families and individuals through the effective and efficient administration of housing assistance programs and to create and cultivate opportunities for program participants to achieve self-sufficiency and economic independence. DHA fulfills its mission of administering programs of the U.S. Department of Housing and Urban Development ("HUD") and partnering with a variety of organizations and entities that serve our applicants, residents and voucher clients.

DHA has met its responsibilities at issue in the Lawsuit. DHA's employees and Board of Commissioners have worked tirelessly over the years to ensure fair housing for residents of Dallas. Not only has DHA put in place internal measures to ensure it is accomplishing its obligations to prevent discrimination under the Civil Rights Act and to affirmatively further fair housing under the Fair Housing Act and related provisions, but DHA has also been under the watchful eye of a federal court since 1985, which has specifically involved additional policies, procedures, and practices that effectively and affirmatively furthered fair housing. The *Walker* desegregation case was brought as a class action by African-Americans against HUD, the City of Dallas and DHA in 1985. The litigation resulted in findings of liability against the City of Dallas, HUD and DHA, created many written opinions,[1] and established a pathway for the future of DHA's operations to affirmatively further fair housing in both its Public Housing developments and its Section 8/Housing Choice Voucher (HCV) Programs. The *Walker* case had many named defendants over the course of almost twenty years.[2]  In 2004, the

---

[1] *See, e.g., Walker v. HUD*, 734 F. Supp. 1231 (N.D. Tex. 1989), *Walker v. HUD*, 734 F. Supp. 1289 (N.D. Tex. 1989), *Walker v. HUD*, 912 F.2d 819 (5th Cir. 1990), *Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999)(providing that "DHA, HUD, and the City of Dallas no longer discriminate against black families in DHA's public housing programs, and -- by all accounts in the records -- all three defendants are active participants in crafting and implementing remedial measures to eliminate the vestiges of past discrimination").

[2] The City of Dallas was joined as a defendant to the lawsuit and a party to the original consent decree in 1989. HUD was dismissed from the lawsuit in 2001 upon agreement by HUD to provide a total of 3,205 Section 8 vouchers ("Walker Vouchers") to DHA to administer and for HUD to provide funding for the Walker Vouchers. HUD agreed to allow DHA to establish a payment standard amount up to 125% of Fair Market Rent for each Walker Voucher, to provide $4.8 million to DHA for mobility counseling, and to make



EXHIBIT

B

Northern District of Texas entered the Agreed Final Judgment, which requires DHA to complete several remaining items to remedy desegregation and affirmatively further fair housing, several of which are currently ongoing.[3]  The specifics of the Agreed Final Judgment are discussed in detail below.

Additionally, DHA has undergone numerous HUD reviews over the years specifically evaluating whether DHA is affirmatively furthering fair housing.  DHA has received **Acceptable Performance** ratings on numerous occasions, the most recent being September 30, 2010.  This review is discussed in more detail below.

### DHA's Relationship with the City of Dallas/Separate Legal Entities

In 1937, Congress passed the United States Housing Act that created the United States Housing Authority (present day HUD).  Under the Act, states were granted the power to authorize local housing authorities who could then receive funding directly from the Public Housing Administration (then an agency of the Department of the Interior, and, beginning in 1965, a department of HUD).  In 1937, the Texas Legislature passed enabling legislation that created housing authorities in all incorporated cities of Texas and allowed local municipalities to activate their public housing authorities by passing a resolution declaring a need for the housing authority to function.  This action gave the local authority to access the U.S. Housing Authority's funding. In 1938, the Dallas City Council authorized the creation of DHA to provide housing to low income persons, under the Act, and the Texas Housing Authorities Law, Chapter 392 of the Texas Local Government Code. As a result, DHA is considered a distinct entity; a "public body corporate and politic of the State of Texas," (Texas Local Government Code §392.011), created for the purpose of providing an adequate supply of housing for persons and families of low and moderate income. Moreover, under Section 392.006,  a housing authority is considered a separate unit of the government and "the functions of a housing authority are essential governmental functions and not proprietary functions. . ." § 392.006.

