# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* CURTIS LOCKEY and CRAIG MACKENZIE | ) ) ) ) | |
| Relators, | ) ) | |
| v. | ) ) | Civil Action No. 3:11-cv-354-O |
| CITY OF DALLAS, TEXAS, *et al.* | ) ) | |
| Defendants. | ) ) | |

# RELATORS' CONSOLIDATED RESPONSE
# IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS [Docs. 26, 28 and 31]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION...............................................................................................................1

    I.   STATUTORY AND REGULATORY FRAMEWORK

        A.  The False Claims Act ...................................................................................2

        B.  The Obligation to Affirmatively Further Fair Housing..............................2

            1. Defendants' Obligations to Take Affirmative Efforts to End Segregation ...........2

            2. The Essential Components of the AFFH Certification ...........................................4

    II.  RELATORS ADEQUATELY ALLEGE THEIR FCA CLAIMS ...................................5

        A.  Standard of Review on Motions to Dismiss.................................................5

        B.  Relators Have Sufficiently Pled FCA Claims Against Defendants ...........................5

            1. Defendants Made False Statements and Engaged in Fraudulent Conduct.............6

            2. Defendants Acted "Knowingly"...........................................................................7

            3. Defendants' Actions Were "Material" ..................................................................8

        C.  Relators Have Satisfied the Rule 9(b) Pleading Standards .......................................9

        D.  The City's Remaining Arguments Should Be Rejected...........................................11

        E.  Relators Seek Only to Enforce Violations During the False Claims Period............14

        F.  The City is Liable for DHA's Violations .................................................................14

   III.  THE PUBLIC DISCLOSURE BAR DOES NOT APPLY...........................................15

        A.  Retroactivity of the 2010 Amendments to the FCA................................................15

        B.  The Public Disclosure Bar Does Not Apply to Relators' Claims ...........................17

            1. "Insider" Status is Irrelevant in the Public Disclosure Inquiry ...........................17

            2. The Public Disclosure Bar is Inapplicable Unless There is a Disclosure of "Allegations or Transactions" From Which Fraud is Apparent...........................18

3. Defendants Do Not Identify Any Publicly-Disclosed "Allegations or Transactions" ................................................................................................................ 20

4. Information Made Public By Relators ................................................................ 25

5. The Newly-Amended FCA Applies to Defendants' Conduct After July 22, 2010 ................................................................................................................ 25

C. Relators Are An Original Source ............................................................................ 26

1. Relators Have Independent Knowledge ............................................................. 27

2. Relators Have Direct Knowledge ....................................................................... 27

3. The Newly-Amended FCA Applies to Defendants' Conduct After July 22, 2010 ................................................................................................................ 30

CONCLUSION .................................................................................................................. 30

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Aetna Cas. & Sur. Co. v. Glidden Co.*, 283 S.W.2d 440 (Tex. Civ. App. 1955) ......................... 14

*Anderson v. City of Alpharetta*, 737 F.2d 1530 (11th Cir. 1984).................................... 3

*Belt v. EmCare, Inc.*, 444 F.3d 403 (5th Cir. 2006) ........................................ 8

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) ........................................ 3, 4

*Cooper v. BCBS of Fla., Inc.*, 19 F.3d 562 (11th Cir. 1994)................................. 28, 29

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*,
    339 F.3d 702 (8th Cir. 2003)....................................................... 3

*Fed. Recovery Servs. v. U.S.*, 72 F.3d 447 (5th Cir. 1995) ....................................... 18

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    130 S. Ct. 1396 (2010) ......................................................... 16

*Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996) ................................... 11

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997).............................. 17

*ICP v. TDHCA*, No. 3:08-cv-0546, 2008 WL 5191935 (N.D. Tex. Dec. 11, 2008).................... 22

*ICP v. TDHCA*, No. 3:08-cv-0546, 2012 WL 953696 (N.D. Tex. Mar. 20, 2012)................. 22, 26

*Kennard v. Comstock Res., Inc.*, 363 F.3d 1039 (10th Cir. 2004) ..................................17, 27-29

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................. 16

*Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002)........................ 3

*Medina County Env't Action Ass'n v. Surface Transp. Bd.*,
    602 F.3d 687 (5th Cir. 2010)........................................................ 8

*Miers v. Hous. Auth. Of City of Dallas*, 266 S.W.2d 487 (Tex. Civ. App. 1954)........................ 14

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
    276 F.3d 1032 (8th Cir. 2002)..................................................... 27

*N.A.A.C.P. v. Sec'y of HUD*, 817 F.2d 149 (1st Cir. 1987) .......................................... 3

*Otero v. New York City Hous. Auth.*, 484 F.2d 1122 (2d Cir. 1973) ............................. 3

*Shannon v. HUD*, 436 F.2d 809 (3d Cir. 1970) ............................................................. 3

*Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673 (5th Cir. 2007) ................................ 5, 14

*Thompson v. HUD*, 348 F. Supp. 2d 398 (D. Md. 2005) ................................................. 3

*U.S. ex rel. Anti-Discrimination Ctr. of Metro of New York, Inc. v. Westchester County*,
    495 F. Supp. 2d 375 (S.D.N.Y. 2007) ..................................................................... 3, 5, 12

*U.S. ex rel. Anti-Discrimination Ctr. of Metro of New York, Inc. v. Westchester County*,
    668 F. Supp. 2d 548 (S.D.N.Y. 2009) ..................................................................... *passim*

*U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866 (7th Cir. 2011) ........................................... 20, 22

*U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex. 2010) ........................... 10

*U.S. ex rel. Colquitt v. Abbott Labs.*, 3:06-cv-1760-M,
    2012 WL 1081453 (Mar. 30, 2012) ...................................................................... 6

*U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*,
    705 F. Supp. 2d 519 (N.D. Tex. 2010) ................................................................... 18

*U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*,
    778 F. Supp. 2d 37 (D.D.C. 2011) ....................................................................... 20, 22-23

*U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008) ................................... 11

*U.S. ex rel. Farmer v. City of Houston*, Civ. H-03-3713,
    2005 WL 1155111 (S.D. Tex. May 5, 2005) ............................................................. 28

*U.S. ex rel. Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439 (5th Cir. 2008) ................................ 18, 24, 27

*U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009) ....................................... *passim*

*U.S. ex rel. Heath v. Dallas/Fort Worth Intern. Airport Bd.*,
    No. 3:00-cv-0100-M, 2003 WL 1197483 (N.D. Tex. May 28, 2004) ................................... 26

*U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011) ...................................
........................................................................................................... *passim*

*U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*,
    336 F.3d 346 (5th Cir. 2003) ............................................................................. 24, 27, 29

*U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) ................................ 11, 18, 28, 29

*U.S. ex rel. Liotine v. CDW Gov't, Inc.*, No. 05-33-DRH,
    2009 WL 3156704 (S.D. Ill. Sept. 29, 2009) ........................................................... 26

*U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458 (5th Cir. 2009) ....................................................... 6, 8, 9

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir. 1999) ........................................................................................ 25

*U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49 (1st Cir. 2009) .................................. 24, 29

*U.S. ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509 (8th Cir. 1994) ........................................ 20, 23

*U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*,
    384 F.3d 168 (5th Cir. 2004) ................................................................................. 18, 24, 29

*U.S. ex rel. Smart v. Christus Health*, 626 F. Supp. 2d 647 (S.D. Tex. 2009) ...................... *passim*

*U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994)
.................................................................................................................................. *passim*

*U.S. ex rel. State of Wisconsin v. Dean*, 729 F.2d 1100 (1984) .................................................. 17

*U.S. ex rel. Steury v. Cardinal Health, Inc.* 625 F.3d 262 (5th Cir. 2010) .................................... 6

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
    125 F.3d 899 (5th Cir. 1997) ......................................................................................... 9

*United States v. Renda Marine, Inc.*, 667 F.3d 651 (5th Cir. 2012) ................................. 16, 18, 21

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ............................................................ 1, 14

*Walker v. HUD*, 734 F. Supp. 1289 (N.D. Tex. 1989) ............................................................. 21, 22

*Wilson v. Birnberg*, 667 F.3d 591 (5th Cir. 2012) ......................................................................... 5

Statutes and Regulations

24 C.F.R. § 91.225 ..................................................................................................... *passim*

24 C.F.R. § 570.601 ................................................................................................... *passim*

24 C.F.R. § 570.602 ........................................................................................................... 2

24 C.F.R. § 903.7 ......................................................................................................... 2, 4, 8

31 U.S.C. § 3729 ........................................................................................................ *passim*

31 U.S.C. § 3730 ................................................................................................. 15, 25, 26, 30

42 U.S.C. § 3608 .......................................................................................................... 2, 3, 7

42 U.S.C. § 5304 ........................................................................................................ *passim*

42 U.S.C. § 5311 ............................................................................................................. 13

42 U.S.C. § 12705 ............................................................................................................. 2

Pub. L. 111-148, § 10104(j)(2), 124 Stat. 901 ............................................................. 15

Rules

Fed. R. Civ. P. 9(b) ............................................................................................. 1, 9, 10, 11

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 17

Fed. R. Civ. P. 12(b)(6) ........................................................................................ *passim*

Fed. R. Evid. 201 ............................................................................................................ 10