DHA and the City of Dallas are separate legal entities. *See City of Dallas 2010 Comprehensive Annual Financial Report*[4]  Under Section 392.031 of the Texas Housing Authorities Law, the Mayor appoints the commissioners of the local, municipal housing authority. A commissioner may not be an officer or an employee of the city. § 392.031. Five unpaid commissioners govern the DHA.  According to the City of Dallas, "the responsibility for the administration and operations of the Authority are vested solely in [DHA's] Board of Commissioners." *City of Dallas 2010 Comprehensive Annual Financial*

---

available $1.9 million for mobility counseling, and $1,000 per voucher for administrative fees to assist with payment of apartment lease application fees and related items. The City was dismissed from the litigation in 2003 on condition of not taking any actions to prohibit DHA from developing required units, paying different sums of money, providing crime statistics for DHA properties, and related obligations.

[3] A true and correct copy of the Agreed Final Judgment is attached hereto as Ex. 1.

[4] A complete copy of the *City of Dallas 2010 Comprehensive Annual Financial Report* can be found at http://www.dallascityhall.com/controller/financial_report.html.

*Report;*[4] see also § 392.051 ("powers of an authority are vested in the commissioners of the authority.") Indeed, DHA may take action by a vote of the majority of commissioners when a quorum is present and needs no approval from the City of Dallas. *See* § 392.036.

DHA receives no direct funding from the City of Dallas and instead administers federal funds received from HUD. According to DHA's 2011 Annual Plan,[5] all of DHA's funding comes from federal resources, rental income, and miscellaneous business activity fees and charges associated with the rentals. All of DHA's federal resources are from HUD. DHA is responsible for its own debts and deficits, and DHA's budget has no effect on the City of Dallas' financial statements, credit rating, or accounting. However, DHA does respond when requested by the City of Dallas to provide information so that the City may confirm that DHA's activities conform to the City's goals as stated in its Consolidated Plan.[6]

The County of Dallas administers its own independent housing agency, the Dallas County Housing Agency (DCHA), through the County's Department of Health and Human Services, which has no relationship with DHA or any of its programs. Section 392.014 of the Texas Housing Authorities Law provides the boundaries of a municipal housing authority such as DHA. Under that section, "the area of operation of a municipal housing authority is the municipality for which the authority is created and the area that is within five miles of the territorial boundaries of the municipality and is not within the territorial boundaries of another municipality." § 392.014. DHA receives no funding from Dallas County. Under the Housing Authorities Law, a county housing authority's territory is "the county in which the authority is created excluding the parts of the county that are within the territorial boundaries of a municipality." § 392.015. DHA is not required to and does not provide any reports to the County of Dallas.

## AFFH Certification Process

a.    **Process**

DHA's major submission to HUD is its Annual Plan and Updated 5 Year Plan ("Annual Plan"). DHA provides an annual certification with its Annual Plan certifying it "will carry out the public housing program of the agency in conformity with title VI of the Civil Rights Act of 1964, the Fair Housing Act, section 504 of the Rehabilitation Act of 1973, and title II of the Americans with Disabilities Act of 1990 and *will affirmatively further fair housing.*"[7] (emphasis added) This submission, required by the law, codified at 24 CFR part 203, includes a HUD checklist and includes, as attachments, all of DHA's policies:

---

[5] A true and correct copy of DHA's 2011 Annual Plan is attached hereto as Exhibit 10.

[6] Ex. 11 is a true and correct copy of an example of the type of typical request to DHA from the City of Dallas as it relates to its Annual Consolidate Action Plan as well as a sample certification that DHA's Annual Plan is consistent with The City of Dallas Consolidated Plan.

[7] See Ex. 12 for a true and correct copy of the Civil Rights Certification DHA attaches to its Annual Plan.

1)   Public Housing Admissions and Continued Occupancy Policy;

2)   Public Housing Utility Allowances;

3)   Public Housing Lease and Grievance Policy;

4)   DHA Pet Policy;

5)   HCV Program Administrative Plan;

6)   HCV Ethics and Integrity Plan;

7)   DHA Procurement Policy; and

8)   DHA's Capital Fund Plan.

The process for preparing the Annual Plan is for knowledgeable senior staff in relevant departments to prepare drafts of the various elements of the plan, circulate to all relevant staff for input, provide copies to all Resident Councils (composed of public housing tenants),  post at all properties, submit to the Resident Advisory Board in a series of meetings to discuss changes, post for public review at the DHA's offices, present to the Board in a public hearing, adopt changes accepted by the Board at a properly posted public meeting by resolution, submit to HUD for 75 day review period, and finally, implement.