Other Authorities

114 Cong. Rec. 2281 (1968) ........................................................................................... 3

S. Rep. 99-345, 1986 U.S.C.C.A.N. 5266 ...................................................................... 2

Tex. Atty. Gen. Op. DM-426, 1996 WL 737214 (Nov. 25, 1996) ............................... 14

Tex. Atty. Gen. Op. DM-71, 1991 WL 527492 (Dec. 31, 1991) ................................. 14

HUD, *Fair Housing Planning Guide* (1996) (available at
http://www.hud.gov/offices/fheo/images/fhpg.pdf) ........................................................ 4

## INTRODUCTION

The Fifth Circuit recently observed in a case under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.: "A hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

Relators bring this case because they caught the City of Dallas and the Dallas Housing Authority ("DHA") with their hands in the federal Government's "cookie jar," and unearthed the "fib" Defendants had been telling the U.S. Department of Housing and Urban Development ("HUD") for years—that they were in full compliance with the civil rights certifications that were preconditions to receiving more than $1.378 billion in federal housing and community development funds between February 22, 2005 and the present (the "False Claims Period"). *See* First Amended Complaint ¶¶ 2, 139-154 (Doc. 16) (Jan. 30, 2012) ("FAC") (App. Tab 2 at R03-43). Congress expressly conditioned receipt of the federal funds at issue on these civil rights certifications in order to leverage the funds to further racial and national origin integration. However, while repeatedly promising the Government that they were identifying and overcoming impediments to fair housing, Defendants were *concealing* such impediments and were furthering segregation.  The FCA holds Defendants to their promises, "insisting that persons who send bills to the Treasury tell the truth." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

Defendants now move to dismiss on the procedural grounds that Relators fail to state a claim under Rule 12(b)(6), that Relators have not pled fraud with the particularity required by Rule 9(b), and that Relators' claims are barred by the FCA's "public disclosure" provision. *See* City of Dallas's Br. in Supp. of its Mot. to Dismiss for Lack of Jurisdiction at 1 (Doc. No. 27) (Mar. 16, 2012) ("City Mem. I"); City of Dallas's Br. in Supp. of its Mot. to Dismiss Pursuant to Rule 12(b)(6) (Doc. 29) (Mar. 16, 2012) ("City Mem. II"); Hous. Auth. of the City of Dallas, Tex.'s

Mem. in Supp. of its Mot. to Dismiss at 3-16 (Doc. 32) (Mar. 19, 2012) ("DHA Mem."). For the reasons outlined below, Defendants' motions must be denied.

## I.      STATUTORY AND REGULATORY FRAMEWORK

### A.      The False Claims Act

Recognizing that the Government lacks the resources to closely monitor the myriad uses of federal funds, Congress enacted the FCA's *qui tam* provision to allow private persons, termed "relators," to "aid the rooting out of fraud," and "serve as a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *Grubbs*, 565 F.3d at 184. Congress amended the FCA in 1986 to bolster private enforcement, explaining that in light of the:

> vast amounts of Federal dollars devoted to various complex and highly regulated assistance and procurement programs, Federal auditors, investigators, and attorneys are forced to make "screening" decisions based on resource factors. Allegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient.

S. Rep. 99-345, 7, 1986 U.S.C.C.A.N. 5266, 5272. The *qui tam* provision addresses that resource gap by establishing a public-private enforcement partnership. Pursuant to that provision, Relators seek to hold Defendants accountable for their false civil rights certifications.

### B.      The Obligation to Affirmatively Further Fair Housing

#### 1.      Defendants' Obligations to Take Affirmative Efforts to End Segregation

Congress has authorized various funding programs to support local housing and community development, including the Community Development Block Grant ("CDBG") and other housing programs administered by HUD. As recipients of funds from these programs, *see, e.g.*, FAC ¶¶ 2, 12, 18, 152-53, Defendants are required to make certifications to HUD that, *inter alia*, each "grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." 42 U.S.C. § 5304(b)(2); *see also id.* §§ 3608(e)(5), 12705(b)(15); 24 C.F.R. §§ 91.225, 570.601, 570.602, 903.7(o).

2

Defendants' promises to "affirmatively further fair housing" ("AFFH") are not empty formalities. In 1968, Congress included the requirement to AFFH in 42 U.S.C. § 3608 precisely because of conditions of segregation in places like Dallas.[1] The AFFH requirements are intended to leverage the use of housing funds to require recipients to dismantle policies and practices that create or reinforce segregation on the basis of race and other protected classes. *See U.S. ex rel. Anti-Discrimination Ctr. v. Westchester County,* 668 F. Supp. 548, 551 (S.D.N.Y. 2009) ("*Westchester II*") (to receive funds, municipality required to identify and overcome fair housing impediments); *Langlois v. Abington Hous. Auth.,* 234 F. Supp. 2d 33, 75 (D. Mass. 2002) (regulations "impose mandatory requirements on [public housing authorities] not only to *certify* their compliance with the fair housing laws, but actually *to comply*") (emphasis in original).

Defendants have been on notice for decades that the AFFH requirements impose on them an "obligation to do more than simply refrain from discriminating (and from purposely aiding discrimination by others)." *NAACP v. HUD,* 817 F.2d 149, 155 (1st Cir. 1987). The AFFH obligations require programs that "assist in ending discrimination and segregation, to the point where the supply of genuinely open housing increases." *Id.* Over the past 40 years, federal courts have repeatedly recognized that the obligation to AFFH requires affirmative measures to end racial segregation and take actions to further integrated housing.[2]

---

[1] *See, e.g.,* 114 Cong. Rec. 2281 (1968) (statement of Sen. Brooke) ("What adds to the murk is officialdom's apparent belief in its own sincerity.  Today's Federal housing official commonly inveighs against the evils of ghetto life even as he pushes buttons that ratify their triumph—even as he ok's public housing sites in the heart of the Negro slums, releases planning and urban renewal funds to cities dead-set against integration, and approves the financing of suburban subdivisions from which Negroes will be barred. These and similar acts are committed daily by officials who say they are unalterably opposed to segregation, and have the memos to prove it. . . . But when you ask one of these gentlemen why, despite the 1962 fair housing Order most public housing is still segregated, he invariably blames it on regional custom, local traditions, personal prejudices of municipal housing officials.").

[2] *See Darst-Webbe Tenant Ass'n v. St. Lois Hous. Auth.,* 339 F.3d 702, 712-13 (8th Cir. 2003); *Comer v. Cisneros,* 37 F.3d 775, 795 (2d Cir. 1994); *NAACP,* 817 F.2d at 155; *Anderson v. City of Alpharetta,* 737 F.2d 1530, 1534 (11th Cir. 1984); *Otero v. NYC Hous. Auth.,* 484 F.2d 1122, 1134 (2d Cir. 1973); *Shannon v. HUD,* 436 F.2d 809, 820-21 (3d Cir. 1970); *U.S. ex rel. Anti-Discrimination Ctr. v. Westchester County,* 495 F. Supp. 2d 375, 385 (S.D.N.Y. 2007) ("*Westchester I*"); *Thompson v. HUD,* 348 F. Supp. 2d 398, 416 (D. Md. 2005); *Langlois,* 234 F.Supp.2d at 73.

2.      The Essential Components of the AFFH Certification

Because HUD lacks the resources to monitor the thousands of recipients and subrecipients of its federal funds, it has developed certifications to ensure that tax dollars are spent consistent with civil rights requirements. *See Comer*, 37 F.3d at 792. Specifically, to receive federal funds, the City makes an AFFH certification promising to: (1) "conduct an analysis to identify impediments to fair housing choice within the [area]"; (2) "take appropriate actions to overcome the effects of any impediments identified through that analysis"; and (3) "maintain records reflecting the analysis and actions in this regard." 24 C.F.R. §§ 91.225(a)(1), 570.601(a)(2). DHA's AFFH certification is a promise to examine its programs, identify "any impediments to fair housing choice within those programs," address those impediments "in a reasonable fashion," work with the City to implement its AFFH initiatives, and maintain records "reflecting these analyses and actions." 24 C.F.R. § 903.7(o). Defendants' certifications are "not a mere boilerplate formality, but rather . . .  a substantive requirement, rooted in the history and purpose of the fair housing laws and regulations." *Westchester II*, 668 F. Supp. 2d at 569.

The City's analysis of impediments ("AI") "is a review of impediments to fair housing choice in the public and private sector," involving, *inter alia*:

- A *comprehensive review* of a State or Entitlement jurisdiction's laws, regulations, and administrative policies, procedures, and practices;
- *An assessment of conditions, both public and private, affecting fair housing choice for all protected classes.*

HUD, *Fair Housing Planning Guide* (1996) at 2-7 (available at http://www.hud.gov/offices/fheo/images/fhpg.pdf) (emphases added) ("HUD Guide").

As defined by HUD, "impediments to fair housing choice" are "*Any* actions, omissions, or decisions" taken "because of" or "which have *the effect* of restricting housing choices or the availability of housing choices on the basis of race, color, religion, sex,

4

disability, familial status, or national origin." *Id*. at 2-8 (emphases added).  Importantly, certifications based on analyses that do not examine impediments faced by African-Americans and Latinos are false certifications. *Westchester II,* 668 F. Supp. 2d at 561-62; *Westchester I*, 495 F. Supp. 2d at 388.