The process to evaluate DHA's responsibility to affirmatively further fair housing involves critical examination of DHA's operating policies to ensure that they do not have the effect of limiting housing choices for any members of protected classes. Additionally, executive staff considers how they can modify program operations to improve housing choice and reach those least likely to be reached by conventional approaches.  This process typically focuses on the following:

a.   Developing or redeveloping housing in neighborhoods of lower racial or economic impaction or investing in existing neighborhoods of racial or economic impaction in a way that will improve those neighborhoods and the quality of life for the people who live there;

b.   Partnering with agencies and entities who offer services residents need to be safer, more comfortable, healthier and better educated.

c.   Establishing ways for DHA's programs to reach members of protected classes who are underserved.  The primary way this is accomplished is by establishing admissions preferences so that people in the greatest need will be served first.  This is particularly critical in a time of reduced Federal funding of low income housing programs;

d.   Educating local landlords about various programs through workshops and other communications and tracking these efforts; and

e.   Finally, DHA examines ways it can increase positive turnover in our programs to free up units and vouchers for applicant families.  DHA operates Family Self Sufficiency programs in both public housing and voucher programs to help motivated families to move beyond housing assistance.

DHA is not responsible for conducting a formal analysis of impediments ("AI") but does consider impediments to fair housing as it administers its programs, as further described below.

### b. DHA's Evaluation of Whether It Is Affirmatively Furthering Fair Housing (AFFH) and Meeting Obligations under Civil Rights Act

DHA believes its obligations, pursuant to affirmatively furthering fair housing and the Civil Rights Act, include the following:

To ensure that its program operations (in the broadest sense, from application through provision of assistance and program termination) have **no disparate impact** on applicants, participants or the public based upon anyone's membership in a protected class based on race, color, national origin, religion, disability or familial status;

To work to **increase housing opportunities** in neighborhoods with lower impaction by race, ethnicity and low income than the neighborhoods from which its applicants typically apply.[8] In the public housing program, this means looking for ways to develop or help others to develop units in underserved eligible neighborhoods. In the voucher program, this entails recruiting a wider number of landlords, helping voucher holders find units in neighborhoods with low impaction, and briefing families who are moving or who have just received vouchers so that they can maximize their families' life goals through participation;[9]

To **invest in the developments that DHA owns in impacted neighborhoods** to improve the sites, housing units and services available for the residents there;

To **ensure that persons with the full range of physical, mental and emotional impairments can participate** in every aspect of the programs DHA administers. This entails making physical changes to its offices, sites and dwelling unit structures, ensuring that it communicates with each person in a way intelligible to him/her, responding in a timely and thoughtful manner to requests for unit modifications and reasonable accommodations, and being open to requests resulting from every individual's disability-related needs;

To make sure that all our **public communications reach eligible people whose native languages are other than English**. To translate our documents for applicants and customers when the number of people whose English

---

[8] Attached as Ex. 2 is a true and correct summary of new construction and major rehabilitation since 1995.

[9] Attached as Ex. 3 is a true and correct summary chart setting forth some of DHA's extensive efforts to increase housing opportunities, including total number of landlord workshops completed and tally of any landlord who refused to lease to Section 8 clients.

proficiency is limited - when the number of eligible families in a language group is the lesser of 1000 persons or 10 percent of the target population in Dallas (in Dallas, 1000 persons is less than 10 percent of the eligible population);

To **modify any business practices which prove to be impediments to anyone's ability to communicate with us or use our programs**; and

To **comply with its development, monitoring, and reporting obligations under the *Walker* Agreed Final Judgment**.

While DHA regularly evaluates itself to ensure compliance with all requirements, it is also periodically reviewed by HUD and others.

### External Evaluations of DHA's Activities

Not only has DHA instituted internal mechanisms to ensure that it fulfils all of its obligations, but DHA has been under the watchful eye of the federal district court since 1985 to ensure DHA satisfies its obligations under the programs it administers and to affirmatively further fair housing. DHA's operations have also been favorably reviewed by the Office of Fair Housing and Equal Opportunity.