Recipients must also "take appropriate actions to overcome the effects of any impediments." 24 C.F.R. §§ 91.225, 570.601. "Appropriate actions" require consideration of efforts to assist racial minorities and minority communities. *See, e.g.,* HUD Guide at 2-22 to 2-25; *Westchester II,* 668 F. Supp. 2d at 562; *Westchester I,* 495 F. Supp. 2d 387-88. In other words, if Defendants were aware that segregation imposed fair housing impediments, they were required to take steps to "overcome" those impediments. A certification that a recipient has complied with that obligation, in the face of evidence that its programs have actually made those impediments worse, as pled in the FAC, is a false certification made to secure federal funds.

## II.     RELATORS ADEQUATELY ALLEGE THEIR FCA CLAIMS

### A.     Standard of Review on Motions to Dismiss

In considering Defendants' motions to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pled facts in the complaint as true and view them in the light most favorable to Relators. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). "Dismissal is improper if the allegations support relief on any possible theory. The question at the motion to dismiss stage is whether, with every doubt resolved in the pleader's behalf, the complaint states any legally cognizable claim for relief." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012).

### B.     Relators Have Sufficiently Pled FCA Claims Against Defendants

Defendants' actions violate two provisions of the FCA[3]: First, Defendants "knowingly present[ed], or cause[d] to be presented, . . . false or fraudulent claim[s] for payment or approval."

---

[3] To streamline the case, Relators abandon Counts III and IV as alleged in their FAC.

*See* 31 U.S.C. § 3729(a)(1) (2006). Second, Defendants "knowingly [made], use[d] or cause[d] to be made or used, . . . false record[s] or statement[s] material to . . . false or fraudulent claim[s]." 31 U.S.C. § 3729(a)(1)(B) (2011).[4] These causes of action can be distilled into the following inquiry: (1) Whether there was a false statement or fraudulent conduct; (2) made or carried out knowingly; (3) that was material.[5] *See U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009).

    1.   <u>Defendants Made False Statements and Engaged in Fraudulent Conduct</u>

    Each year during the False Claims Period, Defendants were required to certify their AFFH compliance, meaning they promised the Government that they identified impediments to fair housing choice and were taking actions to address those impediments. *See* FAC ¶¶ 19-20, 28-31. Through their interactions with the City, however, Relators discovered that Defendants were *discouraging* the development of low-income housing available to minorities in certain sections of Dallas and actively furthering segregation. *See* Joint Decl. of Curtis Lockey & Craig MacKenzie ¶¶ 25, 29 ("Relators' Decl.") (App. Tab 3). Relators' conclusions are corroborated—and Defendants' fraud revealed—through an analysis of Defendants' purported "full disclosure" to the Government of impediments and evidence known to Relators that Defendants in fact failed to consider the AFFH impact of many of their housing programs, as identified in the FAC ¶¶ 67-138. Among other things, Relators allege in detail how Defendants' policies steer housing primarily occupied by minority individuals into segregated, low-opportunity neighborhoods. *Id.* ¶¶ 89-95, 125-28. City officials

---

[4] On May 20, 2009, Congress amended this second FCA cause of action. *See* Pub. L. 111-21, § 4(a), May 20, 2009, 123 Stat. 1621. Although the distinctions between the two versions of the provision are not relevant for the purposes of Defendants' motions, the *newer* version applies to Relators' suit. Congress expressly made the amendment retroactive, and it therefore applies to all suits "pending on" or filed after June 7, 2008, the effective date of the amendment. *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010); *see also U.S. ex rel. Colquitt v. Abbott Labs.*, 3:06-cv-1769-M, 2012 WL 1081453, at *9 n.2 (Mar. 30, 2012).

[5] Although the Court in *Longhi* suggested that the government must also pay out money, the Fifth Circuit has expressly held that "[a] person that presented fraudulent claims that were never paid remains liable," and "a complaint need not allege that the Government relied on or was damaged by the false claim." *See Grubbs*, 565 F.3d at 189. The Court's suggestion in *Longhi*, moreover, was dicta because neither party contested that element. *Id.* at 470-71. Regardless, the distinction is not relevant because Defendants' false statements, claims and certifications caused HUD to disburse over $1.378 billion in funds. *See, e.g.*, FAC ¶¶ 2, 149, 153.

confirmed that low-income housing available to minorities is not welcome in certain areas of

Dallas. *See id.* ¶ 104; Relators' Decl. ¶¶ 9, 21-23. The City misrepresented to HUD the extent to

which projects created affordable housing units. FAC ¶¶ 109, 113. The relevant AIs also failed

adequately to assess the scope of actual impediments faced by African Americans and Latinos or to

analyze the impact of policies on housing choice for those populations. *Id.* ¶¶ 63-64.

The FAC alleges Defendants knew of their obligations to AFFH, and knew of the historic

impact of race and national origin discrimination in Dallas. *See, e.g., id.* ¶¶ 21, 23-24, 42, 80.

However, in the face of an affirmative obligation to identify and analyze these fair housing

impediments and to take appropriate actions to "overcome" them, Defendants knowingly *concealed*

evidence that their programs perpetuated racial and national origin segregation and reduced housing

choice, *see, e.g., id.* ¶¶ 22-24, 64, 69, 80, 82, 87-94, 117-34, all the while certifying to HUD that

they were complying with their AFFH obligations. Had HUD known the truth about conditions in

Dallas, it would have been prohibited from disbursing funds to Defendants. *See* 42 U.S.C. §§ 3608;

5304(b)(2); 24 C.F.R. §§ 91.225(a)(1), 570.601(a)(2); FAC ¶ 20.

2.      Defendants Acted "Knowingly"

Relators have also alleged that Defendants acted "knowingly," which requires only that they

acted in "deliberate ignorance" or "reckless disregard" of falsity. 31 U.S.C. § 3729(b) (2006). "[N]o

proof of specific intent to defraud is required." *Id.*

Relators allege that Defendants were aware of their AFFH obligations and the HUD Guide.[6]

*See, e.g.,* FAC ¶¶ 21, 32, 36, 42, 44, 50. Relators also allege that Defendants knew that Dallas was

---

[6] The City wrongly characterizes this case as "not based on a false statement but on an alleged failure to follow a suggestion" in the HUD Guide that the City conduct or update an AI every three to five years. City Mem. II at 8. Relators do not claim that the delay in updating the AI constituted fraud on the Government; they allege that the City's AFFH *certifications* based on an out-of-date AI that concealed the true state of affairs concerning impediments to fair housing choice were false statements. Further, the City ignores the HUD Guide at its own peril: "Since the HUD Guide is firmly rooted in the statutory and regulatory framework and consistent with the case law, it is persuasive on the issue of whether the County was required to analyze race-based impediments in conducting its AI." *Westchester II*, 668 F.

highly segregated on the basis of race and national origin; they knew of impediments to fair housing choice; they knew that their own polices furthered segregation; they knew of their misrepresentations regarding the purported successes of affordable housing programs; and they knew of their obligations to analyze how the location of affordable housing might affect segregation and fair housing choice, but they concealed and conducted no meaningful analyses of these conditions, and in fact made the problems worse. *See, e.g.*, *id.* ¶¶ 80-82, 89, 92, 109, 113, 127-28, 138. Despite this knowledge, Defendants repeatedly certified to HUD that they were upholding their end of the bargain and continued to seek federal funds. *See, e.g.*, *id.* ¶¶ 149-50. These allegations, taken as true and viewed in favor of Relators, are easily sufficient to establish "deliberate ignorance" or "reckless disregard" of fraud. *See* 31 U.S.C. § 3729(b).

      3.      <u>Defendants' Actions Were "Material"</u>

Under the FCA's broad "materiality" test, a false or fraudulent statement need only "(1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants." *Longhi*, 575 F.3d at 470. "All that is required . . . is that the false or fraudulent statements have the potential to influence the government's decisions." *Id.*

Relators' allegations meet that standard. They repeatedly allege that Defendants' certifications are a precondition to the receipt of federal housing funds, and Defendants are ineligible to receive such funds without truthful certifications of compliance. *See, e.g.*, FAC ¶¶ 28-31, 148; *see also* 42 U.S.C. § 5304(b)(2); 24 C.F.R. §§ 91.225(a)(1), 903.7(o); 570.601(a)(2). Congress made regulatory compliance with AFFH the *sine qua non* of eligibility for federal housing and community development funds, and such funds may not be allocated unless recipients certify

---

Supp. 2d at 563; *see also Medina County Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 700 (5th Cir. 2010) (deferring to agency manual); *Belt v. EmCare, Inc.*, 444 F.3d 403, 416 (5th Cir. 2006) (deferring to agency handbook).

that they will AFFH.[7] Indeed, the City acknowledges it is ineligible for these funds unless it executes periodic certifications of compliance with its obligation to AFFH. City Mem. II at 2-3; FAC ¶ 20. Thus, Relators adequately allege that the certifications "ha[ve] the potential to influence the government's decisions." *Longhi*, 575 F.3d at 470.

Relators' allegations as to these elements are sufficient to plead that Defendants made false claims and certifications, and fraudulent inducements to HUD, all of which are actionable under the FCA. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (where payment conditioned upon certification of compliance with "a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation"); *Longhi*, 575 F.3d at 468 (fraudulent inducement actionable).