### a.   *Walker* Settlement

The *Walker* desegregation case established a pathway for the future of DHA's operations to affirmatively further fair housing in both its Public Housing development activities and its program operation. The Walker case had many named defendants over the course of almost twenty years, including HUD.  The Agreed Final Judgment entered in 2004 by the Northern District of Texas requires DHA to complete several remaining items to remedy desegregation and affirmatively further fair housing, which are currently ongoing, including the following:

1.   DHA shall complete the housing development at Roseland Homes (in "Northern sector" as defined by Relators);

2.   Issue, re-issue, and administer *Walker* Vouchers in Eligible Census Tracts (tracts approved by both Plaintiff's counsel and the Court) within its area of operation (the City of Dallas, any city located in whole or in part within Dallas County, the City of Plano, and the City of Red Oak) as well as in identified counties (Dallas, Tarrant, Denton, Collin, Kaufman, Rockwall, and Ellis);

3.   Use funds for mobility counseling to assist families in exploring housing opportunities in Eligible Census Tracts;

4.   Maintain 119 Project Based Section 8 units and 14 single family homes;

5.   Make good faith efforts to provide Inclusive Communities Project, Inc. ("ICP")[910] with access to its Section 8 briefings and waiting lists;

---

[10] ICP's website (http://www.inclusivecommunities.net) identifies the mission of the organization and the assistance they offer to integrate communities and further fair housing:

6.  Provide monthly reports to Plaintiffs' counsel, detailing specific information concerning the demographics of each household (race, census tract, move-in date, contract rent, Total Tenant Payment, utility allowance, landlord name, address), names of landlord unwilling to lease to HCV clients in Eligible Census Tracts, all Housing Assistance Payment ("HAP") contracts by census tract, list of potentially available units in complete jurisdiction and in Eligible Census Tracts, identify impediments;[11] and

7.  Provide an Annual Report to the Court by January 30 of each year to advise of the status of the outstanding and ongoing requirements.

Before the Agreed Final Judgment, critical and relevant remedial orders were entered affecting DHA (in February 1995) and affecting HUD (in April 1996). The 1995 remedial order affecting DHA details the requirements for DHA, including the following:

(1) to demolish at least 2,630 public housing units owned and operated by DHA in its West Dallas project,

(2) to develop 2,807 replacement units of the demolished West Dallas units through both new construction and Section 8 vouchers and certificates,

(3) to develop either through construction or acquisition, an additional 3,205 new units of public housing in predominantly white areas of metropolitan Dallas in which the poverty rate does not exceed 13%, and

(4) to develop all new public housing units in predominantly white areas until there are as many units in predominantly white areas as there are in minority areas.

DHA worked for years to develop units and increase fair housing opportunities for the Plaintiff class. For instance, the Section 8 Mobility Program was designed to educate landlords about the Section 8 program and to assist Section 8 participants in locating Section 8 housing in non-minority areas of Dallas. The program works to recruit landlords through various mechanisms, including (a) exceptions to HUD's fair market value rent caps on Section 8 vouchers, (b) child care and transportation services, and (c) specific information on crime rates, job training and employment opportunities, day care, medical facilities, neighborhood shopping, transportation, social services, objective indicators of school quality, and environmental hazards or other conditions

---

The Inclusive Communities Project (ICP) is a not-for-profit organization that works for the creation and maintenance of thriving racially and economically inclusive communities, expansion of fair and affordable housing opportunities for low income families, and redress for policies and practices that perpetuate the harmful effects of discrimination and segregation.

ICP envisions an America where equality is created and sustained in community through access to good schools, affordable housing, safe neighborhoods, and economic opportunity. ICP wants to be a resource to those who share that vision by providing information about where those opportunities exist in the North Texas area, where they don't, and why. We will work with individuals and families seeking to secure the benefits of such communities, unfettered by discrimination and prejudice. And we will advocate and promote polices and practices that are consistent with this mission of inclusiveness, fairness, community, and opportunity. Join us.

[11] See e.g., Ex. 4 attached hereto a true and correct copy of Voucher Implementation Plan.

inimical to family life. Notably, the Annual Report to the Court for the year ending December 2007 and filed on February 28, 2008 (attached as Exhibit 5) discusses the Voucher Implementation Plan agreed between the parties. The report identifies 10,611 units that were made available in predominantly white areas.

DHA has survived legal attack and ultimately prevailed in developing many of the units in two locations in what is now referred to as Eligible Census Tracts: Villas at Hillcrest and Frankfort Townhomes. With respect to Hillcrest, neighbors originally challenged the identification of property for the units as being unconstitutional. The Fifth Circuit found that the use of race in selection of the location was unconstitutional:

> Because there are promising, non-racially discriminatory ways to continue desegregating public housing in Dallas, the provision of the court's remedial order calling for the construction or acquisition of units of public housing in "predominantly white" areas is unconstitutional.