## C.      Relators Have Satisfied the Rule 9(b) Pleading Standards

Relators' FCA complaint also meets the Rule 9(b) pleading standards. In traditional "common law fraud," Rule 9(b) requires alleging the "time, place, contents, and identity" underlying the fraud. *Grubbs*, 565 F.3d at 190. That standard, however, "is not a straitjacket," and FCA claims satisfy Rule 9(b) if they allege "details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* at 190.

The FAC alleges at length the details of Defendants' schemes of submitting false certifications and claims for payment to HUD, while simultaneously operating programs that further entrench race and national origin segregation, and failing to disclose those conditions to HUD. *See, e.g.*, FAC ¶¶ 17-23, 30-31, 67-138. The FAC alleges that the false claims and certifications were

---

[7] For example, the CDBG authorizing statute expressly conditions CDBG grants: Any grant "*shall be made only if* the grantee certifies to the satisfaction of the Secretary that . . . (2) the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." 42 U.S.C. § 5304(b)(2) (emphasis added) (citations omitted). Likewise, HUD's Standard Form 424-B, which contains the "assurances and certifications" required for all HUD programs, including those at issue in this litigation, contains the following statement: "These certifications and assurances are material representations of the fact upon which HUD can rely when awarding a grant. If it is later determined that I the applicant, knowingly made an erroneous certification or assurance, I may be subject to criminal prosecution. HUD may also terminate the grant and take other available remedies." *See* App. Tab 4 at R78.

made in periodic AFFH certifications to HUD, and in implied claims for payment from February 22, 2005 to the present. *See, e.g.*, *id.* ¶¶ 17-20, 140-54. Relators plead that the City's false certifications were made each August during the period 2004 through 2011, *see id.* ¶ 146, and that agents of the City made additional requests or demands for payment from HUD from February 22, 2005 to the present, *see id.* ¶¶ 17, 147. The FAC identifies Dallas City Manager Mary K. Suhm as the City official who made the false AFFH certifications. *Id.* ¶ 146. These detailed allegations meet the *Grubbs* standard, giving "defendants adequate notice of the claims." *Grubbs*, 565 F.3d at 191. They include details of Defendants' schemes to submit false claims and are paired "with reliable indicia that lead to a strong inference that claims were actually submitted," *id.* at 190, namely, Defendants received at least $1.378 billion in federal housing funds. FAC ¶¶ 152-53.

In an effort to avoid binding Circuit law on the application of Rule 9(b) to FCA actions, DHA relies heavily on *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004). *See* DHA Mem. at 16-18. The Fifth Circuit in *Grubbs*, however, expressly refused to follow *Karvelas*, repeatedly *rejecting* the First Circuit's reasoning in that case. *Grubbs*, 565 F.3d at 187, 191. Moreover, true to the Court's prediction in *Grubbs* that defendants will often "be in possession of the most relevant records," *id.* at 191, DHA actually supplies an exemplar of the certifications it is required to file each year in the appendix in support of its motion.[8] In fact, in at least six out of the last seven years, DHA's Board Chairman or Vice Chairman signed the AFFH and civil rights certifications that Relators allege were knowingly false.[9] *See* App. Tab 5 at R79-99.

---

[8] DHA reveals that in 2010 Thomas D. Karol, Vice Chairman on the DHA Board, signed the Form HUD-50077 "PHA Certifications of Compliance with PHA Plans and Related Regulations," and Form HUD-50077-CR "Civil Rights Certification," both of which certify DHA "will affirmatively further fair housing." *See* DHA App. at 659-61. Text just above the signature line on both documents makes specific reference to penalties under the FCA, stating: "I hereby certify that all the information stated herein, as well as any information provided in the accompaniment herewith, is true and accurate. **Warning:** HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)." *Id.*; *see also* App. Tab 5 at R94-95.

[9] The Court may take judicial notice of the existence of these documents. *See* Fed. R. Evid. 201; *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 755 n.9 (S.D. Tex. 2010).

Having stated causes of action under the FCA, and having pled their claims in conformance with Rule 9(b), Relators pray that the Court deny Defendants' motions to dismiss on these grounds. In the alternative, if the Court grants the motions, Relators ask for leave and a reasonable time within which to amend their complaint. *See Grubbs*, 565 F.3d at 192.

## D.      The City's Remaining Arguments Should Be Rejected

Perhaps because Relators have pled their FCA claims, the bulk of the City's memorandum amounts to a mischaracterization of Relators' claims and arguments on the merits of the suit, which are improper in a motion to dismiss pursuant to Rule 12(b)(6).

For example, the City wrongly characterizes the FAC as alleging that "any deficiency renders the certification false." City Mem. II at 7. The FAC focuses on what the City *concealed* from HUD about the existence and effect of City policies and private practices on segregation in Dallas. Relators assert that the City utterly failed to comply with its obligation to identify and analyze race- and national origin-based impediments to fair housing choice, such as those created by patterns of segregation. FAC ¶¶ 64-84; *see also Westchester II,* 668 F. Supp. 2d at 563.

Likewise, contrary to the City's contentions, Relators do not seek to "polic[e] technical compliance with administrative guidelines." *See* City Mem. II at 2, 7. The FAC alleges that the AFFH certifications are a central precondition to the receipt of federal housing funds. FAC ¶¶ 28-31, 148. Under federal law, the City is not entitled to receive such funds unless it is in compliance with the AFFH certification. HUD has the authority to make grants "only if" recipients make required certifications.[10] 42 U.S.C. § 5304(b)(2); 24 C.F.R. §§ 91.225(a)(1), 570.601(a)(2).

---

[10] The City cites three cases for the proposition that non-compliance with regulations does not support an FCA claim. *See* City Mem. II at 7. That proposition is true: only *fraudulent* non-compliance, which Relators have alleged, is actionable. The City's cases, moreover, are all inapposite. In *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008) summary judgment was granted in favor of defendants after "extensive discovery." *Id*. at 335. The Fifth Circuit affirmed on review, holding that the relator failed to adduce evidence from which a jury could infer that the defendants acted "with knowledge." *Id*. at 339; *see also U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (same); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (same).

The City also suggests that the AI mentions segregation and "included a summary of the racial composition of the City's census tracts and had maps that displayed the distribution." City Mem. II at 10. In the face of the City's affirmative obligation to identify and analyze impediments in the AIs, the City's silence on how that segregation operated as an impediment to fair housing choice virtually concedes that it failed in its obligation to "conduct an analysis to identify impediments to fair housing choice." 24 C.F.R. §§ 91.225(a)(1), 570.601(a)(2); *see Westchester I,* 495 F. Supp. 2d at 377; *Westchester II,* 668 F. Supp. 2d at 564.

The City references *affordable* housing planning efforts. *See* City Mem. II at 8; City App. at 1138-1221. But the City repeatedly failed to incorporate *fair* housing principles—race- and national-origin based analyses—into its affordable housing planning processes, and failed to mention its own findings about the lack of affordable housing in its Consolidated Plans and AIs, as required by HUD. *See, e.g.*, FAC ¶¶ 55, 59, 64, 103, 107. Even if the City's fact-based merits arguments could be resolved via a Rule 12(b)(6) motion (which they cannot), they fail because Defendants must "analyze impediments erected by race discrimination or segregation." *Westchester II*, 668 F. Supp. 2d at 552.

Similarly, claiming it knew of segregation, *see* City Mem. II at 9-10, the City musters only four weak actions it took in either AI: (1) handling 600 individual complaints of discrimination over a nine-year period in a city with nearly two million residents; (2) providing unspecified education and outreach; (3) reviewing lending practices; and (4) proposing "actions to address housing needs." City Mem. II at 10. In other words, in the face of high levels of segregation, the City concedes, as pled, *see* FAC, ¶¶ 67-84, 135-138, that it did nothing to review how its policies affected segregation and it took no appropriate actions to overcome the impediments born of

segregation. Not only are the City's merits arguments not properly resolved on a motion to dismiss, its proffered defense was explicitly rejected in *Westchester II,* 668 F. Supp. 2d at 564.[11]

Nearly half the City's brief is devoted to a point-by-point refutation of Relators' allegations concerning the manner in which the City's zoning, land use and funding programs exacerbate segregation. *See* City Mem. II at 12-21. Because such merits contentions are improper in a Rule 12(b)(6) motion, the Court need not sift through the City's arguments. The City, moreover, misunderstands the nature of Relator's allegations. Relators allege that each of several enumerated City programs were not analyzed to determine their effects on fair housing choice, and as a consequence, the City continued to operate programs that perpetuated segregation in violation of the City's AFFH certifications. FAC ¶¶ 85-115. Because the City has an *affirmative* obligation to review all of its programs to identify fair housing impediments, Relators are not required to allege every detail concerning all programs that contribute to the conclusion that the City's AFFH certifications were false. *See Grubbs,* 565 F.3d at 190.