169 F.3d at 978. In 2001, the district court modified the vacated remedial order to remove all references to the race of residents in areas in which units could be developed. The only racial classifications it contained were those prohibiting DHA from discriminating against African-Americans in its housing policies. Subsequently, because it was determined that DHA would have picked the Hillcrest location even absent the "predominantly white area" requirement, DHA was found not to have improperly used race and 40 units were ultimately built in the "Northern sector" as defined by Relators. In fact, DHA worked with *Walker* plaintiffs' counsel to identify "Eligible Census Tracts" in its Settlement Voucher Implementation Plans such as the one approved on July 10, 2007 (a true and correct copy is attached as Ex. 6).

Frankfort Townhomes consists of 76 units located in the "Northern sector" as defined by Relators. After DHA purchased the property, numerous homeowners associations were formed for the primary purpose of challenging the creation of public housing units. Several of those organizations sued DHA to challenge the creation of the units. On October 10, 1995, Judge Buchmeyer entered an order approving the units, and they were completed in 1998.[12] The property now also includes a learning center, which houses a charter school available to tenant children.

### b.    HUD/FHEO Reviews

Representatives from the Fort Worth Regional Office of Fair Housing and Equal Opportunity ("FHEO") periodically conduct limited monitoring reviews of housing authorities. FHEO conducted such a review at DHA and collected civil rights related data and examined DHA's application and recording keeping procedures pertaining to DHA's Low Rent Public Housing and Section 8 Housing Choice Voucher Programs. FHEO staff reviewed several areas, including Outreach and Affirmatively Furthering Fair Housing (Handbooks 7465.1 Rev. 2 and 7420.10G and 24 C.F.R.960.103 (b) and 24 C.F.R. Part 982). A true and correct copy of FHEO's observations and conclusions contained in its letter of September 30, 2010 are being attached hereto as Ex. 8.

---

[12] A true and correct copy of Order Approving Public Housing Site is attached as Ex. 7.

DHA received a review of **Acceptable Performance**.  FHEO's observations highlighted the following as to outreach and AFFH:

> (a)     all outreach to potential participants in multiple languages as dictated by needs of local market;
>
> (b)     DHA's variety of methods to attract potential participants;
>
> (c)     DHA's outreach to social service providers that assist individuals with housing needs;
>
> (d)     Publication of its reopening of waiting list in multiple news outlets including a Spanish publication and Vietnamese publication;
>
> (e)     Mailing of waiting list announcement to Texas Housing Association
>
> (f)     Emailing announcement of opening of waiting list to other housing authorities that operate in proximity to DHA; and
>
> (g)     DHA's team of bilingual interpreters.

The section of the reporting which discussed DHA's Civil Rights compliance stated as follows:  *The DHA is operating under an Admissions and Occupancy Plan ("ACOP") that was approved in May, 2010.  The review found no indication that the DHA had failed to account for and document its compliance with its civil rights obligations.  DHA files that were reviewed reveal consistency of application of rules of procedures.*

DHA has gone above and beyond to ensure it is meeting its requirements under the Civil Rights Act and affirmatively furthering fair housing.

## Representations

Since DHA is a separate legal entity from the City of Dallas, its interaction with the City of Dallas is limited.   Annually, the City of Dallas calls on DHA to provide limited information for inclusion in the City of Dallas's Consolidated Plan.  DHA has not been asked to assist with the preparation of the Consolidated Plan or comment on any Analysis of Impediments prepared by the City of Dallas.

DHA sends the City of Dallas a true and correct copy of its Annual Plan each year.  The City of Dallas does not assist with the preparation of DHA's Annual Plan.

As DHA applies for various programs, the City of Dallas must provide a certification that the program being pursued is consistent with the City's  Consolidated Plan.

With regards to any representations regarding AFFH, the Civil Rights Act and relevant certifications, DHA has received positive reviews from HUD and/or FHEO that it is meeting its obligations under the Civil Rights Act and AFFH.  *See, e.g.* September 30, 2010 Letter attached as Ex. 8.

## AFFH and the Civil Rights Act

Since the inception of the Public Housing Agency Plan requirements in 2000 (required by HUD regulations at 24 CFR part 903), DHA has annually reviewed all of its demolition and development plans, programs and actions to insure compliance with its

obligations to affirmatively further fair housing and to identify any impediments that might keep DHA from reaching families in all protected classes who might be in need of housing. Through this analysis, DHA has changed many of its core business operations to reflect the needs of these families and individuals.