Finally, the City suggests that only HUD can enforce AFFH obligations, and that its inaction insulates the City from FCA liability. City Mem. II at 12. The statute to which it cites, 42 U.S.C. § 5311(c), does not, as the City claims, provide an exclusive procedure for enforcement. It merely provides that were HUD to have found the City had "failed to comply substantially" with its statutory obligations, the City could seek judicial review. That remedy is just one method of enforcing the AFFH obligation. Like virtually every other federal agency that provides funds to thousands of entities, HUD relies upon FCA enforcement as a final line of defense against "the

---

[11] "The actions cited by the County to argue that it 'considered race' and therefore conducted an appropriate AI demonstrate in fact that it did not appropriately analyze race-based housing discrimination as required by the obligation to AFFH. While the County claims that it reviewed housing discrimination complaints from the WRO, it does not provide or show any analysis of those complaints and whether they revealed that either discrimination or segregation was an impediment to housing choice. Similarly, the fact that the Consolidated Plans include certain demographic data as to the racial makeup of County and municipality populations does not in any way show that the County conducted any analysis as to how this demographic data related to the existence or lack of race-based impediments to fair housing choice." *Id.*

hungry and unscrupulous host that encompasses it on every side." *Grubbs*, 565 F.3d at 184; *see also*

*Rogan,* 517 F.3d at 452 ("The United States is entitled to guard the public fisc against schemes

designed to take advantage of overworked, harried, or inattentive disbursing officers; the False

Claims Act does this by insisting that persons who send bills to the Treasury tell the truth.").

**E.       Relators Seek Only to Enforce Violations During the False Claims Period**

Defendants' arguments based on the statute of limitations are misplaced. *See* City Mem. II at

24; DHA Mem. at 18. Relators have defined the False Claims Period as encompassing February 22,

2005 to the present. FAC ¶ 17. References to pre-2005 conduct are not meant to expand the scope

of Defendants' liability. Rather, they show that, for instance, the City's 1997 AI was still the

operative document upon which the City's AFFH certifications were made at the beginning of the

False Claims Period until the 2007 AI was adopted (after which time that document became the

basis of the AFFH certifications). Other pre-2005 fact references establish that Defendants had

notice of fair housing impediments and their AFFH obligations.

**F.       The City is Liable for DHA's Violations**

The FAC alleges that DHA is an agency of the City. *See* FAC ¶¶ 13, 16. There is abundant

legal and factual authority for that proposition, *see, e.g.*, Tex. Atty. Gen. Op. DM-426, 1996 WL

737214, at *1 n.6 (Nov. 25, 1996) (housing authorities are agencies of municipalities) (citing *Aetna*

*Cas. & Sur. Co. v. Glidden Co.*, 283 S.W.2d 440 (Tex. Civ. App. 1955); *Miers v. Hous. Auth. of*

*City of Dallas*, 266 S.W.2d 487 (Tex. Civ. App. 1954)); Tex. Atty. Gen. Op. DM-71, 1991 WL

527492, at *1 (Dec. 31, 1991) (same); *see also* App. Tab 5 at R81, 84, 87, 91, 100 (City

certifications that DHA plans are consistent with City's Consolidated Plans), and as such, the City is

liable for DHA's conduct. At the pleadings stage, Relators' allegation must be accepted as true. *See*

*Sonnier*, 509 F.3d at 675.

Relators further allege that the City's own AFFH obligation requires identification and analysis of impediments caused by DHA, inasmuch as DHA provides housing "within the jurisdiction" of the City. *See, e.g.*, FAC ¶¶ 39, 45, 81; *see also* 24 C.F.R. §§ 91.225(a)(1), 570.601(a)(2). The City concedes that it knew of segregation related to DHA, *see* City Mem. II at 10-11, but its response was limited only to "recommend[ing] that DHA enhance its outreach to increase the racial/ethnic diversity" of its population. *Id.* The 2007 AI also concedes that the City did not collect information from DHA about the "race and ethnicity of households." City App. at 101. Thus, the City's failure to analyze and take actions to address impediments related to DHA further establish its direct liability.

## III.    THE PUBLIC DISCLOSURE BAR DOES NOT APPLY

Relators' suit is not barred by the FCA's "public disclosure" bar, 31 U.S.C. § 3730(e)(4)(A) (2006). Defendants engage in a document dump, submitting over 2,500 pages of exhibits and arguing that the information was all "public." The public disclosure bar, however, requires more: It only bars suits "*based* upon" publicly disclosed "*allegations or transactions*," not simply public information. 31 U.S.C. § 3730(e)(4)(A) (2006) (emphasis added); *U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011). Defendants fail to explain why their documents constitute (1) "allegations or transactions" (2) supporting an inference of the civil rights certification fraud on which Relators' claims are "based"—both of which are necessary to trigger the bar. *See Id.*

## A.    Retroactivity of the 2010 Amendments to the FCA

In 2010, the Patient Protection and Affordable Care Act ("PPACA") narrowed the FCA's public disclosure bar and expanded the "original source" provision (which allows relators with "direct" and "independent" knowledge to pursue FCA claims regardless of any public disclosure). *See* 31 U.S.C. § 3730(e)(4) (2011); Pub. L. 111-148, § 10104(j)(2), 124 Stat. 901.[12]

---

[12] App. Tab 6 at R101, attached hereto, provides the text of the provision before and after the PPACA amendments.

The 2010 PPACA amendments made *substantive* changes to the public disclosure provision by, for instance, narrowing the sources of disclosures that trigger the bar (*e.g.*, now only disclosures in federal reports, rather than state reports, qualify). The amendments also made a *procedural* change: The earlier version provided that "[n]o court shall have *jurisdiction* over an action" based on publicly-disclosed allegations or transactions. The law now requires a court to "dismiss" an action if there has been a public disclosure. *See* App. Tab 6 at R101.

The substantive changes are not retroactive. *See Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010). Thus, the newly amended *substantive* portions of the law apply only to Relators' claims based on Defendants' conduct occurring after the PPACA's effective date of July 22, 2010. *See Jamison*, 649 F.3d at 326 n.6 (noting effective date).

In contrast, the *procedural* change—identifying the public disclosure bar as requiring dismissal rather than as jurisdictional—is applicable here. "Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule . . . retroactive," and it is therefore applicable to suits filed after the amendment's effective date. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994). That principle is particularly true with respect to the "[a]pplication of a new jurisdictional rule," as those "speak to the power of the court rather than to the rights or obligations of the parties." *Id.* at 274 (quotation omitted).

Although courts have not yet addressed how best to frame the public disclosure provision now that it is no longer jurisdictional, it is best understood as an affirmative defense. The Fifth Circuit has already recognized its resemblance to a defense, noting that it makes little sense to "require the relator to prove a negative: that there are *no* public disclosures." *Jamison*, 649 F.3d at 327. Understood as a defense, it "is [Defendants'] burden to establish beyond peradventure *all* of the essential elements of the defense." *United States v. Renda Marine, Inc.*, 667 F.3d 651, 659 (5th

Cir. 2012). That procedural change does not affect Defendants' rights with respect to their primary conduct (*i.e.*, their fraudulent claims to the Government), and it therefore has no retroactive effect.[13] The defense, moreover, is not properly raised through a Rule 12(b)(1) motion, as Defendants attempt to do here, *see* City Mem. I at 2; DHA Mem. at 1, because it is no longer a challenge to jurisdiction.

Understanding public disclosure bar challenges as defenses is particularly sensible in light of the fact that even under the pre-PPACA provision, which identified the bar as jurisdictional, Defendants' Rule 12(b)(1) motions would be improper vehicles by which to raise the bar. Under the prior statute, a "challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment." *Jamison*, 649 F.3d at 326. The City's contention that its challenge is not "intertwined" with the merits, *see* City Mem. I at 2, is contrary to binding Circuit law and should be rejected.

Thus, the Court should treat Defendants' public disclosure challenges as affirmative defenses to be resolved on summary judgment.

**B.      The Public Disclosure Bar Does Not Apply to Relators' Claims**

  1.      "Insider" Status is Irrelevant in the Public Disclosure Inquiry

Contrary to DHA's suggestion, *see* DHA Mem. at 1-2, the FCA's public-private enforcement model is not limited to "insider" whistleblowers. *See, e.g., Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044-45 (10th Cir. 2004) (rejecting argument that relators must be "insider[s]"). Indeed, in 1986, Congress expanded the *qui tam* provision specifically to correct the result from *U.S. ex rel. State of Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984), in which the

---

[13] The Court in *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997) held that 1986 *substantive* amendments to the public disclosure law were not retroactive, but it had no occasion to address whether application of a jurisdictional component, standing alone, would be permissible. In fact, the Court noted that jurisdictional rules usually do not "take[] away substantive right[s] but simply *change*[] the tribunal that is to hear the case." *Id*. at 951 (quotation omitted) (emphasis in original). Here, the jurisdictional change does not even rise to that level: it neither creates *nor* transfers jurisdiction, it simply reclassifies what had been labeled a rule of jurisdiction into an affirmative defense.

court refused to allow the State of Wisconsin to act as a *qui tam* relator after conducting an

investigation into fraud. *See Lamers*, 168 F.3d at 1016. Through the 1986 amendments, Congress

acknowledged that independent investigations—like Wisconsin's investigation in *Dean* and

Relators' investigation here—further the FCA's goals of rooting out fraud, especially when the

Federal Government lacks the resources to lead the charge itself.