Examples of the changes are reflected in the policy documents that control the programs, such as the Section 8 Administration Plan (admission preferences for the individuals aging out of foster care and victims of domestic abuse, and taking applications online), the Pet Policy (which explicitly exempts assistance animals that serve persons with disabilities from the Pet rules), the Admission and Continued Occupancy Plan for Public Housing (admission preference for working families, admission preference for vulnerable homeless applicants and site based waiting lists) and Resident Lease and Grievance Procedure.

DHA's housing properties are now located in more desegregated neighborhoods and are internally more racially and ethnically mixed than they were in 2000.[13] During the period covered by the Lawsuit, DHA's efforts to affirmatively further fair housing and to provide desegregated housing opportunities is plainly having a positive effect.

DHA has, as required, considered impediments to fair housing choice, has analyzed what could be done to reduce or eliminate such impediments, and has taken action to expand and enhance housing choice by members of protected classes. The effectiveness of DHA's actions is observable in the increased numbers of people with disabilities and Hispanic/Latino and Asian families assisted in its programs.

In addition to the policy changes, DHA followed and fully complied with the orders of the Federal District Court in the *Walker* case to move families into areas of "non-impaction," as defined by the court, through the Section 8 program, the Public Housing program and the use of Section 8 Project Based Housing Choice Vouchers.

On page 2-11 of the HUD Planning Guide, it suggests that cities:

> Make public housing a path to social and economic mobility, rather than housing of last resort by targeting selected developments for modernization and for other improvements and facilities to make them attractive to current residents and to suburban residents; this also counterbalances concerns that only suburban housing opportunities are being offered.

During the period addressed by this action, DHA took the steps suggested by the cited paragraph, making significant investments in the physical facilities and partnering with providers of non-shelter services to expand the range and value of on-site service for residents.

---

[13] See Chart attached as Ex. 2

DHA has broad experience with the effect of attempting to develop public housing in neighborhoods with low racial concentrations. DHA has defended lawsuits by various Homeowner's Associations in Federal Court related to their opposition to the development of public housing. It took DHA five years to develop the Villas at Hillcrest and three years to develop the Frankfort Townhomes because of that community's resistance. The delay and expense of the lawsuits increased the cost of this development, but ultimately did not deter DHA in carrying out the requirements of the Walker Settlement Agreement.

DHA has worked in both its public housing and housing choice voucher programs to increase housing options for chronically homeless individuals, who are, by definition, persons with disabilities with a history of homelessness. DHA's actions in this regard have sparked resistance from a variety of individuals; nevertheless, DHA works to meet the need of the homeless.

From 2000 to the present, DHA has developed a significant number of new assisted housing units, has aided in the development of a number of other low income housing developments, and has complied with the Federal district court's requirements in *Walker*. A true and correct copy of supporting materials are at Ex. 2.

In addition, DHA has revised the policies governing admission to public housing and the voucher programs to target members of protected classes who have the greatest unmet housing needs. HUD eliminated the three required Federal preferences ((1) for people living in substandard housing, including the homeless, (2) for people displaced through no fault of their own; and (3) for people paying more than 50% of their monthly income for shelter and utilities) with the passage of the 1998 Quality Housing and Work Responsibility Act, but DHA retained the preferences for several years. Beginning in 2009, DHA developed new, Dallas-specific preferences to reach vulnerable homeless people, children aging out of foster care, formerly incarcerated persons, victims of domestic violence, and very low income working families.

All of DHA's waiting lists were closed from 2006 to 2011. DHA implemented an affirmative marketing program in 2009.

In partnership with the Metro Dallas Homeless Alliance and two ex-offender re-entry programs, DHA issued two Requests for Proposals for project-based vouchers to serve both homeless individuals and families with children and formerly incarcerated individuals and their families in Permanent Supportive Housing – a type of housing with "built-in" supportive services.

DHA implemented the Veteran's Administration Supportive Housing program, and is currently approved for 310 vouchers specifically for homeless veterans.

DHA had its significant documents translated into both Spanish and Vietnamese, in compliance with HUD's LEP rules.

DHA's impediment analysis is an ongoing process, rather than a one-time event. DHA not only looks at those it serves but also works to craft methods and strategies to reach all eligible families and individuals.