   2.   The Public Disclosure Bar is Inapplicable Unless There is a Disclosure of
        "Allegations or Transactions" From Which Fraud is Apparent

   The public disclosure bar applies only if (1) there has been a public disclosure; (2) in a form

specified in the statute; (3) of allegations or transactions; and (4) the *qui tam* action is "based upon"

such publicly-disclosed allegations or transactions. *See U.S. ex rel. Dekort v. Integrated Coast

Guard Sys.*, 705 F. Supp. 2d 519, 554 (N.D. Tex. 2010). Even if those elements are met, the suit

will only be barred if Relators are not an "original source." *Id.* Understood as an affirmative

defense, Defendants must establish *all* of these elements "beyond peradventure." *Renda Marine*,

667 F.3d at 659.[14]

   The Fifth Circuit has not delineated the precise contours of elements (3) and (4)—

determining when a suit is "based upon . . . allegations or transactions."[15] Nonetheless, the Court's

most recent pronouncement strongly suggests that the proper approach is a common-sense inquiry

---

[14] The FCA "bars suits based on publicly disclosed *allegations or transactions*, not information." *U.S. ex rel. Springfield Terminal Ry Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994) . In other words, mere disclosure of background information underlying Relators' fraud claims does *not* trigger the bar. The City ignores this distinction, reciting cases addressing the statutory *forms* of disclosure that qualify under the statute (step 2 above), without recognizing that only "allegations or transactions" of fraud, trigger the bar (step 3), and that a relator's suit must be "based on" those allegations or transactions (step 4). *See* City Mem. I at 3-4.

[15] The Circuit cases on point address straightforward circumstances where "essentially the same allegations" of fraud had previously been disclosed. *See U.S. ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare*, 384 F.3d 168, 176 (5th Cir. 2004). The relator in *Reagan* had filed a prior lawsuit alleging "fraud" by the defendant. *Id.* Because that lawsuit, standing alone, still might not have sufficiently "disclosed all of the basic allegations made in [her] FCA claim," *id.* at 174 n.8, the Court went on to explain that the relator's precise allegations of fraud had also been investigated by a federal agency, *id.* at 175. *See also U.S. ex rel. Fried v. W. Ind. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (disclosure of "very essence of the allegations"); *Fed. Recovery Servs. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995) (relator conceded FCA suit based on earlier suit).

into whether the disclosure raises a readily apparent inference of the fraud alleged by the relators. In

*Jamison v. McKesson*, the Court held that disclosure of the following documents "likely [is] not

sufficient" to trigger the bar: (1) documents restating the law Defendant was accused of violating;

(2) reports explaining a typical fraud and noting it was "proliferating" in the industry; (3) a

document listing the defendant as an industry actor; and (4) a report identifying high prices in the

industry. 649 F.3d at 329, 330. All of this information was public, and the Government could have

pieced it together to identify the defendant's fraud, but it "would have been exceedingly difficult"

given the myriad actors and transactions. *Id*. at 330. A federal agency's inspector general ("IG") had

identified that "most nursing homes [were] pay[ing] too much" for a specific therapy, but that did

not change the result, because the report did "not identify fraud as a possible cause of the high

prices," and therefore would not have alerted the Government to a fraudulent scheme.[16]  *Id*.; *see*

*also id*. at 329 (noting problem of forcing Government "to comb through myriad transactions

performed by various types of entities in search of potential fraud" (quotation omitted)).

       That common-sense approach is widely reflected in other cases. For instance, some courts

cite the shorthand: "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its

essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X

and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud

has been committed." *Springfield*, 14 F.3d at 654. Application of this method mirrors the common-

sense approach adopted by the Fifth Circuit in *Jamison*. The relator in *Springfield* uncovered fraud

by comparing publicly-disclosed pay vouchers with publicly-disclosed telephone records and

concluding there were discrepancies between the two. *Id*. at 648. The documents underlying the

relators' investigation were public, and the Government could have undertaken the same

---

[16] In the end, the Court pointed out that the complaint did nothing to assist the Government in combing through the actors or transactions because it listed nearly 450 defendants and parroted the typical industry fraud explained in the public reports. *Id*. at 331. Comparing those *general* allegations with the fraud immediately apparent from the face of the public transactions, the Court concluded that the relators' general allegations were publicly disclosed. *Id*.

investigation. This public information, however, "did not present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction." *Id.* at 656. As in *Jamison*, an inference of fraud was not readily apparent from the publicly-disclosed documents, and therefore the public disclosure bar was inapplicable.

Likewise, the Court in *U.S. ex rel. Smart v. Christus Health*, found no public disclosure where the "*predicate* violation," had been alleged in a prior lawsuit, but no allegations had been made of "claims on the government, false or otherwise," of any "theory of harm to the government," or of "any other hallmarks of a False Claims Act case." 626 F. Supp. 2d 647, 653-54 (S.D. Tex. 2009). The Court refused to "lose sight of the forest for the trees," (mirroring the common-sense approach of *Jamison*): It noted that the fear of "parasitic lawsuits" addressed by the public disclosure bar was not realistically implicated because there was little chance that "one paragraph in a purely private litigation . . . actually put the government on notice of the scheme alleged by Relator."[17] *Id.* at 654-55.

  3. <u>Defendants Do Not Identify Any Publicly-Disclosed "Allegations or Transactions"</u>

Relators allege that Defendants defrauded the Government by certifying AFFH compliance, while in fact they concealed impediments to housing choice they were required to disclose and failed to take steps to overcome or address those impediments. *See* FAC ¶¶ 140-154. None of the Defendants' thousands of pages of documents contain any "allegations or transactions" sufficient to notify the Government of that fraud.

Because Defendants fail to explain why the information they identify satisfies the statutory elements necessary to trigger the public disclosure bar—including why the information constitutes

---

[17] *See also U.S. ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1513 (8th Cir. 1994) (elements of scheme alleged were public, but they "fail[ed] to suggest to the uninitiated reader" the fraud alleged by relator); *U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 869 (7th Cir. 2011) (suggesting disclosures are not "allegations or transactions" unless they reveal "fraud (that is, intentional deceit) . . . fraud is actionable under the False Claims Act, while negligent errors are not"); *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*, 778 F. Supp. 2d 37, 49-50 (D.D.C. 2011) (sources revealing background information, but not "fraud," do not trigger the bar).

"allegations or transactions" on which Relators' suit is based—they have not met their burden to

"establish beyond peradventure *all* of the essential elements of the defense," *Renda Marine*, 667

F.3d at 659, and their motions should be denied.

Nor could Defendants meet that burden because the information they identify does not

constitute the "allegations or transactions" on which Relators' action is based.  Instead, they provide

a dump of thousands of pages of scattered information that would not put the Government on the

trail of the fraud alleged by Relators. The information can be categorized as follows:

> (1) Information about Defendants' <u>involvement in community, housing, and economic development</u>, *see, e.g.*, City Mem. I at 12 (City's involvement with Low Income Housing Tax Credit ("LIHTC") programs); *id*. at 13 (City's involvement with Tax Increment Financing ("TIF")); DHA Mem. at 11 (reports on development of properties);

> (2) Information relating to <u>segregation and concentration of resources</u>, in Dallas and across the country, *see, e.g.*, City Mem. I at 12 (sources regarding concentration of LIHTCs); *id*. at 18 & DHA Mem. at 8 (reports regarding allocation of housing and resources);

> (3) Information about accusations against <u>other actors</u>, *see, e.g.*, City Mem. I at 10 (HUD letters to State of Texas and City of Houston); DHA Mem. at 9-10 (lawsuits against state and federal agencies); and

> (4) Information related to Defendants' <u>misrepresentations</u> to the Federal Government, *see, e.g.*, City Mem. I at 6, 8 (City's consolidated and annual action plans and AIs); DHA Mem. at 6-7 (DHA's annual and five-year plans).

The only information identified by Defendants that might plausibly be characterized as

"allegations" comes from two lawsuits, but these documents do not raise the "allegations" on which

Relators' suit is "based" and therefore do not trigger the public disclosure bar. The first case is

*Walker, et al. v. City of Mesquite, et al.  See* City Mem. I at 7, 16; DHA Mem. at 9. After holding

that the City exercised control over and had a responsibility to prevent discrimination by DHA, and

concluding that since 1938 the City had caused and maintained segregation, the court bound Dallas

to a consent decree. *See Walker v. HUD*, 734 F. Supp. 1289, 1292-1314 (N.D. Tex. 1989). The City

focuses on a motion filed by plaintiffs in that litigation in 1998, accusing the City of violating the consent decree by having failed to AFFH in the late 1990s.[18] *See* City Mem. I at 7.

The *Walker* plaintiffs' motion could not have disclosed the fraud on which Relators' action is based. Their accusations were made approximately *seven years* before the period encompassing Relators' suit (February 22, 2005 to the present, *see* FAC ¶ 17). Those accusations (almost 15 years old) did not address, nor could they have addressed, Defendants' failures to AFFH since 1998, let alone the failures from February 2005 to the present.[19] Moreover, at best the *Walker* plaintiffs' accusations could be characterized as merely of the "*predicate* violation," (*i.e.*, a failure to AFFH), not of Relators' allegations of fraud on the Government; accusations of a predicate violation are insufficient to trigger the bar because they contain "no mention . . . of claims on the government, false or otherwise," nor is there any "theory of harm to the government in the first place." *Smart*, 626 F. Supp. 2d at 654; *Baltazar*, 635 F.3d at 869; *Digital Healthcare*, 778 F. Supp. 2d at 49-50.

The second lawsuit relied upon by Defendants, *Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty Affairs*, is even farther off the mark. *See* City Mem. I at 11, 12; DHA Mem. 9. The plaintiffs in that case brought suit against a *state* agency, challenging its method of allocating LIHTCs. *See ICP v. TDHCA*, No. 3:08-cv-0546-D, 2012 WL 953696, at *1 (N.D. Tex. Mar. 20, 2012). Early in the suit, the state-defendant unsuccessfully argued that Dallas was an indispensable party. *See* City App. at 671-73; *ICP v. TDHCA*, No. 3:08-cv-0546-D, 2008 WL 5191935, at *9 (N.D. Tex. Dec. 11, 2008).