## Funds and Obligations

Attached hereto as Ex. 9 is a true and correct record of HUD funds received by DHA between 2000 and fall 2011. No "Public Housing assistance grants" were sought or received during that period or any earlier period. The majority of funding received by DHA is not grant funding. Rather it is contractual funding. HUD pays DHA to run programs to house low and extremely low income families and individuals. HUD's funding programs fall roughly into three categories: (1) Multi-Family Housing, (2) Community Planning and Development ("CPD") and (3) Public and Indian Housing ("PIH").

Multi-Family Housing provides FHA single family and multifamily funds and HUD's Section 8 New Construction, Substantial Rehabilitation, Property Disposition, Loan Management Set-Aside and other project based programs. DHA's four multifamily properties are funded through Housing.

CPD (Community Planning and Development) funds local governments - cities and counties - through the CDBG, HOME, HOPWA and other programs. DHA does not receive funds from CPD or from the City or County for these programs.

PIH funds public housing (operating funds and capital funds) and the housing choice voucher program. The two resident service grant programs for which DHA has successfully competed, the Resident Opportunity and Self Sufficiency ("ROSS") grant and the Family Self Sufficiency ("FSS") program are utilized in the public housing program and FSS is also used in the HCV program. In addition, DHA has competed successfully for the HOPE VI grants to revitalize severely distressed public housing developments. DHA was awarded two HOPE VI grants during the period that is the subject of the pending lawsuit (*United States ex rel. Curtis Lockey, et al. v. City of Dallas, et al.,* Civil Action No. 3-11-CV-354-O ECF, herein "Lawsuit") to fund Frazier and Turner developments. The ROSS and FSS grants are small and were limited to specific activities (and locations). The HOPE VI grant is always a neighborhood - specific, fund only for the revitalization of severely distressed public housing properties and must, by statute, include a Community Supportive Service component.

## Location

DHA chooses its locations for public housing by considering a variety of factors, including the following considerations:

> The Remedial Decree in *Walker* directed DHA's development of certain properties (and required HUD to fund the development);

> The *Walker* Agreed Final Judgment, which requires additional units at Roseland Homes;

> Beyond the requirements of *Walker*, DHA is constrained by normal development considerations – the cost and availability of land, zoning considerations and the attractiveness of sites for potential Low Income Housing Tax Credit (LIHTC); and

> Frazier HOPE VI and Turner HOPE VI -the two redevelopment transactions cited in the Lawsuit were required to be "severely distressed public housing developments." Turner Courts and Rhodes Terrace were, at the time DHA applied, the most distressed properties in DHA's portfolio.   One of the competitive factors HUD considered in deciding which applications to select for funding was the degree of distress of the properties.   None of DHA's properties in the Northern sector would have been qualified as "severely distressed."

DHA is not the agency with authority to issue or approve the award of credits under the LIHTC program, or the location of properties that receive those awards.   DHA has applied for and used the LIHTC program to develop housing both in the Northern sector and the Southern sector as defined by the Lawsuit.

It is also important, in considering where LIHTC housing is built, to look at the availability of affordable land, the scoring structure of the Qualified Allocation Plan of the Texas Department of Housing and Community Affairs (the agency that awards tax credits), as well as the IRS Code Sec. 42 Regulations that implemented the use of those credits.

DHA developed public and other assisted housing during the period that is the subject of this Lawsuit in both the Southern and Northern sectors of Dallas.  A true and correct list of development and redevelopment activities is attached hereto as Ex. 2.  All of DHA's developments complied with the requirements of the *Walker* Settlement and many developments were reviewed and pre-approved by the *Walker* plaintiffs' attorneys.

DHA maintains that it has carried out its public housing program in conformity with Title VI of the Civil Rights Act of 1964, the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990 and has

affirmatively furthered fair housing.     DHA further maintains that the claims in the Lawsuit as to DHA are unfounded.

### Relators Curtis Lockey and Craig MacKenzie

Neither Relator Curtis Lockey or Craig MacKenzie has ever been an employee of DHA or provided any services to DHA.  To DHA's knowledge, neither Curtis Lockey nor Craig MacKenzie has ever participated in a meeting of DHA's management team in which any of its procedures and plans for affirmatively furthering fair housing were discussed. DHA is not aware of any method or occasion when Curtis Lockey or Craig MacKenzie could have obtained private information about how DHA carries out its housing policies.

DHA is not aware of any relationship Curtis Lockey or Craig MacKenzie has with DHA.

Further, Affiant sayeth not."

MaryAnn M. Russ

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 19th day of March 2012.

Delbra K. Henderson