Neither the state defendant, plaintiffs, nor the court made any mention of the City's or DHA's claims for federal funds, their promises to AFFH as a condition of receiving those funds, or

---

[18] DHA's discussion of *Walker* is limited to an assertion, unsupported by citation to any document, that data regarding segregation of affordable housing has been filed with the Court, *see* DHA Mem. at 9, and a reference to a court order to which DHA is subject, supported only by a citation to an Agreed Final Judgment between plaintiffs in that case and the City. *See id.* at 10 (*citing* DHA App. at 378-82).

[19] Indeed, the City was dismissed from the case in 2003, years before the False Claims Period. *See* City App. at 590.

any harm to the Government, let alone fraud. The proceedings did not even raise the "predicate violation" of Defendants' failure to AFFH. Any background information about LIHTCs in that suit would not "actually put the government on notice of the scheme alleged by Relator[s]."[20] *Smart*, 626 F. Supp. 2d at 655.

Nor do Defendants' document dumps disclose "transactions" on which Relators' suit is based, because the documents do not "set the government on the trail of" fraud, *Jamison*, 649 F.3d at 330, or present "so clear or substantial an indication of foul play as to qualify as" a fraudulent transaction. *Rabushka*, 40 F.3d at 1514. Much of the information illustrates the unremarkable notion that Defendants play a role in economic, housing, and community development. *See, e.g.*, City Mem. I at 13 (citing City App. at 1002 (criteria for TIF districts)); DHA Mem. at 11 (reports of DHA property development). Some documents identify housing and resource segregation in Dallas, but do not attribute those circumstances to Defendants' conduct. *See, e.g.,* City Mem. I at 18 (citing City App. at 1121 (Mayor's plans to develop portions of Dallas)). Others suggest affordable housing is *not* concentrated and/or do not link concentrations to race, national origin, or civil rights and fair housing obligations. *See, e.g.,* DHA Mem. 10 (citing DHA App. at 44 (Mayor contending subsidized housing is distributed)). The documents that discuss Defendants' actions address conduct prior to the False Claims Period, do not approach the specificity of the FAC, and/or do not hint at fraud. *Jamison*, 649 F.3d at 330; *Digital Healthcare*, 778 F. Supp. 2d at 50; *see, e.g.*, City Mem. I at 8 (Tex. Affordable Hous. Project report). Finally, Defendants' own misrepresentations to the Government are "*always* in the possession of the government" and therefore cannot defeat *qui tam* jurisdiction. *Springfield*, 14 F.3d at 656.

---

[20] DHA also identifies a lawsuit in which plaintiffs sued HUD, arguing that *its* method of calculating fair market rents precluded Section 8 participants from obtaining rental housing in affluent Caucasian areas of Dallas. *See* DHA Mem. 10 (citing DHA App. at 166). Although the plaintiffs there argued that HUD had violated *its* duty to AFFH, *see* DHA App. at 177, there was no mention of DHA's responsibilities, let alone its predicate violation or fraud.

Like the publicly-disclosed information in *Jamison*, *Springfield*, and *Smart*, the sources identified by Defendants consist only of innocuous information, insufficient to raise the specter of fraud on the Government. This scattered information differs markedly from the types of disclosures of "allegations or transactions" sufficient to trigger the public disclosure bar. *Compare Fried*, 527 F.3d at 442 (precise fraud debated at Congressional hearings); *Reagan*, 384 F.3d at 174 (prior Government investigation of same allegations); *U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs.*, 336 F.3d 346, 349 (5th Cir. 2003) (precise fraud alleged in prior suit).

Likewise, *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49 (1st Cir. 2009), relied upon by DHA, *see* DHA Mem. 6, is inapplicable. The relators in that case expressly "concede[d] that the events disclosing" the true state of affairs had been publicly disclosed in the media. *Id*. at 54. Thus, the court was only faced with deciding whether a FOIA response, which revealed the defendant's misrepresentation to the Government, could constitute a "public disclosure." *Id*. at 55. Because the court concluded that the FOIA request qualified, and because the relator had *admitted* that the other elements of the FCA allegation had been clearly disclosed in the media, the court held that there had been a public disclosure. *Id*. at 58. Relators here have made no such concession because there are no publicly disclosed sources from which the Government could readily infer Defendants' fraud.

That Defendants felt it necessary to submit over 2,500 pages of exhibits demonstrates that this case is precisely one in which the government would "need to comb through myriad transactions" to ferret out Defendants' fraud, *Jamison*, 649 F.3d at 329 (quotation omitted)—not just the 2,500 pages submitted by Defendants, but equivalent piles of documents for *each* of the thousands of jurisdictions and public housing authorities that receive federal housing funds.[21]

---

[21] Using the short-hand adopted in *Springfield*, given the nature of Defendants' fraud, where "Y" stands for the misrepresentations to the Government, there is no source disclosing "X." Rather, only through Relators' personal interactions with Defendants and by combing over myriad transactions are Defendants' true actions revealed. Thus, the "X" is more accurately thought of as comprising "A + B + C + D + E + F + G," where each letter may represent innocuous information whose "sum" is not apparent absent Relators' contributions.

4.        Information Made Public by Relators

On February 4, 2010, Relators filed a complaint with HUD alleging that the City violated

fair housing laws. *See* App. Tab 7 at R102-03. On June 10, 2010, a news reporter wrote an article

based on conversations with Relators accusing the City of falsely certifying compliance with AFFH

obligations. *See* Jim Schutze, *City Had Better Look Over Its Shoulder Because HUD is Ready to*

*Kick Some Fair Housing Butt*, DALLAS OBSERVER, June 10, 2010 (App. Tab 8 at R104-07). Neither

source implicates nor mentions DHA, and therefore neither constitutes a disclosure of "allegations

or transactions" upon which Relators' claims against DHA are "based." Likewise, Relators' HUD

complaint does not accuse the City of the predicate violation of a failure to AFFH, nor does it

mention any civil-rights certification fraud upon the Government, and therefore it likewise does not

constitute a disclosure under the FCA. *See, e.g., Smart*, 626 F. Supp. 2d at 654. Moreover, as

discussed below, even if the June 10th article constituted a "public disclosure," the bar does not

apply because Relators are an "original source."

5.        The Newly-Amended FCA Applies to Defendants' Conduct After July 22, 2010

Defendants' false claims submitted after July 22, 2010 are governed by the newly amended

version of the public disclosure provision.[22] *See Jamison*, 649 F.3d at 326 n.6 (noting PPACA

effective date); *see also U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 969

(9th Cir. 1999) (holding that when relator's claims covered conduct occurring before *and* after 1986

FCA amendments, court must analyze claims based on post-1986 conduct separately under

amended statute). Under the amended provision, the public disclosure bar *cannot* preclude Relators'

claims to the extent disclosures were made in: (1) Non-Federal civil or administrative hearings; (2)

Federal hearings in which the Government was *not* a party; (3) or non-Federal (*i.e.*, state, local, or

private) reports, hearings, audits, or investigations. *See* 31 U.S.C. § 3730(e)(4)(A) (2011).

---

[22] Defendants submitted certifications to HUD in 2010 and 2011, *see* FAC ¶ 146; App. Tab 5 at R93-100.

With respect to Defendants' actions subsequent to July 22, 2010, most of the sources Defendants' identify are statutorily irrelevant, even assuming arguendo they disclose "allegations or transactions" on which Relators' suit is based. *See, e.g.,* City Mem. I at 6 & DHA Mem. at 7 (City's plans, AIs, and DHA's plans: non-federal reports); City Mem. I at 11 & DHA Mem. at 9-10 (*ICP v. TDHCA*: hearing in which federal Government was not a party); City Mem. I at 12 (Report of Tex. House of Reps.: state report); *id*. at 13-14 (state hearings: non-federal hearings).[23] Thus, even if the Court concluded that such sources were relevant with respect to claims based on Defendants' conduct *prior to* July 22, 2010, they cannot bar Relators' claims based on conduct after that date.

## C.   <u>Relators Are An Original Source</u>

If the Court concludes that the public disclosure bar is triggered, it does not bar Relators' suit because they are an "original source." *See Jamison*, 649 F.3d at 326-27. Under the pre-PPACA statute, an "original source" is "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."[24] 31 U.S.C. § 3730(e)(4)(B) (2006). Relators need not have direct and independent knowledge of *all* elements of the cause of action, including Defendants' misrepresentations to the government. *See, e.g., U.S. ex rel. Heath v. Dallas/Fort Worth Intern. Airport Bd.*, No. 3:99-cv-0100-M, 2004 WL 1197483, at *7 (N.D. Tex. May 28, 2004); *see also Springfield*, 14 F.3d at 656-57.

---

[23] Nor are these materials transformed into "news media" simply because they may be available on the internet. The City cites out-of-circuit decisions holding that certain information on the internet can constitute "news media" under the prior version of the statute. *See* City Mem. I at 3. Other cases are to the contrary. *See, e.g., U.S. ex rel. Liotine v. CDW Gov't, Inc.*, 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sept. 29, 2009) (questioning whether information on internet is necessarily "publicly disclosed" or "media"). Regardless, it cannot be the case under the amended statute that a report posted on the internet constitutes "news media," because such a holding would allow the "news media" category to swallow Congress's amendment expressly limiting "reports" only to "Federal report[s]." 31 U.S.C. § 3730(e)(4)(A)(ii) (2011).

[24] Relators voluntarily provided the information on which their allegations are based to the Government before filing their action. *See* FAC ¶¶ 7, 8.

1.      Relators Have Independent Knowledge

Even if the June 10, 2010 article constituted a "public disclosure" under the FCA as to their

claims against the City, Relators' knowledge is "independent" of the disclosure because they were

responsible for and the direct source of the information. *See Laird*, 336 F.3d at 355 (because relator

was responsible for disclosure, it would have been error to dismiss on basis that knowledge was not

"independent"); *see* Relators' Decl. ¶ 30.[25]

2.      Relators Have Direct Knowledge

Relators' knowledge is also "direct," because it was "gained by [their] own efforts."

*Jamison*, 649 F.3d at 332. Relators need not have witnessed fraudulent conduct to have "direct"

knowledge of it. If that were so, independent efforts like Wisconsin's investigation in *Dean* would

be barred, a result Congress expressly precluded by amending the provision in 1986. *Cf. Minn.*

*Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1049 (8th Cir. 2002)

(rejecting holding that would have disqualified Wisconsin in *Dean*). In fact, the Fifth Circuit has

repeatedly acknowledged that a relator's knowledge may be "direct" when he undertakes an

investigation that "translate[s] into some additional compelling fact, or . . . demonstrate[s] a new

and undisclosed relationship between disclosed facts, that puts a governmental agency on the trail of

fraud, where that fraud might otherwise go unnoticed."  *Fried*, 527 F.3d at 443.

That principle is deeply ingrained in the case law; courts routinely hold that relators have

"direct" knowledge when a personal experience arouses suspicion and prompts an independent

investigation. For example, in *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039 (10th Cir. 2004), one

of the relators, Wright, noticed drops in payments he received from land he owned, which aroused

his suspicion that the defendant was defrauding the government by underpaying him. *Id.* at 1040-41.

Wright enlisted the assistance of another relator, Kennard, and the two "researched and investigated

---

[25] To the extent that the Court concludes Relators' HUD complaint constitutes a public disclosure under the Act,
Relators' knowledge is "independent" for the same reason.

public records," which revealed fraud by the defendant. *Id.* at 1041. Acknowledging that "a complete and thorough investigation of a fraud on the Government will likely necessarily involve some review of contracts, documents, or other information in the public domain," *id.* at 1045, the court concluded that the relators were "original sources." Even Kennard (who was recruited solely for the investigation) was an original source because "he did his own research and investigation." *Id.* at 1046. Through their "independent investigation," which included "sort[ing] through relatively obscure public documents," combined with their own "deduction[s]," the relators discovered the alleged fraud and therefore qualified as an original source.[26] *Id.*

Like the public disclosure analysis, the key inquiry is not whether the Government could have conducted a similar investigation—such an investigation would have been possible in *Kennard* and the other cases cited in footnote 26. Rather, the question is whether the relator's investigation revealed fraud that might otherwise go unnoticed.

In May 2008, Relators began working with the City of Dallas on a proposal for an affordable housing project called the LTV Tower Redevelopment ("LTV Tower"). *See* Relators' Decl. ¶ 1, App. Tab 3 at R44. In a meeting with Karl Zavitkovsky, the Director of Economic Development for the City of Dallas, Mr. Zavitkovsky expressed strong opposition to a source of funding that would have required the LTV Tower to accept tenants who use Section 8 vouchers to subsidize rental payments, and he told Relators that "Downtown Dallas is not the right place for low-income housing" and that "low-income housing is not part of the vision for Downtown Dallas." *Id.* ¶¶ 5-6. Relators were aware of the need for additional affordable housing in Downtown and the Northern

---

[26] *See also Lamers*, 168 F.3d at 1018 (relator original source; although investigation was based on public-information, "Congress wanted to encourage busybodies who, through independent efforts, assist the government in ferreting out fraud," and relator provided service to Government by "keeping an eye on how the City's practices matched up to its statements"); *Springfield*, 14 F.3d at 657 (relator's suspicions based on personal activities, corroborated by research of publicly available documents, qualified him as original source); *Cooper v. BCBS of Fla., Inc.*, 19 F.3d 562, 568 (11th Cir. 1994) (relator who researched public documents after suspicions based on personal experiences was original source); *U.S. ex rel. Farmer v. City of Houston*, Civ. H-03-3713, 2005 WL 1155111, at *5 (S.D. Tex. May 5, 2005) (relator's investigation, "heavily based on public information," constituted direct knowledge).

Sector of Dallas. *Id*. ¶ 2. They and City officials knew that such housing would be disproportionately occupied by African American and Latino families. *Id*. ¶¶ 3, 6. Relators therefore understood the comments to constitute "code words," indicating opposition to racial and national origin integration Downtown. *Id*. ¶¶ 6, 9. Relators heard various City officials use similar "code words" to express opposition to the placement of racially integrated affordable housing in high-opportunity areas in Dallas. *Id*. ¶¶ 21-23 The City proceeded to erect a series of hurdles, not applied to other proposals, obstructing development of the LTV Tower. *Id*. ¶¶ 10-15. Relators' personal experiences led them to conclude that the City was actively discouraging the development of low-income housing outside of the Southern Sector, and in particular it did not want low-income housing in Downtown Dallas. *Id*. ¶ 25. Relators conducted an investigation corroborating what they discovered from their firsthand experiences: Contrary to their certifications to the Government, Defendants discouraged the development of low-income housing where minority residents might live in certain sectors of the City, particularly Downtown Dallas. *Id*. ¶¶ 26-29. Thus, Relators' personal experiences and subsequent independent investigation qualify them as an "original source." *See Kennard*, 363 F.3d at 1045; *Cooper*, 19 F.3d at 568; *Lamers*, 168 F.3d at 1018.

The cases Defendants cite do not warrant a different result. In *Reagan*, the relator was not responsible for the disclosure, a prior investigation, and admitted that her knowledge was not "independent" of it. 384 F.3d at 178. Moreover, she added nothing new to the investigation; she simply disagreed with the conclusion it reached. *Id*. at 178. The City also cites *Laird*, but that decision favors Relators. *Laird* held that, because the relators were responsible for the public disclosure, their knowledge was "independent," 336 F.3d at 355, and it remanded for a determination regarding the "direct" prong, acknowledging cases such as *Cooper*.[27] *Id*. at 356.

---

[27] The court in *Ondis*, cited by DHA, *see* DHA Mem. at 14-15, concluded that the relator did not have "direct" knowledge based on his investigation, but the court ignored the line of cases discussed in the text. 587 F.3d at 59.

3.    <u>The Newly-Amended FCA Applies to Defendants' Conduct After July 22, 2010</u>

Like the public disclosure analysis above, Relators' allegations of fraud based on claims submitted by Defendants after July 22, 2010 are governed by the newer version of the "original source" provision. Under the amended statute, an individual is an "original source," if, prior to a public disclosure under subsection (e)(4)(a), he "has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B) (2011). Relators' February 4, 2010 HUD complaint was made prior to any disclosure in the media. If the Court concludes the complaint constituted a public disclosure under the Act, it also constitutes a voluntary disclosure to the Government, and Relators are an "original source" with respect to their claims based on Defendants' conduct subsequent to July 22, 2010.

**CONCLUSION**

For the foregoing reasons, Relators pray that this Court deny the motions to dismiss.

Dated: April 26, 2012.

Respectfully Submitted,

    /s/ Michael Allen
Michael Allen* (VA Bar No. 25141)
Stephen Hayes* (CA Bar No. 280948)
RELMAN, DANE & COLFAX, PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036-2456
Tel.:  (202) 728-1888
Fax:  (202) 728-0848
E-mail: mallen@relmanlaw.com
       shayes@relmanlaw.com

Brian DeVoss (TX Bar No. 24052885)
Dennis Roossien (TX Bar No. 00784873)
MUNSCH HARDT KOPF & HARR, PC
3800 Lincoln Plaza
500 N. Akward St.
Dallas, TX 75201
Tel.:  (214) 855-7577
Fax:  (214) 978-4386
E-mail: dbevoss@munsch.com
       droosien@munsch.com

*Admitted to appear pro hac vice

## CERTIFICATE OF SERVICE
## NORTHERN DISTRICT OF TEXAS

I hereby certify that a true and correct copy of the foregoing Relators' Consolidated Response in Opposition to Defendants' Motions to Dismiss and accompanying documents were filed and served this 26th day of April, 2012, using the CM/ECF system, which will serve as notification of such filing on the following:

Earsa Jackson
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202
*Counsel for Defendant Dallas Housing Authority*

Charles Estee
Assistant City Attorney
Peter B. Haskel
7BN Dallas City Hall
1500 Marilla Street
Dallas, Texas 75201
*Counsel for Defendant City of Dallas*

Colin D. Speaker
Asst. U. S. Atty.
801 Cherry St., Suite 1700
Unit 4
Fort Worth, Texas 76102
*Attorney for United States*

__ s/ Michael Allen_____
Michael Allen